# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

PADRES UNIDOS DE TULSA, *et al.*,

*Plaintiffs-Appellees,*

v.

GENTNER DRUMMOND, *et al.*,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Bernard M. Jones
No. 5:24-cv-511-J

## OPENING BRIEF OF THE STATE OF OKLAHOMA

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellants*

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

PRIOR OR RELATED APPEALS ............................................................. 1

STATEMENT OF JURISDICTION .......................................................... 1

ISSUES PRESENTED ............................................................................ 2

INTRODUCTION .................................................................................. 3

STATEMENT OF THE CASE ................................................................ 5

    A.  Oklahoma has experienced a crisis of illegal immigration. ............ 5

    B.  Oklahoma enacted HB 4156 to protect those lawfully present in the State. ........................................................................... 8

    C.  Illegal aliens sued to facially enjoin HB 4156's enforcement. ........ 10

STANDARD OF REVIEW ...................................................................... 14

SUMMARY OF THE ARGUMENT ........................................................ 15

ARGUMENT ....................................................................................... 18

  I.  THE DISTRICT COURT ERRED: PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. ............................................... 18

    A.  Lawbreaking cannot provide standing to challenge HB 4156. ...... 18

    B.  Plaintiffs lack a cause of action under federal immigration law. . 22

    C.  HB 4156 is not facially preempted by federal immigration law.... 30

        1.  *HB 4156 is not field preempted.* ................................ 33

        2.  *HB 4156 is not conflict preempted.* ............................ 37

  II.  OKLAHOMA MAY DEFEND ITSELF AGAINST AN ADMITTED INVASION. ..... 40

  III.  CONGRESS DID NOT INTEND TO SHIELD LAWBREAKING VIA PSEUDONYM. ........................................................... 42

  IV.  THE DISTRICT COURT IMPROPERLY CERTIFIED A CLASS OF LAWBREAKERS. ................................................................ 46

  V.  THE DISTRICT COURT IMPROPERLY WEIGHED THE REMAINING INJUNCTION FACTORS. ....................................................... 48

CONCLUSION ..................................................................................... 49

STATEMENT REGARDING ORAL ARGUMENT ................................... 50

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
   532 U.S. 275 (2001)........................................................................................ 23

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)........................................................................................ 46

*Arizona v. United States,*
   567 U.S. 387 (2012)........................... 3, 16, 18, 30, 31, 32, 33, 35, 36, 37, 38, 39

*Armstrong v. Exceptional Child Ctr., Inc.,*
   575 U.S. 320 (2015)...............................................23, 24, 25, 27, 29, 31

*Ayotte v. Planned Parenthood of N. New England,*
   546 U.S. 320 (2006)........................................................................................ 49

*Broadrick v. Oklahoma,*
   413 U.S. 601 (1973)........................................................................................ 48

*Califano v. Yamasaki,*
   442 U.S. 682 (1979)........................................................................................ 46

*California v. Texas,*
   593 U.S. 659 (2021)........................................................................................ 20

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
   520 U.S. 564 (1997)........................................................................................ 33

*Chamber of Com. of U.S. v. Whiting,*
   563 U.S. 582 (2011)..................................................................................34, 37

*Coe v. U.S. Dist. Court for Dist. of Colo.,*
   676 F.2d 411 (10th Cir. 1982).....................................................................44, 45

*Combs v. Snyder,*
   101 F. Supp. 531 (D.D.C. 1951)...................................................................... 48

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,*
   589 U.S. 327 (2020)........................................................................................ 22

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000)........................................................................................ 32

*CTS Corp. v. Waldburger,*
   573 U.S. 1 (2014)............................................................................................ 16

*Davis v. Passman,*
442 U.S. 228 (1979) ............................................................................... 23

*DeCanas v. Bica,*
424 U.S. 351 (1976) ............................................................................... 33

*DeVillier v. Texas,*
601 U.S. 285 (2024) ............................................................................... 23

*Doe v. City of Albuquerque,*
667 F.3d 1111 (10th Cir. 2012) ............................................................. 49

*Doe v. Frank,*
951 F.2d 320 (11th Cir. 1992) ............................................................... 44

*Doe v. Mass. Inst. of Tech.,*
46 F.4th 61 (1st Cir. 2022) .................................................................... 44

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,*
269 F.3d 1149 (10th Cir. 2001) ............................................................. 14

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ............................................................................... 15

*Ex parte Young,*
209 U.S. 123 (1908) ......................................................................... 25, 27

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ......................................................................... 18, 19

*Femedeer v. Haun,*
227 F.3d 1244 (10th Cir. 2000) .................................................. 43, 44, 45

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963) ............................................................................... 33

*Fourth Corner Credit Union v. Fed. Reserve Bank of Kan. City,*
861 F.3d 1052 (10th Cir. 2017) ............................................................. 20

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
505 U.S. 88 (1992) ................................................................................. 37

*Gilbert v. Minnesota,*
254 U.S. 325 (1920) ............................................................................... 38

*Gonzaga Univ. v. Doe,*
536 U.S. 273 (2002) .................................................................. 24, 27, 29

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ................................................................ 30

*GTE Corp. v. Williams*,
  731 F.2d 676 (10th Cir. 1984) ............................................... 14

*Hayes v. Wal-Mart Stores*,
  725 F.3d 349 (3d Cir. 2013) .................................................. 47

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
  599 U.S. 166 (2023) ............................................................... 29

*Heideman v. S. Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003) ............................................. 14

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................... 19

*Huron Portland Cement Co. v. City of Detroit*,
  362 U.S. 440 (1960) ............................................................... 39

*Initiative & Referendum Inst. v. Walker*,
  450 F.3d 1082 (10th Cir. 2006) ............................... 19, 21, 22

*Isr. Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.*,
  16 F.3d 198 (7th Cir. 1994) ................................................... 29

*Kansas v. Garcia*,
  589 U.S. 191 (2020) ............... 3, 11, 16, 17, 30, 31, 33, 35, 36, 37, 38, 39, 40

*Koon v. United States*,
  518 U.S. 81 (1996) ................................................................. 14

*L.M. ex rel. A.M. v. City of Gardner*,
  No. 19-2425-DDC, 2019 WL 4168805 (D. Kan. Sept. 3, 2019) ................................. 45

*Lindsey v. Dayton–Hudson Corp.*,
  592 F.2d 1118 (10th Cir. 1979) ...................................... 43, 44

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................... 16, 19

*Luo v. Wang*,
  71 F.4th 1289 (10th Cir. 2023) ....................................... 43, 44

*M.G. ex rel. Garcia v. Armijo*,
  117 F.4th 1230 (10th Cir. 2024) ........................................... 28

*M.M. v. Zavaras,*
139 F.3d 798 (10th Cir. 1998)................................................................43, 44

*Mass. Mut. Life Ins. Co. v. Russell,*
473 U.S. 134 (1985) ............................................................................ 24

*Medina v. Planned Parenthood S. Atl.,*
145 S. Ct. 2219 (2025) ........................................................................ 29

*Mitchum v. Foster,*
407 U.S. 225 (1972) ............................................................................ 24

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024).......................................................................... 4, 15

*Nat'l Coal. of Latino Clergy, Inc. v. Henry,*
No. 07-CV-613-JHP, 2007 WL 4390650 (N.D. Okla. Dec. 12, 2007) ...................... 48

*Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs,*
886 F.2d 1240 (10th Cir. 1989).............................................................. 43

*New State Ice Co. v. Liebmann,*
285 U.S. 262 (1932)............................................................................ 35

*Parker Drilling Mgmt. Servs. v. Newton,*
587 U.S. 601 (2019)............................................................................ 37

*Parker v. Brown,*
317 U.S. 341 (1943)............................................................................ 31

*Plyler v. Doe,*
457 U.S. 202 (1982).....................................................................3, 15, 34

*Prairie Band of Potawatomi Indians v. Pierce,*
253 F.3d 1234 (10th Cir. 2001).............................................................. 14

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,*
324 U.S. 806 (1945).........................................................................48, 49

*Ramos v. Louisiana,*
590 U.S. 83 (2020)............................................................................. 36

*Rice v. Santa Fe Elevator Corp.,*
331 U.S. 218 (1947).........................................................................31, 32

*Safe Streets Alliance v. Hickenlooper,*
859 F.3d 865 (10th Cir. 2017)...................................23, 24, 25, 26, 27, 29

*Schrier v. Univ. of Colo.*,
427 F.3d 1253 (10th Cir. 2005) ................................................. 14

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996) ......................................................................... 27

*Shondel v. McDermott*,
775 F.2d 859 (7th Cir. 1985) ...................................................... 20

*Smith v. Turner*,
48 U.S. (7 How.) 283 (1849) ....................................................... 41

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ....................................................................... 18

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ................................................................. 18, 20

*Tarrant Reg'l Water Dist. v. Herrmann*,
656 F.3d 1223 (10th Cir. 2011) .................................................. 31

*Texas v. DHS*,
No. 2:23-cv-55, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) .................................. 5

*Trump v. CASA, Inc.*,
145 S. Ct. 2540 (2025) ...................................................... 17, 46, 48

*United States ex rel. Little v. Triumph Gear Sys.*,
870 F.3d 1242 (10th Cir. 2017) ............................................ 43, 44

*United States v. Abbott*,
110 F.4th 700 (5th Cir. 2024) ..................................................... 41

*United States v. Carel*,
668 F.3d 1211 (10th Cir. 2011) .................................................. 42

*United States v. Hansen*,
599 U.S. 762 (2023) ....................................................................... 15

*United States v. Salerno*,
481 U.S. 739 (1987) ......................................................................... 4

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) ....................................................................... 31

*Vallario v. Vandehey*,
554 F.3d 1259 (10th Cir. 2009) .................................................. 46

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002) ........................................................ 27

*W.N.J. v. Yocom*,
257 F.3d 1171 (10th Cir. 2001) ..................................... 45

*Wal-Mart Stores v. Dukes*,
564 U.S. 338 (2011) ........................................................ 47

*Ward v. Utah*,
398 F.3d 1239 (10th Cir. 2005) ..................................... 15

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) ........................................................ 15

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) .......................................................... 30

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................ 14

## **Statutes**

8 U.S.C. § 1101 ................................................................. 38

8 U.S.C. § 1158 ................................................................. 28

8 U.S.C. § 1225 ................................................................. 28

8 U.S.C. § 1231 ................................................................. 28

8 U.S.C. § 1325 ................................................................. 21

8 U.S.C. § 1326 ............................................................. 21, 25

8 U.S.C. § 1357 ............................................................. 38, 39

18 U.S.C. § 758 ................................................................. 38

22 U.S.C. § 7105 ............................................................... 38

28 U.S.C. § 1292 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

28 U.S.C. § 1345 ................................................................. 1

42 U.S.C. § 1983 ................................................................. 1

House Bill 4156 .................... 3, 6, 8, 9, 10, 15, 16, 17, 19, 20, 21, 32, 34, 35, 37, 39, 40

OKLA. STAT. tit. 21, § 1795 .......................... 3, 8, 9, 10, 46

## Constitutional Provisions

U.S. CONST. art. I, § 10, cl. 3 ................................................ 41

U.S. CONST. art. IV, § 4 ..................................................... 41

U.S. CONST. art. VI, cl. 2 ................................................... 31

 U.S. CONST. amend. X ....................................................... 35

## Rules and Regulations

FRCP 10 ................................................................... 43

FRCP 17 ................................................................... 43

FRCP 23 ................................................................... 47

90 Fed. Reg. 8333
(Jan. 20, 2025) ........................................................... 41

90 Fed. Reg. 8443
(Jan. 20, 2025) ........................................................... 41

90 Fed. Reg. 8467
(Jan. 20, 2025) ........................................................... 41

## Other Authorities

DEA, *Facts About Fentanyl* ................................................. 6

DEP'T OF HOMELAND SEC., *Fact Sheet: DHS Shows Results in the Fight to Dismantle Cartels and Stop Fentanyl from Entering the U.S.*
(July 31, 2024) ............................................................ 6

Garrett Yalch, et al., *Gangsters, money and murder: How Chinese organized crime is dominating Oklahoma's illegal medical marijuana market*,
THE FRONTIER (March 14, 2024) .......................................... 7, 8

Letter to President Joseph R. Biden, Jr., Supporting Texas's Efforts to Secure the Border
(Jan. 29, 2024) ............................................................ 5

Paul Demko, *'Tokelahoma' at the Crossroads*,
POLITICO (March 7, 2023) ................................................... 7

THE WHITE HOUSE, A Proclamation on Securing the Border
(June 4, 2024) ............................................................. 8

THE WHITE HOUSE, *Fact Sheet: President Donald J. Trump Declares a National Emergency at the Southern Border*, (Jan. 22, 2025) ................................................................................. 5

THE WHITE HOUSE, *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations* (Jan. 26, 2024) ................................................................................. 5

U.S. CUSTOMS AND BORDER PROTECTION, *Southwest Land Border Encounters* ................. 5

*United States of America v. State of Oklahoma*, No. 24-6144 (10th Cir. July 17, 2024),

*appeal dismissed as moot*, 2025 WL 1993431 (10th Cir. Mar. 25, 2025).

**STATEMENT OF JURISDICTION**

Plaintiffs sued Oklahoma government officials for declaratory and injunctive relief under 42 U.S.C. § 1983 and in equity, invoking the district court's jurisdiction under 28 U.S.C. § 1331. But the district court lacked Article III jurisdiction because Plaintiffs lack standing. Nevertheless, the district court granted preliminary injunctive relief on June 3, 2025, and Defendants timely filed a notice of appeal on June 4, 2025. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.      Whether Plaintiffs can rely on illegal activity as the basis for their standing.

2.      Whether Plaintiffs in violation of federal immigration law have a private right or cause of action in equity to enforce that same federal immigration law.

3.      Whether House Bill 4156 ("HB 4156") is facially field- and conflict-preempted, even though it merely complements federal law in imposing penalties on aliens who enter Oklahoma without authorization to enter the United States.

4.      Whether the district court erred in rejecting Oklahoma's invasion argument, given the executive branch's repeated classification of the national emergency at the southern border as an invasion.

5.      Whether the district court erred by allowing the individual Plaintiffs to use pseudonyms to protect them from the consequences of their federal lawbreaking.

6.      Whether the district court erred by provisionally certifying a class of federal lawbreakers in their challenge to a state law.

# INTRODUCTION

In the throes of a crisis of illegal immigration, Oklahoma enacted HB 4156. This law makes it a state offense, with state penalties, for a noncitizen who is in the United States illegally to unlawfully enter, re-enter, or remain in Oklahoma. *See* OKLA. STAT. tit. 21, § 1795. "From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). This bedrock principle holds true in the immigration context, where states routinely prosecute illegal aliens for crimes they commit. Moreover, States have never been deprived of "power to deter the influx of persons entering the United States against federal law." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982). When Congress "prescribe[s] what it believes to be the appropriate standard for the treatment of [aliens], the States may, of course, follow the federal direction." *Id.* at 219 n.19 (1982).

That is precisely what Oklahoma did by enacting HB 4156, which in no way conflicts with or undermines federal law—as the United States now acknowledges. HB 4156 mirrors federal criminal law by design, assisting the United States by curbing illegal immigration within Oklahoma's borders. In plain terms, Oklahoma "has moved to protect its sovereignty—not in contradiction of federal law, but in complete compliance with it." *Arizona v. United States*, 567 U.S. 387, 437 (2012) (Scalia, J., concurring in part and dissenting in part). "If securing its territory in this fashion is not within the power of [Oklahoma], we should cease referring to it as a sovereign State." *Id.*

Objecting to this appropriate exercise of state sovereignty, several private individuals and organizations have facially challenged HB 4156. But even though the Supreme Court has "made facial challenges hard to win," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024), the district court granted Plaintiffs the sweeping relief they sought, enjoining HB 4156 in its entirety, first through a TRO and then through a preliminary injunction. In doing so, the district court erred, plain and simple. At the threshold, Plaintiffs—who rely on their federally illegal activity as the basis for bringing this suit—lack standing and a cause of action to enforce the preemptive effect of federal immigration law. And, on the merits, the district court made the extraordinary determination that a state law that mirrors federal law and simply governs who may be present in that state is preempted in *every* application. The district court erred in expanding implied preemption to snuff out Oklahoma's lawful sovereign action. And the error was compounded by the district court's willingness to allow Plaintiffs to proceed under pseudonyms, expressly enabling Plaintiffs' ongoing federal lawbreaking in the midst of a suit supposedly brought to vindicate the supremacy of federal law.

In the end, Plaintiffs have failed to prove their facial challenge—"the most difficult challenge to mount"—because they are unable to show that "no set of circumstances exists under which" HB 4156 would comply with federal law. *United States v. Salerno*, 481 U.S. 739, 745 (1987). This Court should reverse the district court, vacate the injunction, and allow Oklahoma to protect its sovereignty as well as all individuals lawfully present within its borders.

<u>STATEMENT OF THE CASE</u>

## A. Oklahoma has experienced a crisis of illegal immigration.

Our Nation has been enduring a crisis of illegal immigration, as both current and former administrations have agreed.[1] The U.S. Border Patrol consistently encounters over two million illegal immigrants each year who have evaded authorities at the southern border—and this number merely represents those who got caught.[2] This has "effectively add[ed] the population of Iowa and Utah to our country in less than three years."[3] As one federal court has found, "organized criminal organizations take advantage of these large numbers." *Texas v. DHS*, No. 2:23-cv-55, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023), *rev'd on other grounds*, 123 F.4th 186 (5th Cir. 2024). The trafficking of human beings across the United States border "has become an incredibly lucrative enterprise for the major Mexican drug cartels." *Id.* Alarmingly, "the infrastructure built by the cartels for human cargo can also be used to ship illegal

---

[1] THE WHITE HOUSE, *Fact Sheet: President Donald J. Trump Declares a National Emergency at the Southern Border* (Jan. 22, 2025), https://tinyurl.com/yr3j33he; THE WHITE HOUSE, *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations* (Jan. 26, 2024), https://perma.cc/K9S8-TLZV.

[2] U.S. CUSTOMS AND BORDER PROTECTION, *Southwest Land Border Encounters*, https://tinyurl.com/mwnx26f8.

[3] Letter to President Joseph R. Biden, Jr., Supporting Texas's Efforts to Secure the Border (Jan. 29, 2024), *available at* https://www.iowaattorneygeneral.gov/media/cms/Final__Letter_Supporting_Gover nor_A_63A1CE73CAB1F.pdf.

substances, namely fentanyl." *Id.* In one recent fiscal year, the Border Patrol seized 27,000 pounds of fentanyl—enough to kill every man, woman, and child in America several times over.[4] The crisis has not spared Oklahoma. As a direct response, the Oklahoma Legislature enacted HB 4156. *See* HB 4156, § 1(B) ("[A] crisis exists in Oklahoma."). The law is straightforward: if a person lacks authorization to enter or remain in the country—that is, if the person is here illegally—then he or she may not enter or remain in Oklahoma.

The Legislature made clear in the text why HB 4156 was necessary. The border crisis has swamped Oklahoma with an unprecedented surge of criminal activity. This onslaught takes the form of "illegal marijuana grow operations, which have exploded in number in recent years." *Id.* It brings "fentanyl distribution, sex trafficking, and labor trafficking" at the hands of "organized crime, such as drug cartels, [that] have no regard for Oklahoma's laws or public safety." *Id.* As a result, "Oklahoma agents and law enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers, many of whom entered without authorization through our southern border." *Id.* Oklahoma communities are being harmed and harassed, while its police are overburdened and overwhelmed. The state's "crisis of unauthorized entry

---

[4] DEP'T OF HOMELAND SEC., *Fact Sheet: DHS Shows Results in the Fight to Dismantle Cartels and Stop Fentanyl from Entering the U.S.* (July 31, 2024), https://tinyurl.com/bf65z7n2; *see also* DEA, *Facts About Fentanyl*, https://tinyurl.com/mte3r9px (describing how 2 milligrams of fentanyl is "considered a potentially lethal dose").

and presence is endangering Oklahomans, devastating rural, urban, and suburban communities and is severely straining even the most diligent and well-resourced state and local government entities." *Id.*

Fentanyl-related deaths in Oklahoma "have increased by nearly 500 percent over the past few years." U.S. HOUSE HOMELAND SEC. COMM., *"Every State Is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis* (Dec. 7, 2023) (statement of U.S. Rep. Bice of Oklahoma).[5] Although every state in the Nation is threatened by the rampant trafficking activity of the various drug cartels, Oklahoma has been described as the "latest and wildest frontier in the marijuana underworld." Garrett Yalch et al., *Gangsters, money and murder: How Chinese organized crime is dominating Oklahoma's illegal medical marijuana market*, THE FRONTIER (March 14, 2024).[6] Between 2018 and 2023 alone, Oklahoma shut down more than 800 marijuana growing operations that have ties to organized crime and "seized more than 600,000 pounds of illegal weed and made nearly 200 arrests." Paul Demko, *'Tokelahoma' at the Crossroads*, POLITICO (March 7, 2023).[7] Many illegal grow operations directly trace to Chinese

---

[5] *Available at* https://perma.cc/HTS5-BP7U.

[6] *Available at* https://www.readfrontier.org/stories/gangsters-money-and-murder-how-chinese-organized-crime-is-dominating-oklahomas-illegal-medical-marijuana-market/#:~:text=Gangsters%2C%20money%20and%20murder%3A%20How,Oklahoma's%20illegal%20medical%20marijuana%20market&text=A%20quadruple%20murder%20in%20Oklahoma,ties%20to%20China's%20authoritarian%20regime.

[7] *Available at* https://www.politico.com/news/magazine/2023/03/07/oklahoma-marijuana-legalization-00085299.

organized crime. *See* Yalch, *supra.* The victims of this industry include thousands of Chinese migrants (and those of other nationalities) who are often smuggled across the Texas border and end up in Oklahoma. *Id.* Foreign workers suffer from rampant physical abuse, trafficking, wage theft, forced prostitution, and more. *Id.* Before leaving office, President Biden emphasized that "[d]oing nothing is not an option." THE WHITE HOUSE, Remarks by President Biden on Securing Our Border (June 4, 2024).[8] Oklahoma agreed. That is why Oklahoma enacted HB 4156.

**B. Oklahoma enacted HB 4156 to protect those lawfully present in the State.**

In the most basic terms, HB 4156 creates an Oklahoma criminal analogue to federal criminal illegal entry and reentry. It contains two principal provisions. First, an alien commits an "impermissible occupation" by "willfully and without permission enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States." HB 4156, § 2(B) (codified at OKLA. STAT. tit. 21, § 1795(B)). A violation of this provision is a misdemeanor punishable by imprisonment for up to one year, or by a fine of up to $500, or both. *Id.* § 2(C)(1) (codified at OKLA. STAT. tit. 21, § 1795(C)(1)). Under this provision, any unlawfully present noncitizen "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.*

---

[8] *Available at* https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/04/remarks-by-president-biden-on-securing-our-border/.

Second, HB 4156 makes it a crime for an alien to "enter[], attempt[] to enter, or ... at any time [be] found in Oklahoma" if he or she has previously been "denied admission, excluded, deported, or removed, or has departed the United States while an order of exclusion, deportation, or removal is outstanding." *Id.* § 2(D) (codified at OKLA. STAT. tit. 21, § 1795(D)). This provision has two exceptions. It does not apply to an alien (1) if "[p]rior to reembarkation of the alien at a place outside the United States or application by the alien for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission," or (2) if the alien was "previously denied admission and removed" and "such alien established that he or she was not required to obtain such advance consent under" HB 4156's Section 2 or "any prior statute." *Id.* § 2(D)(1)–(2) (codified at OKLA. STAT. tit. 21, § 1795(D)(1)–(2)). A violation is a felony punishable by up to two years in prison, or by a fine of up to $1,000. *Id.* § 2(C)(2) (codified at OKLA. STAT. tit. 21, § 1795(C)(2)). Under this provision, the unlawfully present alien "shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.* Neither provision enables Oklahoma to deport anyone to a foreign country, nor does the law require those unlawfully present to leave the country: the convicted individuals just cannot remain in Oklahoma.

Importantly, HB 4156 provides an affirmative defense to prosecution if (1) "[t]he federal government has granted the defendant ... lawful presence in the United States" or "asylum under Section 1158 of Title 8 of the United States Code," or (2) "[t]he

defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals program between June 15, 2012, and July 16, 2021." *Id.* § 2(F) (codified at OKLA. STAT. tit. 21, § 1795(F)). In other words, if the alien's conduct does not violate federal illegal-entry or illegal-reentry statutes, or if the federal government has granted the alien lawful presence or asylum in the United States, then HB 4156 disallows a prosecution in Oklahoma. In the meantime, nothing in HB 4156 prevents—or even purports to inhibit in any way—illegal aliens from seeking asylum or other relief under federal law. HB 4156 was set to take effect in Oklahoma on July 1, 2024. *Id.* § 5.

## C. Illegal aliens sued to facially enjoin HB 4156's enforcement.

The first legal challenge to HB 4156 came in May 2024, when the Biden Administration sued, primarily on preemption grounds. *See* J.A. Vol. 1 at 12.[9] Shortly afterward, a similar lawsuit was filed by Padres Unidos de Tulsa and four private individuals. *See id.* at 12–13. The district court consolidated the two cases. *See id.* at 13. Days before HB 4156 was to take effect, the district court granted the United States' motion for a preliminary injunction and deemed the private plaintiffs' motion moot as a result. *Id.* at 12–42. The district court acknowledged that "Oklahoma undoubtedly 'bears many of the consequences of unlawful immigration.'" *Id.* at 17 (quoting *Arizona*, 567 U.S. at 397). Even so, the court enjoined enforcement of HB 4156 in its entirety,

---

[9] All references to the Appendix refer to the Joint Appendix and include pinpoint cites in the following format: J.A. Vol. [#] at [page].

before it could take effect or be interpreted by any state court. The district court relied on the United States' opposition to HB 4156 in arriving at its decision. Among other things, the court distinguished the Supreme Court's key decision in *Kansas* because "the federal government 'fully support[ed]' Kansas' power to prosecute" in that case. *Id.* at 32 (quoting *Kansas*, 589 U.S. at 212). And it credited the United States' claims that "it and the public [would] suffer irreparable harm if H.B. 4156 takes effect," specifically finding that "the bill would harm the United States' relationship with foreign nations by antagonizing foreign governments; straining diplomatic relations and … exposing United States citizens abroad to reciprocal and retaliatory treatment." *Id.* at 40.

Oklahoma timely appealed that decision. On March 14, 2025, however, the United States voluntarily dismissed its complaint against Oklahoma. *Id.* at 43. Accordingly, this Court dismissed that appeal as moot. *Id.* at 46–47. Seven weeks then passed with no further action taken by any Plaintiff from the original lawsuits. Then, on May 13, 2025, every named individual Plaintiff suddenly dropped from the case, without explanation. In their place, two anonymous individuals—joined by Padres Unidos de Tulsa and another organization, League of United Latin American Citizens Oklahoma City ("LULAC OKC")—filed a combined motion for a temporary restraining order (TRO) or a preliminary injunction. *Id.* at 50.

In doing so, the new individual Plaintiffs admitted their "intent to engage in criminal conduct.*" Id.* at 122. They acknowledged that, in order to establish standing, they "have had to make allegations which could subject them to a number of criminal

*and immigration* consequences." *Id.* (emphasis added). By their own admission, Plaintiffs' actions would "fall[] squarely within the 'illegal entry' and 'illegal reentry' crimes" at issue, *id.* at 54, crimes that mirror federal law. On the back of this admitted federal lawbreaking, Plaintiffs immediately obtained the district court's leave to file a second amended complaint, which named Oklahoma's Attorney General and other state officials as Defendants. *Id.* at 130. In the main, Plaintiffs contended that HB 4156 is preempted (by the same federal law they admitted breaking) and violates the Dormant Commerce Clause. *Id.* at 144–45. Plaintiffs sought to certify a class, and they also asked for an order granting them leave to proceed in this litigation under pseudonyms, in part because of fear of federal blowback to their admitted illegality. *Id.* at 86, 118.

Plaintiffs waited seven weeks to move for relief—during which HB 4156 was in effect—and yet the court below gave the State less than two days to respond before quickly granting the TRO. *Id.* at 194. Despite the United States' change of position,[10] and its reliance on the United States earlier, the district court announced that, "consistent with its prior ruling, the Court finds that Plaintiffs are likely to succeed on

---

[10] Apart from voluntarily dismissing its challenge to HB 4156, the United States has now voiced its support for "the ability of States to adopt complementary legislation that advances the federal [immigration] policy" in a lawsuit brought by private plaintiffs challenging an analogous Florida law. Brief for the United States as *Amicus Curiae* Supporting Appellants at 1, *Fla. Immigrant Coal. v. Att'y Gen., State of Fla.*, No. 25-11469 (11th Cir. July 7, 2025), 2025 WL 1924781, at *1.

their claims that H.B. 4156 is preempted." *Id.* at 211.[11] Again, in its 2024 decision, the district court had accorded determinative weight to the United States' "declarations … regarding Oklahoma's interference with its comprehensive foreign-policy framework." *Id.* at 40. Now, the court alighted on a new touchstone to support a finding of preemption: "Congress's intent—not the shifting enforcement priorities of presidential administrations—controls the preemption inquiry." *Id.* at 209.

The court also provisionally granted class certification, *id.* at 223, and it permitted the individual Plaintiffs to proceed pseudonymously because they "should not be forced to choose between challenging H.B. 4156 and exposing themselves to the federal authorities," *id.* at 198. "To require them to litigate this matter under their real names," the court wrote, "would effectively place a target on their backs." *Id.* After the issuance of the TRO, Oklahoma continued to oppose the issuance of injunctive relief, arguing that "[t]o grant equitable relief, pseudonym status, and provisional class certification to Plaintiffs plainly subverts federal criminal law in the name of upholding it." J.A. Vol. 2 at 233. But the district court "remain[ed] unmoved." *Id.* at 312. Upon expiration of the TRO on June 3, 2025, the district court "grant[ed] Plaintiffs a preliminary injunction enjoining Defendants from enforcing H.B. 4156." *Id.* at 298. The court also refused to

---

[11] Having found that "Plaintiffs are likely to prevail on their preemption claims," the district court did not address Plaintiffs' Dormant Commerce Clause theory. *See* J.A. Vol. 1 at 211 n.11. And Plaintiffs have not initiated a cross-appeal on that issue.

revisit its rulings allowing provisional class certification and pseudonym status. *Id.* at 312. Oklahoma timely filed its notice of appeal on June 4, 2025. *Id.* at 315.

<h2 style="text-align:center">S<span style="font-variant:small-caps">TANDARD OF</span> R<span style="font-variant:small-caps">EVIEW</span></h2>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008); *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). To obtain it, a plaintiff must show that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001). Put simply, preliminary injunctions are the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). And "the right to relief must be clear and unequivocal." *Schrier*, 427 F.3d at 1258 (quotation omitted).

This Court reviews a preliminary injunction grant for abuse of discretion. *Dominion Video Satellite*, 269 F.3d at 1153. "A district court abuses its discretion if it commits an error of law, or is clearly erroneous in its preliminary factual findings." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1243 (10th Cir. 2001) (quotations omitted). This Court evaluates the district court's factual findings for clear error, while reviewing its legal determinations de novo. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

Crucially, when a plaintiff seeks facial relief, "it is necessary to proceed with caution and restraint." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). This is "[b]ecause facial challenges push the judiciary towards the edge of its traditional purview and expertise." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005). As a result, the Supreme Court has "made facial challenges hard to win" because they "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Moody*, 603 U.S. at 723 (citation omitted). Facial challenges to laws are "disfavored," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), and plaintiffs bringing a facial challenge "normally 'must establish that no set of circumstances exists under which the [statute] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (citation omitted). Therefore, "courts must be vigilant in applying a most exacting analysis to such claims." *Ward*, 398 F.3d at 1247.

## SUMMARY OF THE ARGUMENT

Plaintiffs challenge Oklahoma's efforts, through HB 4156, to aid the federal government in its duty to deter illegal immigration. The district court abused its discretion when it facially enjoined Oklahoma from enforcing HB 4156, which, as is commonplace in the field of criminal law, creates a state analogue to two existing federal crimes. To reach this result, the court improperly brushed aside the "discernible impact on traditional state concerns" from "the influx of persons entering the United States against federal law." *Plyler*, 457 U.S. at 228 n.23. Plaintiffs are not likely to succeed in their claims. They lack standing, they do not possess a cause of action under federal

immigration law, and they have not shown that HB 4156 is inconsistent with the federal immigration framework or that federal law preempts HB 4156 in all applications.

Right out of the gate, the district court erred when it found Plaintiffs have standing to sue Oklahoma. Simply put, Plaintiffs lack a "legally protected interest" in furthering their federally illegal activity. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Similarly, the organizational Plaintiffs lack standing due to their members' unlawful presence in the United States. Moreover, Plaintiffs do not have a private right of action or an action in equity to enforce federal immigration law. The court erred in concluding that Plaintiffs have a cognizable claim, as equity will not support lawbreaking.

On the merits, HB 4156 is neither field nor conflict preempted. The district court erroneously ignored the presumption against preemption, which "has greatest force when Congress legislates in an area traditionally governed by the States' police powers." *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014). Furthermore, the district court admittedly stretched *Arizona*, 567 U.S. 387, beyond its holding to find that HB 4156 is implicitly field preempted. In doing so, it wrongly discounted the Supreme Court's subsequent ruling in *Kansas*, 589 U.S. 191, a decision that clarifies *Arizona*'s scope and cuts against the district court's conclusion. Neither *Arizona* nor *Kansas* holds that all state laws touching on immigration are preempted. And HB 4156 does not involve alien registration, which is the only occupied field the Supreme Court has ever identified in this arena. HB 4156 is a proper exercise of Oklahoma's police power, and it only criminalizes actions already punishable under federal law. The district court has

mistaken an "overlap[ping]" statute for an obstacle. *Kansas*, 589 U.S. at 212. And Oklahoma has the power to defend itself under the U.S. Constitution, in any event.

The district court compounded these errors by giving pseudonymous status to Plaintiffs, expressly insulating federal lawbreakers from the consequences of their illegal acts. Congress could not possibly have intended this. For similar reasons, the district court erred by provisionally certifying two classes of federal lawbreakers at Plaintiffs' request. Congress did not intend for its class certification structure to be used to create and protect classes of anonymous federal lawbreakers. Such an outcome is absurd.

The district court also incorrectly balanced the remaining injunction factors, which favor Oklahoma. Any irreparable injury falls on Oklahoma, which is harmed when a court forbids the use of a tool to combat an ongoing crisis—a crisis acknowledged by Presidents of both parties. And any harm potentially suffered by Plaintiffs is outweighed by the harm done to Oklahoma when the "State is enjoined by a court from effectuating statutes enacted by representatives of its people." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025) (citation omitted). Moreover, Plaintiffs have come to this Court with unclean hands, as they seek to enlist federal courts to evade the consequences of their own lawbreaking.

In the end, it was premature and erroneous for the district court to enjoin HB 4156 "before the state courts had an opportunity to construe it and without some showing that enforcement of the provision in fact conflicts with federal immigration

law and its objectives." *Arizona*, 567 U.S. at 416. This Court should therefore reverse and vacate the preliminary injunction.

<h2 align="center">ARGUMENT</h2>

### I. THE DISTRICT COURT ERRED: PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

#### A. Lawbreaking cannot provide standing to challenge HB 4156.

Confirming Article III standing is a critical threshold inquiry. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "First and foremost," that is, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 338–39 (cleaned up). "[T]he standing requirement means that the federal courts decide some contested legal questions later rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches in the democratic process." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

Although "organizations can assert the standing of their members," *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009), such standing must be rigorously scrutinized at the injunction phase. *See All. for Hippocratic Med.*, 602 U.S. at 393–94 ("organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals"). A membership organization may have standing to bring suit if, in pertinent part, "(a) its members would otherwise have standing to sue in their own right; [and] (b) the interests it seeks to protect are germane to the organization's purpose."

18

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "Like an individual," the Supreme Court has held, "an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct." *All. for Hippocratic Med.*, 602 U.S. at 394 (quotation omitted).

Most important here, "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc); *see also Lujan*, 504 U.S. at 560 (a plaintiff cannot show injury if he has no "legally protected interest" in the conduct he wishes to vindicate). Here, the anonymous individual plaintiffs have openly admitted their "intent to engage in criminal conduct." J.A. Vol. 1 at 122. And they conceded below that, in order to establish standing, they "have had to make allegations which could subject them to a number of criminal *and immigration* consequences." *Id.* (emphasis added). Indeed, Plaintiffs have admitted that they "fall[] squarely within the 'illegal entry' and 'illegal reentry' crimes" under HB 4156. *Id.* at 54. If that is the case, they also fall squarely within the ambit of federal criminal law, which HB 4156 mirrors. Thus, the individual Plaintiffs "lack[] standing" because they are "complaining that [Oklahoma] government action will make [their federal] criminal activity more difficult." *Walker*, 450 F.3d at 1093. Their interest in being present in Oklahoma, per the express mandate of Congress enshrined in federal statutes, is "not 'legally protected.'" *Id.*

And if the individual Plaintiffs lack individualized standing, which they clearly do, the organizational Plaintiffs cannot avoid the same fate. For their part, neither Padres Unidos nor LULAC OKC identified any member with standing below. Because the members do not have standing, neither group can assert associational standing. *See Summers*, 555 U.S. at 498 (requiring "plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm").

In sum, Plaintiffs complain that Oklahoma's actions will make their ongoing criminal activity more difficult. This cannot be a ground for standing, as "a court won't use its equitable power to facilitate illegal conduct." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1054 (10th Cir. 2017) (Moritz, J.); *see also Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985) (observing that an "obviously sensible application" of the "unclean hands" doctrine is "to withhold an equitable remedy that would encourage, or reward (and thereby encourage), illegal activity, as where the injunction would aid in consummating a crime").

As for the alternative possibility, that one or more of the Plaintiffs is here with express federal permission, despite their admissions otherwise, then enforcement of HB 4156 would be precluded altogether because HB 4156 does not go beyond what federal law prohibits. In other words, the lack of a credible threat of prosecution— "whether today or in the future"—equates to a lack of actual or imminent harm for standing purposes. *California v. Texas*, 593 U.S. 659, 670 (2021). This puts individual Plaintiffs between a rock and a hard place. Either they are here illegally under federal

law, in which case standing cannot be conferred, or they are not here illegally, in which case HB 4156 does not apply. It really is that simple.

For its part, the district court insisted that Oklahoma's "reliance on *Walker* is misplaced." J.A. Vol. 1 at 201. Initially, in granting a TRO, the district court found that *Walker*'s "brief reference to criminal activity was nothing more than an illustrative example—one of several types of conduct generally deemed insufficient to meet the threshold for standing." *Id.* But that reasoning should support *Oklahoma's* position. *Walker* stated a rule: the term "legally protected interest" in the standing analysis "has independent force and meaning." 450 F.3d at 1093. This Court then gave three examples of this rule's application, one of which was broadly phrased: "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" *Id.* That example *is* illustrative, and it applies here: Plaintiffs are present in the United States illegally, by their admission, and they are suing because their continued violation of federal law will undeniably be more difficult if the State can prosecute them for illegal presence.

In its later order, the district court shifted gears, arguing that Plaintiffs "are surely not attempting to make federal 'criminal activity' any easier" because "removal proceedings are civil, *not criminal*, in nature." J.A. Vol. 2 at 305. But this dodges the fact that the core statutes at issue—8 U.S.C. §§ 1325 and 1326—contain *criminal* penalties for the *criminal* activity that forms the basis of the alleged standing here. This is not, in other words, a removal case at its core. Plaintiffs are trying to use the federal courts to

make their federal criminal lawbreaking easier. In their own words, Plaintiffs have an "intent to engage in criminal conduct," and they "have had to make allegations which could subject them to a number of criminal and immigration consequences." J.A. Vol. 1 at 122. The district court erroneously brushed away these statements and this Court's binding precedent. The court claimed that *Walker*, "as written … does not apply" here, J.A. Vol. 2 at 306, but that is exactly what *Walker* does. It was the court below that had to invent limiting language that *Walker* itself did not contain.

Of course, Oklahoma does not argue that Plaintiffs' unlawful presence precludes them from judicial relief entirely; they may raise preemption in state-court defenses. Nor is Oklahoma arguing that Plaintiffs are categorically excluded from federal courts on other claims unrelated to illegal presence. The State is simply arguing, based on binding precedent, that to show standing for an equitable pre-enforcement facial challenge Plaintiffs cannot have a "legally protected interest" in being present in Oklahoma without punishment when the federal government has criminalized that very presence. Plaintiffs, who purport to be here unlawfully, bear the burden of making a rigorous showing of standing. The district court erred in finding that they had done so.

**B. Plaintiffs lack a cause of action under federal immigration law.**

In addition to demonstrating standing, a plaintiff must show he has a private right or cause of action to support a lawsuit based on federal law. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,* 589 U.S. 327, 334 (2020) ("private rights of action to enforce federal law must be created by Congress") (citation omitted); *Davis v. Passman,*

442 U.S. 228, 239 n.18 (1979) (explaining how a "cause of action" differs from related concepts). No private right of action exists here.

To begin, the Supremacy Clause "certainly does not create a cause of action" and is "not the 'source of any federal rights.'" *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (citation omitted). "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325. The Supremacy Clause, that is, does not "give affected parties a constitutional (and hence congressionally unalterable) right to enforce federal laws against the States." *Id.* Rather, a "private right[] of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). As the Supreme Court explained just last year, "[c]onstitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts," but instead are "invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024).

The most relevant precedent interpreting *Armstrong* in the Tenth Circuit is *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017). In *Hickenlooper*, this Court firmly rejected an attempt by private individuals and organizations to obtain equitable relief against Colorado for injuries resulting from that state's contravention of the federal Controlled Substances Act ("CSA"). Like here, the plaintiffs there argued that a state law (legalizing marijuana) was preempted. But rather than permit equitable relief,

this Court concluded that the plaintiffs had no "*federal substantive rights* that have been injured by Colorado." *Id.* at 877. Even in the context of preemption and equity, that is, the Court put the burden on the plaintiffs to show that the CSA gave them a "substantive private right" to sue. *Id.* at 914 (Hartz, J., concurring).

In doing so, this Court reviewed *Armstrong* and "over thirty Supreme Court cases" and explained that "where the text and structure" of a law provide "no indication that Congress intend[ed] to create new individual rights, there is no basis for a private suit." *Id.* at 901 n.13 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002)). It is "critical[]," this Court held, that unless Congress has given a plaintiff "a federal right of her or his own to vindicate *in the CSA*, the plaintiff cannot maintain a cause of action—in law *or in equity*—against any defendant for violating the CSA." *Id.* at 902 (second emphasis added). This Court "will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *Id.* (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 145 (1985)). "'Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity' for injunctive relief to issue." *Id.* at 902–03 (quoting *Mitchum v. Foster*, 407 U.S. 225, 237 (1972)).

This Court further explained that "[f]or a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'" *Id.* at 903 (quoting *Gonzaga*, 536 U.S. at 284). Obviously, nothing in the Immigration and Nationality Act ("INA") prohibitions on illegal entry and reentry is phrased in a way that suggests *benefits* for the people breaking those laws. Punishments, not benefits, are the express instructions. *See,*

*e.g.*, 8 U.S.C. § 1326(a) ("alien … shall be fined … or imprisoned not more than 2 years, or both"). Regardless, like in *Hickenlooper*, "no discerning inquiry is necessary because [Plaintiffs] have *never* alleged that they have any substantive rights" in the INA or anywhere else "by which they can enforce the [INA's] preemptive effects." 859 F.3d at 903. Plaintiffs are "required to plausibly allege that they are vindicating a federal substantive right to be able to maintain a cause of action in equity of the type they assert here. But they failed to do so." *Id.* at 903–04. "Perhaps in antiquity a private citizen could enter a judicial forum and demand equitable relief in the absence of any injury to a protected substantive right. But such incantations almost certainly ceased to hold any power in 1788." *Id.* at 904. If a United States citizen cannot obtain this relief, then surely an illegal alien is even more so prohibited.

Plaintiffs and the district court both leaned on *Hickenlooper*'s footnote 19 as creating a toehold for recognizing a cause of action here. *See* J.A. Vol. 1 at 182; J.A. Vol. 2 at 286; J.A. Vol. 2 at 301–02. In that footnote, this Court echoed *Armstrong* (and *Ex parte Young*, 209 U.S. 123 (1908)), in stating that "if an individual claims federal law immunizes him from state *regulation*, the court may issue an injunction upon finding the state *regulatory actions* preempted." *Hickenlooper*, 859 F.3d at 906 n.19 (quoting *Armstrong*, 575 U.S. at 326). But in that same footnote, this Court indicated that "immunizes" means that the person has federal "rights" that he cannot be forced to give up through a threat of state prosecution. *See id.* ("It is the official 'coercion' at issue (e.g., 'putting the challenger to the choice between abandoning his *rights* or risking *prosecution*') that

gives rise to such preemption-based *defenses*." (citation omitted)). The idea that the INA grants violators of its criminal strictures immunity or a substantive right is illogical and is not what Congress intended. It simply cannot be the case that law-abiding Colorado citizens lack a right to obtain equitable relief for injuries caused by Colorado's contravention of federal law (*Hickenlooper*), while lawbreaking non-citizens in Oklahoma may obtain prospective equitable relief to allow them to thwart federal law (here). This dichotomy would turn the rule of law on its head.

Nevertheless, the district court did just that. The court acknowledged that equitable authority is not unbounded. J.A. Vol. 2 at 302. But it then essentially placed the burden on *Oklahoma* to show that Congress clearly foreclosed equitable relief to federal lawbreakers with the INA, rather than placing the burden on Plaintiffs to show that the INA expressly permits equitable relief or creates a cause of action for Plaintiffs. *See id.* at 302–03 ("[T]he Court discerns no such intent to foreclose equitable relief here." (cleaned up) (citation omitted)). This has it backward. Congress must straightforwardly create an avenue; it is not assumed to have done so.

Similarly, the district court held that Oklahoma's argument "rests on a flawed premise that a plaintiff seeking to enjoin state officials from enforcing a preempted law must first identify a federal statutory right of their own." *Id.* at 301 n.7. But how is this a flawed premise? Only one page prior the court *admitted* that, in order "[t]o enforce a federal statute, a plaintiff must identify 'a federal right of his or her own to vindicate under the statute at issue.'" *Id.* at 300 (quoting *Hickenlooper*, 859 F.3d at 902). The district

court's own statements cannot be reconciled with each other. Nevertheless, the court below wrote in response to Oklahoma's objections that "the Supreme Court has permitted an *Ex parte Young* claim where plaintiffs alleged only that a state's regulatory actions violate federal law—preemption included." *Id.* at 301 n.7 (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). But even ignoring the court's reliance on a distinguishable pre-*Armstrong* case, that broad logic, if accepted, would have seemingly made *Hickenlooper* come out the other way.

In any event, the district court erred in concluding that Congress did not intend with the INA to foreclose equitable relief such as that Plaintiffs seek here. J.A. Vol. 2 at 302–03. The court's view cannot be squared with the text and purpose of the INA. Again, for a statute to grant rights, "its text must be phrased in terms of the persons benefited." *Gonzaga*, 536 U.S. at 284 (citation omitted). And the Supreme Court has previously cautioned that, where Congress created a "detailed remedial scheme," federal courts "should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young.*" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996). Here, there is no indication in the INA that Congress intended for private plaintiffs to benefit from the INA in this way or bring lawsuits such as this one. Put bluntly: the INA *criminalizes Plaintiffs' actions.* What more does Congress need to say? The district court had no substantive response. Rather, it asserted that "courts have routinely entertained equitable claims against state legislation mirroring federal immigration laws." J.A. Vol. 2 at 303. But the only cases the court cited are two very

27

recent decisions concerning similar state laws, one of which occurred before the United States switched positions. *Id.* at 303–04. This is hardly a robust fountain of precedent for such a drastic holding; rather, it shows this issue is still novel and percolating.

Moreover, "several characteristics of the federal statute before the Court, when taken together, make clear that Congress intended to foreclose respondents from bringing this particular action for injunctive relief." *M.G. ex rel. Garcia v. Armijo*, 117 F.4th 1230, 1252 (10th Cir. 2024) (cleaned up) (citation omitted). Here, the INA repeatedly explains that the targets of its provisions do not have a right to sue. *See, e.g.*, 8 U.S.C. § 1231(a)(4)(D) ("No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien."); *id.* § 1158(d)(7) ("No private right of action. … Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."). Further, Congress directed immigration officers to "order ... removed from the United States without further hearing or review" aliens who lack a credible fear of persecution or an intention to apply for asylum. *Id.* § 1225(b)(1). In response, the district court found it "difficult to follow" how different INA provisions indicate a lack of a right to sue relating to the specific entry and reentry crimes here. J.A. Vol. 2 at 303. But Oklahoma's point is not difficult to understand. Criminalization, combined with express INA hostility to lawsuits for persons here illegally, plainly indicates that no cause of action exists.

"[T]he decision whether to let private plaintiffs enforce a [federal statute] poses delicate questions of public policy." *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2229 (2025). In the present scenario, the "fairest reading" of the INA shows that Congress has "displace[d]" the option of "equitable relief." *Armstrong*, 575 U.S. at 329; *see also Isr. Aircraft Indus. Ltd. v. Sanwa Bus. Credit Corp.*, 16 F.3d 198, 200–01 (7th Cir. 1994) ("No case during the last generation creates a private right of action to enforce a statute cast in the form of a criminal prohibition ...."). Granting Plaintiffs a cause of action to enforce the preemptive aspect of immigration laws that they are concededly violating is entirely inappropriate here, and the district court erred in holding otherwise.

Plaintiffs' invocation of Section 1983 for their Commerce Clause claim does not help their lack of a cause of action, either. Per *Hickenlooper*, the "same threshold inquiry applies when we ask 'whether a statutory violation may be enforced through § 1983.'" 859 F.3d at 902 (quoting *Gonzaga*, 536 U.S. at 283). It is a "plaintiff's burden under § 1983" to show that a statute '*unambiguously* confer[s] individual federal rights.'" *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 230 (2023) (Alito, J., dissenting) (agreeing with the majority's explanation of Section 1983). "[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms." *Gonzaga*, 536 U.S. at 290. Congress has not done so here. And any private right of action claim predicated on Section 1983 and Congress's Dormant Commerce Clause power must fail because a dormant power necessarily implies the lack of a positive exercise of congressional authority in creating a cause of action.

Just four years ago, the Supreme Court observed—in rejecting the argument that equitable relief just *had* to be available to a group of plaintiffs—that "those seeking to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021). Put succinctly, there is no "unqualified right to pre-enforcement review of constitutional claims in federal court." *Id.* "To this day," the Supreme Court explained, "*many* federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims, *not* in federal pre-enforcement cases." *Id.* at 49–50 (emphases added). That is how *Kansas* came about; the aliens were convicted in state court, had their convictions overturned by the Kansas Supreme Court (on preemption grounds), and then had the convictions reinstated by the U.S. Supreme Court. *See* 589 U.S. at 198–202, 213. Oklahoma's position here is not esoteric or unfair, according to the Supreme Court itself. Plaintiffs lack a cause of action for a pre-enforcement challenge, and they are not entitled to equitable pre-enforcement relief.

### C. HB 4156 is not facially preempted by federal immigration law.

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 398. Under the Supremacy Clause, "the Laws of the United States" take priority over conflicting state laws. U.S. CONST. art. VI, cl. 2. But "the states are sovereign, save only as Congress may constitutionally subtract from their

authority." *Parker v. Brown*, 317 U.S. 341, 351 (1943). Put another way, federal enforcement priorities do not preempt state law—only federal law does. *See Kansas*, 589 U.S. at 212. "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law ...." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.). Whether express or implied, the "preemption of state laws represents a serious intrusion into state sovereignty." *Id.* at 773 (cleaned up). Preemption is a powerful tool that should not be imposed lightly to thwart state legislation: "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Federal law can preempt state law either by an express statement of preemption or by implication. *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1223, 1241 (10th Cir. 2011). Plainly, Congress has never expressly stated that the states are prohibited from enacting the laws in question here, or laws merely touching on immigration. Thus, this case is solely about implied preemption. Implied preemption encompasses both field preemption and conflict preemption. *Id.* On the former, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive … that Congress left no room for the States to supplement it'

or where there is a 'federal interest … so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice*, 331 U.S. at 230). Conflict preemption may occur in two ways: "where compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Oklahoma—as a separate, dual sovereign—retains police powers relating to the field of immigration. And HB 4156 falls within those powers. HB 4156 merely codifies an analogue to the federal crimes of illegal entry and reentry, thereby complementing federal law instead of obstructing it. Every act punished by HB 4156 is already a federal crime. It does not create new standards governing the admissibility or removability of aliens, and it does not regulate alien registration, which was the only topic deemed field preempted in *Arizona*. *See* 567 U.S. at 401. Nor does HB 4156 authorize Oklahoma officials to remove illegal aliens from the country. The district court erred as a matter of law when it expressly went beyond *Arizona* and held, in effect, that the *entire* field of immigration law is off-limits under principles of implied preemption.

## 1. HB 4156 is not field preempted.

Field preemption can be justified only by "a demonstration that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress." *DeCanas v. Bica*, 424 U.S. 351, 357 (1976), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404, and *Kansas*, 589 U.S. at 195 (quotations omitted). Nothing less than an "unambiguous congressional mandate" will support a finding of field preemption. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 616–17 (1997) (Thomas, J., dissenting) (field preemption "is itself suspect, at least as applied in the absence of a congressional command that a particular field be pre-empted"). Only "[i]n rare cases" has the Supreme Court held "that Congress has 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas*, 589 U.S. at 208 (citation omitted).

This is not such a case. The federal government has broad power to regulate immigration. Federal immigration law controls "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355. But the Supreme Court "has never held that every state enactment which in any way deals with aliens" is "pre-empted by this constitutional power, whether latent or exercised." *Id.* And critically, the Supreme Court has also not "conclude[d] that the States are without any power to deter the influx of persons

33

entering the United States against federal law, and whose numbers might have a discernable impact on traditional state concerns." *Plyler*, 457 U.S. at 228 n.23.

The fact that the federal government possesses exclusive power to admit and naturalize aliens does not deprive Oklahoma (or any other state) of the concurrent and complementary ability to regulate the presence of aliens within that State's borders. For that reason, Oklahoma can and does prosecute illegal immigrants for theft, murder, and violations of countless other statutes that Plaintiffs would not dream of claiming are preempted. Indeed, the Supreme Court has expressly recognized that "the States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal." *Id.* at 225. Both are true here, which eliminates the possibility that Oklahoma's law is field preempted. HB 4156 mirrors federal objectives enshrined in law, and it is undeniably a legitimate state goal to penalize federal lawbreakers who remain in the State illegally.

The federal government's authority to naturalize and admit (*i.e.*, legalize) does not necessarily displace the States's police power to exclude *illegal* aliens. *See Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 588 (2011) (federal interest in immigration does not supersede States' "broad authority under their police powers" to enact law relating to immigration) (quotation omitted). States do not have to do so, of course. Rather, "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory ... without risk to the rest of the country."

*New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting); *see also* U.S. CONST. amend. X. But they are free to assist the federal government.

HB 4156 neither extends federal law nor criminalizes something not already federally criminal. Nor does it extend or even purport to extend beyond Oklahoma's borders to entry and reentry in the United States as a whole. Oklahoma's law is solely concerned with its own borders and protecting those lawfully present within. In this regard, HB 4156 is very much like the law in *Kansas*, 589 U.S. 191, which the district court below labored mightily to downplay. *See* J.A. Vol. 2 at 308–09. *Kansas* upheld an identity-theft statute criminalizing an alien's use of a false identity for work authorization. 589 U.S. at 195. In upholding that law against a defensive challenge, the Supreme Court distinguished *Arizona*, while underscoring that "in the *vast majority* of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Id.* at 212 (emphasis added).

Last year, the district court initially distinguished *Kansas* because the state prosecutions in that case "were not at odds with federal interests." J.A. Vol. 1 at 32 (quoting *Kansas*, 589 U.S. at 212). And how did the district court discern that? In large part because "the federal government 'fully support[ed]' Kansas' power to prosecute," *id.* (quoting *Kansas*, 589 U.S. at 212), whereas at the time the United States opposed Oklahoma's law. Now, however, the United States supports state laws like Oklahoma's. *See supra* n.10. But rather than apply its earlier logic to the updated situation, the court below altered its reasoning. In an abrupt about-face, *Kansas* is now taken by the district

court to mean that a "preemption analysis" must not "shift based on the enforcement priorities of a given administration." J.A. Vol. 1 at 210. Respectfully, it is the district court's shifting rationale that is problematic. Per the court below, when the federal government opposes Oklahoma, that opposition is critical to the preemption analysis. But when the federal government supports Oklahoma, that is just an "enforcement priorit[y]" that is irrelevant to preemption. *Id.* Heads or tails, Oklahoma loses.[12]

At root, what *Kansas* really instructs is that to "overlap" is not the same thing as to undermine. 589 U.S. at 212. In failing to follow both *Arizona* and *Kansas*, the district court abused its discretion, and this Court's reversal is required. To the extent that *Arizona* sweeps as broadly as the district court held, then the decision should be overruled or narrowed by the Supreme Court. In the twelve years since *Arizona*, the illegal-immigration crisis has grown ever more unmanageable for the states and ever more threatening to state sovereignty. And "*stare decisis* isn't supposed to be the art of methodically ignoring what everyone knows to be true." *Ramos v. Louisiana*, 590 U.S. 83, 105 (2020). Oklahoma's law permissibly adjoins federal immigration law as valid—and necessary—supplementary legislation.

---

[12] The district court emphasized that "courts across the country have unanimously held that nearly identical state illegal entry and reentry laws … are likely preempted." J.A. Vol. 2 at 297 (citation omitted). But as the court acknowledged, several of these decisions were "in cases brought by the federal government," *id.*, which has since abandoned its position. Moreover, this may be the case where the plaintiffs most openly admit to breaking federal law, which is not an insignificant distinction.

## 2. *HB 4156 is not conflict preempted.*

No provision of HB 4156 is conflict preempted by federal law. Conflict preemption exists only where it is "impossib[le]" to comply with both state and federal law, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotations omitted). This is necessarily a high hurdle. "In all cases," the purported "conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Kansas*, 589 U.S. at 202. It is not enough to say that "a state statute is in tension with federal objectives." *Whiting*, 563 U.S. at 607 (quotation omitted). And "there is no federal preemption *in vacuo*"—that is, "without a constitutional text, federal statute, or treaty made under the authority of the United States." *Kansas*, 589 U.S. at 202 (quotation omitted); *see also Whiting*, 563 U.S. at 607 (a "freewheeling judicial inquiry" is an insufficient method for finding preemption). It is abundantly clear that "a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and in the judgment).

Here, it is undeniably possible to comply with the state and federal laws in question. Thus, obstacle preemption is the only avenue. But that claim fails, as well. The federal government may adopt state laws for federal purposes. *See, e.g.*, *Parker Drilling Mgmt. Servs. v. Newton*, 587 U.S. 601, 604 (2019). And state governments may adopt federal law for state purposes. *See, e.g.*, *Gilbert v. Minnesota*, 254 U.S. 325, 331

(1920). "[T]here can by definition be no conflict" between the laws of two sovereigns where state law "trace[s] the federal law." *Whiting*, 563 U.S. at 601–02. Indeed, "[o]ur federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap." *Kansas*, 589 U.S. at 212. More specifically here, except in matters of alien registration, the Supreme Court has never held that state laws that overlap with federal criminal immigration statutes are impermissible. *See Kansas*, 589 U.S. at 210 ("In *Arizona*, ... we held that federal immigration law occupied the field of alien registration. 'Federal law,' we observed, 'makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders.'") (quoting *Arizona*, 567 U.S. at 401–02) (internal citations omitted)). *Arizona*, that is, provides a narrow exception to the broad and unremarkable general rule that state and federal criminal laws can and do readily coexist. And that exception should be expanded, if at all, only in the most compelling of situations, which this is not.

As a practical matter, the effective implementation of HB 4156 will likely require meaningful cooperation with federal authorities. Oklahoma must prove, after all, that an individual lacks legal immigration status, which is admittedly difficult to do without consulting the federal government. This is not unusual: multiple sections of the federal immigration statutes call for state–federal cooperation in immigration enforcement. *See, e.g.*, 8 U.S.C. §§ 1101(a)(15)(T)(i)(III)(aa), 1101(a)(15)(U)(iii), 1324(c), 1357(g)(1)–(10); 18 U.S.C. § 758; 22 U.S.C. § 7105(c)(3)(C)(i). That is to say, the "federal scheme" "leaves

room" for enforcement of a state law like HB 4156, much as it did "for a policy requiring state officials to contact ICE as a routine matter." *Arizona*, 567 U.S. at 412–13 (citation omitted). In other words, Oklahoma's law is not an obstacle to federal enforcement of its own similar provisions.

Federal law also expressly permits state officials to "'communicate with the [Federal Government] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States.'" *Id.* at 411–12 (quoting 8 U.S.C. § 1357(g)(10)(A)). They do so regularly. Along the same lines, "Congress has made clear that no formal agreement or special training needs to be in place" for state officers to communicate with the federal government about immigration status. *Arizona*, 567 U.S. at 411–12.

In sum, HB 4156 comports and harmonizes with federal law; it does not stand as an obstacle to its application. "[T]here are now many instances in which a prosecution for a particular course of conduct could be brought by either federal or state prosecutors." *Kansas*, 589 U.S. at 212. HB 4156 does not criminalize under Oklahoma law anything that is not already criminal under federal law. It is no obstacle to federal law to make the violation of federal criminal immigration law a companionate crime in Oklahoma. "To hold otherwise would be to ignore the teaching of [Supreme Court] decisions which enjoin seeking out conflicts between state and federal [law] where none clearly exists." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 446 (1960). Federal law preempts state law only when the two contradict each other. The district

court's pre-enforcement judicial guesswork notwithstanding, HB 4156 poses no obstacle to federal immigration law.

In conclusion, HB 4156 derives from—and complements—federal law. As such, it exemplifies a *cooperative* relationship between federal and state sovereigns. It does not displace, interfere with, or create any conflict with the overarching framework of federal immigration law. And when both sovereigns in question are comfortable with the law's legality, that has significance. The district court initially agreed—until the United States withdrew its opposition to HB 4156. Now, despite the United States' position, the district court insists that "Congress intended to make immigration regulation exclusively federal." J.A. Vol. 2 at 310 (quotation omitted). But this Court should not so readily endorse an unstintingly maximalist approach to preemption in the arena of federal immigration law—especially in light of *Kansas*. In finding obstacle preemption, the district court erroneously elevated the abandoned views of the prior administration over the intentional decisions of the present one. It should be reversed.

## II. OKLAHOMA MAY DEFEND ITSELF AGAINST AN ADMITTED INVASION.

Plaintiffs never engaged with Oklahoma's alternative reliance on Article I, Section 10 of the Constitution, which allows states to defend themselves when "actually invaded." To be sure, the district court dismissed that reliance as unconvincing. But that dismissal was largely based on a lack of any authoritative support. *See* J.A. Vol. 1 at 38–39. Since then, the United States declared a national emergency at the southern border and repeatedly classified this emergency as an actual invasion. In the *Securing Our*

*Borders* executive order, for example, the President explained that the "United States has endured a large-scale invasion at an unprecedented level" because "[m]illions of illegal aliens … successfully entered the United States … including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations." 90 Fed. Reg. 8467, 8467 (Jan. 20, 2025). And in the *Guaranteeing the States Protection Against Invasion* Proclamation, the President acknowledged that "the Federal Government has failed" in fulfilling its constitutional obligation "to 'protect each of [the States] against Invasion." 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) (quoting U.S. CONST. art. IV, § 4). *See also Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025).

"A sovereign isn't a sovereign if it can't defend itself against invasion." *United States v. Abbott*, 110 F.4th 700, 725 (5th Cir. 2024) (Ho, J., concurring in the judgment in part and dissenting in part). Oklahoma still retains an inherent, sovereign power of self-defense. *See* U.S. CONST. art. I, § 10, cl. 3. Upon entering the Union, "the States did not part with that power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. (7 How.) 283, 400 (1849) (McLean, J.). Oklahoma has experienced a deluge of illegal immigration and criminality: desperate traffickers, deadly weapons, and dangerous drugs. It is not arrant hyperbole to label this an invasion when, as noted above, the United States agrees and has argued that its own constitutional protection responsibilities have been triggered. And it certainly does not violate the Constitution when a state takes relatively minor steps to protect the health and lives of its citizens and lawful residents from this invasion.

The harm inflicted by foreign cartels in Oklahoma is staggering. If both the State of Oklahoma and United States have diagnosed the current situation as an invasion, then Plaintiffs presumably face a high hurdle to show otherwise. But again, Plaintiffs have barely even tried. Put differently, Plaintiffs cannot succeed on a facial challenge to Oklahoma's "legislative judgment" unless it establishes that "the challenged statute violates the Constitution in all, or virtually all, of its applications." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (quotation omitted). That burden has not been met here, at least in part because the Constitution contemplates States defending themselves from invasions. Given that the United States and Oklahoma are in lockstep on this point, facial relief is inappropriate.

The court below improperly shied away from these critical developments. Last year, a presidential election was held, with illegal immigration front and center. The people then elected a new federal administration that promised to enforce immigration law, and that administration withdrew its opposition to HB 4156. The district court's original order enjoining HB 4156 was based in part on the United States' opposition to H.B. 4156, which is no longer the case. *See* J.A. Vol. 1 at 210; J.A. Vol. 2 at 309–10. And the State's defense was based in part on claims of an invasion, which the United States has now confirmed exists. This cannot all just be cast aside without reason.

### III.  CONGRESS DID NOT INTEND TO SHIELD LAWBREAKING VIA PSEUDONYM.

By seeking to cloak themselves with pseudonyms, the individual Plaintiffs have attempted to enlist a federal court as the enabler of their admitted federal lawbreaking.

But as a general and important rule, legal proceedings are public events to which members of the public have a right and interest in accessing. *See Luo v. Wang*, 71 F.4th 1289, 1296 (10th Cir. 2023); *M.M. v. Zavaras*, 139 F.3d 798, 800 (10th Cir. 1998) ("Even a superficial recognition of our judicial history compels one to recognize that secret court proceedings are anathema to a free society."). The public's significant interest in judicial proceedings includes knowing the identities of the parties. "Ordinarily, those using the courts must be prepared to accept the public scrutiny that is an inherent part of public trials." *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000).

Consistent with this, the Federal Rules of Civil Procedure require that "[t]he title of the complaint must name all the parties," FRCP 10(a), and "must be prosecuted in the name of the real party in interest," FRCP 17(a)(1). As such, the Federal Rules do not support a general right to the "unusual procedure" of proceeding in litigation pseudonymously. *Femedeer*, 227 F.3d at 1246; *see also Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989) (per curiam); *Zavaras*, 139 F.3d at 800; *United States ex rel. Little v. Triumph Gear Sys.*, 870 F.3d 1242, 1249 (10th Cir. 2017). Because such a practice runs contrary to federal rules, contravenes the public interest, and creates practical difficulties, burdens, and inconveniences in the litigation process, courts should exercise any discretion in this area sparingly. *See, e.g.*, *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1125 (10th Cir. 1979).

In this Court, there are three categories of "exceptional cases" in which a plaintiff may be permitted to proceed pseudonymously: (1) matters of a highly sensitive and

personal nature; (2) matters with a real danger of physical harm; and (3) matters where the injury litigated against would be incurred as a result of the disclosure of plaintiff's identity. *Femedeer*, 227 F.3d at 1246 (citing *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)); *see also Lindsey*, 592 F.2d at 1125 (pseudonymity is "allowed only where there is an important privacy interest to be recognized"). As a practical matter, it appears that this Court has denied nearly all opposed requests to proceed anonymously. *See, e.g., Luo*, 71 F.4th at 1303 (affirming denial of anonymity based in part on plaintiff's "admitted and alleged conduct"); *Lindsey*, 592 F.2d at 1125 (affirming refusal to allow pseudonym in case involving claims of malicious prosecution and slander); *Coe v. U.S. Dist. Court for Dist. of Colo.*, 676 F.2d 411, 418 (10th Cir. 1982) (similar); *Femedeer*, 227 F.3d at 1246 (similar); *Zavaras*, 139 F.3d at 804 (similar); *Triumph Gear Sys.*, 870 F.3d at 1250 (similar).

In sum, "[j]udicial hostility to a party's use of a pseudonym springs from our Nation's tradition of doing justice out in the open, neither 'in a corner nor in any covert manner.'" *Doe v. Mass. Inst. of Tech.*, 46 F.4th 61, 68 (1st Cir. 2022) (citation omitted). And pseudonym permission is *not* found in the Rules of Civil Procedure or any relevant congressional enactment.

Here, Congress has outlawed the underlying immigration behavior Plaintiffs are engaging in. If congressional intent is truly the lodestar, then there can be no pseudonym status for these Plaintiffs. Nevertheless, the district court opined that requiring the individual Plaintiffs "to litigate under their real names … would effectively place a target on their backs simply for seeking judicial review of a state law they claim

… is likely preempted." J.A. Vol. 2 at 311 (citation and quotation omitted). Even more incredibly, the court wrote that Plaintiffs "should not be forced to choose between challenging H.B. 4156 and exposing themselves to federal authorities." J.A. Vol. 1 at 198. The court, that is, found that protecting Plaintiffs from the consequences of their federal lawbreaking constituted "exceptional" circumstances that "neatly" fell under *Femedeer*'s first exception: "'matters of a highly sensitive and personal nature.'" J.A. Vol. 2 at 311–12 (quoting *Femedeer*, 227 F.3d at 1246). This was error.

There is no indication that Congress intended to protect the identities of litigants who are unlawfully present in the United States from federal authorities. All the available evidence—including criminalization itself—counsels strongly otherwise. The first *Femedeer* category is flatly inapplicable here. "Matters of a highly sensitive and personal nature" typically include challenges to acts that could cause public embarrassment if litigants were forced to proceed under their true names. *See W.N.J. v. Yocom*, 257 F.3d 1171, 1172 (10th Cir. 2001) (citing *Coe*, 676 F.2d at 416). Other examples involve sexual assault of minors and similar cases where disclosure of a plaintiff's identity "might lead to further severe emotional distress" or "the real potential of additional psychological harm." *L.M. ex rel. A.M. v. City of Gardner*, No. 19-2425-DDC, 2019 WL 4168805, at *2 (D. Kan. Sept. 3, 2019). Here, Plaintiffs' unlawful immigration status does not involve personal intimate details of an embarrassing nature that should be shielded from the public or federal authorities. Surely federal lawbreaking

of any sort can never be deemed personal or intimate enough to deserve the protection of a federal court. The district court erred in granting Plaintiffs anonymity.

## IV. THE DISTRICT COURT IMPROPERLY CERTIFIED A CLASS OF LAWBREAKERS.

The district court's order would not have as large an impact if relief were limited to the individual Plaintiffs. *See Trump v. CASA, Inc.,* 145 S. Ct. 2540, 2552 (2025) ("[W]e [have] consistently rebuffed requests for relief that extended beyond the parties."). But along with their demand for injunctive relief, Plaintiffs asked the district court for provisional class certification under Rule 23. J.A. Vol. 1 at 86. Plaintiffs specified two classes: the "Entry Class" and the "Reentry Class"—the former consisting of all aliens subject to the crime of "Impermissible Occupation," per OKLA. STAT. tit. 21, § 1795(C), and the latter consisting of all aliens subject to Oklahoma's separate felony offense for entering the state after having been "denied admission, excluded, deported, or removed," per OKLA. STAT. tit. 21, § 1795(D). The district court granted provisional class certification in its TRO order, J.A. Vol. 1 at 223, and declined to reconsider that ruling in the preliminary injunction order, J.A. Vol. 2 at 312–13 n.14.

A class action departs from the "the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). From the outset, "Rule 23's requirements must be interpreted in keeping with Article III constraints." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). That is, "any 'analysis of class certification must begin with the issue of standing.'" *Vallario v. Vandehey*, 554 F.3d 1259, 1268 n.7 (10th Cir. 2009) (citation omitted). Any

party seeking class certification must also prove numerosity, typicality, commonality, and adequacy. FRCP 23(a)(1)–(4); *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 349 (2011). For reasons explained above, Plaintiffs lack standing to challenge HB 4156. And they cannot prove that they satisfy Rule 23(a)'s certification factors.

Most significantly, Plaintiffs seek proposed classes composed of admitted federal lawbreakers who are not challenging the federal law they are breaking. *See* J.A. Vol. 1 at 220. This cannot count for standing. And even if Plaintiffs could establish standing, provisional class certification is still improper under Rule 23(a). Indeed, Plaintiffs fail at the first step: numerosity, in support of which they offered nothing more than "[m]ere speculation as to the number of class members." *Hayes v. Wal-Mart Stores*, 725 F.3d 349, 357 (3d Cir. 2013). The district court gave credit to conjecture from Plaintiffs about the size of the proposed classes. *See* J.A. Vol. 1 at 219 ("Plaintiffs … indicat[e] that 'Oklahoma is home to an estimated 90,000 undocumented immigrants.' Given this substantial number, it stands to reason that the number of noncitizens falling within each proposed class would easily reach into the hundreds." (citation omitted)). This amorphous approach cannot provide definite grounds for class certification. The district court provisionally certified ambiguously numbered classes of people who are united in their violation of fundamental federal law. This was erroneous.

## V. THE DISTRICT COURT IMPROPERLY WEIGHED THE REMAINING INJUNCTION FACTORS.

Finally, the equities here favor Oklahoma and its law enforcement over Plaintiffs and lawbreaking. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *CASA*, 145 S. Ct. at 2562 (alteration and quotations omitted). This principle should apply *a fortiori* when a law regulates "harmful, constitutionally unprotected conduct." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Oklahoma maintains a legitimate interest in ensuring that the individuals within its borders are lawfully within the country, as well.

Plaintiffs also have unclean hands. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("[H]e who comes into equity must come with clean hands."). Plaintiffs asked for—and received from the district court—a preliminary injunction to protect federally illegal conduct. "Few things are clearer than that one who comes seeking protection for conduct that he concedes to be criminal has unclean hands within the meaning of this principle." *Combs v. Snyder*, 101 F. Supp. 531, 532 (D.D.C. 1951), *aff'd*, 342 U.S. 939 (1952); *see also Nat'l Coal. of Latino Clergy, Inc. v. Henry*, No. 07-CV-613-JHP, 2007 WL 4390650, at *9 (N.D. Okla. Dec. 12, 2007) ("Plaintiffs seemingly concede the validity of the federal immigration laws, and file this suit in order to remove any barriers the state of Oklahoma has erected to their continued violation of those federal laws. … To allow these Plaintiffs to do so would make this Court an

'abetter of iniquity' and this Court finds that simply unpalatable.") (quoting *Precision Instrument Mfg.*, 324 U.S. at 814). As such, Plaintiffs should not have been granted relief.

As a final matter, Oklahoma's statutory enactments are presumed constitutional. *E.g.*, *Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012) ("[W]e give all statutes a presumption of constitutionality ....") (quotation omitted). Furthermore, "a statute may be invalid as applied to one state of facts and yet valid as applied to another." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quotation omitted). A court should "prefer ... to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Id.* at 328–29. The district court did not apply this presumption of constitutionality, nor did it delicately analyze HB 4156 for potentially legitimate applications. Its analysis was therefore erroneous.

## CONCLUSION

This Court should reverse and vacate the preliminary injunction.

## STATEMENT REGARDING ORAL ARGUMENT

Oklahoma supports oral argument in this case. The issues of sovereignty and security are highly significant for the State and its citizens, and further questioning and discussion would assist both the parties and this Court moving forward.

Respectfully submitted,

s/ *Garry M. Gaskins, II*

GARRY M. GASKINS, II
   *Solicitor General*
ZACH WEST
   *Director of Special Litigation*
CULLEN D. SWEENEY
   *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
   STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface requirements of Fed. R. App. P. 32 because it was prepared in a proportionally spaced font (Garamond, 14-point) using Microsoft Word 2016. The document complies with the type-volume limitation of Fed. R. App. P. 32, because it contains 12,956 words, excluding the parts exempted.

s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II

**CERTIFICATE OF DIGITAL SUBMISSION**

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with the most updated Crowdstrike antivirus software.

s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II

**CERTIFICATE OF SERVICE**

I certify that on August 29, 2025, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system. No paper copies are required pursuant to 10th Cir. R. 31.5.

s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II

# ATTACHMENT 1

Order [Dkt. 87]

District Court Order granting
Motion for a Preliminary Injunction
Filed 06/03/2025

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, et al.,          )
                                         )
                Plaintiffs,          )
                                         )
v.                                       )          Case No. CIV-24-511-J
                                         )
GENTNER DRUMMOND, et al.,                )
                                         )
                Defendants.          )

## <u>ORDER</u>[1]

On May 20, 2025, after fairly substantial briefing, this Court temporarily restrained enforcement of Oklahoma House Bill 4156 (H.B. 4156),[2] which authorizes state officers to arrest, prosecute, and punish noncitizens who enter Oklahoma without authorization to enter the United States. *See Padres Unidos de Tulsa v. Drummond*, ___ F. Supp. 3d ___, No. CIV-24-511-J, 2025 WL 1444433, at *1–16 (W.D. Okla. May 20, 2025). In its 31-page ruling, the Court found that Plaintiffs had standing and were likely to prevail on their claims that H.B. 4156 is preempted. *See id.* This conclusion was hardly novel: in cases brought by both the federal government and private parties, "courts across the country have unanimously held that nearly identical state illegal entry and reentry laws . . . are likely preempted by federal immigration law governing noncitizen entry." *Fla. Immigrant Coal. v. Uthmeier*, ___ F. Supp. 3d ___, No. 25-21524-CV-WILLIAMS, 2025 WL 1423357, at *10 (S.D. Fla. Apr. 29, 2025) (collecting cases).

---

[1] All page citations in this Order refer to the Court's CM/ECF pagination.

[2] H.B. 4156 is codified at Okla. Stat. tit. 21, § 1795.

Now, 14 days later, the Court must consider whether a preliminary injunction is warranted. *See* (Pls.' Mot. for Inj.) [Doc. No. 60].[3]  Because the standard for a temporary restraining order is "essentially the same" as that for a preliminary injunction,[4] *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018), one might wonder what has changed.  The answer is nothing.

Indeed, the Constitution still empowers Congress to "establish an uniform Rule of Naturalization."  U.S. Const. art. I, § 8, cl. 4.  Congress's "comprehensive framework regulating the entry, presence, and removal of noncitizens"[5] stands firmly intact.  *United States v. Oklahoma*, 739 F. Supp. 3d 985, 991 (W.D. Okla. 2024).  Any preemption challenge continues to turn on "Congress's intent," not the shifting enforcement priorities of presidential administrations. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 324 (2016) (internal quotation marks omitted). And this Court remains bound by the Supreme Court's instruction that "the power to control immigration—the entry, admission, and removal of noncitizens—*is exclusively a federal power*." *Oklahoma*, 739 F. Supp. 3d at 991 (emphasis added) (quoting *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024)); *see also Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.").  So consistent with this understanding and its ruling 14 days ago, the Court grants Plaintiffs a preliminary injunction enjoining Defendants from enforcing H.B. 4156.

[3] At the Court's direction, Defendants opposed the request for a preliminary injunction on May 27, 2025.  *See* (Defs.' Resp.) [Doc. No. 82].  Plaintiffs replied two days later.  *See* [Doc. No. 86].

[4] A party seeking a temporary restraining order or preliminary injunction must show "(1) a likelihood of success on the merits; (2) a likelihood that [he] will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [his] favor; and (4) that the injunction is in the public interest."  *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (internal quotation marks omitted).

[5] Congress enacted this statutory framework, the Immigration and Nationality Act (INA), in 1952.

2

This conclusion does not overlook that a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and internal quotation marks omitted); *see also Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (stressing that preliminary relief "is an extraordinary remedy, the exception rather than the rule" (internal quotation marks omitted)).  It merely reflects that Plaintiffs have met that burden.

The Court does not aim to parrot its prior ruling.  *See Padres Unidos*, 2025 WL 1444433, at *1–16.  Instead, it addresses only the new arguments raised against preliminary relief and clarifies what the issuance of such relief does, and doesn't, mean.  That discussion follows.

I.    **Discussion**

A.    **Cause of Action**

A plaintiff must assert a valid cause of action to obtain relief.  *Davis v. Passman*, 442 U.S. 228, 236–41 (1979).  At the threshold, Defendants argue that Plaintiffs lack a valid cause of action for the relief they seek.  *See* Defs.' Resp. at 12–20.  In doing so, they lean heavily on the Tenth Circuit's decision in *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017), which they argue broadly curtails a private party's ability to obtain injunctive relief on preemption grounds.  *See* Defs.' Resp. at 15–18.

In *Hickenlooper*, two landowners and a nonprofit, citing the Supremacy Clause, sued to enjoin Colorado's state-authorized marijuana regime on the ground that it sanctioned conduct illegal under, and thus preempted by, the federal Controlled Substances Act (CSA).  859 F.3d at 876.  These plaintiffs were not themselves subject to any regulation under the state regime and instead alleged only incidental injuries—such as property damage and emotional harms—

3

stemming from its implementation. *See id.* at 896 ("The [landowners] seek . . . far-flung relief even though their only alleged injuries concern property damage and emotional harms."). Effectively, they sought to wield the CSA's preemptive force as a basis for dismantling a state framework that, while not regulating them directly, facilitated federally unlawful conduct. *See id.* at 895 (observing the plaintiffs' attempt "to enforce the CSA's preemptive effects . . . so long as they have been injured—in any way—by official conduct that also violates a federal statute" (emphasis omitted)).

But as the Tenth Circuit explained, "the Supremacy Clause is not the source of any federal rights" and "certainly does not create a cause of action." *Id.* at 900 (internal quotation marks omitted) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015)). Nor does it "give *affected* parties a constitutional (and hence congressionally unalterable) *right to enforce federal law* against the States." *Id.* (emphasis in original) (quoting *Armstrong*, 575 U.S. at 325). To enforce a federal statute, a plaintiff must identify "a federal right of his or her own to vindicate under the statute at issue." *Id.* at 902 (internal quotation marks and alterations omitted). And because the plaintiffs had no such substantive rights in the CSA to vindicate, they could not invoke it to remedy their injuries. *See id.* at 877, 901–03.

Importantly, though, *Hickenlooper* did not purport to foreclose the availability of an equitable cause of action under *Ex parte Young*.[6] In addressing a different subset of plaintiffs in the case, *Hickenlooper* stressed that they were not seeking to "enjoin Colorado from *enforcing* [anything] *against them*." *Id.* at 906 (emphasis in original). Rather, they targeted the broader

---

[6] *Ex parte Young* represents an equitable exception to Eleventh Amendment sovereign immunity. 209 U.S. 123, 155–56 (1908). The doctrine allows a plaintiff to sue a state official, in their official capacity, in seeking to enjoin enforcement of a state law that conflicts with federal law. *See id.* at 159–60.

implementation of the regime itself.  *See id.*  *Hickenlooper* then reaffirmed that "[o]f course, a 'court may not convict a criminal defendant of violating a state law that federal law prohibits,'" and reiterated that "if an individual claims federal law immunizes him from state *regulation*, the court may issue an injunction upon finding the state *regulatory actions* preempted."[7]  *Id.* at 906 n.19 (emphasis in original) (quoting *Armstrong*, 575 U.S. at 326).  In such cases, *Hickenlooper* confirmed, "court[s] need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Id.* (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645–46 (2002)).  This is precisely what Plaintiffs assert and seek here.  *See* [Doc. No. 64] at 2–3, 7–12, 15.

In short, while *Hickenlooper* reaffirmed that the Supremacy Clause is not self-executing, it did not displace the equitable authority of federal courts to issue an injunction when a plaintiff shows "federal law immunizes him from state *regulation*."  859 F.3d at 906 n.19 (emphasis in original) (quoting *Armstrong*, 575 U.S. at 326); *see also CNSP, Inc. v. Webber*, No. 17-0355 KG/SCY, 2020 WL 2745456, at *8 (D.N.M. May 27, 2020) ("[*Hickenlooper*] emphasized the plaintiffs could not maintain their preemption claims because they did not seek to enjoin the state

---

[7] Defendants cite additional language from *Hickenlooper* "indicat[ing] that 'immunizes' means that the person has federal 'rights' that he cannot be forced to give up through a threat of state prosecution."  Defs.' Resp. at 17.  They then contend that Plaintiffs' equitable claims fail because it is "illogical" to conclude that the INA "grants violators of its criminal str[u]ctures any sort of immunity or substantive 'rights.'"  *Id.*  But this argument rests on a flawed premise that a plaintiff seeking to enjoin state officials from enforcing a preempted law must first identify a federal statutory right of their own.  On the contrary, the Supreme Court has permitted an *Ex parte Young* claim where plaintiffs alleged only that a state's regulatory actions violate federal law— preemption included.  *See Verizon Md.*, 535 U.S. at 645 ("The prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law— clearly satisfies our straightforward inquiry." (internal quotation marks omitted)).  Naturally, Defendants may dispute whether H.B. 4156 actually contravenes federal law.  "But the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim."  *Verizon Md.*, 535 U.S. at 646.

from enforcing the state marijuana laws '*against them*.' The Tenth Circuit contrasted the plaintiffs' claims with claims brought pursuant to *Ex parte Young*, explaining 'if an individual claims federal law immunizes him from state *regulation*, the court may issue an injunction upon finding the state *regulatory actions* preempted.'" (emphasis in original) (internal citation omitted) (quoting *Hickenlooper*, 859 F.3d at 906 n.19)); *cf. Verizon Md.*, 535 U.S. at 638–48 (permitting *Ex parte Young* suit to enjoin state commission order allegedly preempted by federal law); *Farmworker Assoc. of Fla., Inc. v. Uthmeier*, No. 23-CV-22655-RAR, 2025 WL 1133682, at *5 (S.D. Fla. Apr. 17, 2025) ("Nothing in *Armstrong* interferes with the[] 'ability to sue to enjoin unconstitutional actions by state and federal officers'—an ability that, as *Armstrong* made clear, is 'the creation of courts of equity,' and which 'reflects a long history of judicial review of illegal executive action, tracing back to England.'" (quoting *Armstrong*, 575 U.S. at 327)).

Now this is not to say that this equitable authority is unbounded. As the Supreme Court has explained, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327. "Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Id.* at 327–28 (internal quotation marks omitted).

But the Court discerns no such "'intent to foreclose' equitable relief" here. *Id.* at 328 (quoting *Verizon Md.*, 535 U.S. at 647). Defendants point to three provisions of the INA as evidence of such intent, starting with 8 U.S.C. § 1231(a)(4)(D). *See* Defs.' Resp. at 19. That provision states that where a noncitizen is imprisoned on a state or federal crime and subject to an order of removal but has not yet completed their sentence, "[n]o cause or claim may be asserted . . . against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien." 8 U.S.C. § 1231(a)(4)(D). In other words,

Congress made clear that noncitizens serving criminal sentences may not sue to compel their release from custody or removal from the United States before completing their sentence. Plaintiffs make no such request here. And nothing about § 1231(a)(4)(D)'s contextual placement suggests that Congress intended to foreclose a preemption challenge to a state immigration law.

Second, in describing the "procedure" for asylum proceedings, 8 U.S.C. § 1158(d)(7) states that "[n]othing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." Plaintiffs' request here is in no way tied to the asylum procedures set out in subsection (d).

Third, 8 U.S.C. § 1182(a)(7)(A)(i) renders "inadmissible" any noncitizen who lacks "valid entry document[s]." Under 8 U.S.C. § 1225(b)(1)(A), certain "inadmissible" noncitizens— namely, those "arriving" at the border or those not admitted or paroled and who cannot affirmatively show two years of continuous presence in the United States—may be summarily removed by federal immigration officers "without further hearing or review" unless they indicate an intent to apply for asylum or express a fear of persecution. Again, it's difficult to follow how Congress's authorization of expedited removal proceedings in limited circumstances reflects an intent to foreclose the preemption challenge at issue here.

And the same is true with respect to Defendants' suggestion that Congress has impliedly foreclosed equitable challenges to state laws that criminalize conduct already criminalized under federal law. *See* Defs.' Resp. at 18–19. To be sure, they do not cite a single case adopting that view in this context. And for good reason: courts have routinely entertained equitable claims against state legislation mirroring federal immigration laws. *See, e.g.*, *Texas*, 97 F.4th at 275–77

(entertaining suit in equity challenging state immigration law closely mirroring federal unlawful entry and reentry provisions); *Fla. Immigrant Coal.*, 2025 WL 1423357, at *1–22 (same).

In short, the Court concludes that Plaintiffs have stated a cognizable claim in equity for the relief they seek.

### B.    Standing

The Court has already found that Plaintiffs have Article III standing to seek preliminary relief. *See Padres Unidos*, 2025 WL 1444433, at *3–8. And though that ruling arose in the context of a temporary restraining order, the Court applied the same standard that governs preliminary injunctions.[8] *See id.* at *3. That discussion need not be repeated here.

Even so, one argument against standing warrants closer scrutiny. Defendants argue again that Plaintiffs lack a "legally protected interest."[9] Defs.' Resp. at 20–24. In doing so, they rely on *Initiative and Referendum Institute v. Walker*'s observation that "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not legally protected." 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc) (internal quotation marks

---

[8] Article III of the Constitution limits federal courts' jurisdiction by requiring that litigants have standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "Standing must be substantiated 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). At the preliminary injunction stage, this means that "at least one" plaintiff "make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A plaintiff "must establish three elements [for standing]: an injury-in-fact, causation, and redressability." *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007)).

[9] To establish the first element of standing, an injury-in-fact, "a plaintiff must show that they have suffered or likely will suffer 'an invasion of a *legally protected interest*' that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical.'" *Rocky Mountain Gun*, 121 F.4th at 109 (emphasis added) (quoting *Lujan*, 504 U.S. at 560).

omitted).  From that, Defendants gather that Plaintiffs lack a legally protected interest because their presence in the United States is unauthorized under federal law.  *See* Defs.' Resp. at 20–24.

*Walker* involved a First Amendment challenge to a Utah constitutional provision requiring a supermajority for certain ballot initiatives.  *Walker*, 450 F.3d at 1085.  In addressing standing, the Tenth Circuit offered several illustrative examples of asserted interests that are not "legally protected."  *Id.* at 1093.  Relevant here, it quoted a federal practice treatise for the proposition that "a person complaining that government action will make his *criminal* activity more difficult lacks standing because his interest is not 'legally protected.'"  *Id.* (emphasis added) (quoting 3 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, *Federal Practice and Procedure* § 3531.4, at 830 (2d ed. Supp. 2005)).  *Walker* offered no commentary on this general statement, nor did it elaborate on how or when such reasoning applies.  *See id.*  And understandably so: *Walker* concerned an intent to engage in political advocacy, not criminal conduct.  *See id.* at 1098.

This Court has already expressed concern about the implications of Defendants' reading of *Walker* in the context of preemption challenges.  *See Padres Unidos*, 2025 WL 1444433, at *4.  But even setting that concern aside, *Walker*'s general principle appears to address a different circumstance altogether.  As the Supreme Court observed, "it is not a [federal] *crime* for a removable alien to remain present in the United States."  *Arizona*, 567 U.S. at 407 (emphasis added).  And removal proceedings are civil, *not criminal*, in nature.  *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984).  So when Plaintiffs seek to prevent enforcement of a state law that imposes penalties for unauthorized presence, they are surely not attempting to make federal "criminal activity" any easier.  *Walker*, 450 F.3d at 1093.  Put differently, they do not ask this Court

to bless prospective entry or reentry into the country—conduct that *is* criminalized under federal law. *See* 8 U.S.C. §§ 1325(a), 1326(a).

To be clear, none of this condones unauthorized presence or past criminal entries. The Court said as much from the outset. *See Padres Unidos*, 2025 WL 1444433, at *3 ("To be clear, the Court is not asked to enjoin enforcement of federal immigration law. [Plaintiffs], if discovered in Oklahoma, may very well face removal or prosecution under the comprehensive federal immigration regime that Congress established."). The only question in this limited context is whether Plaintiffs have standing to sue—and whether *Walker*'s general principle applies. Perhaps, as Defendants suggest, *Walker* stands for the sweeping proposition that all "lawbreakers' lack standing. Defs.' Resp. at 23. But absent any elaboration from *Walker* itself, the Court must take the quoted statement at face value. And as written, it does not apply.

For these reasons and those previously set out, the Court finds that Plaintiffs have standing to seek preliminary relief.

### C.    Likelihood of Success on the Merits

In two cases now[10]—one brought by the federal government and this one by private parties—the Court has found that the challengers are likely to prevail on their claims that H.B.

---

[10] In their response, Defendants suggest that the Court has overlooked the fact that Plaintiffs bring a facial challenge to H.B. 4156. *See* Defs.' Resp. at 11. To be sure, a facial challenge "is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (brackets and internal quotation marks omitted). And the Supreme Court has indeed "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). But still, the fact that there could be "murderers" and "rapists" prosecuted under H.B. 4156 does not defeat a facial challenge. Defs.' Resp. at 12. The question is not whether those individuals could be prosecuted for other crimes, but whether H.B. 4156's regulation of *immigration* conflicts with federal law. Further, to the extent Defendants maintain that Article I, Section 10, Clause 3 (the State War Clause) of the Constitution insulates H.B. 4156 from a facial challenge, the Court has already found that argument unpersuasive. *See Padres Unidos*, 2025 WL 1444433, at *10 ("The Court's position then and now . . . is that the 'historical and constitutional context' of the State War

4156 is preempted.[11]  *See Oklahoma*, 739 F. Supp. 3d at 997–1004; *Padres Unidos*, 2025 WL

1444433, at *8–9.  In granting the temporary restraining order in this case, the Court was

unconvinced that the federal government's newfound "greenlight[ing]" of H.B. 4156 weakened

Plaintiffs' position.  *Padres Unidos*, 2025 WL 1444433, at *8.  That is because, again, "*Congress's*

*intent—not the shifting enforcement priorities of presidential administrations—controls the*

*preemption inquiry.*"  *Id.* (emphasis in original).  And applying that inquiry in light of *Arizona*,[12]

the Court concluded that "Congress's preemptive intent could not be clearer."  *Id.*  This conclusion,

again, is no outlier.  *See Fla. Immigrant Coal.*, 2025 WL 1423357, at *10 ("[C]ourts across the

country have unanimously held that nearly identical state illegal entry and reentry laws recently

---

Clause does not support its use as a defense for legislation like H.B. 4156." (quoting *Oklahoma*,
739 F. Supp. 3d at 1005)).

[11] Federal law can preempt—that is, invalidate—state law either expressly or implicitly.  *Tarrant
Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011).  Implied preemption, the
sole kind of preemption at issue in this case, includes field preemption and conflict preemption.
*Id.*  Field preemption occurs when "States are precluded from regulating conduct in a field that
Congress, acting within its proper authority, has determined must be regulated by its exclusive
governance."  *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred
from a framework of regulation 'so pervasive . . . that Congress left no room for the States to
supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be
assumed to preclude enforcement of state laws on the same subject.'"  *Id.* (quoting *Rice v. Santa
Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Conflict preemption, on the other hand, can occur
in one of two ways: "where compliance with both federal and state regulations is a physical
impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and
execution of the full purposes and objectives of Congress."  *Id.* (internal quotation marks and
citations omitted).  "What is a sufficient obstacle is a matter of judgment, to be informed by
examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby
v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

[12] In *Arizona*, the Supreme Court held that most provisions of S.B. 1070, Arizona's attempt to
regulate immigration, were preempted.  567 U.S. at 400–10.  "While making clear that the
problems posed to the States by illegal immigration must not be underestimated, the Supreme
Court nonetheless constrained the state legislation that it concluded impermissibly intruded into
areas of immigration regulation."  *Oklahoma*, 739 F. Supp. 3d at 994 (brackets, internal citation,
and quotation marks omitted).  This Court has repeatedly recognized that "*Arizona*'s logic . . .
naturally extend[s]" to H.B. 4156.  *Padres Unidos*, 2025 WL 1444433, at *9 (alterations in
original) (quoting *Oklahoma*, 739 F. Supp. 3d at 998).

enacted are likely preempted by federal immigration law governing noncitizen entry." (collecting cases)).

Defendants, as they have before, urge that *Kansas v. Garcia*, 589 U.S. 191 (2020), not *Arizona*, should guide the Court's preemption inquiry. *See* Defs.' Resp. at 24–28. In *Garcia*, three noncitizens used another person's Social Security number on tax-withholding forms when securing employment. 589 U.S. at 195. Following their convictions under Kansas statutes for identity theft and making false information, they argued that the laws were preempted by the Immigration Reform and Control Act of 1986 (IRCA) as applied to their conduct. *See id.* They raised both field and conflict preemption claims. *See id.* at 208–13.

As to field preemption, the Supreme Court found the Kansas statutes "*fundamentally unrelated*" to any field occupied by Congress. *Id.* at 208 (emphasis in original). It explained that IRCA's "employment verification system is designed to prevent the employment of unauthorized aliens, whereas tax-withholding forms help to enforce income tax laws." *Id.* at 208–09. Moreover, "using another person's Social Security number on tax forms threatens harm that has *no connection with immigration law*." *Id.* at 209 (emphasis added).

Turning to conflict preemption, the Supreme Court held that the limited overlap between the Kansas statutes and federal laws prohibiting similar conduct did not come close to establishing preemption. *See id.* at 211 ("The mere fact that state laws like the Kansas provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption."). *Garcia* warned that "[o]ur federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap," and stressed that "there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap." *Id.* at 212. And to the extent state prosecutions might disrupt federal enforcement

priorities, it reminded that "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Id.* (quoting U.S. Const. art. VI, cl. 2).

But, of course, this Court has never suggested that minimal overlap alone suffices for preemption. In finding likely field preemption days ago, the Court explained that there is "strong support for the conclusion that Congress . . . legislated . . . comprehensively in the field of noncitizen entry and reentry." *Padres Unidos*, 2025 WL 1444433, at *9 (quoting *Oklahoma*, 739 F. Supp. 3d at 999); *see also Oklahoma*, 739 F. Supp. 3d at 1000 ("[T]here is strong evidence Congress intended to occupy the field for *any decision* related to noncitizen removal." (alterations in original) (quoting *Texas*, 97 F.4th at 285)). "And applying the Supreme Court's instruction that '[w]here Congress occupies an entire field, . . . even complimentary state regulation is impermissible,' it concluded that 'Oklahoma's attempt to parallel federal law must fail.'" *Padres Unidos*, 2025 WL 1444433, at *9 (quoting *Oklahoma*, 739 F. Supp. 3d at 999).

In finding likely conflict preemption, the Court likewise "observed that '[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer.'" *Id.* (quoting *Oklahoma*, 739 F. Supp. 3d at 1003). And it explained that "H.B. 4156's sweeping authorization for state officers to arrest, prosecute, and punish noncitizens . . . conflicted with the 'system Congress created.'" *Id.* (quoting *Oklahoma*, 739 F. Supp. 3d at 1003).

To be sure, the Court's findings were influenced by the broader implications surrounding immigration policy—such as "federal enforcement discretion and immigration considerations . . . like foreign policy, resource allocation, and humanitarian concerns." *Id.* But that is entirely consistent with Supreme Court precedent. In assessing the preemption of several provisions of a

state immigration law in *Arizona*, the Supreme Court engaged in "extensive discussion" of the same longstanding considerations. *See Oklahoma*, 739 F. Supp. 3d at 1001 (citing *Arizona*, 567 U.S. at 395, 397). In the end, that discussion was "not an invitation for preemption analysis to shift based on the enforcement priorities of a given administration," but rather an explanation for why, given the magnitude of immigration regulation, Congress intended "to make immigration regulation exclusively federal." *Padres Unidos*, 2025 WL 1444433, at *9; *see also Biden v. Texas*, 597 U.S. 785, 815 (2022) (Kavanaugh, J., concurring) ("Because the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently. That is Administrative Law 101.").

And *Arizona* remains binding on this Court. Surely it cannot be said that *Garcia*'s rejection of enforcement-priority-based preemption in a case having "no connection with immigration law," *Garcia*, 589 U.S. at 209, casts doubt on *Arizona*'s thorough examination of these and other concerns in a case—like this one—that touches so directly on immigration regulation, *see Oklahoma*, 739 F. Supp. 3d at 1002 ("Sensitive matters of immigration policy 'must be made with one voice.'" (quoting *Arizona*, 567 U.S. at 409)).

So again, for these reasons and consistent with its prior rulings, the Court finds that Plaintiffs are likely to prevail on their claims that H.B. 4156 is preempted.[13]

D.    **Pseudonymity**

In granting the temporary restraining order 14 days ago, the Court allowed Plaintiffs Barbara Boe and Christopher Coe to proceed under their designated pseudonyms. *See Padres*

---

[13] The Court likewise finds, consistent with its ruling 14 days ago, that Plaintiffs face a likelihood of irreparable harm absent preliminary relief and that the balancing the harms and public interest tilt in their favor. *See Padres Unidos*, 2025 WL 1444433, at *10–11.

*Unidos*, 2025 WL 1444433, at *2–3.  Defendants now ask the Court to reconsider that ruling.  *See* Defs. Resp. at 29–36.

"Proceeding under a pseudonym in federal court is, by all accounts, 'an unusual procedure.'"  *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000) (quoting *M.M. v. Zavaras*, 139 F.3d 798, 800 (10th Cir. 1998)).  There is no "specific statute or rule supporting the practice," and "the Federal Rules of Civil Procedure mandate that all pleadings contain the name of the parties."  *Id.*

Still, a plaintiff may be permitted to proceed under a pseudonym in "exceptional cases." *Id.* (quoting *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)).  While "[t]he risk that a plaintiff may suffer some embarrassment is not enough," pseudonym status may be warranted in "cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *Id.* (quoting *Doe*, 951 F.2d at 324).  Though pseudonymity is not the norm, "there is a long tradition in the federal courts of plaintiffs bringing suit under an alias."  *Speech First, Inc. v. Shrum*, 92 F.4th 947, 950 (10th Cir. 2024).  "The decision whether to allow litigation by pseudonym is left to the Court's discretion."  *Doe v. Priority Background Sols., Inc.*, No. 24-CV-337-JFH-SH, 2024 WL 4564534, at *1 (N.D. Okla. Oct. 24, 2024) (citing *Zavaras*, 139 F.3d at 802).

The Court previously found that Boe and Coe presented with "exceptional" circumstances warranting pseudonymity.  Requiring them to litigate under their real names, the Court explained, "would effectively place a target on their backs simply for seeking judicial review of a state law they claim—and this Court once found—is likely preempted."  *Padres Unidos*, 2025 WL 1444433, at *3 (citing *Oklahoma*, 739 F. Supp. 3d at 997–1004).  That dilemma, tied directly to their immigration status, falls neatly within the category of "matters of a highly sensitive and personal

nature" and thus qualifies as an "exceptional" circumstance. *Femedeer*, 227 F.3d at 1246 (internal quotation marks omitted). The Court sees no reason to depart from that position.

Nor do Defendants' mischaracterizations of the Court's ruling move the needle. As they see it, "[i]t is entirely inappropriate for a federal court to protect federal lawbreakers from the federal consequences of their actions." Defs.' Resp. at 32. But the Court was clear: its ruling was limited to pseudonymity and did not insulate Plaintiffs from "removal or prosecution under the comprehensive federal immigration regime that Congress established." *Padres Unidos*, 2025 WL 1444433, at *3. After all, this case concerns a state immigration law, and the federal government stands in no better—or worse—position to prosecute or remove Plaintiffs for federal immigration violations by virtue of their pseudonymity.

Finally, Defendants' speculative concerns about standing do not outweigh the showing for pseudonymity. Defendants suggest that Boe and Coe may be deported or leave Oklahoma during this litigation. *See* Defs.' Resp. at 33–34. And if their true names remain undisclosed, Defendants argue, neither they nor the Court would be in any position to assess whether the case has become moot.

The Court remains unmoved. Boe and Coe have each lived in the United States for over a decade. *See* Pls.' Mot. for Inj., Exs. 1–2. And while nothing compels them to remain in Oklahoma during this case, they express no desire to leave. *See id.* On the contrary, their desire to stay is a driving reason they filed suit. *See id.*

In sum, the Court sees no reason to revisit its conclusion that this case presents "exceptional" circumstances permitting the use of pseudonyms.[14]

---

[14] Nor does the Court find any reason to revisit its *conditional* certification, for purposes of preliminary relief, of the (1) "Entry Class" and (2) "Reentry Class." *See Padres Unidos*, 2025 WL

## II.    __Conclusion__

As this Court has said before, nothing here today "make[s] light of the concerns Defendants raise." *Padres Unidos*, 2025 WL 1444433, at *3. Oklahoma, now as then, "may have understandable frustrations with the problems caused by illegal immigration." *Oklahoma*, 739 F. Supp. 3d at 1007 (quoting *Arizona*, 567 U.S. at 416).

Nor, lest it need repeating, does this ruling shield those who violate federal immigration law from the consequences of their actions. The federal government retains, as it always has, "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. And noncitizens who violate federal immigration law—whether in Oklahoma or elsewhere—remain subject to that authority, if and when the federal government chooses to act.

At its core, indeed, this ruling changes little at all. States, like Oklahoma, remain free to prosecute noncitizens and citizens alike for crimes they maintain flow from unlawful immigration. And the federal government, as the Supreme Court has held "[f]or nearly 150 years," retains its "*exclusive*[]" power to control immigration. *Oklahoma*, 739 F. Supp. 3d at 991 (emphasis in original).

In the end, that is why H.B. 4156 must fail—not to excuse unlawful presence or shield criminal conduct, but because it is what the Constitution demands.

For these reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction [Doc. No. 60]. Pending further proceedings, Defendants—along with their officers, agents, servants, employees, attorneys, and any person acting in concert or participation with them—are hereby preliminarily enjoined from enforcing H.B. 4156. This injunction applies to the following classes:

---

1444433, at *13 (conditionally certifying classes upon satisfaction of Federal Rules of Civil Procedure 23(a) and 23(b)(2)).

(1) the Entry Class, consisting of all noncitizens subject to H.B. 4156's "Impermissible Occupation" offense under Okla. Stat. tit. 21, § 1795(C); and (2) the Reentry Class, consisting of all noncitizens subject to H.B. 4156's separate felony offense for "enter[ing], attempt[ing] to enter, or [being] at any time found in Oklahoma" after having been "denied admission, excluded, deported, or removed, or ha[ving] departed the United States while an order of exclusion, deportation, or removal is outstanding" under Okla. Stat. tit. 21, § 1795(D).

Plaintiffs shall post a bond of $17.87 as security. *See* Fed. R. Civ. P. 65(c).

IT IS SO ORDERED this 3rd day of June, 2025.

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE