No. 25-6080

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

PADRES UNIDOS DE TULSA, *et al.*,

*Plaintiffs-Appellees,*

v.

GENTNER DRUMMOND, *et al.*,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Bernard M. Jones
No. 5:24-cv-511-J

## JOINT APPENDIX – VOLUME 1

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellants*

## INDEX
### VOL. 1 OF 2

| Bates No. | Description |
|---|---|
| J.A. 003 | 2025.08.25 Dkt. Sheet |
| J.A. 012 | 2024.06.28 Dkt. [39] Order Granting US Mtn for Prelim. Injunction |
| J.A. 043 | 2025.03.14 [50] Notice of Voluntary Dismissal |
| J.A. 045 | 2025.03.25 [52] Order Dismissing Appeal as Moot |
| J.A. 050 | 2025.05.13 [60] Pls' Mtn for a TRO/Preliminary Injunction |
| J.A. 067 | 2025.05.13 [60-1] Ex. 1 - Decl. of Barbara Boe |
| J.A. 071 | 2025.05.13 [60-2] Ex. 2 - Decl. of Christopher Coe |
| J.A. 075 | 2025.05.13 [60-3] Ex. 3 - Decl. of Michelle Lara |
| J.A. 080 | 2025.05.13 [Dkt. 60-4] Ex. 4 - Decl. of Nichole Maldonado |
| J.A. 086 | 2025.05.13 [Dkt. 61] Pls' Mtn for Class Certification and Appointment of Class Counsel |
| J.A. 104 | 2025.05.13 [Dkt. 61-1] Ex. 1 - Decl. of Noor Zafar |
| J.A. 114 | 2025.05.13 [Dkt. 61-2] Ex. 2 - Decl. of Megan Lambert |
| J.A. 118 | 2025.05.13 [Dkt. 62] Pls' Mtn for Leave to Proceed Under Pseudonyms |
| J.A. 130 | 2025.05.13 [Dkt. 64] Second Amended Complaint |
| J.A. 147 | 2025.05.15 [Dkt. 76] Defs' Resp. in Opp. to Mtn for TRO |
| J.A. 178 | 2025.05.16 [Dkt. 78] Pls' Reply in Supp. of Mtn for TRO |
| J.A. 194 | 2025.05.20 [Dkt. 80] Order Granting TRO |

APPEAL,MAXFIELD,_TLC

# U.S. District Court
# Western District of Oklahoma[LIVE] (Oklahoma City)
# CIVIL DOCKET FOR CASE #: 5:24-cv-00511-J

United States of America v. Oklahoma State of et al
Assigned to: Judge Bernard M. Jones
Case in other court:  Tenth Circuit, 24-06144
               Tenth Circuit, 25-06080
Cause: 28:2201 Constitutionality of State Statute(s)

Date Filed: 05/21/2024
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 05/21/2024 | 1 | COMPLAINT against Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton filed by United States of America. (Attachments: # 1 Exhibit 1 - DOJ Letter re HB 4156, # 2 Exhibit 2 - IJ Ketter re HB 4156, # 3 Civil Cover Sheet)(naa) (Entered: 05/21/2024) |
| 05/21/2024 | 2 | Summons Issued Electronically as to Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton. (naa) (Entered: 05/21/2024) |
| 05/22/2024 | 3 | ENTRY of Appearance by Christopher A. Eiswerth on behalf of United States of America (Eiswerth, Christopher) (Entered: 05/22/2024) |
| 05/22/2024 | 4 | MOTION for Preliminary Injunction *Or*, MOTION for Permanent Injunction *and Opening Brief in Support* by United States of America. (Attachments: # 1 Exhibit 1 -- Jacobstein Declaration, # 2 Exhibit 2 -- Hott Declaration)(Eiswerth, Christopher) (Entered: 05/22/2024) |
| 05/22/2024 | 5 | ENTRY of Appearance by Jean Lin on behalf of United States of America (Lin, Jean) (Entered: 05/22/2024) |
| 05/29/2024 | 6 | SUMMONS Returned Executed by United States of America. Oklahoma State of served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service)(Eiswerth, Christopher) (Entered: 05/29/2024) |
| 05/29/2024 | 7 | SUMMONS Returned Executed by United States of America. Kevin Stitt served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service)(Eiswerth, Christopher) (Entered: 05/29/2024) |
| 05/29/2024 | 8 | SUMMONS Returned Executed by United States of America. Gentner Drummond served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service)(Eiswerth, Christopher) (Entered: 05/29/2024) |
| 05/29/2024 | 9 | SUMMONS Returned Executed by United States of America. Oklahoma Department of Public Safety served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service) (Eiswerth, Christopher) (Entered: 05/29/2024) |
| 05/29/2024 | 10 | SUMMONS Returned Executed by United States of America. Tim Tipton served on 5/22/2024. (Attachments: # 1 Exhibit 1 - Proof of Service)(Eiswerth, Christopher) (Entered: 05/29/2024) |

J.A. 003

| 06/05/2024 | 11 | ENTRY of Appearance by Garry M Gaskins, II on behalf of Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton (Gaskins, Garry) (Entered: 06/05/2024) |
|---|---|---|
| 06/05/2024 | 12 | ENTRY of Appearance by Zachary P West on behalf of Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton (West, Zachary) (Entered: 06/05/2024) |
| 06/05/2024 | 13 | UNOPPOSED MOTION to Consolidate Cases by All Defendants. (Attachments: # 1 Exhibit A - 014 Amended Complaint (2024.05.24))(West, Zachary) (Entered: 06/05/2024) |
| 06/05/2024 | 14 | UNOPPOSED MOTION for Extension of Time to File Answer re 1 Complaint, by All Defendants. (Attachments: # 1 Attachment Proposed Order Mtn to Stay 2024.06.05) (West, Zachary) (Entered: 06/05/2024) |
| 06/05/2024 | 15 | JOINT MOTION to Extend Deadlines or Hearings by All Defendants. (Attachments: # 1 Attachment Proposed Order Joint Mtn for Briefing Sched. 2024.06.05)(West, Zachary) (Entered: 06/05/2024) |
| 06/05/2024 | 16 | **ORDER** ~ Defendants' Unopposed Motion for a Stay of Their Deadline to Respond to the Complaint 14 is GRANTED. The Court will set any deadlines for responding to the complaint after ruling on Plaintiffs pending motion for injunctive relief. Joint Motion for Briefing Schedule 15 is GRANTED, as more fully set out in the Order. Signed by Judge Bernard M. Jones on 6/5/2024. (dwl) (Entered: 06/05/2024) |
| 06/05/2024 | 17 | **ORDER** ~ Granting 13 Defendants' Unopposed Motion to Consolidate. The files of each consolidated case shall be maintained in United States of America v. State of Oklahoma, et al., CIV-24-511-J, and all filings shall reflect the Court's style heading in that case. Signed by Judge Bernard M. Jones on 6/5/2024. (dwl) (Entered: 06/05/2024) |
| 06/05/2024 | 18 | ENTRY of Appearance by Cullen D Sweeney on behalf of All Defendants (Sweeney, Cullen) (Entered: 06/05/2024) |
| 06/06/2024 | 19 | ENTRY of Appearance by Devraat Awasthi on behalf of Jordy Madrigal Martinez, Antonio Marquez, Rene Doroteo Hernandez (Awasthi, Devraat) Modified on 6/6/2024: document flattened to optimize CM/ECF display; no other changes made (ekw). (Entered: 06/06/2024) |
| 06/07/2024 | 20 | ENTRY of Appearance by Megan E Lambert on behalf of Rene Doroteo Hernandez, Antonio Marquez, Jordy Madrigal Martinez (Lambert, Megan) Document flattened to optimize CM/ECF display; no other changes made . Modified on 6/10/2024 (naa). (Entered: 06/07/2024) |
| 06/13/2024 | 21 | RESPONSE in Opposition re 4 MOTION for Preliminary Injunction *Or* MOTION for Permanent Injunction *and Opening Brief in Support* filed by All Defendants. (Attachments: # 1 Exhibit 1 - AG Drummond's Written Testimony, # 2 Exhibit 2 - Decl. of Donnie Anderson, # 3 Exhibit 3 - Decl. of Rodney S. Scott, # 4 Exhibit 4 - Decl. of Christopher Landau)(Gaskins, Garry) (Entered: 06/13/2024) |
| 06/17/2024 | 22 | UNOPPOSED MOTION to Add Party *Immigration Reform Law Institute* by JOHN ANDREW CHAFFIN. (Attachments: # 1 Attachment Amicus Brief, # 2 Attachment Proposed Order)(Chaffin, John) (Entered: 06/17/2024) |
| 06/17/2024 | 23 | ENTRY of Appearance by John A Chaffin on behalf of JOHN ANDREW CHAFFIN (Chaffin, John) (Entered: 06/17/2024) |

**J.A. 004**

| 06/17/2024 | 24 | UNOPPOSED MOTION for Leave to Appear Pro Hac Vice *Immigration Reform Law Institute* Filing fee $ 100, receipt number AOKWDC-4455768 by JOHN ANDREW CHAFFIN. (Attachments: # 1 Attachment, # 2 Attachment, # 3 Attachment, # 4 Attachment)(Chaffin, John) (Entered: 06/17/2024) |
|---|---|---|
| 06/17/2024 | 25 | ENTRY of Appearance by Elissa Stiles on behalf of Rene Doroteo Hernandez, Antonio Marquez, Jordy Madrigal Martinez (Stiles, Elissa) (Entered: 06/17/2024) |
| 06/17/2024 | 26 | MOTION for Leave to Appear Pro Hac Vice *for Nicholas Espiritu* Filing fee $ 100, receipt number AOKWDC-4455849 by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Attachments: # 1 Attachment PHV Application Form)(Stiles, Elissa) (Entered: 06/17/2024) |
| 06/17/2024 | 27 | MOTION for Leave to Appear Pro Hac Vice *for Tanya Broder* Filing fee $ 100, receipt number AOKWDC-4455860 by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Attachments: # 1 Attachment PHV Application Form)(Stiles, Elissa) (Entered: 06/17/2024) |
| 06/18/2024 | 28 | REPLY by Plaintiff United States of America *in Support of Motion for Preliminary or Permanent Injunction* filed by United States of America. (Attachments: # 1 Exhibit 1: Order Granting Prelim Inj, US v. Iowa)(Eiswerth, Christopher) (Entered: 06/18/2024) |
| 06/18/2024 | 29 | RESPONSE in Support re 4 MOTION for Preliminary Injunction *Or* MOTION for Permanent Injunction *and Opening Brief in Support* filed by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Zafar, Noor) (Entered: 06/18/2024) |
| 06/27/2024 | 30 | **ORDER** ~ Granting 26 , 27 Motions to Appear Pro Hac Vice. Nicholas Espritu and Tanya Broder are hereby admitted to practice before this Court for the limited purpose of participating in this case. Signed by Judge Bernard M. Jones on 6/27/2024. (dwl) (Entered: 06/27/2024) |
| 06/27/2024 | 31 | ENTRY of Appearance by Noor Zafar on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Zafar, Noor) (Entered: 06/27/2024) |
| 06/27/2024 | 32 | ENTRY of Appearance by Omar Jadwat on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Jadwat, Omar) (Entered: 06/27/2024) |
| 06/27/2024 | 33 | ENTRY of Appearance by Spencer Elijah Wittmann Amdur on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Amdur, Spencer) (Entered: 06/27/2024) |
| 06/27/2024 | 34 | ENTRY of Appearance by Oscar Sarabia Roman on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Sarabia Roman, Oscar) (Entered: 06/27/2024) |
| 06/27/2024 | 35 | ENTRY of Appearance by Wafa Junaid on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Junaid, Wafa) (Entered: 06/27/2024) |

**J.A. 005**

| | | |
|---|---|---|
| 06/27/2024 | 36 | ENTRY of Appearance by Cody Wofsy on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Wofsy, Cody) (Entered: 06/27/2024) |
| 06/28/2024 | 37 | ENTRY of Appearance by Nicholas David Espiritu on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Espiritu, Nicholas) Document flattened to optimize CM/ECF display; no other changes made . Modified on 6/28/2024 (naa). (Entered: 06/28/2024) |
| 06/28/2024 | 38 | **ORDER** ~ Denying 22 , 24 Motions for leave to file briefs as amicus curiae of Immigration Reform Law Institute. Signed by Judge Bernard M. Jones on 6/28/2024. (dwl) (Entered: 06/28/2024) |
| 06/28/2024 | 39 | **ORDER** ~ Granting 4 United States Motion for Preliminary Injunction. Oklahoma is hereby ENJOINED from enforcing H.B. 4156 pending further proceedings. Signed by Judge Bernard M. Jones on 6/28/2024. (dwl) (Entered: 06/28/2024) |
| 06/28/2024 | 40 | **ORDER** ~ The Padres Unidos Plaintiffs' motion for a preliminary injunction, see Padres Unidos de Tulsa v. Drummond, No. CIV-24-526-J, 15 , is DENIED AS MOOT. Signed by Judge Bernard M. Jones on 6/28/2024. (dwl) (Entered: 06/28/2024) |
| 07/02/2024 | 41 | ENTRY of Appearance by Cullen D Sweeney on behalf of All Defendants (Sweeney, Cullen) (Entered: 07/02/2024) |
| 07/08/2024 | 42 | ENTRY of Appearance by Tanya Broder on behalf of Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa (Broder, Tanya) (Entered: 07/08/2024) |
| 07/17/2024 | 43 | NOTICE OF APPEAL as to 39 Order on Motion for Preliminary Injunction, Order on Motion for Permanent Injunction by Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton. Filing fee $ 605, receipt number AOKWDC-4476242. (Sweeney, Cullen) (Entered: 07/17/2024) |
| 07/17/2024 | 44 | PRELIMINARY RECORD LETTER - Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 43 Notice of Appeal, (Attachments: # 1 Attachment 1 - Preliminary Record on Appeal)(naa) (Entered: 07/17/2024) |
| 07/17/2024 | 45 | Tenth Circuit USCA Case Number 24-6144 for 43 Notice of Appeal, filed by Tim Tipton, Gentner Drummond, Kevin Stitt, Oklahoma Department of Public Safety, Oklahoma State of. Civil case docketed. Preliminary record filed. DATE RECEIVED: 07/17/2024 Docketing statement, Notice of Appearance, and Transcript order form due 07/31/2024 for Gentner Drummond, Oklahoma Department of Public Safety, State of Oklahoma, Kevin Stitt and Tim Tipton. Transcript order form due 07/31/2024 for Gentner Drummond, Oklahoma Department of Public Safety, State of Oklahoma, Kevin Stitt and Tim Tipton. Notice of appearance due on 07/31/2024 for Rene Doroteo Hernandez, Jordy Madrigal Martinez, Antonio Marquez, Ximena Monserrat Lopez Mena, Padres Unidos de Tulsa, and United States of America. [24-6144] (naa) (Entered: 07/17/2024) |
| 07/26/2024 | 46 | TRANSCRIPT Order Form by Gentner Drummond, Oklahoma Department of Public Safety, Oklahoma State of, Kevin Stitt, Tim Tipton re 43 Notice of Appeal, that transcripts are not necessary. See order form for dates and proceedings. (Gaskins, Garry) (Entered: 07/26/2024) |

**J.A. 006**

| 07/26/2024 | 47 | TRANSCRIPT LETTER advising no transcripts are necessary re 43 Notice of Appeal, filed by Tim Tipton, Gentner Drummond, Kevin Stitt, Oklahoma Department of Public Safety, Oklahoma State of. The record is ready for appeal purposes. (naa) (Entered: 07/26/2024) |
|---|---|---|
| 01/17/2025 | 48 | UNOPPOSED MOTION to Withdraw as Attorney *Christopher A. Eiswerth* by United States of America. (Eiswerth, Christopher) (Entered: 01/17/2025) |
| 01/17/2025 | 49 | **ORDER** ~ Granting 48 Motion to Withdraw as Attorney. Christopher A. Eiswerth is permitted to withdraw as counsel of record for Plaintiff and is relieved of further appearance or participation in this matter. Signed by Judge Bernard M. Jones on 1/17/2025. (dwl) (Entered: 01/17/2025) |
| 03/14/2025 | 50 | NOTICE of Voluntary Dismissal by United States of America (Lin, Jean) (Entered: 03/14/2025) |
| 03/16/2025 | 51 | NOTICE (other) by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa *Notice Regarding Voluntary Dismissal Filed by the United States* (Zafar, Noor) (Entered: 03/16/2025) |
| 03/25/2025 | 52 | ORDER of USCA as to 43 Notice of Appeal, filed by Tim Tipton, Gentner Drummond, Kevin Stitt, Oklahoma Department of Public Safety, Oklahoma State of. Dismissed as moot. Oral argument set for 4/10/25 at the Washburn University School of Law is vacated. Private Plaintiffs in this appeal are not properly designated as appellees and their motion to intervene is denied. Private Plaintiffs motion to remand is also denied as moot. This appeal is dismissed as moot. Oklahomas request to vacate the judgment of the district court is denied as unnecessary. Written, unsigned, unpublished;. Judges Holmes, Moritz and Rossman. [24-6144] (rp) (Entered: 03/26/2025) |
| 04/23/2025 | 53 | MOTION to Withdraw as Attorney *Nicholas Espiritu* by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Espiritu, Nicholas) (Entered: 04/23/2025) |
| 05/06/2025 | 54 | **ORDER** ~ Granting 53 Motion to Withdraw as Attorney. Nicholas Espiritu is permitted to withdraw as counsel of record and is relieved of further participation in this matter. Signed by Judge Bernard M. Jones on 5/6/2025. (dwl) (Entered: 05/06/2025) |
| 05/06/2025 | 55 | MOTION to Withdraw as Attorney *Wafa Junaid* by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Junaid, Wafa) (Entered: 05/06/2025) |
| 05/07/2025 | 56 | **ORDER** ~ Granting 55 Motion to Withdraw as Attorney. Wafa Junaid is permitted to withdraw as counsel of record and is relieved of further participation in this matter. Signed by Judge Bernard M. Jones on 5/7/2025. (dwl) (Entered: 05/07/2025) |
| 05/07/2025 | 57 | FIRST MOTION for Leave to Appear Pro Hac Vice *for Grace Choi.* Filing fee $ 100, receipt number AOKWDC-4690940 by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Attachments: # 1 Attachment 1 - Grace Choi Request for Admission Pro Hac Vice) (Stiles, Elissa) (Entered: 05/07/2025) |
| 05/13/2025 | 58 | NOTICE of Voluntary Dismissal by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez (Awasthi, Devraat) (Entered: 05/13/2025) |

**J.A. 007**

| 05/13/2025 | 59 | MOTION for Leave *to Amend Complaint* by Padres Unidos de Tulsa. (Attachments: # 1 Exhibit 1 - Second Amended Complaint)(Awasthi, Devraat) (Entered: 05/13/2025) |
| 05/13/2025 | 60 | MOTION for Temporary Restraining Order *or, in the Alternative, a Preliminary Injunction and Memorandum of Law in Support* by Padres Unidos de Tulsa. (Attachments: # 1 Exhibit 1 - Declaration of Barbara Boe, # 2 Exhibit 2 - Declaration of Christopher Coe, # 3 Exhibit 3 - Declaration of Padres Unidos de Tulsa, # 4 Exhibit 4 - Declaration of LULAC)(Awasthi, Devraat) (Entered: 05/13/2025) |
| 05/13/2025 | 61 | MOTION to Certify Class *and to Appoint Class Counsel* by Padres Unidos de Tulsa. (Attachments: # 1 Exhibit 1 - Declaration of Noor Zafar, # 2 Exhibit 2 - Declaration of Megan Lambert)(Awasthi, Devraat) (Entered: 05/13/2025) |
| 05/13/2025 | 62 | MOTION for Leave to Proceed Under Pseudonyms by Padres Unidos de Tulsa. (Awasthi, Devraat) (Entered: 05/13/2025) |
| 05/13/2025 | 63 | **ORDER** ~ Granting 59 Motion for Leave. Padres Unidos de Tulsa shall file the second amended complaint no later than May 14, 2025, as more fully set out in the Order. Signed by Judge Bernard M. Jones on 5/13/2025. (dwl) (Entered: 05/13/2025) |
| 05/13/2025 | 64 | AMENDED COMPLAINT against All Defendants filed by Padres Unidos de Tulsa, Christopher Coe, League of United Latin American Citizens Oklahoma City, Barbara Boe.(Awasthi, Devraat) (Entered: 05/13/2025) |
| 05/14/2025 | 65 | **ORDER** ~ Granting 57 Motion to Appear Pro Hac Vice. Grace Choi is hereby admitted to practice before this Court for the limited purpose of participating in this case. Signed by Judge Bernard M. Jones on 5/14/2025. (dwl) (Entered: 05/14/2025) |
| 05/14/2025 | 66 | **ORDER** ~ Defendants Attorney General Gentner Drummond, Oklahoma Department of Public Safety Commissioner Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler shall respond to the request for a TRO by 5:00 p.m. on May 15, 2025, as more fully set out in the Order. Signed by Judge Bernard M. Jones on 5/14/2025. (dwl) (Entered: 05/14/2025) |
| 05/14/2025 | 67 | ENTRY of Appearance by Megan E Lambert on behalf of League of United Latin American Citizens Oklahoma City (Lambert, Megan) (Entered: 05/14/2025) |
| 05/14/2025 | 68 | ENTRY of Appearance by Megan E Lambert on behalf of Barbara Boe (Lambert, Megan) (Entered: 05/14/2025) |
| 05/14/2025 | 69 | ENTRY of Appearance by Megan E Lambert on behalf of Christopher Coe(on behalf of all those similarly situated) (Lambert, Megan) (Entered: 05/14/2025) |
| 05/14/2025 | 70 | ENTRY of Appearance by Cody Wofsy on behalf of Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City (Wofsy, Cody) (Entered: 05/14/2025) |
| 05/14/2025 | 71 | ENTRY of Appearance by Noor Zafar on behalf of Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City (Zafar, Noor) (Entered: 05/14/2025) |
| 05/14/2025 | 72 | ENTRY of Appearance by Oscar Sarabia Roman on behalf of Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City (Sarabia Roman, Oscar) (Entered: 05/14/2025) |

**J.A. 008**

| 05/14/2025 | 73 | ENTRY of Appearance by Spencer Elijah Wittmann Amdur on behalf of Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City (Amdur, Spencer) (Entered: 05/14/2025) |
| 05/14/2025 | 74 | ENTRY of Appearance by Omar Jadwat on behalf of Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City (Jadwat, Omar) (Entered: 05/14/2025) |
| 05/14/2025 | 75 | ENTRY of Appearance by Grace Choi on behalf of Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City, Padres Unidos de Tulsa (Choi, Grace) (Entered: 05/14/2025) |
| 05/15/2025 | 76 | RESPONSE in Opposition re 60 MOTION for Temporary Restraining Order *or, in the Alternative, a Preliminary Injunction and Memorandum of Law in Support* filed by Vicki Behenna, Gentner Drummond, Steve Kunzweiler, Tim Tipton. (West, Zachary) (Entered: 05/15/2025) |
| 05/16/2025 | 77 | **ORDER** ~ On May 14, 2025, this Court ordered Defendants to respond to Plaintiffs' request for a temporary restraining order by 5:00 p.m. on May 15, 2025. Defendants complied. If Plaintiffs wish to reply, they shall do so by 5:00 p.m. today. Signed by Judge Bernard M. Jones on 5/16/2025. (dwl) (Entered: 05/16/2025) |
| 05/16/2025 | 78 | REPLY to Response to Motion re 60 MOTION for Temporary Restraining Order *or, in the Alternative, a Preliminary Injunction and Memorandum of Law in Support* filed by All Plaintiffs. (Awasthi, Devraat) (Entered: 05/16/2025) |
| 05/19/2025 | 79 | USCA MANDATE Issued re 43 Notice of Appeal, filed by Tim Tipton, Gentner Drummond, Kevin Stitt, Oklahoma Department of Public Safety, Oklahoma State of. Mandate issued. [24-6144] (rp) (Entered: 05/19/2025) |
| 05/20/2025 | 80 | **ORDER** ~ The Court GRANTS Plaintiffs' motion for injunctive relief 60 to the extent it seeks a TRO; GRANTS Plaintiffs' motion for leave to proceed under pseudonyms 62 ; and GRANTS Plaintiff's motion for class certification 61 to the extent it seeks provisional certification for purposes of preliminary relief, as more fully set out in the Order. Signed by Judge Bernard M. Jones on 5/20/2025. (dwl) (Entered: 05/20/2025) |
| 05/22/2025 | 81 | **ORDER** ~ Defendants shall respond to Plaintiffs' request for a preliminary injunction by May 27, 2025. Plaintiffs, to the extent they wish to reply, shall do so by May 29, 2025. Signed by Judge Bernard M. Jones on 5/22/2025. (dwl) (Entered: 05/22/2025) |
| 05/27/2025 | 82 | RESPONSE in Opposition re 60 MOTION for Temporary Restraining Order *or, in the Alternative, a Preliminary Injunction and Memorandum of Law in Support* filed by Vicki Behenna, Gentner Drummond, Steve Kunzweiler, Tim Tipton. (Attachments: # 1 Exhibit 1 [021-1] Ex. 1 AG Drummond's Written Testimony (2024.06.13), # 2 Exhibit 2 [021-2] Ex. 2 Decl. of Donnie Anderson (2024.06.13))(West, Zachary) (Entered: 05/27/2025) |
| 05/28/2025 | 83 | UNOPPOSED MOTION for Leave *to File Oversized Reply* by Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City, Padres Unidos de Tulsa. (Lambert, Megan) (Entered: 05/28/2025) |
| 05/29/2025 | 84 | **ORDER** ~ Granting 83 Plaintiffs' unopposed motion for leave to file an oversized reply, not exceeding 20 pages. Signed by Judge Bernard M. Jones on 5/29/2025. (dwl) (Entered: 05/29/2025) |

**J.A. 009**

| 05/29/2025 | 85 | ENTRY of Appearance by Elissa Stiles on behalf of Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City (Stiles, Elissa) (Entered: 05/29/2025) |
|---|---|---|
| 05/29/2025 | 86 | REPLY to Response to Motion re 60 MOTION for Temporary Restraining Order *or, in the Alternative, a Preliminary Injunction and Memorandum of Law in Support* filed by Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City, Padres Unidos de Tulsa. (Stiles, Elissa) (Entered: 05/29/2025) |
| 06/03/2025 | 87 | **ORDER** ~ Granting 60 MOTION for a Preliminary Injunction, as more fully set out in the Order. Plaintiffs shall post a bond of $17.87 as security. Signed by Judge Bernard M. Jones on 6/3/2025. (dwl) (Entered: 06/03/2025) |
| 06/04/2025 | 88 | NOTICE OF APPEAL as to 87 Order on Motion for TRO by Vicki Behenna, Gentner Drummond, Steve Kunzweiler, Tim Tipton. (Sweeney, Cullen) (Entered: 06/04/2025) |
| 06/05/2025 | 89 | PRELIMINARY RECORD LETTER - Electronic Transmission of Notice of Appeal with Preliminary Record sent to Tenth Circuit Court of Appeals re 88 Notice of Appeal (Attachments: # 1 Attachment 1 - Preliminary Record on Appeal)(rp) (Entered: 06/05/2025) |
| 06/05/2025 | 90 | Tenth Circuit USCA Case Number 25-6080 for 88 Notice of Appeal filed by Tim Tipton, Vicki Behenna, Gentner Drummond, Steve Kunzweiler. Civil case docketed. Preliminary record filed. DATE RECEIVED: 06/04/2025 Fee is due by 06/20/2025 for Vicki Behenna, Gentner Drummond, Steve Kunzweiler and Tim Tipton. Docketing statement and Transcript order form due 06/20/2025 for Vicki Behenna, Gentner Drummond, Steve Kunzweiler and Tim Tipton. Notice of appearance due on 06/20/2025 for Vicki Behenna, Barbara Boe, Christopher Coe, Rene Doroteo Hernandez, Gentner Drummond, Steve Kunzweiler, League of United Latin American Citizens Oklahoma City, Jordy Madrigal Martinez, Antonio Marquez, Ximena Monserrat Lopez Mena, Padres Unidos de Tulsa, and Tim Tipton. [25-6080] (rp) (Entered: 06/05/2025) |
| 06/11/2025 | 91 | Security BOND in the amount of $ 17.87 posted by Barbara Boe, Christopher Coe(on behalf of all those similarly situated), Christopher Coe(on behalf of themselves), League of United Latin American Citizens Oklahoma City, Padres Unidos de Tulsa. (alw) (Entered: 06/11/2025) |
| 06/17/2025 | 92 | MOTION to Withdraw as Attorney *Tanya Broder* by Rene Doroteo Hernandez, Ximena Monserrat Lopez Mena, Antonio Marquez, Jordy Madrigal Martinez, Padres Unidos de Tulsa. (Broder, Tanya) (Entered: 06/17/2025) |
| 06/17/2025 | 93 | ORDER of USCA as to 88 Notice of Appeal filed by Tim Tipton, Vicki Behenna, Gentner Drummond, Steve Kunzweiler. Order filed by Clerk of the Court granting attorney Tanya Broder's motion to withdraw as counsel for the Private Plaintiffs. Served on 06/17/2025. Text only entry - no attachment. [24-6144] (rp) (Entered: 06/18/2025) |
| 06/20/2025 | 94 | TRANSCRIPT Order Form by Vicki Behenna, Gentner Drummond, Steve Kunzweiler, Tim Tipton re 88 Notice of Appeal that transcripts are not necessary. (rp) (Entered: 06/20/2025) |
| 06/20/2025 | 95 | TRANSCRIPT LETTER advising no transcripts are necessary re 88 Notice of Appeal filed by Tim Tipton, Vicki Behenna, Gentner Drummond, Steve Kunzweiler. The record is ready for appeal purposes. (rp) (Entered: 06/20/2025) |

**J.A. 010**

| 06/23/2025 | 96 | **ORDER** ~ Granting 92 Motion to Withdraw as Attorney. Tanya Broder is permitted to withdraw as counsel of record. Signed by Judge Bernard M. Jones on 6/23/2025. (dwl) (Entered: 06/23/2025) |
| 06/23/2025 | 97 | USCA Appeal Fees received in the amount of $605.00 receipt number 500012482 re 88 Notice of Appeal filed by Tim Tipton, Vicki Behenna, Gentner Drummond, Steve Kunzweiler. Receipt mailed to Maranda Spears at maranda.spears@oag.ok.gov (kb) (Entered: 06/23/2025) |
| 07/23/2025 | 98 | MOTION to Withdraw as Attorney *Devraat Awasthi* by Barbara Boe, Christopher Coe(on behalf of all those similarly situated), League of United Latin American Citizens Oklahoma City, Padres Unidos de Tulsa. (Awasthi, Devraat) (Entered: 07/23/2025) |
| 07/24/2025 | 99 | **ORDER** ~ Granting 98 Motion to Withdraw as Attorney. Devraat Awasthi is permitted to withdraw as counsel of record and is relieved of further participation in this matter. Signed by Judge Bernard M. Jones on 7/24/2025. (dwl) (Entered: 07/24/2025) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 08/25/2025 12:48:58 | | |
| **PACER Login:** | indianawest | **Client Code:** | Unidos |
| **Description:** | Docket Report | **Search Criteria:** | 5:24-cv-00511-J Start date: 1/1/1974 End date: 8/25/2025 |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

**J.A. 011**

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, et al.,      )
                                       )
                    Plaintiffs,        )
                                       )
v.                                     )      Case No. CIV-24-511-J
                                       )
THE STATE OF OKLAHOMA, et al.,         )
                                       )
                    Defendants.        )

## ORDER

This matter centers around the constitutionality of Oklahoma House Bill 4156 (H.B. 4156), signed into law by Oklahoma Governor Kevin Stitt on April 30, 2024.  The law, effective July 1, 2024, imposes state criminal penalties on noncitizens who enter Oklahoma without authorization to enter the United States.  *See* H.B. 4156, 59th Leg., 2d Reg. Sess. (Okla. 2024) (codified at Okla. Stat. tit. 21, § 1795).

On May 21, 2024, the United States filed suit against the State of Oklahoma, Oklahoma Governor Kevin Stitt, Oklahoma Attorney General Gentner Drummond, the Oklahoma Department of Public Safety, and Oklahoma Department of Public Safety Commissioner Tim Tipton (collectively, Oklahoma).  [Doc. No. 1].  The United States seeks declaratory and injunctive relief enjoining Oklahoma from enforcing H.B. 4156.  On May 22, it formally moved to enjoin enforcement, arguing principally that H.B. 4156 is preempted under federal law.  [Doc. No. 4].

On May 23, a similar lawsuit was filed by Padres Unidos de Tulsa and one private individual against Oklahoma Attorney General Gentner Drummond, Oklahoma Department of Public Safety Commissioner Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler.  *Padres Unidos de Tulsa v. Drummond*, No. CIV-24-526-J (W.D. Okla.), [Doc. No. 1].  An amended complaint was filed on May 24, adding

three more private individuals as plaintiffs. *Id.*, [Doc. No. 14]. The same day, on grounds similar to those argued by the United States, Padres Unidos de Tulsa and the four private individuals (collectively, the Padres Unidos Plaintiffs) moved to enjoin enforcement of H.B. 4156. *Id.*, [Doc. No. 15].

The Court consolidated the two cases on June 5. [Doc. No. 17].[1] The United States' motion for injunctive relief is presently before the Court.[2] (U.S. Mot.) [Doc. No. 4]. Oklahoma responded, (Okla. Resp.) [Doc. No. 21], and the United States replied, [Doc. No. 28].[3] Upon careful review of the parties' submissions, the Court makes its determination.

## I.    Background

### A.    Federal Statutory Immigration Framework

The federal government "has broad, undoubted power over the subject of immigration and the status of aliens," authority that rests on its constitutional power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and its "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394–95 (2012). "For nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of noncitizens—is *exclusively* a federal power." *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024) (emphasis in original) (collecting cases); *see also*

---

[1] Unless otherwise specified, all subsequent document references are to the electronic case filing system in *United States v. Oklahoma*, No. CIV-24-511-J.

[2] The United States and the Padres Unidos Plaintiffs raise substantially similar arguments in their respective motions for injunctive relief. In response, however, Oklahoma raises a standing argument against the Padres Unidos Plaintiffs that it does not raise against the United States. Given the Court's desire to promptly rule on the underlying constitutionality of H.B. 4156, this Order will address only the United States' motion.

[3] All page citations refer to the Court's CM/ECF pagination.

*DeCanas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."), *superseded by statute on other grounds as recognized in Arizona*, 567 U.S. at 404; *Hampton v. Mow Sun Wong*, 426 U.S. 88, 95 (1976) ("Congress and the President have broad power over immigration and naturalization which the States do not possess."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government.").  It "has repeatedly emphasized that over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal quotation marks omitted); *see also Lopez v. INS*, 758 F.2d 1390, 1392 (10th Cir. 1985) ("[W]e note that the United States Constitution confers on Congress the power to regulate matters relating to immigration. . . . This broad grant of authority is exclusive to Congress.").

Consistent with this legislative power, in 1952, Congress enacted the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*  The INA provides a comprehensive framework regulating the entry, presence, and removal of noncitizens.  *Patel v. Garland*, 596 U.S. 328, 331 (2022) ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States.  When noncitizens violate those rules, Congress has provided procedures for their removal."); *DeCanas*, 424 U.S. at 353 (deeming the INA a "comprehensive federal statutory scheme for regulation of immigration").  This framework is bolstered by a multifaceted enforcement scheme—with both criminal and civil components.

For instance, federal law mandates that entry into the United States occur through designated entry points, where noncitizens must present necessary entry documents and undergo inspection by federal immigration officers.  8 U.S.C. § 1225(a)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the

United States shall be inspected by immigration officers."); 8 C.F.R. § 235.1 (requiring that noncitizens apply for lawful entry in person at designated ports of entry and present required documents for inspection). Under the INA, noncitizens who surreptitiously enter or reenter the United States may face federal criminal prosecution. 8 U.S.C. §§ 1325(a), 1326(a). The law also criminalizes activities that involve smuggling noncitizens into the United States, transporting noncitizens within the United States, or otherwise assisting unlawfully present noncitizens to remain. *Id.* § 1324.

In addition to these criminal penalties, noncitizens who have engaged in certain types of prohibited conduct may be denied admission to the United States or, if already present, face removal. *Id.* § 1182(a) (establishing grounds for denying admission and for removing an unadmitted noncitizen); *id.* § 1227(a) (establishing grounds for removing an admitted noncitizen). Removal proceedings are civil, not criminal, in nature. *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984). Where a federal immigration officer determines that a noncitizen arriving in the United States is inadmissible because they misrepresented their admission status or lack valid entry documents, the immigration officer must generally order the noncitizen removed from the United States without further hearing or review. 8 U.S.C. §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), 1182(a)(7). Similar expedited proceedings apply to noncitizens already present in the country if they "(1) [are] inadmissible because he or she lacks a valid entry document; (2) [have] not 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility'; and (3) [are] among those whom the Secretary of Homeland Security has designated for expedited removal." *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) (citing 8 U.S.C. § 1225(b)(1)(A)(i), (iii)(I)-(II)). Conversely, for all other removable noncitizens apprehended within the United States, more standard proceedings apply. 8 U.S.C. § 1229a(a)(3)

("Unless otherwise specified . . . , a [standard] proceeding . . . shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.").

The INA specifies that "[a]n immigration judge shall conduct [standard] proceedings for deciding the inadmissibility or deportability of an alien." *Id.* § 1229a(a)(1). During these proceedings, "aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal." *Arizona*, 567 U.S. at 396 (citing 8 U.S.C. §§ 1229a(c)(4), 1158 (asylum), 1229b (cancellation of removal), 1229c (voluntary departure)). "If . . . the alien is [ultimately] ordered removed, the alien can appeal the removal order to the Board of Immigration Appeals and, if that appeal is unsuccessful, the alien is generally entitled to review in a federal court of appeals." *Thuraissigiam*, 591 U.S. at 108 (citing 8 U.S.C. §§ 1229a(c)(5), 1252(a)).

The INA empowers the Department of Homeland Security (DHS), among other federal agencies, to administer and enforce immigration laws. The Secretary of DHS is "charged with the administration and enforcement" of the INA "and all other laws relating to the immigration and naturalization of aliens," and "shall establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority." 8 U.S.C. § 1103(a)(1), (3). DHS's authority extends to immigration enforcement efforts at and within the country's borders. *Id.* § 1103(a)(5) (granting the Secretary of DHS "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens"); *id.* § 1357 (granting federal immigration officers specific law enforcement powers for enforcing immigration laws).

Subagencies within DHS "play a major role in enforcing the country's immigration laws." *Arizona*, 567 U.S. at 397. U.S. Customs and Border Protection, in conjunction with other federal

agencies, bears responsibility to "enforce . . . all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, . . . and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States."  6 U.S.C. § 211(c)(8).  U.S. Immigration and Customs Enforcement, another DHS subagency, is "responsible for the identification, apprehension, and removal of illegal aliens from the United States."  *Arizona*, 567 U.S. at 397 (internal quotation marks omitted).  Subagencies within DHS often collaborate with local and state authorities in federal immigration enforcement efforts, and it is evident that Congress contemplated some assistance from state and local officers.  *Id.* at 410.  Indeed, "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer."  *Id.* at 408.

### B.     Unlawful Immigration in Oklahoma

"The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States."  *Id.* at 397.  Oklahoma undoubtedly "bears many of the consequences of unlawful immigration."  *Id.*  This Court need look no further than H.B. 4156 itself.

H.B. 4156 declares that a "crisis exists in Oklahoma," one which is "endangering Oklahomans, devastating rural, urban, and suburban communities and is severely straining even the most diligent and well-resourced state and local governmental entities."  H.B. 4156 § 1(B).  "Throughout the state, law enforcement comes into daily and increasingly frequent contact with foreign nationals who entered the country illegally or who remain here illegally."  *Id.*  "Often, these persons are involved with organized crimes such as drug cartels, they have no regard for Oklahoma's laws or public safety, and they produce or are involved with fentanyl distribution, sex trafficking, and labor trafficking."  *Id.*  H.B. 4156 provides that "Oklahoma agents and law

enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers, many of whom entered without authorization through our southern border." *Id.* Oklahoma places the blame for this crisis squarely on the current presidential administration. *See, e.g.*, Okla. Resp. at 26 ("The current presidential administration and its political appointees are loath to enforce federal law and secure the border, thus making their distaste for H.B. 4156 comprehensible.").

Criminal activity associated with unlawful immigration is not, however, a recent phenomenon. Indeed, in *Arizona*, a preemption case decided in 2012, the Supreme Court acknowledged the "[h]undreds of thousands of deportable aliens . . . apprehended in Arizona" around that time. *Arizona*, 567 U.S. at 397; *see also id.* ("Unauthorized aliens who remain in the State constitute, by one estimate, almost 6% of the population."). The record before the *Arizona* Court evidenced "an epidemic of crime, safety risks, serious property damage, and environmental problems associated with the influx of illegal migration across private land near the Mexican border." *Id.* at 398 (internal quotation marks omitted). Arizona, like Oklahoma, was exceedingly frustrated with the then-presidential administration's enforcement of federal immigration laws—consequences it bore directly. *See* Brief for Petitioners, *Arizona*, 567 U.S. 387 (2012) (No. 11-182), 2012 WL 416748, at *2 ("The President fairly describes our Nation's system of immigration regulation and enforcement as 'broken.' Lack of effective enforcement of the existing immigration rules has permitted an estimated 11 million aliens to reside in the United States unlawfully." (footnote omitted)); *id.* at *3 ("Th[e] flood of unlawful cross-border traffic, and the accompanying influx of illegal drugs, dangerous criminals and highly vulnerable persons, have resulted in massive problems for Arizona's citizens and government, leaving them to bear a seriously disproportionate share of the burden of an already urgent national problem."); *id.* at *3–4

7

("Unlawfully entering aliens include criminals evading prosecution in their home countries and members of Mexican drug cartels—organizations the federal government has called more sophisticated and dangerous than any other organized criminal enterprise.  Such cartels have repeatedly threatened the lives of American police officers working near the border." (footnote and internal quotation marks omitted)); *id.* at *8 ("Arizona has repeatedly asked the federal government for more vigorous federal enforcement, but to no avail." (internal citation omitted)). And Arizona sought to address its "crisis" with its own state immigration legislation, S.B. 1070. *See id.* at *60 ("[I]t is the disuniformity of federal immigration enforcement efforts that has funneled unlawful entrants to Arizona and exacerbated the crisis that led to S.B. 1070's enactment.").

Notwithstanding these serious concerns, the Supreme Court in *Arizona* found that most provisions of S.B. 1070 were preempted.  *See Arizona*, 567 U.S. at 400–10.  While making clear that "[t]he problems posed to the State[s] by illegal immigration must not be underestimated," *id.* at 398, the Supreme Court nonetheless constrained the state legislation that it concluded impermissibly intruded into areas of immigration regulation.

### C.   H.B. 4156

For reasons similar to those in *Arizona*, Oklahoma's H.B. 4156 takes aim at illegal immigration.  To that end, the law first criminalizes "impermissible occupations" in Oklahoma. "A person commits an impermissible occupation if the person is an alien"—meaning "any person not a citizen or national of the United States"—and "willfully and without permission enters and remains in the State of Oklahoma without having first obtained legal authorization to enter the United States."  H.B. 4156 § 2(A)-(B).  A first-time conviction for impermissible occupation is classified as a misdemeanor, "punishable by imprisonment in the county jail for a term of not more

than one (1) year, or by a fine of not more than Five Hundred Dollars ($500.00), or by both such fine and imprisonment." *Id.* § 2(C)(1). Any second or subsequent conviction for impermissible occupation, or any impermissible occupation "committed during the commission of any other crime," is classified as a felony, "punishable by imprisonment in the custody of the Department of Corrections for a term of not more than two (2) years, or by a fine of not more than One Thousand Dollars ($1,000.00), or by both such fine and imprisonment." *Id.* § 2(C)(2). And for any impermissible occupation, "the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.* § 2(C)(1)-(2).

A charge of impermissible occupation is subject to certain affirmative defenses, specifically: (1) the federal government has granted the defendant "lawful presence in the United States"; (2) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; and (3) the defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals Program between certain dates. *Id.* § 2(F).

H.B. 4156 also criminalizes the act of entering or attempting to enter Oklahoma by "[a]ny alien who has been denied admission, excluded, deported, or removed, or has departed the United States while an order of exclusion, deportation, or removal is outstanding," unless (1) "[p]rior to reembarkation of the alien at a place outside the United States or application by the alien for admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission"; or (2) "[w]ith respect to an alien previously denied admission and removed, such alien established that he or she was not required to obtain such advance consent." *Id.* § 2(D). A noncitizen convicted under § 2(D) is deemed guilty of a

9

J.A. 020

felony, punishable by imprisonment for up to two years, a fine not exceeding $1,000.00, or both. *Id.* And like § 2(C), all those convicted under § 2(D) must leave Oklahoma. *Id.*

## II.   Preliminary Injunction Standard

The United States seeks a preliminary injunction barring Oklahoma's enforcement of H.B. 4156. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "An injunction can issue only if each factor is established." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022). "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

## III.   Analysis

### A.   Likelihood of Success on the Merits

The United States contends that H.B. 4156 facially[4] violates both the Supremacy Clause and the Commerce Clause of the United States Constitution. Regarding the Supremacy Clause, the United States argues, among other things, that H.B. 4156 impermissibly regulates conduct comprehensively governed by federal law, undermines the federal government's dominant interest in setting immigration policy, and conflicts with established procedures for state and local participation in immigration enforcement. *See* U.S. Mot. at 18–27. As for the Commerce Clause,

---

[4] A litigant "may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011). "A facial challenge is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *Id.* (brackets and internal quotation marks omitted).

it argues that H.B. 4156 discriminates against foreign commerce, disrupts uniform immigration laws, and prevents the federal government from speaking with one voice in foreign relations.  *Id.* at 28–29.

### 1.    Preemption Under the Supremacy Clause

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."  *Arizona*, 567 U.S. at 398.  Nonetheless, the Supremacy Clause of "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'"  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting U.S. Const. art. VI, cl. 2).  It is well established that "state law that conflicts with federal law is 'without effect.'"  *Id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).  "Congress may . . . pre-empt, *i.e.*, invalidate, a state law through federal legislation."  *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

Federal law can preempt state law either by an express statement of preemption or by implication.  *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011).  Only the latter is at issue here.

Implied preemption includes field preemption and conflict preemption.  *Id.*  Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to

11

J.A. 022

preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Conflict preemption can occur in one of two ways: "where compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Categories of preemption, however, are not "rigidly distinct." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5 (1990). "Indeed, field preemption may be understood as a species of conflict pre-emption," because "[a] state law that falls within a pre-empted field [necessarily] conflicts with Congress' intent . . . to exclude state regulation." *Id.*

### 2.    The United States' Right to Sue in Equity

At the outset, the Court must determine whether the United States has the right to seek equitable relief under the Supremacy Clause. Though Oklahoma recognizes the general availability of equitable relief, it asserts that such relief is unavailable in this case because the United States has not relied on a specific statutory authority or a traditional equitable principle. Okla. Resp. at 38–39. The Court disagrees.

While Oklahoma is correct that the Supremacy Clause does not create a cause of action, it is well established that "in a proper case, relief may be given in a court of equity to prevent an injurious act by a public officer." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (ellipses and internal quotation marks omitted); *see also id.* at 324–25 (explaining that "the Supremacy Clause is not the source of any federal rights," and "certainly does not create a cause

12

of action" (internal quotation marks omitted in first quotation)).  Specifically, courts of equity have created the "ability to sue to enjoin unconstitutional actions by state and federal officers." *Id.* at 327.  As such, the federal government may bring an action in equity to enforce federal supremacy. *See United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016) (discussing *Armstrong* and noting that, "[t]o the extent that *Armstrong*'s Supremacy Clause holding is motivated by the desire to preserve the federal government's 'ability to guide the implementation of federal law,' this counsels in favor of—not against—permitting the United States to invoke preemption in order to protect its interest" (quoting *Armstrong*, 575 U.S. at 326)); *United States v. Bd. of Cnty. Commr's of Cnty. of Otero*, 843 F.3d 1208, 1209 (10th Cir. 2016) (affirming grant of summary judgment premised upon the Supremacy Clause); *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) (noting "the general rule that the United States may sue to protect its interests").

Oklahoma is also correct that the Court is limited in its jurisdiction and, specifically as relevant here, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327; *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996).  Accordingly, for Oklahoma to prevail on its argument that equitable relief is unavailable, it must identify some law that has displaced the Court's equitable powers.  *See Armstrong*, 575 U.S. at 329 (noting that "equitable relief . . . is traditionally available to enforce federal law" unless Congress has "displace[d]" it).  As the Fifth Circuit recently found when considering this very question, "[t]he United States has broad powers and rights granted by the Constitution and Congress regarding immigration matters."  *Texas*, 97 F.4th at 276.  And, as in that case, Oklahoma here "cites to no constitutional or statutory provision that expressly or impliedly displaces an action arising in equity to enjoin executive action with regard

13

J.A. 024

to the matters at issue in this litigation." *Id.* The United States thus properly brings its federal preemption claim.

### 3. Assessment of H.B. 4156

#### a. Field Preemption

Looking to H.B. 4156, its objective is clear: to criminally punish noncitizens found in Oklahoma who have entered or reentered the United States unlawfully. It provides for fines and/or imprisonment of noncitizens in Oklahoma who have entered or reentered the United States without legal authorization. Additionally, all noncitizens convicted under H.B. 4156 are subject to mandatory expulsion from the state.

The INA addresses virtually all matters related to immigration, but it is especially outspoken on noncitizen entry. "Policies pertaining to the entry of aliens" are "entrusted exclusively to Congress," *Galvan v. Press*, 347 U.S. 522, 531 (1954), and Congress has legislated quite extensively in that respect, establishing "a comprehensive framework to identify *who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully," *Texas*, 97 F.4th at 283 (emphasis in original) (footnotes omitted).

Unlawful entry and reentry are criminal offenses under 8 U.S.C. §§ 1325 and 1326. Under § 1325(a), criminal liability attaches when a noncitizen (1) enters or attempts to unlawfully enter the United States at a place other than a designated port of entry, (2) eludes examination and inspection by immigration officers, or (3) attempts to enter or enters the United States by a willfully false or misleading representation or the willful concealment of a material fact. 8 U.S.C. § 1325(a). A noncitizen who has previously been removed or voluntarily departed under an outstanding removal order may be convicted for violating § 1326(a) after reentering or attempting to reenter

the United States or after being "found in" the United States without authorization to enter.   8 U.S.C. § 1326(a).

The prohibitive provisions of H.B. 4156, §§ 2(C) and 2(D), largely resemble §§ 1325(a) and 1326(a).   Comparing § 2(C) and § 1325(a), both provisions criminalize the same underlying conduct—unlawful entry into the United States—but § 2(C) specifically targets noncitizens located in Oklahoma after doing so.[5]   Sections 2(D) and 1326(a) are nearly identical.   Both provisions criminalize the act of entering, attempting to enter, or being found in the United States after having been denied admission, excluded, deported, or removed, or after departing while an order of exclusion, deportation, or removal is outstanding.   Both provisions also provide exceptions for noncitizens who have obtained express consent from the Attorney General to reapply for admission or who were not required to obtain such consent.

Effectively, H.B. 4156 criminalizes conduct already proscribed under federal law.   The parties agree as much.   *See* U.S. Mot. at 21 ("H.B. 4156 seeks to criminalize conduct already proscribed by federal law—the unlawful entry and reentry into the United States, 8 U.S.C. §§ 1325 and 1326—despite the comprehensive federal immigration scheme governing such conduct."); Okla. Resp. at 16 ("In the most basic terms, H.B. 4156 authorizes an Oklahoma criminal analogue to federal criminal illegal entry.").   The issue, then, is whether federal regulation of noncitizen entry and reentry is sufficiently comprehensive to give rise to a reasonable inference that Congress left no room for similar action by Oklahoma.

---

[5] H.B. 4156 defines an "impermissible occupation" as a noncitizen's entry into Oklahoma "without having first obtained legal authorization to enter the United States."   H.B. 4156 § 2(B).   This definition would naturally encompass the forms of unlawful entry proscribed by 8 U.S.C. § 1325(a).

15

J.A. 026

The Supreme Court's ruling in *Arizona* is instructive.  There, the Supreme Court found preempted Section 3 of Arizona state law S.B. 1070, which replicated noncitizen registration requirements under federal law and "add[ed] a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400.  It reasoned that Congress, through its "comprehensive" and "harmonious" framework for noncitizen registration, left no room for additional state regulation— even state regulation that "ha[d] the same aim as federal law and adopt[ed] its substantive standards." *Id.* at 401–02 (internal quotation marks omitted in second quotation).  This is because "[e]ven if a State may make violation of federal law a crime in some instances, it cannot do so in a field . . . that has been occupied by federal law." *Id.* at 402.  "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.* at 401.

This Court acknowledges, to Oklahoma's credit, that the discussion of parallel legislation in *Arizona* focused on noncitizen registration, not noncitizen entry and reentry.  *See* Okla. Resp. at 29 ("[T]he federal government lacks exclusive power over the field of all laws relating to immigration for the simple reason that the Supreme Court has never extended field preemption beyond alien registration.").  And this Court is likewise aware that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by [the federal government's] constitutional power, whether latent or exercised." *DeCanas*, 424 U.S. at 355.  Nevertheless, this Court sees no reason why *Arizona*'s logic does not naturally extend to this case, where H.B. 4156 criminalizes conduct proscribed by the comprehensive federal framework regulating noncitizen entry and reentry.  Just recently, the Fifth Circuit extended *Arizona*'s reasoning to S.B. 4, a Texas law with two provisions "closely resembl[ing]" 8 U.S.C. §§ 1325(a) and 1326(a). *Texas*, 97 F.4th at 280.  The Fifth Circuit discussed at length the

16

comprehensiveness of the INA, particularly its regulation of noncitizen entry and reentry. *See, e.g.*, *id.* ("The [INA's] central concern is the entry and stay of aliens in the United States. The [INA] makes it unlawful for any noncitizen to enter the United States other than through a port of entry, and punishes any noncitizen who unlawfully reenters or remains in the United States." (footnotes and internal quotation marks omitted)). This comprehensiveness, it reasoned, would preclude even parallel state regulation:

> In the same way Arizona S.B. 1070 added a state-law penalty for conduct proscribed by federal law, S.B. 4 criminalizes behavior already prohibited by the INA. Particularly applicable in the present case, the Supreme Court held in *Arizona* that permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted. That is just as true regarding the Texas laws regarding entry and removal.

*Id.* (brackets, footnotes, and internal quotation marks omitted).[6] Other circuit courts have likewise extended *Arizona*'s reasoning to preclude state attempts to criminalize the unlawful transport, concealment, and inducement of unlawfully present noncitizens because such activities are comprehensively regulated under federal law. *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1263–64 (11th Cir. 2012); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024–26 (9th Cir. 2013); *United States v. South Carolina*, 720 F.3d 518, 531–32 (4th Cir. 2013).

Thus, there is "strong support" for the conclusion that Congress has legislated so comprehensively in the field of noncitizen entry and reentry that it left no room for supplementary state legislation. *Texas*, 97 F.4th at 288; *see also DeCanas*, 424 U.S. at 359 (acknowledging the "comprehensiveness of legislation governing the entry and stay of aliens"); *Patel*, 596 U.S. at 331 ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the

---

[6] The Fifth Circuit's reasoning came in the form of an extensive interlocutory ruling denying Texas' request for a stay of an injunction issued by the United States District Court for the Western District of Texas.

United States."); *Elkins v. Moreno*, 435 U.S. 647, 664 (1978) (deeming the INA "a comprehensive and complete code covering all aspects of admission of aliens to this country"); *United States v. Texas*, --- F. Supp. 3d ---, 2024 WL 861526, at *13 (W.D. Tex. Feb. 29, 2024) ("Congress has created a comprehensive framework 'of federal statutes criminalizing the acts undertaken by noncitizens and those who assist them in coming to' the United States." (brackets omitted) (quoting *Ga. Latino*, 691 F.3d at 1264)). Again, "[w]here Congress occupies an entire field," as it has in the field of noncitizen entry and reentry, "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401. As such, Oklahoma's attempt to parallel federal law must fail.

A similar fate befalls H.B. 4156's expulsion penalty. Expulsion from Oklahoma is a criminal penalty imposed for a conviction of unlawful entry or reentry under H.B. 4156. Having found H.B. 4156's regulation of unlawful entry and reentry field preempted, this expulsion penalty would naturally fail. However, even viewing the expulsion penalty in isolation, there is strong support for a finding of preemption. To Oklahoma's credit, H.B. 4156 mandates expulsion only from Oklahoma, rather than from the United States. But that does not necessarily mean the law avoids intrusion into a federal domain. The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792 (internal quotation marks omitted). Through the INA, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. "[T]here is strong evidence Congress intended to occupy the field for *any decision* related to noncitizen removal." *Texas*, 97 F.4th at 285 (emphasis added).

For example, in *United States v. Alabama*, the Eleventh Circuit found preempted a provision of Alabama state law amounting to a "calculated policy of expulsion" from the state.

18

J.A. 029

691 F.3d 1269, 1294 (11th Cir. 2012). The provision prohibited Alabama state courts "from enforcing or recognizing contracts between a party and an unlawfully present alien," *id.* at 1292, effectively barring "undocumented aliens . . . from enforcing contracts for basic necessities," *id.* at 1293. By imposing "distinct, unusual and extraordinary burdens," the provision was designed "to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state." *Id.* at 1294 (internal quotation marks omitted in first quotation). The Eleventh Circuit concluded that the law "constitute[d] an impermissible intrusion into the federal domain" of noncitizen expulsion. *Id.* at 1293; *see also id.* at 1294 (highlighting the "comprehensive statutory framework governing alien removal"). It did not matter that the law served to expel noncitizens only from Alabama: "If every other state enacted similar legislation to overburden the lives of aliens, the immigration scheme would be turned on its head. The federal government—not the fifty states working in concert—retains the power to exclude aliens from the country." *Id.* at 1295 n.21.

Consider as well the Third Circuit's decision in *Lozano v. City of Hazleton*, where it found preempted several city ordinances that made "legal immigration status a condition precedent to entering into a valid lease." 620 F.3d 170, 179 (3d Cir. 2010), *vacated on other grounds*, 563 U.S. 1030 (2011). The *Lozano* court emphasized the comprehensive federal scheme regulating the entry and treatment of noncitizens in the United States, which "plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status." *Id.* at 220. The city ordinances at issue effectively did just that. And while the ordinances aimed to "regulate presence only within [the] city limits, not the entire country," the Third Circuit's analysis remained unaffected: "To be meaningful, the federal government's exclusive control over residence in this country must extend to any political subdivision. Again, it is not only Hazleton's

19

ordinance that we must consider.  If Hazleton can regulate as it has here, then so could every other state or locality.  *Id.* at 221; *see also id.* at 220 ("[W]e cannot bury our heads in the sand ostrich-like ignoring the reality of what these ordinances accomplish.").

Relatedly, the Supreme Court has recognized that "[t]he federal power to determine immigration policy is well settled."  *Arizona*, 567 U.S. at 395; *see also Texas*, 2024 WL 861526, at *15 (finding, in the context of field preemption, that the federal government has a "dominant interest in regulating immigration enforcement").  This power naturally encompasses discretion on enforcement, "where '[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy.'"  *Biden v. Texas*, 597 U.S. 785, 805–06 (2022) (quoting *Arizona*, 567 U.S. at 397); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (acknowledging that an agency's enforcement decision "often involves a complicated balancing of a number of factors which are peculiarly within its expertise," including "whether a violation has occurred," "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all").  "Because the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently.  That is Administrative Law 101."  *Biden*, 597 U.S. at 815 (Kavanaugh, J., concurring).

Oklahoma largely dismisses these broader considerations cited by the United States, insisting that the United States' "claim that H.B. 4156 would harm [its] relationship with foreign nations in multiple ways and antagonize foreign governments can be taken as nothing other than a brazen admission that the United States thinks it can decline to enforce the laws Congress has

enacted because foreign governments will get angry."   Okla. Resp. at 26 (ellipses, citation, and internal quotation marks omitted).   In support of this position (and others throughout its response), Oklahoma leans heavily on the Supreme Court's decision in *Kansas v. Garcia*, 589 U.S. 191 (2020), which upheld the state convictions of three noncitizens for fraudulently using another person's Social Security number on tax-withholding forms when obtaining employment.   The Supreme Court broadly rejected the noncitizens' claims that their state convictions were preempted by federal immigration laws, finding that "using another person's Social Security number on tax forms threatens harm that has no connection with immigration law," *Garcia*, 589 U.S. at 209, and that the prosecutions were not at odds with federal interests,[7] *id.* at 212.   Indeed, the federal government "fully support[ed]" Kansas' power to prosecute.   *Id.*

Certainly, the same cannot be said in this case, where federal pushback is the genesis of litigation and H.B. 4156 touches so deliberately on matters of immigration regulation.   Nor can this Court simply adopt Oklahoma's political frustrations and ignore *Arizona*'s extensive discussion of the broader implications surrounding immigration policy.   Among other things, "immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws."   *Arizona*, 567 U.S. at 395; *see also id.* ("Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."); *id.* ("It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one

---

[7] The noncitizens maintained that prosecution would limit the federal government's ability to "obtain[] the cooperation of unauthorized aliens in making bigger cases."   *Garcia*, 589 U.S. at 211.

national sovereign, not the 50 separate States.").[8]  The *Arizona* Court cautioned that "[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397.  These theoretical concerns appear to be at play in this case, as Mexico has already expressed concern over H.B. 4156.  *See* Press Release, Secretaría de Relaciones Exteriores (Apr. 30, 2024), available at https://perma.cc/E6Z4-HS7W.

Most noteworthy, though, is *Arizona*'s application of these principles to § 3 of S.B. 1070, which criminalized a noncitizen's failure to comply with certain registration requirements under federal law.  *See Arizona*, 567 U.S. at 400.  In finding § 3 field preempted, the Supreme Court reasoned that "[w]ere § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.  If the Supreme Court believed that state prosecution for federal registration violations implicated federal policy considerations, it is hard to fathom how criminal prosecution and expulsion under H.B. 4156 would not pose similar, if not greater, concerns.  *See Texas*, 97 F.4th at 280 ("Equally important, in concluding there was field preemption, the Supreme Court in *Arizona* relied on the fact that were § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determined that prosecution would frustrate federal policies.  The same is true of the Texas laws at issue here." (brackets and internal

---

[8] *Arizona*'s observations are by no means isolated.  *See, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government.").

22

quotation marks omitted)).  However well-intentioned, H.B. 4156 authorizes state prosecution for conduct already subject to comprehensive federal regulation and bound within federal immigration policy.  If permitted to stand, each state could give itself "independent authority" to achieve its own immigration policy, *Arizona*, 567 U.S. at 402, undoubtedly "'diminishing the Federal Government's control over enforcement' and 'detracting from the integrated scheme of regulation created by Congress,'" *id.* (brackets omitted) (quoting *Wis. Dep't of Indus. v. Gould, Inc.*, 475 U.S. 282, 288–89 (1986)).

While this Court may very well be sympathetic to the concerns raised by Oklahoma, such concerns should not—and, indeed, cannot—be allowed to undermine the long-standing, comprehensive federal framework that defines immigration policy.  Sensitive matters of immigration policy "must be made with one voice." *Id.* at 409.  And for better or for worse, that voice belongs not to one individual state, but to the United States.  Accordingly, the Court finds that H.B. 4156 is likely field preempted.

### b.      Conflict Preemption

Field preemption aside, the United States argues that H.B. 4156 is likely conflict preempted.  Again, conflict preemption "occurs either when compliance with both the federal and state laws is a physical impossibility, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998).

Oklahoma argues that "'[t]here can by definition be no conflict' between the laws of two sovereigns where state law 'trace[s] the federal law.'"  Okla. Resp. at 23 (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 601–02 (2011)).  It adds that "[t]he mere fact that state laws . . . overlap to some degree with federal criminal provisions does not even begin to make a case

for conflict preemption." *Id.* at 27 (quoting *Garcia*, 589 U.S. at 211). That may be true, but the Supreme Court has recognized that "[c]onflict is imminent when two separate remedies are brought to bear on the same activity." *Crosby*, 530 U.S. at 380 (internal quotation marks omitted). "Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions . . . undermines the congressional calibration of force." *Id.*

H.B. 4156 penalizes unlawful entry conduct and targets removable noncitizens with fines, imprisonment, and mandatory expulsion. Under federal law, however, "there are various avenues by which a noncitizen may ultimately be admitted or receive absolution even though he or she initially entered illegally." *Texas*, 97 F.4th at 289. A noncitizen who unlawfully enters the United States is removable, 8 U.S.C. §§ 1182(a)(6)(A)(i), 1229a, but "[b]eing found removable is not always the end of the story . . . because Congress has authorized relief from removal in certain contexts," *Patel*, 596 U.S. at 332. Noncitizens may, for example, apply for asylum or cancellation of removal—often for the first time after removal proceedings have begun. 8 U.S.C. §§ 1158(a)(1), 1229b. And in the case of asylum, the defense can ultimately be raised for the first time during either standard or expedited removal proceedings. *Id.* §§ 1229a(c)(4), 1225(b)(1)(A), 1225(b)(1)(B); 8 C.F.R. §§ 208.2(b), 1240.11(c).

In other words, there are mechanisms under federal law that allow unlawfully present noncitizens to remain in the United States—whether in Oklahoma or elsewhere. *See Holder v. Martinez Gutierrez*, 566 U.S. 583, 586 (2012) ("The immigration laws have long given the Attorney General discretion to permit certain otherwise-removable aliens to remain in the United States."). H.B. 4156 conflicts with this federal system. While it offers certain affirmative defenses to those already granted lawful presence or asylum under federal law, *see* H.B. 4156 § 2(F), it ignores the opportunities offered under federal law for discretionary relief once prosecution has

24

J.A. 035

begun.  Oklahoma insists that "[e]ither someone has permission to be here, or they do not."  Okla. Resp. at 33.  But it is just not that simple: "[I]t is impossible for a State to determine which aliens the Federal Government will eventually deport, which the Federal Government will permit to stay, and which the Federal Government will ultimately naturalize.  Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country, perhaps even as a citizen."  *Plyler v. Doe*, 457 U.S. 202, 240 n.6 (1982) (Powell, J., concurring).

But a more sweeping and glaring conflict exists.  "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408.  Under 8 U.S.C. § 1357(g), for instance, DHS is authorized to enter into written agreements with state and local jurisdictions, allowing specially trained state or local officers to perform specific functions related to the investigation, apprehension, or detention of noncitizens, under federal supervision.  Additionally, § 1357(g) provides that an agreement is not necessary for any state or political subdivision "to communicate with the Attorney General regarding the immigration status of any individual," or "to otherwise cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."  *Id.* § 1357(g)(10)(A)-(B).  Federal law even permits state and local officers to make arrests for immigration crimes in certain defined circumstances.  *See, e.g.*, *id.* § 1324(c) (permitting "all . . . officers whose duty it is to enforce criminal laws" to make arrests for violations of immigration law concerning smuggling, transporting, or harboring); *id.* § 1252c (authorizing state and local law enforcement officers to "arrest and detain" a noncitizen who is "illegally present in the United States" and "has previously been convicted of a felony in the United States and deported or left the United States after such conviction," but "only after the State or local law

25

enforcement officials obtain appropriate confirmation from" federal officials "of the status of such individual and only for such period of time as may be required for" federal officials " to take the individual into Federal custody for purposes of deporting or removing the alien from the United States"). Leaning on these avenues of assistance, Oklahoma insists that "the federal scheme leaves room for enforcement of a state law like H.B. 4156." Okla. Resp. at 24 (internal quotation marks omitted).

Congress' delineation of these cooperative frameworks, however, "is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present." *Texas*, 97 F.4th at 292. "Nor is it a grant of authority to a state to enact a statute that gives authority under state law to state officials to arrest or remove someone illegally present." *Id.* at 292–93. The Supreme Court's decision in *Arizona* is again instructive. There, Section 6 of S.B. 1070 authorized state officers to arrest a person if the officer had probable cause to believe that person was removable. *Arizona*, 567 U.S. at 407. Supporters of § 6 cited to Congress' authorization of cooperation under 8 U.S.C. § 1357(g). *Id.* at 410. But the Supreme Court concluded that "no coherent understanding of the term [cooperate] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Id.* at 410. By authorizing such unilateral activities that deviated from the procedures established by federal law, § 6 "allow[ed] the State to achieve its own immigration policy" and "create[d] an obstacle to the full purposes and objectives of Congress." *Id.* at 408, 410.

The Supreme Court's reasoning applies with greater force here. As constructed, H.B. 4156 would grant state officials broad power to unilaterally arrest, prosecute, and punish noncitizens for immigration offenses "absent any request, approval, or other instruction from the Federal

26

J.A. 037

Government." *Id.* at 410. "This is not the system Congress created," *id.* at 408, nor can the existing system be expanded to fit Oklahoma's preferred legislative design. For these reasons, the Court finds that H.B. 4156 is also likely conflict preempted.

### c.   "Invasion" Defense

Notwithstanding preemption, Oklahoma insists it "retains an inherent, sovereign power of self-defense against invasion." Okla. Resp. at 37. Though it cites scant case law suggesting the defense is applicable here, it derives this "invasion" defense from Article I, Section 10, Clause 3 (the State War Clause) of the United States Constitution, which provides that "[n]o State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3.

Neither the Supreme Court nor the Tenth Circuit has recognized the application of the State War Clause as broadly as Oklahoma advocates. And when a similar argument was raised in defense of S.B. 4 in Texas, both the Western District of Texas and the Fifth Circuit rejected its use. The Western District of Texas performed an extensive analysis of the historical and constitutional context of the State War Clause, concluding in detail that the surge in unauthorized immigration did not qualify as an "invasion" under the Constitution and that S.B. 4 was not a wartime measure. *See Texas*, 2024 WL 861526, at *24–37. The Fifth Circuit, in its interlocutory ruling, reasoned that "[c]onstitutional text, structure, and history provide strong evidence that federal statutes addressing matters such as noncitizen entry and removal are still supreme even when the State War Clause has been triggered." *Texas*, 97 F.4th at 295. Other courts have similarly rejected application of the State War Clause in the context of immigration. *See California v. United States*, 104 F.3d

1086, 1090–91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469–70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996). In short, this Court is unpersuaded that it should be an outlier in permitting a sweeping application of the State War Clause.[9]

### B.  Irreparable Harm

The second preliminary-injunction factor asks whether irreparable injury is likely to befall the movant without an injunction. *Winter*, 555 U.S. at 20. What makes an injury "irreparable" is the inadequacy of a monetary remedy. *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017).

The United States argues that irreparable harm necessarily results from enforcement of a preempted state law. U.S. Mot. at 29. Though the Supreme Court has suggested that may be the case, it has not definitively held that it is. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366–67 (1989). And though some courts have held as much, the Tenth Circuit has not. *See United States v. Texas*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) ("Because the United States has established a likelihood that the [state law] violates the Supremacy Clause, irreparable harm is presumed."); *Alabama*, 691 F.3d at 1301 ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."); *cf. Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 755 (10th Cir. 2024) (noting the difference between establishing irreparable harm for a claim of deprivation of an individual constitutional right and for a separation of powers claim). Nonetheless, as recently

---

[9] Because the Court finds that the United States is likely to prevail on its claim under the Supremacy Clause, it need not address the United States' likelihood of prevailing under the Commerce Clause. *See Whinery v. Premier Funeral Mgmt. Grp. IV, LLC*, No. CIV-20-130-D, 2020 WL 13669025, at *2 (W.D. Okla. May 15, 2020) ("To show a substantial likelihood of success on the merits, the movant must, at a minimum, present a prima facie case for prevailing on at least one claim asserted in its pleading." (internal quotation marks omitted)).

found by the Southern District of Iowa when considering this question, "persuasive authority recognizes that the United States clearly would suffer *some* level of significant harm when a state tries to enforce its own immigration laws that are likely preempted by federal law." *United States v. Iowa*, --- F. Supp. 3d ---, 2024 WL 3035430, at *14 (S.D. Iowa June 17, 2024). As that court noted, "[t]his makes sense: the whole point of field preemption, in particular, is that the federal regulatory scheme is 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Id.* (quoting *Arizona*, 567 U.S. at 399).

Here, the United States claims that it and the public will suffer irreparable harm if H.B. 4156 takes effect, specifically noting that the bill would harm the United States' relationship with foreign nations by antagonizing foreign governments; straining diplomatic relations and, thus, making cooperation more difficult on matters such as trade agreements, disaster response arrangements, anti-terrorism efforts, anti-drug-trafficking efforts, and other priorities; undermining long-term strategic partnerships formed to reduce irregular migration; undermining partnerships to provide protections to refugees; and exposing United States citizens abroad to reciprocal and retaliatory treatment that could impair their ability to travel, conduct business, or live abroad. Additionally, the United States claims that H.B. 4156 will displace the federal exercise of discretion in enforcing immigration laws, as well as interfere with federal immigration proceedings.

Having reviewed the arguments and declarations presented by both sides, including declarations provided by the United States regarding Oklahoma's interference with its comprehensive foreign-policy framework as well as Mexico's expression of its concern over the signing of H.B. 4156, the Court finds the United States' arguments are well-taken. *See, e.g.*, *Texas*, 97 F.4th at 295 ("In this case, repeated representations by the Executive Branch supported by

formal diplomatic protests and concrete disputes are more than sufficient to demonstrate that the state [law] stands in the way of Congress's diplomatic objectives." (quoting *Crosby*, 530 U.S. at 386)).  Indeed, as the United States notes, Oklahoma's cursory argument against irreparable harm asserts primarily that H.B. 4156 is not preempted without adequately refuting the United States' declarations of harm.  Accordingly, the Court finds that the United States has demonstrated it is likely to suffer irreparable injury in the absence of an injunction.  *See Iowa*, 2024 WL 3035430, at *14 ("Collectively, these harms are significant enough to make the threat of irreparable harm factor weigh in favor of injunctive relief as to . . . the United States . . . ."); *Texas*, 2024 WL 861526, at *38 (finding irreparable harm by virtue of a violation of the Supremacy Clause); *South Carolina*, 720 F.3d at 533 ("The irreparable injury to the nation's foreign policy if the relevant sections take effect has been clearly established by the United States.").

### C.    Equities and Public Interest

The final two factors of the preliminary injunction inquiry are the balance of equities and public interest, but when the United States is a party to a preliminary injunction motion, these factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Though Oklahoma argues an injunction is not in the public interest because it will suffer greater harm than the United States if it cannot enforce H.B. 4156, *see* Okla. Resp. at 41–42, as the Eleventh Circuit has found, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations.  Frustration of federal statutes and prerogatives are not in the public interest, and we discern no harm from the state's nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301; *see also Texas*, 97 F.4th at 296 (holding that in the areas of immigration and foreign affairs, it is the federal interest that prevails, as "state and local interests are subservient to those of the nation at large"); *South Carolina*, 720 F.3d at 533 (affirming entry

of preliminary injunction where state law was likely preempted by federal immigration law, and holding that the balance of equities tipped in favor of the federal government and preliminary injunctive relief was in the public interest); *Iowa*, 2024 WL 3035430, at *15 (finding the factors weigh in favor of injunctive relief where the state law is likely preempted by federal law); *Texas*, 2024 WL 861526, at *40–41 (same). This Court finds these cases persuasive and concludes that the balance of equities and public interest factors weigh in favor of granting injunctive relief when, as here, the state law is likely preempted by federal law.

**IV.** **Conclusion**

Oklahoma "may have understandable frustrations with the problems caused by illegal immigration . . . , but the State may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416. Should more explicit guidance foreclose that conclusion, this Court will listen.

But until then, for the reasons set forth herein, the United States' motion for a preliminary injunction [Doc. No. 4] is GRANTED. Oklahoma is hereby ENJOINED from enforcing H.B. 4156 pending further proceedings.

IT IS SO ORDERED this 28th day of June, 2024.

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE

31

J.A. 042

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>THE STATE OF OKLAHOMA, *et al.*,<br><br>    Defendants. | Case No. 5:24-cv-00511-J |

## NOTICE OF VOLUNTARY DISMISSAL

  Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), the United States of America hereby dismisses the above-captioned action.  The United States and defendants agree that each party bears its own cost.

Dated: March 14, 2025     Respectfully submitted,

              YAAKOV M. ROTH
              Acting Assistant Attorney General
              Civil Division

              ALEXANDER K. HAAS
              Director, Federal Programs Branch

              */s/ Jean Lin*
              JEAN LIN
              Special Litigation Counsel
              U.S. Department of Justice
              Civil Division, Federal Programs Branch
              1100 L Street, NW
              Washington, DC  20005
              Phone:  202 514-3716
              Email:  jean.lin@usdoj.gov
              Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2025, I electronically transmitted the foregoing document to the Clerk of Court using the CM/ECF system, which automatically transmits notice of electronic filing to registered participants in the ECF system.


*/s/ Jean Lin*
JEAN LIN

FILED
United States Court of Appeals
Tenth Circuit

March 25, 2025

Christopher M. Wolpert
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

and

PADRES UNIDOS DE TULSA; XIMENA
MONSERRAT LOPEZ MENA; JORDY
MADRIGAL MARTINEZ; ANTONIO
MARQUEZ; RENE DOROTEO
HERNANDEZ,

      Plaintiffs,

v.

STATE OF OKLAHOMA; KEVIN
STITT, in his official capacity as Governor
of Oklahoma; GENTNER DRUMMOND,
in his official capacity as Attorney General
of Oklahoma; OKLAHOMA
DEPARTMENT OF PUBLIC SAFETY;
TIM TIPTON, in his official capacity as
Commissioner of Oklahoma Department of
Public Safety,

      Defendants - Appellants,

and

VICKI BEHENNA, in her official capacity
as District Attorney of Oklahoma County;
STEVE KUNZWEILER, in his official
capacity as District Attorney of Tulsa
County,

      Defendants.

No. 24-6144
(D.C. No. 5:24-CV-00511-J)
(W.D. Okla.)

------------

IMMIGRATION REFORM LAW
INSTITUTE; UNITED MEXICAN
STATES,

    Amicus Curiae.

---

**ORDER**

---

Before **HOLMES**, Chief Judge, **MORITZ**, and **ROSSMAN**, Circuit Judges.

---

This matter is before us on the United States' status report and the State of
Oklahoma's motion to dismiss the appeal and to vacate the judgment of the district court,
both of which were filed in response to the court's order of March 13, 2025. In addition,
the Private Plaintiffs, who were provisionally granted leave to intervene in this appeal,
have moved to remand the case to the district court for further proceedings as necessary.

Upon consideration, the oral argument scheduled for April 10, 2025 at the
Washburn University School of Law is vacated and counsel scheduled to appear are
excused from attendance. After further considering the status of the Private Plaintiffs in
this appeal, we clarify that they are not properly designated as appellees and their motion
to intervene is denied. Private Plaintiffs' motion to remand is also denied as moot.
Finally, this appeal is dismissed as moot. On the circumstances presented here,
Oklahoma's request to vacate the judgment of the district court is denied as unnecessary.
*See Janssen v. Harris*, 321 F.3d 998, 1000 (10th Cir. 2003) (noting effect of a notice of

2

dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(i).

Entered for the Court
CHRISTOPHER M. WOLPERT, Clerk

by: Jane K. Castro
Chief Deputy Clerk

3

J.A. 047

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                               Jane K. Castro
Clerk of Court                                                   Chief Deputy Clerk

March 25, 2025

Mr. Garry Michael Gaskins II
Mr. Cullen D. Sweeney
Mr. Zachary Paul West
Office of the Attorney General for the State of Oklahoma
Litigation Department
313 NE 21st Street
Oklahoma City, OK 73105

**RE:**    **24-6144, United States, et al v. State of Oklahoma, et al**
       Dist/Ag docket: 5:24-CV-00511-J

Dear Counsel:

Enclosed please find an order issued today by the court.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:    Spencer Elijah Wittmann Amdur
       Devraat Awasthi
       Maxwell A. Baldi
       Tanya Broder
       Matt Crapo
       Nicholas David Espiritu
       Omar C. Jadwat
       Amit Jain
       Wafa Junaid
       Donya Khadem

J.A. 048

Megan Lambert
Joshua Adam Matz
Christopher Morel
Leif Eric Overvold
Oscar Sarabia Roman
Daniel Tenny
Cody Wofsy
Noor Zafar

CMW/djd

2

J.A. 049

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, *et al.*

       *Plaintiffs*,

       v.

GENTNER DRUMMOND, *et al.*

       *Defendants*.

Case No.  5:24-cv-00511-J

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW IN SUPPORT

## <u>MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION</u>

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs hereby respectfully move the Court for a temporary restraining order and preliminary injunction restraining Defendants from enforcing any provision of House Bill 4156 ("H.B. 4156") (codified at Okla. Stat. tit. 21, § 1795), which regulates the entry, presence, and expulsion from Oklahoma of noncitizens who have entered the United States without inspection. As this Court previously found, H.B. 4156 violates the Supremacy Clause of the United States Constitution. And as explained in the supporting brief, H.B. 4156 also violates the Commerce Clause and, absent expedited and preliminary injunctive relief, Plaintiffs will suffer immediate and irreparable harm. The United States has dismissed its action against Oklahoma, and Oklahoma has begun enforcing H.B. 4156. Accordingly, Plaintiffs respectfully request that the Court expedite a ruling on this motion.

1

## INTRODUCTION

This Court enjoined H.B. 4156 as a policy that impermissibly "undermine[s] federal law." *United States v. Oklahoma*, 739 F. Supp. 3d 985, 1007 (W.D. Okla. 2024) (quoting *Arizona v. United States*, 567 U.S. 387, 400–02 (2012)).

Oklahoma appealed this Court's injunction. Before the Court of Appeals for the Tenth Circuit could consider the appeal, a new Administration voluntarily dismissed the United States's action against H.B. 4156. *See* Notice of Voluntary Dismissal, *United States v. Oklahoma*, No. 5:24-cv-00511-J (W.D. Okla. Mar. 14, 2025), ECF No. 50. The Tenth Circuit dismissed the appeal as moot and canceled argument. *See* Ord. at 2, *United States v. Oklahoma*, No. 24-6144 (10th Cir. Mar. 25, 2025). Oklahoma has taken that as license to begin enforcing H.B. 4156.[1] *See, e.g.*, *Oklahoma v. Falcon-Romo*, OKLA. STATE COURT NETWORK, https://perma.cc/QX3P-EYFJ (last visited May 9, 2025) (Case No. CM-2025-264, first charges filed under H.B. 4156).

The law has not changed, however. H.B. 4156 is the same law that this Court enjoined. Moreover, since this Court's decision, courts across the country have unanimously struck down laws like H.B. 4156, reaffirming 150 years of Supreme Court precedent that immigration is an *exclusively* federal power. *See United States v. Iowa*, 126 F.4th 1334, 1353 (8th Cir. 2025) (affirming the district court's injunction against S.F. 2340), *vacated on other grounds*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *Idaho Organization of Resource Councils v. Labrador*, No. 1:25-CV-00178-AKB,

---

[1] Plaintiffs do not concede that this Court's injunction is no longer in place.

2025 WL 1237305, at *20 (D. Idaho Apr. 29, 2025) (enjoining the Idaho ICE Act); Omnibus Ord. at 36-37, 47, *Fla. Immigrant Coal. v. Uthmeier*, No. 1:25-cv-21524-KMW (S.D. Fla. Apr. 29, 2025), ECF No. 67 ("Florida Ord.").

H.B. 4156 is creating chaos and enormous harms. Oklahomans, like Plaintiffs Barbara Boe and Christopher Coe[2]—long-time residents of Oklahoma who are undocumented and face arrest, prosecution, and expulsion from the State under H.B. 4156—and Padres Unidos de Tulsa ("Padres Unidos") and League of United Latin American Citizens Oklahoma City ("LULAC OKC"), organizations whose members are confronted with the same dangers, bring this case on behalf of a putative class. Many Oklahomans who have spent most of their lives in the State will suddenly face prosecution and banishment. They will be uprooted from the communities they have nurtured and separated from their families and loved ones.

Accordingly, Plaintiffs ask the Court to issue a preliminary injunction on an expedited basis.

## STANDARD OF REVIEW

A preliminary injunction should issue where Plaintiffs can demonstrate that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1277 (10th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555

---

[2] Plaintiffs move to proceed in pseudonym, and a motion is forthcoming.

U.S. 7, 20 (2008)).

## ARGUMENT

### I.    Plaintiffs Have Standing to Challenge H.B. 4156.

As a threshold matter, Plaintiffs have standing to challenge H.B. 4156. *See* Ord. at 2, *United States v. Oklahoma*, No. 24-6144 (10th Cir. Sept. 6, 2024) (granting prior individual plaintiffs' and Padres Unidos's motion to intervene); *United States v. Iowa*, 737 F. Supp. 3d 725, 740-45 (S.D. Iowa 2024) (similar plaintiffs showed standing); *Idaho*, 2025 WL 1237305, at *2-8 (same); Florida Ord. at  512 (same).

Individual Plaintiffs Barbara Boe and Christoper Coe demonstrate an injury-in-fact as required for standing because (1) they have "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) their intended future conduct is "arguably . . . proscribed by the statute," and (3) "the threat of future enforcement . . . is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160-64 (2014). They are "among the direct targets of" H.B. 4156, *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1097 (10th Cir. 2006), falling squarely within the "illegal entry" and "illegal reentry" crimes, respectively, *see* Ex. A, Declaration of Barbara Boe ¶¶ 5, 7; Ex. B, Declaration of Christopher Coe ¶ 5.

Plaintiffs Padres Unidos and LULAC OKC also have associational standing. For both organizations, at least one of their members is directly affected by H.B. 4156 and would therefore have standing to sue in their own right, the interest the organizations seek to protect are germane to their purposes, and neither the claims asserted nor relief requested requires the members to participate in the lawsuit. *See Speech First, Inc. v.*

*Shrum*, 92 F.4th 947, 949 (10th Cir. 2024) (citing *Friends of the Earth v. Laidlaw*, 528

U.S. 167, 181 (2000)); *see also* Ex. C, Declaration of Michelle Lara ¶¶ 4, 9, 10-11

("Padres Unidos Decl."); Ex. D, Declaration of Nicole Maldonado ¶¶ 5, 12, 13-14

("LULAC OKC Decl.").

## II.    This Court Has Already Found Plaintiffs Are Likely to Succeed on the Merits.

This Court found that Oklahoma "may not pursue polices that undermine federal

law" and therefore enjoined Oklahoma from enforcing H.B. 4156. *Oklahoma*, 739 F.

Supp. 3d at 1007. Nothing has changed since the Court's decision. Thus, Plaintiffs are

likely to succeed on the merits of their claims.

### A.    H.B. 4156 violates the Supremacy Clause.

This Court has already held that H.B. 4156 is likely field and conflict preempted.

*See United States v. Oklahoma*, 739 F. Supp. 3d 985, 1002, 1004 (W.D. Okla. 2024).

H.B. 4156 is likely field preempted because the unlawful entry and reentry

provisions of H.B. 4156, §§ 2(C) and 2(D), criminalize the same conduct already

proscribed under federal law, namely under 8 U.S.C. §§ 1325 and 1326. *See id.* at 997-

98. This Court found the Supreme Court's ruling in *Arizona v. United States*—where the

Supreme Court struck down S.B. 1070 because its noncitizen registration requirement

intruded on a field occupied by federal law—instructive. *See id.* at 998 (citing *Arizona*,

567 U.S. at 400-02). Citing other circuit courts that extended *Arizona*'s reasoning to

preclude state attempts to criminalize activities comprehensively regulated under federal

law, this Court found that Congress similarly "legislated so comprehensively in the field

of noncitizen entry and reentry that it left no room for . . . Oklahoma's attempt to parallel federal law . . . ." *See id.* at 999 (citing *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1263–64 (11th Cir. 2012); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024–26 (9th Cir. 2013); *United States v. South Carolina*, 720 F.3d 518, 531–32 (4th Cir. 2013)).

The same is true for H.B. 4156's expulsion penalty. *See Oklahoma*, 739 F. Supp. 3d at 999. This Court found that, even though H.B. 4156 mandates expulsion only from Oklahoma, rather than from the United States, Oklahoma "cannot . . . be allowed to undermine the long-standing, comprehensive federal framework that defines immigration policy" and that "[s]ensitive matters of immigration policy 'must be made with one voice.'" *See id.* at 999-1002 (citing *United States v. Alabama*, 691 F.3d 1269, 1294 (11th Cir. 2012); *Lozano v. City of Hazleton*, 620 F.3d 170, 179 (3d Cir. 2010), *judgment vacated on other grounds sub nom. City of Hazleton, Pa. v. Lozano*, 563 U.S. 1030 (2011); *Biden v. Texas*, 597 U.S. 785, 805-06 (2022); *Arizona*, 567 U.S. at 400).

This Court also found that H.B. 4156 is likely conflict preempted. *See id.* at 1004. This is because H.B. 4156 conflicts with the federal system, where "there are mechanisms . . . that allow unlawfully present noncitizens to remain in the United States—whether in Oklahoma or elsewhere." *Id.* at 1003. Moreover, "H.B. 4156 would grant state officials broad power to unilaterally arrest, prosecute, and punish noncitizens for immigration offenses 'absent any request, approval, or other instruction from the Federal Government[,]'" which "is not the system Congress created[.]" *Id.* at 1004 (citing *Arizona*, 567 U.S. at 408, 410).

**B.**      **H.B. 4156 violates the Commerce Clause.**

Because this Court has already found that H.B. 4156 is likely preempted under the Supremacy Clause, it need not address the likelihood of prevailing under the Commerce Clause. *See id.* at 1005 n.9. Nevertheless, H.B. 4156 also violates the Commerce Clause.

The Constitution provides that Congress may "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause also has a dormant component that prevents a State "from retreating into economic isolation" by passing laws that discriminate against interstate commerce. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (citation omitted); *see Ore. Waste Sys., Inc. v. Dep't of Env't Quality of Ore.*, 511 U.S. 93, 99 (1994).

"The clearest example of [discriminatory] legislation is a law that overtly blocks the flow of interstate commerce at a State's borders." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978); *see also Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935) (states cannot "set a barrier to traffic between one state and another"). The Supreme Court has thus repeatedly invalidated laws that constitute an "attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade." *See City of Philadelphia*, 437 U.S. at 627-28 (collecting cases).

"[P]recedents firmly establish[] that the federal commerce power surely encompasses the movement in interstate commerce of *persons* as well as commodities." *United States v. Guest*, 383 U.S. 745, 758-59 (1966) (emphasis added). Thus, it is interstate commerce for a person to travel from one state to another. *See Covington & C.*

*Bridge Co. v. Commonwealth of Kentucky*, 154 U.S. 204, 218 (1894) (explaining that "to travel in person from Cincinnati to Covington" constitutes interstate commerce); *Hoke v. United States*, 227 U.S. 308, 320 (1913) (similar).

Recognizing that the movement of persons into and out of a state is interstate commerce, the Supreme Court held in *Edwards v. California* that the Commerce Clause was violated where California attempted to "fenc[e] out indigent immigrants"—that is, people seeking to move there from out of state. *City of Philadelphia*, 437 U.S. at 627 (citing *Edwards*, 314 U.S. 160, 173-74 (1941)). There, California "assert[ed] that the huge influx of migrants into California in recent years has resulted in problems of health, morals, and especially finance." *Edwards*, 314 U.S. at 173. California thus contended "that a State may close its borders to the interstate movement of paupers." Respondent's Br., 1941 WL 52964, at *2 (1941). But the Supreme Court concluded that California's statute violated the Commerce Clause's "prohibition against attempts on the part of any single State to isolate itself from difficulties common to all of them by restraining the transportation of persons and property across its borders." *Edwards*, 314 U.S. at 173.

So too here. H.B. 4156 "overtly blocks the flow of interstate commerce at a State's borders," *City of Philadelphia*, 437 U.S. at 624, by banning certain noncitizens—namely those who irregularly entered the United States—from the State of Oklahoma. The statute reinforces that ban by forcing any noncitizen convicted of violating the statute to leave the state within three days of their conviction. Because H.B. 4156 discriminates against interstate commerce by banning certain categories of immigrants from entering Oklahoma, H.B. 4156 is "virtually per se invalid" under the Commerce Clause. *Ore.*

8

*Waste Sys., Inc.*, 511 U.S. at 99.

Like California, Oklahoma asserts that problems are caused by migration into the State. *See* H.B. 4156 § 1 (referring to "fentanyl distribution" and other issues).[3] Even if there were merit to Oklahoma's concerns, H.B. 4156 is not a constitutional way to address them. Oklahoma cannot penalize crossing state lines or expel people from the State in order "to isolate itself from difficulties common to" the country as a whole. *Edwards*, 314 U.S. at 173.

Because H.B. 4156 discriminates against interstate commerce by banning certain categories of immigrants from entering Oklahoma, H.B. 4156 is "virtually per se invalid" under the Commerce Clause. *Ore. Waste Sys., Inc.*, 511 U.S. at 99.

## III.    Plaintiffs Will Suffer Irreparable Injury Absent an Injunction.

Absent an injunction, the individual plaintiffs and members of Padres Unidos and LULAC OKC will suffer irreparable harm by being placed at risk of arrest, prosecution, and detention under a state statute preempted by federal law. It is well established that

---

[3] Oklahoma's attempt to blame these problems on undocumented people is factually baseless. For example, fentanyl overwhelmingly enters the United States through ports of entry, not through irregular migration, and is smuggled by U.S. citizens, not migrants. *See* David Bier, *Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato Inst. (Sept. 14, 2022) ("[F]entanyl is smuggled through official crossing points specifically because it is easier to conceal it on a legal traveler or in legal goods than it is to conceal a person crossing the border illegally."), https://perma.cc/8RTW-MENH; *see* U.S. Sent'g Comm'n, *Quick Facts: Fentanyl Trafficking Offenses* (2022), https://perma.cc/XDY9-S49M; Statement of Brian Sulc, Executive Director, Transnational Organized Crime Mission Center, Office of Intelligence and Analysis, Department of Homeland Security (May 18, 2022), https://perma.cc/76WQ-4YTU. In any event, the State cannot demonstrate that H.B. 4156's entry ban serves any "legitimate local purpose" that "cannot be adequately served by reasonable nondiscriminatory alternatives." *Ore. Waste Sys., Inc.*, 511 U.S. at 101.

"the threat of criminal prosecution" under a preempted state law "constitutes irreparable harm for purposes of a preliminary injunction." *Farmworker Ass'n of Fla., Inc. v. Moody*, No. 23-CV-22655, 2024 WL 2310150, at *17 (S.D. Fla. May 22, 2024) (citation omitted); *see also, e.g., GLAHR* 691 F.3d at 1269; *Valle del Sol*, 732 F.3d at 1029; *Ga. Latino All. for Hum. Rts. v. Deal*, 793 F. Supp. 2d 1317, 1339 (N.D. Ga. 2011); *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858, 878 (N.D. Tex. 2008). That harm is exacerbated by the statute's removal provision, which further threatens to banish Plaintiffs and others like them. They would face the trauma of being separated from their families, who would lose needed medical care and financial support, and communities. *See* Boe Decl. ¶¶ 6-9; Coe Decl. ¶¶ 8-10; Padres Unidos Decl. ¶¶ 10-11; LULAC OKC Decl. ¶¶ 13-14.

Preventing people from caring for themselves and their families constitutes irreparable injury. *See Evans v. Utah*, 21 F. Supp. 3d 1192, 1210 (D. Utah 2014). Each threatened injury to Plaintiffs' family unity, health, educational opportunity, and loss of home, standing alone, would warrant a finding of irreparable harm. *See Reiland v. Indep. Sch. Dist. No. 11 of Tulsa Cnty., Oklahoma*, No. 22-CV-484, 2022 WL 20689737, at *4 (N.D. Okla. Nov. 1, 2022) (preventing plaintiff from attending child's school activities constituted irreparable injury); *Brown v. Day*, 434 F. Supp. 2d 1035, 1039 (D. Kan. 2006) (risk of deprivation of basic life necessities constitutes irreparable injury); *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003) (irreparable harm based on the risk of "trauma to already troubled children").

## IV.    The Balance of Equities and Public Interest Support an Injunction.

The balance of equities tips decisively in favor of the Plaintiffs, and an injunction is strongly in the public interest. When the Defendants are governmental actors, the third and fourth factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). In contrast to the real and severe harms faced by Plaintiffs explained above, this Court found that the State can claim "no harm from the state's nonenforcement of invalid legislation[,]" and "[f]rustration of federal statutes and prerogatives are not in the public interest[.]" *Oklahoma*, 739 F. Supp. 3d at 1007 (citing *Alabama*, 691 F.3d at 1301; *Texas,* 97 F.4th at 296; *South Carolina*, 720 F.3d at 533).

Additionally, H.B. 4156 will erode the public trust that law enforcement has worked to create with immigrant communities that is integral to public safety. Indeed, the Oklahoma Association of Chiefs of Police and Metro Law Enforcement Agency Leaders has stated that H.B. 4156 "places crime victims at risk by increasing the fear of reporting to law enforcement" and threatens to "deteriorate public trust in law enforcement in already vulnerable communities, ultimately resulting in increased public safety concerns."[4] The Association warned that H.B. 4156 will "destroy the connections and relationships we have built within our local immigrant communities and set us back for many years to come." *Id*., *see also Texas*, 2024 WL 861526, at *40 ("Because SB 4 authorizes state police officers to arrest many unauthorized noncitizens, victims of abuse or human trafficking will risk arrest and removal if they report their crimes," making

---

[4] KOKH Staff, *Oklahoma Association of Chiefs of Police Release Joint Statement on HB 4156*, OKC Fox 25 (May 14, 2024), https://perma.cc/PR5E-L4F6.

"noncitizen crime victims less likely to report violent crimes."); *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 270 (S.D.N.Y. 2020) (enjoining public charge rule due to its chilling effect on immigrants seeking services).

To be sure, Oklahoma has concerns about immigration. But under our constitutional structure, that "is not a controversy between equals," *Texas*, 2024 WL 861526, at *40, for "state and local interests are subservient to those of the nation at large" when it comes to the government's sovereign immigration power, *Texas*, 97 F.4th at 296. As this Court held, "Oklahoma may have understandable frustrations with the problems caused by . . . immigration, but the State may not pursue policies that undermine federal law." *Oklahoma*, 739 F. Supp. 3d at 1007 (quoting *Arizona*, 567 U.S. at 416) (internal quotations omitted).

## V.     This Court Should Grant an Injunction That Extends to All Members of the Provisional Class or, in the Alternative, a Statewide Injunction.

Plaintiffs have concurrently filed a motion for class certification establishing their compliance with the requirements of Rule 23. Plaintiffs reincorporate those arguments here and request this Court issue provisional class certification. This Court should grant provisional class certification and issue a temporary restraining order and preliminary injunction that protects all members of the provisional class, as courts regularly do in these circumstances, and as two courts that recently considered laws similar to H.B. 4156 have done. *See Idaho*, 2025 WL 1237305, at *1 (granting preliminary injunction and provisionally certifying two classes of Plaintiffs for this purpose); *See* Florida Ord. at 36-37, 47 (same); *see also Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab.*

*Servs.*, 31 F.3d 1536, 1548 (10th Cir. 1994) (affirming preliminary injunction to putative class and holding that a class certification was not necessary).

Even without a class, a statewide injunction would still be necessary to protect the Plaintiffs. The Tenth Circuit and other circuit courts have upheld statewide injunctions covering non-parties where an injunction was necessary to ensure complete relief. *See Kansas Health Care*, 31 F.3d at 1538, 1542, 1548 (affirming preliminary injunction applying to all Medicaid-participating nursing homes in Kansas in a case brought by about half of the state's nursing homes); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (issuing statewide injunction where it is "necessary to provide complete relief to the plaintiffs"); *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (relief extends no further than "necessary to redress the plaintiff's injuries") (Gorsuch, J., concurring) (cleaned up). A statewide injunction is necessary to provide complete relief to Plaintiffs in this case. Plaintiff organizations Padres Unidos and LULAC OKC have many individual members across the state who will be affected by H.B. 4156, and there is no easy way of verifying membership during, for example, a traffic stop. *See* Padres Unidos Decl. ¶¶ 7-8; LULAC OKC Decl. ¶ 12; *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) (granting statewide injunction because a limited injunction, where officers would have to determine plaintiff status or membership on the fly during fast-moving interactions like traffic stops, would be impracticable); *Koe v. Noggle*, 688 F. Supp. 3d 1321, 1362 (N.D. Ga. 2023) (granting statewide injunction because a limited injunction would compromise the plaintiffs' anonymity). Thus, the Court should issue statewide relief.

## VI.    Bond Should Be Waived.

The Court should dispense with any bond requirement in granting Plaintiffs classwide interim relief. The Court of Appeals for the Tenth Circuit "ha[s] held that a trial court may, in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction . . . ." *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987). This is especially true where, as in this case, a "case seeks to enforce a constitutional right against the government." *Rocky Mountain Gun Owners v. Polis*, 685 F. Supp. 3d 1033, 1061 (D. Colo. 2023), *rev'd on other grounds*, 121 F.4th 96 (10th Cir. 2024).

## CONCLUSION

For the foregoing reasons, the Court should issue a temporary restraining order or, in the alternative, a preliminary injunction to a provisionally certified class.

Dated: May 13, 2025                    Respectfully submitted,

                                       */s/ Devraat Awasthi*

Elissa Stiles (OK Bar. No. 34030)      Devraat Awasthi (OK Bar. No. 35544)
Rivas and Associates                   Megan Lambert (OK Bar. No. 33216)
P.O. Box 470348                        American Civil Liberties Union of
Tulsa, OK 74147                        Oklahoma Foundation
T: (918) 419-0166                      P.O. Box 13327
F: (918) 513-6724                      Oklahoma City, OK 73113
*estiles@rivasassociates.com*          T: (405) 525-3831
                                       *mlambert@acluok.org*
                                       *dawasthi@acluok.org*

14

**J.A. 064**

Spencer Amdur*
Oscar Sarabia Roman*
Cody Wofsy*
American Civil Liberties Union
Foundation, Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
*samdur@aclu.org*
*osarabia@aclu.org*
*cwofsy@aclu.org*

Noor Zafar*
Omar Jadwat*
Grace Choi**
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
*nzafar@aclu.org*
*ojadwat@aclu.org*
*gchoi@aclu.org*


*Attorneys for Plaintiffs*
*\* Admitted pro hac vice*
*\*\*Pro hac vice application filed*

15

**J.A. 065**

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2025, I filed a true and correct copy of the foregoing

using the CM/ECF system, which will serve the filing on all counsel of record.

/s/ *Devraat Awasthi*
Devraat Awasthi

# EXHIBIT 1

## <u>DECLARATION OF BARBARA BOE</u>

I, Barbara Boe,[1] hereby declare under the penalty of perjury under the laws of the United States of America:

1.      I make this declaration based on my personal knowledge, except where I have indicated otherwise. If called as a witness, I could and would testifr competently and truthfully to these matters.

2.      I am a citizen of Mexico. I am 51 years old.

3.      I currently have two jobs. I work at a manufacturing company and a restaurant. Working two jobs takes up most of my day, but in the past, I played a lot of soccer with friends. I cannot play soccer anymore due to some past work-related injuries and my hypertension.

4.      I have not been convicted of any crimes.

5.      I first entered the United States in 2000 without inspection. I was 27 years old. I have not left since I entered. I moved to Oklahoma immediately. It is my home.

I       have paid my taxes every year since 2001.

6.      I currently live in Tulsa, Oklahoma. I am single and have no children. I am a member of the LGBTQ community. I came to the United States to escape the oppression, discrimination, and abuse I was experiencing in Mexico due to my sexual orientation.

---

[1] Barbara Boe is a pseudonym.

1

7.      I have family that live in New Jersey and North Carolina. I travel to those states often to see them and spend holidays with them. I love my family. I am especially proud of my niece in North Carolina who is a former marine.

8.      I am worried that I will be arrested and convicted under H.B. 4156 and ordered to leave Oklahoma. Oklahoma is my home, and I fear being returned to a country where people like me who are gay suffer discrimination and harassment. In Tulsa, I have been accepted for who I am and have been able to form relationships and live freely as I am.

9.      I also fear being banished from Oklahoma to another state because I purchased a home in Oklahoma and have a long-term job here. I fear losing everything I have worked very hard for if I had to leave the state.

10.      If H.B. 4156 goes into effect, it will cause significant harm to me and others like me, who came to the United States to work and contribute to our communities.

11.      I want to be a representative plaintiff in this case. I understand that if the Court grants the motion for class certification, I will represent a large number of people who, like me, would be affected by this law.

12.      I understand that, as a class representative, it would be my responsibility to represent the interests of all the class members in this lawsuit, and not just my own personal interests. I also understand the need to stay informed about what is happening in the case.

2

13.     I understand that I agree to represent many others like me. I believe it is important to help others remain here in Oklahoma, their home.

14.     I am scared about my identity and participation in this lawsuit being made public because I fear for my safety. I fear that certain individuals will retaliate against me because of my participation in this lawsuit. I have heard about the current Administration or supporters retaliating against people who sue or speak out against the Administration.

I declare under penalty of perjury under the laws of the United States of America that the information provided above is true and correct.

Executed on May 9, 2025, in Tulsa, Oklahoma.

Barbara Boe

3

# EXHIBIT 2

## DECLARATION OF CHRISTOPHER COE

I, Christopher Coe,[1] hereby declare under the penalty of perjury under the laws of the United States of America:

1.      I make this declaration based on my personal knowledge, except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am a citizen of Mexico. I am 37 years old.

3.      I currently work for a construction company, helping build homes. I have been working at this company for more than 10 years.

4.      I have not been convicted of any crimes, just been given a couple of traffic citations.

5.      I first entered the United States without inspection in 2007. I remained in the U.S. until 2010 when I was detained by ICE, while working near the Canada border. I was returned to Mexico and remained there until 2012 when I attempted to reenter the United States without inspection. I was captured at the border, detained for 15 days, and ordered removed and returned to Mexico. Another 15 days later, I reentered the United States without inspection successfully and have lived here since then.

6.      I currently live in Broken Arrow, Oklahoma, along with my wife and stepdaughter. My wife was a victim of a crime in Oklahoma and suffered trauma as a result of it.

---

[1] Chistopher Coe is a pseudonym.

1

7.    Because of her victimization and cooperation with authorities, we are in the process of gaining our lawful status, but we still are not lawful permanent residents.

8.    I am worried that I will be arrested and convicted under H.B. 4156 and ordered to leave Oklahoma. Oklahoma is my home that I share with my wife and stepchild. I am their only primary provider and protector. I fear being separated from them and the home we have created.

9.    If H.B. 4156 goes into effect, it will cause significant harm to me and others like me, who came to the United States to work and contribute to our families and communities.

10.    Being removed from Oklahoma would be extremely disruptive for my family and would devastate their well-being.

11.    I want to be a representative plaintiff in this case. I understand that, if the Court grants the motion for class certification, I would represent a large number of people who, like me, would be affected by this law.

12.    I understand that, as a class representative, it would be my responsibility to represent the interests of all the class members in this lawsuit, and not just my own personal interests. I also understand the need to stay informed about what is happening in the case.

13.    I understand that I agree to represent many other families like ours. I believe it is important to help families like ours.

14.    I am scared about my identity and participation in this lawsuit being made public because I fear for my and my family's safety. I fear that certain individuals would

2

retaliate against us because of my participation in the lawsuit. I have heard about the current Administration or supporters retaliating against people who sue or speak out against the Administration.

I declare under penalty of perjury under the laws of the United States of America that the information provided above is true and correct.

Executed on May 2, 2025, in Tulsa, Oklahoma.

_____
Christopher Coe

3

**J.A. 074**

# EXHIBIT 3

## DECLARATION OF MICHELLE LARA, EXECUTIVE DIRECTOR OF PADRES UNIDOS

I, Michelle Lara, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I make this declaration based on personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully.

2.      I have been a member of Padres Unidos de Tulsa ("Padres Unidos") since its founding in 2022. I currently serve as Founding Executive Director and point of contact for the organization.

3.      Padres Unidos is a membership-based advocacy organization founded in 2022 in Tulsa, Oklahoma. The organization consists of students, parents, and teachers seeking to advocate for a quality education for Latinx immigrant students and Spanish-speaking Tulsa Public School System students.

**Padres Unidos' Mission & Programs**

4.      Padres Unidos' mission is to amplify the voices of students and families to increase access to meaningful educational opportunities for immigrant students and all community members in the Tulsa Public School System.

5.      Padres Unidos builds advocacy skills and organizes members of the Latinx immigrant and Spanish-speaking community to ensure access to the full range of high-quality educational services, including mental health resources, meal assistance, special education services, and reading and math achievement. The organization works

1

collectively to ensure that schools, school boards, and superintendents provide equitable resources and support to their students and children.

6.      The organization empowers members to engage in this work by hosting in person learning sessions, more frequent virtual sessions, and supporting individual meetings with school officials to promote the educational success of Latinx immigrant and Spanish speaking students and families.

**Padres Unidos' Membership**

7.      Padres Unidos is a membership-based organization. Membership is based on letting us know they would like to join the group and participating in our learning sessions and advocacy efforts.

8.      Padres Unidos currently has over 100 members. Our members include students, parents, and educators with diverse immigration histories and statuses.

**Effect of H.B. 4156 on Padres Unidos and Its Members**

9.      Padres Unidos serves members who will be directly affected by H.B. 4156 and the disruption, uncertainty, and fear it will create for immigrants in Oklahoma. Members who entered the United States without inspection or who previously left and reentered without authorization may be arrested and prosecuted under H.B. 4156's "Illegal Entry" or "Illegal Reentry" provisions.

10.      For example, one member, Danny Doe,[1] is a 47-year-old Guatemala national who entered the United States without inspection in 2001 and has never left. He lives in

_____

[1] Danny Doe is a pseudonym.

2

Tulsa with his U.S.-citizen wife and their two U.S.-citizen children. He travels outside of Oklahoma regularly for family-related travel. One of his sons has already seen a counselor due to his sadness and anxiety from worrying about his dad's immigration status. Danny works in commercial cleaning and is the primary financial provider for his family. Danny fears being criminalized for simply continuing to live in Oklahoma, where his family and life are rooted.

11.     Another member, Mario Moe,[2] is a 39 old Salvadoran national who resides in Oklahoma with his wife and four U.S.- citizen children, including a child with a serious medical condition. He first entered the United States without inspection in 2001, receive voluntary departure in 2007, reentered in 2008, and was removed in 2013 following a reduced charge for public intoxication. He reentered that same year and has lived in Oklahoma ever since. Mario currently has a pending U visa, as he was a victim of a crime, and has received a bona fide determination. Mario is a dedicated father and active community member. He fears being arrested and separated from his children under H.B. 4156.

12.     Padres Unidos has already seen a chilling effect among our members due to fear of enforcement. If H.B. 4156 is allowed to take effect, we anticipate a sharp decline in member participation in school meetings, advocacy, and public programs. Members will be less likely to attend in-person sessions or speak with public officials if they fear arrest under the new law.

_____

[2] Mario Moe is a pseudonym.

3

J.A. 078

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on May 12, 2025, in Tulsa, Oklahoma.


Michelle Lara

4

# EXHIBIT 4

## DECLARATION OF NICOLE MALDONADO, PRESIDENT OF LEAGUE OF UNITED LATIN AMERICAN CITIZENS OKLAHOMA CITY

I, Nicole Maldonado, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am the President of League of United Latin American Citizens Oklahoma City ("LULAC OKC"), a position I have held since March 7, 2025. In my role as President, I represent LULAC OKC in building partnerships, community outreach, coalition-making, and community-based projects that are relevant to the Hispanic community to help them achieve their full potential.

2.      LULAC is a nationwide, non-profit, non-partisan, membership-based organization with 535 councils (local chapters) and over 325,000 members. LULAC was established in 1929 and has its headquarters in Washington, D.C.

3.      LULAC OKC is the LULAC local chapter in Oklahoma City, council number 19002. It was established in 2001. As of May 6, 2025, LULAC OKC has 34 members. LULAC OKC carries out LULAC's mission and activities, detailed below, in the Oklahoma City area.

## LULAC's Mission and Activities

4.      LULAC is the largest and oldest Latino civil rights organization in the United States. LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights in all aspects.

5. LULAC advances the economic condition, educational attainment, political influence, housing, health, and civil rights of Hispanic Americans through community-based programs operating at more than 535 LULAC councils nationwide.

6. LULAC has a national board, president, and professional staff, as well as several issue-specific committees.

7. LULAC provides citizenship application assistance and civics and citizenship education to its members, many of whom are immigrants.

8. LULAC and its affiliates provide approximately one million dollars in scholarships to Hispanic students each year. LULAC Institute programs include citizenship and voter registration drives as well as education and health events and programs that empower the Hispanic community at the local, state and national level.

9. In addition, LULAC offers educational programming to disadvantaged youth which impacts more than 18,000 Hispanic students per year at fourteen regional centers. LULAC affiliates, including LULAC's employment arm, provide job skills and literacy training to the Hispanic community through more than forty-eight employment training centers located throughout the United States. The LULAC Corporate Alliance, an advisory board of Fortune 500 companies, fosters stronger partnerships between Corporate America and the Hispanic community.

10. LULAC Oklahoma City strives to advance the economic condition, educational attainment, and health of Latino Americans through community-based programs and partnerships with local supporters. The organization involves and serves all

2

Latino nationality groups and welcomes individuals of all origins.

**LULAC's Membership**

11.     LULAC's members include U.S. citizens and immigrants who are both documented and undocumented. LULAC's members have a wide range of immigration statuses and histories. For example, LULAC members include: naturalized citizens, asylees, lawful permanent residents ("LPR"), humanitarian parole recipients, recipients of Deferred Action for Childhood Arrivals ("DACA"), holders of Temporary Protected Status ("TPS"), recipients of Special Immigrant Juvenile Status ("SIJS"), former unaccompanied minors who were released to relatives or sponsors and were permitted to stay in the U.S. under the custody of the Office of Refugee Resettlement ("ORR"), federal protection beneficiaries, such as persons covered under the Violence Against Women Act ("VAWA"), holders of a visa for Victims of Human Trafficking ("T visa"), holders of a visa for Victims of Criminal Activity ("U visa"), and persons possessing orders to withhold and/or defer their removal. LULAC members also include people who have submitted applications for a wide range of immigration benefits that have yet to be resolved, people who are currently in removal proceedings, people who have been released from federal custody with and without federal notices to appear, and people who entered unlawfully and have not subsequently had contact with federal immigration authorities.

12.     Our membership changes on a weekly basis, as new members join and, sometimes, existing members leave. Maintaining and updating our membership lists is an

3

**J.A. 083**

ongoing, resource-intensive process. Given our limited capacity, it sometimes takes up to a week before a new member is reflected in our systems. We also have no existing process to confirm a person's current membership in LULAC for outside entities, and setting up and deploying that kind of system would seriously strain LULAC's resources. Many of LULAC's members will be directly harmed by H.B. 4156, as they entered the United States without inspection. Thus, they would be subject to H.B. 4156's Illegal Entry or Illegal Reentry provisions any time they enter Oklahoma, such as when they are traveling back into Oklahoma following seasonal work or vacation elsewhere.

**H.B. 4156 Affects LULAC's Members**

13.    For example, one LULAC member, Ronaldo Roe,[1] is a Mexican national who entered the United States without inspection in 2007. He regularly travels throughout Oklahoma for work and occasionally travels out of state for personal reasons, including attending a recent wedding in Florida. He fears being arrested under H.B. 4156 and worries that this would prevent him from continuing his critical caregiving responsibilities for his brother, who requires daily dialysis, as well as for his parents and two nephews for whom he is a legal guardian, causing significant hardship to his family.

14.    Another LULAC member, Soto Soe,[2] entered the United States without inspection in 2002. He received a voluntary departure order in 2008. He re-entered the United States without inspection in 2009, until 2014 when he received another voluntary

---

[1] Ronaldo Roe is a pseudonym.
[2] Soto Soe is a pseudonym.

departure order. After attempting to enter the United States again in 2014, he was stopped at the border and issued a removal order. He last re-entered the United States in 2015 and he has been here ever since. He is married and has a child, and though he is separated from his wife, both his wife and son are U.S. citizens. He has a pending application for lawful permanent residence under the Violence Against Women Act. He dedicates his time to caring for his son. He fears that if he is arrested or punished under H.B. 4156, he won't be able to provide and care for his son.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____

Nicole Maldonado

Executed on this 6th day of May 2025.

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

PADRES UNIDOS DE TULSA, et al.,

*Plaintiffs*,

v.

GENTNER DRUMMOND, et al.,

*Defendants*.

Case No.  5:24-cv-00511-J

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

A class action lawsuit is appropriate to challenge Oklahoma's House Bill 4156, which enacts new state immigration crimes for entry and reentry. *See* 2024 Okla. Sess. Laws ch. 69, codified at Okla. Stat. tit. 21, § 1795; *see also* Second Am. Compl. ¶¶ 33-45. This law impermissibly regulates noncitizens' presence in the State, violates the Supremacy Clause by intruding upon exclusive federal authority over immigration, and burdens interstate travel in contravention of the Commerce Clause. *See* Pls.' Mot. Prelim. Inj. at 5-9.

Plaintiffs respectfully request that this Court certify two classes under Federal Rules of Civil Procedure 23(a) and 23(b)(2) in order to provide relief from the law's uniform provisions to all affected individuals:

1. The "Entry Class" comprises all noncitizens subject to H.B. 4156's new state crime of "Impermissible Occupation" which criminalizes "willfully and without permission

1

enter[ing] and remain[ing] in the State of Oklahoma without having first obtained legal authorization to enter the United States."

2. The "Reentry Class" includes all noncitizens who may be subject to H.B. 4156's separate felony offense for "enter[ing], attempt[ing] to enter, or [being] at any time found in Oklahoma" after they have been "denied admission, excluded, deported, or removed, or ha[ve] departed the United States while an order of exclusion, deportation, or removal is outstanding."

These classes satisfy the requirements of Rule 23(a) and fall within the scope of Rule 23(b)(2). Because H.B. 4156 threatens thousands of noncitizens who live in or travel through Oklahoma, the numerosity requirement is satisfied. The classes raise common legal questions that will generate common answers, including whether the statute is preempted by federal immigration law or whether it violates the Commerce Clause. The classes also raise common factual issues as Plaintiffs and class members are subject to prosecution under the same statute. Plaintiffs' claims are typical of all who risk arrest, detention, and forced expulsion under this state law. Plaintiffs' counsel, attorneys from the ACLU Immigrants' Rights Project and the ACLU of Oklahoma, collectively have significant experience in class-based litigation and will adequately represent the classes in seeking relief against H.B. 4156's enforcement.

Plaintiffs' proposed classes likewise satisfy Rule 23(b)(2) because Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Defendants' enforcement of H.B. 4156 uniformly targets noncitizens who entered the

United States without inspection or reentered after a prior removal or denial of admission, subjecting them to arrest, prosecution, and expulsion from Oklahoma regardless of their eligibility for federal immigration relief. As such, Defendants are operating in a manner that is common to all Plaintiffs and the classes are entitled to an injunction prohibiting the enforcement of H.B. 4156.

Further, because of the threat of imminent arrests, Plaintiffs respectfully request provisional class certification for the purpose of issuing a temporary restraining order or preliminary injunctive relief, followed by final certification thereafter.

**Class Representatives**

Plaintiffs seeking class certification include two organizational plaintiffs, Padres Unidos de Tulsa ("Padres Unidos") and League of United Latin American Citizens Oklahoma City ("LULAC OKC"), and two individual noncitizens (collectively, "Representative Plaintiffs"). These representatives are divided into two classes that mirror H.B. 4156's "Illegal Entry" and "Illegal Reentry" offenses. They present uniform legal theories and share the same interest in obtaining a declaration and permanent injunction preventing H.B. 4156's enforcement.

Padres Unidos is a nonprofit membership organization dedicated to advancing the rights and well-being of immigrant communities in Oklahoma. *See* Decl. of Michelle Lara ("Lara Decl.") ¶¶ 3–6. Members include noncitizens subject to the "Illegal Entry" and "Illegal Reentry" provisions, who routinely travel between states and have pending federal applications for immigration relief. *See id.* ¶¶ 9–12. These members live throughout Oklahoma and have deep roots in the state—they work, attend school, and raise their

3

families here. *See id.* ¶¶ 3–8. If H.B. 4156 takes effect, they will face arrest, prosecution, and forced expulsion from the state, despite their longstanding presence in the state and while their federal immigration cases remain pending.

LULAC OKC is a local chapter of the nation's oldest and largest Latino civil rights organization. *See* Decl. of Nicole Maldonado ("Maldonado Decl.") ¶¶ 2–4. LULAC OKC's members include noncitizens subject to the "Illegal Entry" and "Illegal Reentry" provisions, who have a wide range of immigration statuses and experiences. *See id.* ¶¶ 11– 14. These members routinely travel in and out of Oklahoma for work, family, and community events. LULAC OKC's mission is to advance the well-being of Latino Oklahomans through education, job training, and civic engagement. H.B. 4156 places its members at imminent risk of arrest and removal for routine travel or presence in Oklahoma and undermines LULAC OKC's ability to carry out its programs. *See id*.

The individual plaintiffs serve as representatives of the Entry and Reentry Classes, respectively. Each is a longtime Oklahoma resident with U.S. citizen family members. They face prosecution under H.B. 4156 based on either their initial entry or prior removal history. Barbara Boe, a Mexican national, entered the U.S. without inspection in 2000 and has lived in Tulsa ever since. She travels regularly outside of Oklahoma to visit family in New Jersey and North Carolina. She is a member of the LGBTQ+ community and came to the United States to escape the oppression, discrimination, and abuse she was experiencing in Mexico on account of her sexual orientation. She fears having to leave Oklahoma, which has been her home for over twenty years, and being forced to return to Mexico, where gay people suffer harm. *See* Decl. of Barbara Boe ("Boe Decl.") ¶¶ 2–14.

**J.A. 089**

Christopher Coe reentered the U.S. without inspection in 2012 and now resides in Oklahoma with his wife and stepdaughter. His wife is a crime survivor, and their family is pursuing immigration relief together. Coe has lived and worked in Oklahoma for more than a decade and fears that H.B. 4156 will result in prosecution and separation from his family. *See* Decl. of Christopher Coe ("Coe Decl.") ¶¶ 2–12.

These organizational and individual plaintiffs have a shared interest in halting H.B. 4156's enforcement and are well-situated to represent the classes seeking relief.

## ARGUMENT

Rule 23 was enacted to "facilitate the bringing of class actions in the civil-rights area." 7A Wright & Miller, *Federal Practice & Procedure* § 1775 (3d ed. 2018). Civil rights cases like this one—where plaintiffs challenge a uniform policy or statute that applies broadly to a defined group—are particularly amenable to class treatment. As courts in this Circuit have recognized, "[d]oubts should be resolved in favor of class certification," especially where injunctive or declaratory relief is sought. *In re Williams Cos. ERISA Litig.*, 231 F.R.D. 416, 420 (N.D. Okla. 2005) (cleaned up).

To obtain class certification, plaintiffs must meet the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and satisfy at least one provision of Rule 23(b). *See* Fed. R. Civ. P. 23(a), (b); *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010). At the class certification stage, "the question is not whether the . . . plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met," and the court must accept the substantive allegations of the complaint as true. *DG ex rel. Stricklin*, 594 F.3d at 1194; *see*

*also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action."). Class certification is particularly appropriate here, and all requisite elements of Rule 23 have been met.

Moreover, Plaintiffs seek only provisional class certification for purposes of issuing preliminary relief, allowing additional time for the court to evaluate the matter before granting full class certification. Provisional class certification depends on and is in service of the associated preliminary relief. *See, e.g.*, *Idaho Organization of Resource Councils v. Labrador*, No. 1:25-CV-00178-AKB, 2025 WL 1237305, at *20 (D. Idaho Apr. 29, 2025) (provisionally certifying class in similar challenge against the Idaho ICE Act); Omnibus Ord., *Fla. Immigrant Coal. v. Uthmeier*, No. 1:25-cv-21524-KMW (S.D. Fla. Apr. 29, 2025), ECF No. 67 (provisionally certifying class in similar challenge against S.B. 4C).

## I. The Proposed Classes Satisfy the Numerosity Requirement of Rule 23(a)(1)

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Tenth Circuit has made clear that there is no fixed threshold for numerosity; rather, courts must consider the specific facts of the case to determine whether joinder is impracticable. *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

Here, each proposed class includes thousands of individuals across Oklahoma who are at risk of enforcement under H.B. 4156. The Entry Class includes noncitizens who live in or travel to Oklahoma and who may be subject to prosecution for entering the state without federal authorization. The Reentry Class includes noncitizens present in Oklahoma

who have a prior removal or deportation order and are similarly at risk under the statute. Oklahoma is home to an estimated 90,000 undocumented immigrants, many of whom live in mixed-status households or are pursuing immigration relief. *See* Migration Policy Institute, *Profile of the Unauthorized Population: Oklahoma* (2024). These individuals move for work, attend schools, visit family across state lines, or return to the state after travel. Even a small subset of this population would far exceed the class sizes that courts in this Circuit have found sufficient to satisfy Rule 23(a)(1). *See Barton v. Corrs. Corp. of Am.,* No. 03-cv-428-JHP-SAJ, 2005 WL 5329514, at *3 (N.D. Okla. Sept. 1, 2005) (certifying class of 66 members); *Fabian v. Indep. Sch. Dist. No. 89 of Oklahoma Cty*., 409 F. Supp. 94, 95 (W.D. Okla. 1976) (certifying class of 142).

The proposed classes are also not static. As in other civil rights actions, future class members will continue to emerge as individuals travel into, return, or relocate to Oklahoma, triggering potential criminal liability under H.B. 4156. This continual evolution of the class weighs in favor of a finding that joinder is impracticable. *See, e.g.*, *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) ("[T]he fact that the class includes unknown, unRepresentative future members also weighs in favor of certification."); *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 915 (10th Cir. 2018) ("Considerations such as class members' limited understanding of the law, limited English skills, [and] geographic dispersal therefore weigh in favor of class certification.").

Moreover, where injunctive or declaratory relief is sought, the numerosity requirement is applied more leniently. *See Horn v. Associated Wholesale Grocers, Inc*., 555 F.2d 270, 275–76 (10th Cir. 1977) ("[W]here the relief sought is injunctive and declaratory,

even speculative and conclusory representations as to the size of class are sufficient."). Satisfaction of Rule 23(a)(1) does not require impossibility of joinder, but only that plaintiffs would suffer significant hardship or inefficiency if forced to proceed individually. *See id.* As such, the numerosity requirement is easily satisfied.

## II. The Proposed Classes Share Common Questions of Law and Fact

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is satisfied so long as there is a single question that is capable of classwide resolution—where the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Hill v. Marathon Oil Co.*, No. CIV-08-37-R, 2010 WL 2365447, at *2 (W.D. Okla. June 9, 2010) ("There need only be one issue of law or fact common to all class members to satisfy the element of commonality.").

This case presents shared legal and factual questions across the proposed classes. Plaintiffs challenge H.B. 4156 on uniform legal grounds: that the statute is preempted by federal immigration law under the Supremacy Clause and unlawfully restricts the free movement of people across Oklahoma's borders in violation of the dormant Commerce Clause. These common questions are "capable of classwide resolution" because they turn on the validity of the statute itself, not individualized facts. *See Dukes*, 564 U.S. at 350. Plaintiffs do not seek individualized adjudication; rather, the classes raise facial challenges to a uniform statutory scheme that subjects all class members to the risk of arrest,

8

**J.A. 093**

prosecution, and removal based on their immigration history and movement across state lines.

Proposed class members also share a common base of facts. All class members are subject to the same statutory provisions and face the same consequences based solely on their immigration status, presence, and movement within the state. Their "shared risk" of prosecution under H.B. 4156's uniform provisions is sufficient to satisfy commonality. *See DG ex rel. Stricklin*, 594 F.3d at 1197. Individual variations in background, travel history, or immigration status do not defeat commonality where plaintiffs "have suffered the same injury" from the same conduct by the defendant. *Dukes*, 564 U.S. at 350. Nor must Plaintiffs show that every question can be resolved classwide—just that the statute at issue "generate[s] common *answers* apt to drive the resolution of the litigation." *Id*. Because Plaintiffs challenge a single statute that applies broadly and uniformly, Rule 23(a)(2)'s commonality requirement is easily satisfied.

## III. The Class Representatives Claims Are Typical of the Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement is met when the class representatives' claims arise from the same course of conduct and are based on the same legal theories as the claims of the class. *See Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *In re Cox Enters., Inc.*, No. 12-ML-2048-C, 2014 WL 104964, at *4 (W.D. Okla. Jan. 9, 2014).

Here, the Representative Plaintiffs challenge H.B. 4156 on the same legal grounds as all class members. They seek the same declaratory and injunctive relief as the proposed

class, and they face the same imminent threat of prosecution based on movement across state lines and immigration history. *See DG ex rel. Stricklin*, 594 F.3d at 1197 ("[T]ypicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."). Their claims are not only representative of, but inextricable from, those of the class they seek to represent.

That class members may have different backgrounds or individual circumstances does not defeat typicality. "The commonality and typicality requirements of Rule 23(a) tend to merge," as both serve to ensure the claims of the class representatives align with those of absent class members. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Because all class members are subject to the same statute and raise the same legal challenges, the typicality requirement is satisfied.

## IV. The Representatives Are Adequate

Rule 23(a)(4) requires that the Representative plaintiffs "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Courts in the Tenth Circuit evaluate adequacy by answering two questions: "(1) do the Representative plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the Representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002). The Tenth Circuit has recognized that organizations, in addition to individual plaintiffs, may serve as class representatives in lawsuits where the organization's mission and its members' interests align with the relief sought. *See Abercrombie & Fitch Co.*, 765 F.3d at 1212 (recognizing organizational plaintiff as an adequate class representative in ADA

litigation); *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW) v. Brock*, 477 U.S. 274, 289–90 (1986) ("The very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests."). The Representative Plaintiffs in this litigation, organizational plaintiffs Padres Unidos and LULAC OKC, as well as individual plaintiffs, meet these obligations.

A. *Padres Unidos as Entry and Reentry Class Representative*

Padres Unidos de Tulsa, a nonprofit organization, seeks to represent its members who face the risk of arrest, prosecution, and expulsion under H.B. 4156. Its mission is to amplify the voices of immigrant families, particularly Latinx and Spanish-speaking families, in Tulsa's public schools. *See* Lara Decl. ¶¶ 3–6. These members include individuals who entered the United States without inspection, have reentered after past removal orders, and have a broad range of immigration histories and statuses. *See id.* ¶¶ 8, 9–11.

Many Padres Unidos members regularly travel across state lines for work or family obligations and would be directly impacted by H.B. 4156's Entry and Reentry provisions. For example, Danny Doe entered the U.S. without inspection in 2001 and never left. He travels outside of Oklahoma regularly for family-related travel. He is worried that H.B. 4156 will separate him from his wife and two U.S.-citizen children, for whom he is the primary financial provider. He is also worried that this will aggravate his son's mental health, as his son is already seeing a counselor due to his anxiety about his dad's immigration status. *See* Lara Decl. ¶ 10. Another member, Mario Moe, a Salvadoran

national and father of four U.S.-citizen children, has reentered the U.S. multiple times after past removal orders and now has a pending U visa. He fears prosecution under H.B. 4156 could separate him from his family, including a child with a serious medical condition. *See id.* ¶ 11. Padres Unidos is a proper class representative as an organization "suing to vindicate its members' interests" and can draw upon a "preexisting reservoir of expertise and capital," *UAW*, 477 U.S. at 289.

B. *LULAC OKC as Entry and Reentry Class Representative*

LULAC OKC is a nonprofit, membership-based organization that advances the civil rights, health, and educational access of Latino communities in Oklahoma. Its members include noncitizens with diverse immigration histories and statuses. *See* Maldonado Decl. ¶¶ 5–11.

LULAC OKC has a diverse and evolving membership, and many of its members travel across state lines for both work and personal reasons and would be directly impacted by H.B. 4156. For example, Ronaldo Roe, a longtime Oklahoma resident, entered the United States without inspection in 2007 and travels for out-of-state family events. He fears prosecution under the "illegal entry" provision, which could impact his ability to care for his brother, who requires daily dialysis, and his parents and nephews, for whom he is a legal guardian. *See id.* ¶ 13. Another member, Soto Soe, reentered the U.S. after a prior removal order. He worries that H.B. 4156, specifically the "illegal reentry" crime, could jeopardize his ability to support his U.S.-citizen son. *See id.* ¶ 12. Because LULAC OKC's mission and programming are aligned with protecting the interests of its members and

securing relief from enforcement under H.B. 4156, it satisfies the adequacy requirement of Rule 23(a)(4).

### C. *Individual Entry Class Representatives*

Barbara Boe is a Mexican national who entered the United States without inspection in 2000. She travels regularly outside of Oklahoma to visit family in New Jersey and North Carolina. She is a member of the LGBTQ+ community and fears having to leave Oklahoma, which has been her home for over twenty years, and being forced to return to Mexico, where gay people suffer harm. *See* Boe Decl. ¶¶ 2–12. Ms. Boe has the same interests as other members of the Entry Class and every incentive to pursue this action vigorously on their behalf. *See id.* ¶¶ 10–13.

### D. *Individual Reentry Class Representatives*

Christopher Coe lives in Oklahoma with his wife and stepdaughter. After multiple removals in the early 2010s, Coe reentered the United States without inspection in 2012 and has remained in Oklahoma ever since. He works in residential construction and is the primary provider for his household. His wife, a crime survivor, is pursuing lawful status that may extend to him as well. Coe fears that H.B. 4156 would upend his family's stability and expose him to prosecution, detention, and separation from his loved ones. *See* Coe Decl. ¶¶ 2–10. Mr. Coe faces the same imminent threat as others in the Reentry Class and has every incentive to vigorously pursue relief on behalf of all similarly situated class members. *See id.* ¶¶ 11–13.

## V. Class Counsel Is Adequate Under Rule 23(g)

Under Federal Rule of Civil Procedure 23(g), any order certifying a class must appoint class counsel who will "fairly and adequately represent the interests of the class." In deciding whether counsel meet that standard, courts consider "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). The Tenth Circuit likewise examines whether counsel are free from conflicts, have significant expertise, and demonstrate a willingness to devote the resources necessary for effective representation. *See Rutter & Wilbanks*, 314 F.3d at 1187–88 (discussing adequacy factors).

Here, Plaintiffs' counsel satisfy these criteria. They have invested considerable time meeting with affected individuals, gathering facts, and researching how H.B. 4156 conflicts with both federal immigration statutes and preemption doctrines. Counsel have extensive familiarity with complex federal litigation, including civil-rights actions, preemption cases, and class-based requests for equitable relief. Indeed, counsel have litigated against laws similar to H.B. 4156 in other states. Counsel have the institutional resources necessary to vigorously pursue this litigation to conclusion. The ACLU Immigrants' Rights Project and its affiliate the ACLU of Oklahoma are nationally-recognized organizations with substantial capacity to conduct discovery, motion practice, class administration, and enforcement of injunctive relief. No conflicts of interest appear in the record, and the proposed counsel's litigation history demonstrates a proven capacity to undertake

representation that demands significant briefing, motion practice, and ongoing oversight. *See* Decl. of Noor Zafar, Ex. A; Decl. of Megan Lambert, Ex. B.

Under these circumstances, appointment of Plaintiffs' counsel as class counsel is warranted. They have satisfied Rule 23(g)(1)(A) by investigating and pleading the claims, demonstrating the requisite knowledge and experience, and pledging to devote the resources required for this litigation. They "will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

## VI. The Classes Satisfy Rule 23(b)(2)

Rule 23(b)(2) authorizes certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). That requirement is "almost automatically satisfied in actions primarily seeking injunctive relief." *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994); *see also Dukes*, 564 U.S. at 360–61 (Rule 23(b)(2) applies when "a single injunction or declaratory judgment would provide relief to each member of the class").

Certification under Rule 23(b)(2) is appropriate here. H.B. 4156 is a state statute that purports to create two new immigration-related crimes. These provisions apply broadly to noncitizens regardless of individual circumstances, and their enforcement by Defendants presents a common legal threat to all members of the Entry and Reentry Classes. The uniform nature of the statute—and the indiscriminate risk it poses—makes this case especially suitable for certification under Rule 23(b)(2). *See, e.g., Shook v. Bd. of Cnty.*

15

**J.A. 100**

*Comm'rs of El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) (Rule 23(b)(2) is particularly suited for cases involving "a shifting . . . population");

Here, the Entry and Reentry Classes present the same legal theory: Oklahoma's attempt to regulate immigration is preempted by federal law and violates the Commerce Clause. Each class member faces the same threat of arrest, prosecution, and expulsion based solely on the application of H.B. 4156. And the relief they seek, an injunction blocking the statute's enforcement, would apply equally to the entire class. Because the same state law threatens all class members in the same way, and because the requested injunction would provide uniform relief, Rule 23(b)(2) is satisfied.

## CONCLUSION

The Court should grant class certification or, if the Court requires additional time to consider the motion, grant provisional class certification.

Dated: May 13, 2025                    Respectfully submitted,

                                       /s/ *Devraat Awasthi*
Elissa Stiles (OK Bar. No. 34030)      Devraat Awasthi (OK Bar. No. 35544)
Rivas and Associates                   Megan Lambert (OK Bar. No. 33216)
P.O. Box 470348                        American Civil Liberties Union of
Tulsa, OK 74147                        Oklahoma Foundation
T: (918) 419-0166                      P.O. Box 13327
F: (918) 513-6724                      Oklahoma City, OK 73113
*estiles@rivasassociates.com*          T: (405) 525-3831
                                       *mlambert@acluok.org*
                                       *dawasthi@acluok.org*

16

**J.A. 101**

Spencer Amdur*
Oscar Sarabia Roman*
Cody Wofsy*
American Civil Liberties Union
Foundation, Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
*samdur@aclu.org*
*osarabia@aclu.org*
*cwofsy@aclu.org*

Noor Zafar*
Omar Jadwat*
Grace Choi**
American Civil Liberties Union
Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
*nzafar@aclu.org*
*ojadwat@aclu.org*
*gchoi@aclu.org*

*Attorneys for Plaintiffs*
*\* Admitted pro hac vice*
*\*\*Pro hac vice application filed*

17

**J.A. 102**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2025, I filed a true and correct copy of the

foregoing using the CM/ECF system, which will serve the filing on all counsel of record.

/s/ *Devraat Awasthi*

Devraat Awasthi

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, et al.,

*Plaintiffs*,

v.

GENTNER DRUMMOND, et al.,

*Defendants*.

Case No.  5:24-cv-00511-J

## DECLARATION OF NOOR ZAFAR IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Noor Zafar, declare as follows:

1.      I am a Senior Staff Attorney at the American Civil Liberties Union Foundation Immigrants' Rights Project ("ACLU"), and am counsel for Plaintiffs in this case. I make this declaration to describe my qualifications and those of my colleagues to serve as counsel for the Proposed Class in this case. The following facts are based on my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

**Noor Zafar**

2.      I am a member of the New York bar and am admitted to practice before the U.S. District Court for the Southern District of New York and the U.S. Courts of Appeals for the Second, Ninth, Tenth, and Eleventh Circuits. I graduated from Harvard Law School in 2016.

1

3.      Since coming to the ACLU in 2018, I have served as counsel on several major immigration-related cases. *See, e.g., Padres Unidos v. Drummond*, 24-cv-526 (W.D. Okla. 2024) (preemption challenge to state immigration law); *Am. C.L. Union Immigrants' Rts. Project v. United States Immigr. & Customs Enf't,* 58 F.4th 643, 646 (2d Cir. 2023) (FOIA obtaining disclosure of ICE records); *Sierra Club v. Trump*, 963 F.3d 874 (9th Cir. 2020) (injunction against diversion of military funds to construct border wall); *Mahmoud Khalil v. Joyce*, 2:25-cv-01963 (D.N.J. 2025) (habeas challenge to immigration detention based on protected speech).

4.      I have also served as counsel in *Samma v. U.S. Dep't of Def.*, No. 20-cv-1104 (D.D.C. 2020), a class action on behalf of noncitizen service members that successfully challenged a policy denying them an expedited path to citizenship.

5.      Prior to joining the ACLU, I worked as a Bertha Justice fellow at the Center for Constitutional Rights, where I represented detainees at Guantánamo Bay and engaged in litigation and advocacy relating to the laws of war, immigration, and religious profiling. *See, e.g.*, *Hassan v. City of New York*, 14-1688 (3d Cir. 2015); *al-Hajj v. Trump*, 9-cv-745 (D.D.C. 2018) (habeas action on behalf of law of war detainees at Guantánamo).

**Cody Wofsy**

6.      Cody Wofsy is a Deputy Director at the ACLU. He is a member of the California bar, and is admitted to practice in the U.S. Supreme Court; the U.S. Courts of Appeals for the First, Second, Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh, and District of Columbia Circuits; and the U.S. District Courts for the Northern, Southern, Central, and Eastern Districts of California, the District of Columbia, and the Western District of Texas.

Mr. Wofsy graduated from Yale Law School in 2013 and served as a Law Clerk to the Honorable Myron H. Thompson of the U.S. District Court for the Middle District of Alabama and the Honorable Marsha S. Berzon of the Ninth Circuit Court of Appeals.

7.    Mr. Wofsy litigates complex immigration-related cases at all levels of the federal and state courts. *See, e.g.*, *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) (affirming in part injunction of policies limiting asylum within the expedited removal system); *East Bay Sanctuary Covenant v. Barr*, *Capital Area Immigrants' Rights Coal. v. Trump*, *East Bay Sanctuary Covenant v. Trump* (challenges to restrictive asylum policies); *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (denying stay in part of preliminary injunction of an Executive Order barring nationals of certain countries from entering the United States); *Morales v. Chadbourne*, 235 F. Supp. 3d 388 (D.R.I. 2017) (granting partial summary judgment in case challenging immigration arrest); *Ramon v. Short*, 2020 MT 69, 399 Mont. 254, 460 P.3d 867 (holding state officers lack authority to conduct civil immigration arrests); *People ex rel. Wells v. DeMarco*, 168 A.D.3d 31, 88 N.Y.S.3d 518 (N.Y. App. Div. 2018) (same).

8.    Mr. Wofsy also represents amici in a number of cases involving the federal government's administration of the immigration laws. *See, e.g.*, *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062 (2020) (rejecting government's interpretation of jurisdictional provision); *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020) (rejecting government assertion of authority to impose immigration related conditions on grant program); *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020) (same); *City of Philadelphia v. Attorney Gen. of United States*, 916 F.3d 276 (3d Cir. 2019), *reh'g denied* (June 24, 2019) (same);

3

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) (rejecting government efforts to enjoin California Values Act as preempted by immigration statutes), *cert. denied,* No. 19-532, 2020 WL 3146844 (U.S. June 15, 2020); *San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) (affirming injunction of immigration-enforcement Executive Order); *see also Simon v. City of New York*, 893 F.3d 83 (2d Cir. 2018) (reversing dismissal of case challenging arrest on material witness warrant).

9.     As relevant here, Mr. Wofsy has litigated several challenges to state and local laws regulating immigration, including laws similar to S.B. 4C. *See, e.g.*, *United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) (argued) (denying Texas's motion to stay preliminary injunction against state law creating entry and reentry crimes on preemption grounds); *Iowa Migrant Movement for Justice v. Bird*, 2025 WL 319926 (8th Cir. Jan 24, 2025) (involving similar state law, which the Eighth Circuit affirmed an injunction against); *United States v. Oklahoma*, 739 F. Supp. 3d 985 (W.D. Okla. 2024) (granting preliminary injunction against state law creating entry and reentry crimes on preemption grounds); *Idaho Organization of Resource Councils v. Labrador*, No. 25- cv-00178 (D. Idaho filed Mar. 27, 2025) (class action) (TRO granted); *Fla. Immigrant Coal. v. Uthmeier*, No. 1:25-cv-21524-KMW (S.D. Fla. filed Apr. 2, 2025) (class action) (TRO granted).

**Omar Jadwat**

10.     Omar Jadwat has been an attorney with the ACLU since 2002 and is the current Director. Mr. Jadwat graduated from New York University School of Law in 2001, then clerked for the Honorable John G. Koeltl of the U.S. District Court for the Southern District of New York.

11.    Mr. Jadwat is a member of the New York bar, and is admitted to practice in the U.S. Supreme Court; the U.S. Courts of Appeals for the First, Second, Third, Fourth, Fifth, Eighth, Ninth, Tenth, Eleventh, and District of Columbia Circuits; and the U.S. District Courts for the Southern and Eastern Districts of New York. He has argued notable immigrants' rights cases at all levels of the federal court system.

12.    Mr. Jadwat has served as counsel in multiple class action or systemic immigration cases. His cases include: *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017) (challenge to Muslim travel ban).

13.    As relevant here, Mr. Jadwat has litigated numerous challenges to state and local laws regulating immigration, including laws similar to S.B. 4C. *See, e.g.*, *United States v. Texas*, 97 F.4th 268 (5th Cir. 2024); *Iowa Migrant Movement for Justice v. Bird*, 2025 WL 319926 (8th Cir. Jan 24, 2025); *United States v. Oklahoma*, 739 F. Supp. 3d 985 (W.D. Okla. 2024); *Lozano v. City of Hazleton*, 724 F.3d 297, 300 (3d Cir. 2013) (argued) (affirming injunction against city provisions seeking to prohibit unauthorized noncitizens from working or renting housing); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 528 (5th Cir. 2013) (affirming injunction against criminal and civil provisions seeking to prevent unauthorized noncitizens from renting housing in city); *Hisp. Int. Coal. of Alabama v. Governor of Alabama*, 691 F.3d 1236, 1240 (11th Cir. 2012) (remanding for entry of preliminary injunction against state statute seeking to bar public postsecondary education for unauthorized noncitizens); *Idaho Organization of Resource Councils v. Labrador*, No. 25-cv-00178 (D. Idaho filed Mar. 27, 2025) (class action) (TRO granted); *Fla. Immigrant Coal. v. Uthmeier*, No. 1:25-cv-21524-KMW (S.D. Fla. filed Apr.

5

2, 2025) (class action) (TRO granted).

14.    In addition to his work at the ACLU, Mr. Jadwat has taught classes on immigration law and litigation at New York University School of Law and Cardozo School of Law.

**Spencer Amdur**

15.    Spencer Amdur is a Staff Attorney at the ACLU. He is a member of the bar of California, and is admitted to practice in the U.S. Courts of Appeals for the Second, Fourth, Fifth, Seventh, Ninth, Tenth, and District of Columbia Circuits; and the U.S. District Courts for the District of Columbia, Northern and Southern Districts of California, and the Western District of Texas. He graduated from Yale Law School in 2013 and clerked for the Honorable Judith W. Rogers of the U.S. Court of Appeals for the D.C. Circuit. Prior to his work at the ACLU, he was a Trial Attorney at the Federal Programs Branch of the Civil Division within the U.S. Department of Justice, as well as an Arthur Liman Public Interest Fellow at the Lawyers' Committee for Civil Rights in San Francisco.

16.    Mr. Amdur litigates complex immigration-related cases at all levels of the federal and state courts. *See, e.g.*, *Trump v. Int'l Refugee Assistance Project* (described *supra*); *Roy v. County of Los Angeles*, No. 12-cv-9012, 2018 WL 914773 (C.D. Cal. Feb. 7, 2018) (granting summary judgment as to certain subclasses in class action challenge to federal and local immigration detention policies); *P.K. v. Tillerson*, 1:17-cv-01533 (D.D.C. filed 2017) (challenge to State Department policy denying visas to winners of the Diversity Visa Lottery); *Al Mowafak v. Trump*, No. 3:17-cv-557 (N.D. Cal. filed 2017) (challenge to restrictions on refugee admissions). He also represents amici in a number of cases

6

involving the federal government's administration of immigration laws. *See, e.g.*, *City of Chicago v. Barr and City of Philadelphia v. Att'y Gen.* (described *supra*); *County of Santa Clara v. Trump*, No. 17-17480 (9th Cir.) (reviewing injunction of immigration-enforcement Executive Order).

17.     As relevant here, Mr. Amdur has litigated several challenges to state and local laws regulating immigration, including laws similar to S.B. 4C. *See, e.g.*, *United States v. Texas*, 97 F.4th 268 (5th Cir. 2024) (described *supra*); *Iowa Migrant Movementfor Justice v. Bird*, 2025 WL 319926 (8th Cir. Jan 24, 2025) (described *supra*); *United States v. Oklahoma*, 739 F. Supp. 3d 985 (W.D. Okla. 2024) (described *supra*); *Texas v. Travis Cty.*, 272 F. Supp. 3d 973 (W.D. Tex. 2017) (dismissing lawsuit seeking declaration of state immigration law's constitutionality); *Idaho Organization of Resource Councils v. Labrador*, No. 25-cv-00178 (D. Idaho filed Mar. 27, 2025) (class action) (TRO granted); *Fla. Immigrant Coal. v. Uthmeier*, No. 1:25-cv-21524-KMW (S.D. Fla. filed Apr. 2, 2025) (class action) (TRO granted).

**Oscar Sarabia Roman**

18.     Oscar Sarabia Roman has been a Staff Attorney at the ACLU since 2022. He graduated from U.C. Berkeley, School of Law in 2021 and clerked for the Honorable Virginia A. Phillips of the U.S. District Court for the Central District of California.  Mr. Sarabia Roman is a member of the District of Columbia and California bars.  He is admitted to practice before the U.S. Court of Appeals for the Ninth Circuit and Tenth Circuit, and the U.S. District Courts for the Central District of California and the Southern District of New York.

19.     Mr. Sarabia Roman has served as counsel on several complex immigration cases, including *JGG v. Trump*, No. 25-00766 (D.D.C. filed Mar. 15, 2025) (class action); *East Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. filed May 18, 2023); *United States v. Texas*, No. 21-cv-00173 (W.D. Tex. filed July 30, 2021).  As relevant here, Mr. Sarabia Roman has litigated challenges to state and local laws regulating immigration, including laws similar to S.B. 4C.  *See, e.g.*, *United States v. Oklahoma*, 739 F. Supp. 3d 985 (W.D. Okla. 2024); *Idaho Organization of Resource Councils v. Labrador*, No. 25-cv-00178 (D. Idaho filed Mar. 27, 2025) (class action) (TRO granted); *Fla. Immigrant Coal. v. Uthmeier*, No. 1:25-cv-21524-KMW (S.D. Fla. filed Apr. 2, 2025) (class action) (TRO granted).

**Grace Choi**

20.     Grace Choi is a fellow at the ACLU. She is a member of the New York bar and is admitted to practice before the U.S. District Courts for the Southern and Eastern Districts of New York. She is a 2022 graduate of Yale Law School. After graduation, Ms. Choi clerked for the Honorable John G. Koeltl of the U.S. District Court for the Southern District of New York and worked at the New York Legal Assistance Group in the Immigrant Protection Unit, where she represented individuals in immigration matters. In law school, she represented a class of all immigrants detained by ICE in the First Circuit for over six months pursuant to a mandatory detention statute, *Reid v. Donelan*, No. 13-CV-30125-MAP (D. Mass. filed July 1, 2013), and a class of immigrants detained by ICE at a detention facility in Massachusetts during the height of the COVID-19 pandemic, *Savino v. Hodgson*, No. 20-CV-10617-WGY (D. Mass. filed Mar. 27, 2020). She joined

the ACLU in 2024 and has served as counsel on major cases concerning the rights of noncitizens. *See, e.g.*, *New Hampshire Indonesian Community Support v. Trump*, 2025 WL 457609 (D.N.H. Feb. 11, 2025); *Idaho Organization of Resource Councils v. Labrador*, No. 25-cv-00178 (D. Idaho filed Mar. 27, 2025) (class action) (TRO granted); *Fla. Immigrant Coal. v. Uthmeier*, No. 1:25-cv-21524-KMW (S.D. Fla. filed Apr. 2, 2025) (class action) (TRO granted).

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Noor Zafar*
Noor Zafar

Executed on May 12, 2025.

9

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, *et al.*

      *Plaintiffs*,

    v.

GENTNER DRUMMOND, *in his official capacity as* Oklahoma Attorney General, *et al.*

      *Defendants*.

Civil Action No. 5:24-CV-511-J
(Class Action)

## DECLARATION OF MEGAN LAMBERT IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

I, Megan Lambert, hereby declare under penalty of perjury:

1. I am an attorney with the American Civil Liberties Union of Oklahoma Foundation (ACLU of Oklahoma) and have knowledge of the facts contained in this declaration. ACLU of Oklahoma is co-counsel for Plaintiffs in the above-captioned litigation, and I submit this declaration, which details the qualifications of ACLU of Oklahoma attorneys in support of Plaintiffs' Motion for Class Certification.

2. The ACLU of Oklahoma is an affiliate of the American Civil Liberties Union, a national non-profit organization founded in 1920 for the purpose of protecting civil rights and civil liberties guaranteed by the United States Constitution.

3. Since its founding in 1964, the ACLU of Oklahoma has an extensive institutional history of protecting the constitutional rights of Oklahomans and has advocated for the rights of institutionalized persons, educators, students, persons who speak

out against governmental abuse, women, and minorities of religious, ethnic, and

racial character. The ACLU of Oklahoma has litigated civil rights cases in

Oklahoma for decades and has worked to protect the rights of immigrants in

Oklahoma since at least 2010.

4.     The ACLU of Oklahoma attorneys involved in representing Plaintiffs include

Devraat Awasthi and myself.

5.     Devraat Awasthi is the Legal Fellow of the ACLU of Oklahoma. He is admitted to

practice in Oklahoma, the U.S. District Court for the Western District of

Oklahoma, the U.S. District Court for the Northern District of Oklahoma, and the

U.S. Court of Appeals for the Tenth Circuit. Mr. Awasthi graduated from the

University of Oklahoma College of Law in 2023.

6.     I am the Legal Director of the ACLU of Oklahoma. I am admitted to practice in

Oklahoma, the U.S. District Court for the Western District of Oklahoma, the U.S.

District Court for the Northern District of Oklahoma, the U.S. Court of Appeals

for the Tenth Circuit, and the U.S. Supreme Court. I graduated from the University

of Oklahoma College of Law in 2017. I served as a Gallogly Legal Fellow of the

ACLU of Oklahoma from 2017 to 2019 and as a Staff Attorney of the ACLU of

Oklahoma from 2019 to 2021. My practice consists primarily of impact civil rights

litigation under the United States and Oklahoma Constitutions. I represented the

plaintiffs in *Copeland, et al. v. C.A.A.I.R., et al.*, No. 17-CV-564-TCK-JFK (N.D.

Okla.), a class action challenging the unconstitutional operations and conditions of

a work camp misrepresenting itself as a drug and alcohol rehabilitation center and

prison diversion program. I am also representing the plaintiffs in *White, et al. v.*
*Hesse, et al.*, No. 5:19-CV-1145-JD (W.D. Okla.), a putative class action
challenging the unconstitutional pre-trial detention practices and procedures of
Canadian County.

7.     I have been involved in the investigation and preparation of this lawsuit, including
developing facts and legal arguments, for the past year. I am familiar with the
issues and will zealously represent the plaintiffs and the class. Achieving the
requested remedy of this lawsuit and protecting the rights of immigrants is central
to the founding purpose of the ACLU of Oklahoma. Neither I nor the ACLU of
Oklahoma is receiving any reimbursement from the individual plaintiffs or class
members in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ⎯7⎯ day of ⎯May⎯ 2025.

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Megan Lambert

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

---

PADRES UNIDOS, *et al.*

                *Plaintiffs*,

          v.

GENTNER DRUMMOND, *in his official capacity as* Oklahoma Attorney General, *et al.*

              *Defendants*.

Civil Action No. 5:24-CV-511-J

---

## PLAINTIFFS' MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS

Plaintiffs Barbara Boe and Christopher Coe respectfully move this Court for an order granting them leave to proceed under pseudonyms. They seek to challenge the constitutionality and enjoin the enforcement of H.B. 4156, an Oklahoma state law that threatens immigrants like Barbara Boe and Christopher Coe with arrest, prosecution, and banishment from the State. Plaintiffs seek the Court's protection of their identities so that they may pursue this litigation without fear of retaliation or risk of physical violence, and in furtherance of their substantial privacy interests. Because these concerns outweigh the usual practice of named parties in federal litigation, Plaintiffs should be permitted to proceed under pseudonyms.[1] Defendants oppose the requested relief.

---

[1] To protect their privacy pending consideration of this motion, in their Complaint and this motion, Plaintiffs have used the pseudonyms for which they seek leave to use in this action.

**J.A. 118**

## BACKGROUND

Barbara Boe has been a longstanding resident of Oklahoma, since she entered the United States without inspection in 2000. She is in her 50s and works at a manufacturing company and a restaurant. She regularly travels to other states to visit family members. She fears arrest, detention, and removal under H.B. 4156. As a member of the LGBTQ+ community, she fears being forced to return to her country of origin of Mexico, where she experienced discrimination and harassment based on her sexual orientation. She fears being unable to visit her family here in the United States, with whom she is very close. Finally, she fears being torn apart from the community and life, free from discrimination and oppression, she has built for herself in Oklahoma. *See* Declaration of Barbara Boe ¶¶ 2–10 ("Boe Decl.").

Christopher Coe lives in Oklahoma with his wife and stepdaughter. After multiple removals in the early 2010s, Coe reentered the United States in 2012 and has remained in Oklahoma ever since. He works in residential construction and is the primary provider for his household. His wife, a crime survivor, relies on him for financial and emotional support. She is pursuing lawful status that may extend to him as well. Coe fears that H.B. 4156 would upend his family's stability and expose him to prosecution, detention, and separation from his loved ones. This would be extremely disruptive for his family and would devastate their well-being. Christopher Coe also fears physical retaliation from the individual who committed a crime against his wife. *See* Declaration of Christopher Coe ¶¶ 3–10, 14 ("Coe Decl.").

## ARGUMENT

In general, a complaint must state the names of all parties. Fed. R. Civ. P. 10(a). But the Tenth Circuit allows plaintiffs to proceed anonymously "where there are significant privacy interests or threats of physical harm implicated by the disclosure of the plaintiff's name." *M.M. v. Zavaras*, 139 F.3d 798, 801 (10th Cir. 1998) (quoting *Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989)); *see also Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000). Although "identifying a plaintiff only by a pseudonym is an unusual procedure," it is appropriate "where there is an important privacy interest to be recognized," and is "subject to a decision by the judge as to the need for the cloak of anonymity." *Doe H. v. Haskell Indian Nations Univ.*, 266 F. Supp. 3d 1277, 1288 (D. Kan. 2017) (quoting *Lindsey v. Dayton-Hudson Corp.*, 592 F.2d 1118, 1125 (10th Cir. 1979)).

To determine whether a plaintiff may proceed anonymously, the court may use "informed discretion" to weigh a plaintiff's right to privacy—including (1) whether there is a "real danger of physical harm," (2) whether the claims "involv[e] matters of a highly sensitive and personal nature," and (3) "where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity"—against the countervailing public interest in disclosure. *M.M.*, 139 F.3d at 803 (first quoting *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992); and then quoting *James v. Jacobson*, 5 F.3d 233, 242 (4th Cir. 1993)). In this case, where Plaintiffs face real danger of physical harm and which involves matters of a highly sensitive and personal nature, Plaintiffs' privacy interests far outweigh the public

interest in disclosure. Accordingly, this Court should grant Plaintiffs' motion to proceed under pseudonym.

## I.    Plaintiffs face real danger of physical harm.

Courts in this circuit have allowed plaintiffs to proceed under pseudonym where "they face sufficient dangers and risks of injury, including risks of physical harm[.]" *D.B.U. v. Trump*, No. 1:25-CV-01163-CNS, 2025 WL 1101149, at *1 (D. Colo. Apr. 14, 2025) (citing *Femedeer*, 227 F.3d at 1246).

In particular, courts in this circuit recognize the risk of physical harm to individuals who face retaliatory physical or even mental harm, should their identities be revealed to the public. *See D.B.U.* at *1 (citation omitted); *Doe v. United States Dep't of State*, No. 1:15-CV-01971, 2015 WL 9647660, at *3 (D.D.C. Nov. 3, 2015)); *see also B.S.L. v. Garland*, No. 21-9519, 2022 WL 985817, at *1 (10th Cir. Apr. 1, 2022) (citing *A.B. v. Sessions*, 741 Fed. Appx. 563, 563 n.* (10th Cir. 2018)). Christopher Coe fears physical retaliation from the individual who committed a crime against his wife. He and his family are in the process of receiving lawful status because his wife was the victim of a crime. *See* Coe Decl. ¶¶ 6-7. He fears that the individual will retaliate against him and his family—who are not parties to this case and include minor children—should they find out that they are cooperating with authorities investigating the crime. *See id.* ¶¶ 6-7, 14. Courts in this circuit have allowed plaintiffs to proceed in pseudonym where individuals would "retaliate against them for their role in initiating and pursuing [a] criminal investigation." *Does v. Rodriguez*, Nos. 06-CV-00805-LTB, 06-MC-00017-LTB, 2007 WL 684114, at *2 (D. Colo. Mar. 2, 2007).

Moreover, Plaintiffs' admission of intent to engage in criminal conduct creates a risk of physical danger. *See Doe v. U.S. Imm. & Customs Enforcement*, No. 1:23-CV-00971-MLG-JMR, 2024 WL 4389461 at *3 (D.N.M. Oct. 3, 2024) [hereinafter *Doe v. ICE*, 2024 WL 4389461] (risk of retaliation from immigration officials is a risk of physical danger); *Doe v. Hobson*, 300 F.R.D. 576, 577 (M.D. Ala. 2014) (granting leave to proceed under pseudonyms in light of plaintiffs' fear "of the possibility of criminal prosecution or deportation, the attachment of social stigma, the annoyance of private harassment, and the potential threat of violence"). Here, to establish standing, the individual plaintiffs have had to make allegations which could subject them to a number of criminal and immigration consequences. *Doe v. ICE*, 2024 WL 4389461, at *2; *see also* Boe Decl. ¶¶ 5, 7; Coe Decl. ¶ 5. First, their admissions regarding their immigration histories could subject them to enforcement under federal entry or reentry crimes. *See* 8 U.S.C. §§ 1325, 1326. These crimes carry the risk of fines or imprisonment for six months upon a first offense and two years for subsequent offenses. *See* 8 U.S.C. §§ 1325(a), 1326(a); *see also id.* § 1326(b) (providing enhanced reentry penalties for certain people). Second, while both of the individual plaintiffs may be subject to immigration proceedings and the risk of deportation, *see id.* § 1229a, for those with prior removal orders, like Christopher Coe, the consequences may be more severe, including reinstatement of removal, *see id.* § 1231(a)(5). Additionally, if banished from Oklahoma under H.B. 4156, Barbara Boe fears being forced to return to Mexico, where she experienced harm on account of her sexual orientation that led her to flee to the United States. *See* Boe Decl. ¶¶ 6, 8.

Finally, both Plaintiffs reasonably fear retaliation because immigration is a emotional and divisive issue, particularly in Oklahoma's political climate. *See id.* ¶ 14; Coe Decl. ¶ 14. Courts have allowed litigants to proceed anonymously where their "fear of criminal prosecution . . . involved politically charged and controversial issues[,]" such that "it [wa]s more likely that prosecution might be used as a tool to suppress the litigation, or that individual officers could feel so strongly about an issue as to personally retaliate against the plaintiffs." *Faith Action For Cmty. Equity v. Hawaii*, No. CIV. 13-00450 SOM, 2014 WL 320587, at *5 (D. Haw. Jan. 29, 2014). There are reports of anti-immigrant vigilante groups present in Oklahoma. *See* Joshua Kaplan, *Armed and Underground: Inside the Turbulent, Secret World of an American Militia*, PROPUBLICA (Aug. 17, 2024), https://perma.cc/5VUH-UYVK. Earlier this year, in Moore, Oklahoma, a couple was charged with assault for attacking a driver with a Mexican flag on his truck. *See 'Let's Come Together': Moore Man Offers Message of Unity After Racist Incident at Local Gym*, NEWS9 (Feb. 12, 2025, 4:58 AM), https://perma.cc/P9XS-FBQ5. In Oklahoma, hate crimes increased by 150% between 2022 and 2023, and the majority of hate crimes (approximately 80%) are motivated by race, ethnicity, and ancestry. *See Oklahoma*, U.S. Dep't of Just., https://perma.cc/5R4E-H6QF (last visited May 8, 2025). Accordingly, Plaintiffs reasonably fear retaliation from challenging H.B. 4156, which passed due to significant anti-immigrant sentiment in Oklahoma.

**II.     This case presents matters of a highly sensitive and personal nature, and disclosure may result in retaliation and cause Plaintiffs to incur the injury litigated against.**

This case involves the highly sensitive and personal matter of Plaintiffs' immigration status. Particularly where, as here, immigration status is linked to criminal consequences, however, the sensitivity of that information is heightened, and courts have permitted plaintiffs to proceed pseudonymously under such circumstances. *See, e.g.*, *Lozano v. City of Hazleton*, 620 F.3d 170, 194–96 (3d Cir. 2010), *vacated on other grounds by* 563 U.S. 1030 (2011); Order Granting Motion to Proceed Under Pseudonym, *Iowa Migrant Movement for Just. v. Bird*, No. 4:24-cv-00161-SHL-SBJ (S.D. Iowa June 6, 2024), ECF No. 37.

Furthermore, disclosure of the names of the Plaintiffs who are participating in this case would also invite the very injury complained of. Many of the Plaintiffs have pending applications for relief from immigration enforcement under federal immigration law. If it is disclosed, however, that the Plaintiffs simultaneously participated in a challenge to the constitutionality of a state immigration law, Plaintiffs reasonably fear adverse determinations in their immigration proceedings or, as described above, federal criminal prosecution as retaliation for their participation in this case. *See, e.g.*, *Chehab ex rel. Alwaieh v. Noem*, No. 1:25-CV-10614, 2025 WL 825236 (D.R.I. Mar. 16, 2025); *see also D.B.U*, 2025 WL 1101149, at * 1 (without responsive briefing, establishing "protection from retaliation" as a condition upon sharing of pseudonymous plaintiffs' information with defendants); *Does I Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1071 (9th Cir. 2000) (risk of deportation created an "extraordinary" threat of retaliation); *Here Are The*

7

**J.A. 124**

*Students Trump Wants to Deport Over Their Speech*, ROLLINGSTONE (Mar. 28, 2025),

https://www.rollingstone.com/politics/politics-features/trump-deport-student-speech-

palestine-mahmoud-khalil-ozturk-1235305498/ (describing retaliation, through detention

and placement in removal proceedings, for protected speech). Those adverse

determinations would result in expulsion from Oklahoma and possible removal from the

United States—the injury that Plaintiffs brought this suit to prevent.

**III.    The public interest also favors granting anonymity.**

Ordinarily, the public interest in open courts weighs against leave to proceed under

pseudonyms. *M.M.*, 129 F.3d at 800. But where, as here, the vindication of significant

constitutional issues may depend on leave to proceed pseudonymously in light of real and

reasonable fears of retaliation, the public interest is reversed in favor of granting leave to

proceed. *See, e.g.*, *Doe v. Farmington Mun. Sch.*, No. CV 21-103 SCY/KK, 2021 WL

1390777, at *3 (D.N.M. Apr. 13, 2021) ("[R]equiring Plaintiff to proceed under her own

name would risk subjecting her and her family to retaliation and exacerbated psychological

harm . . . that . . . outweighs the public's countervailing interest in access to Plaintiff's

identity in these proceedings."). Protecting constitutional rights is of the utmost public

interest, and lawsuits seeking to vindicate those rights by definition serve the public. *Cf.*

*Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 807 (10th Cir. 2019).

Indeed, this Court, like courts across the country considering similar laws, has already held

that HB 4156 is likely unconstitutional. *United States v. Oklahoma*, 739 F. Supp. 3d 985,

1002, 1004 (W.D. Okla. 2024); *United States v. Iowa*, 737 F. Supp. 3d 725, 751 (S.D. Iowa

2024) (preliminary injunction against near-identical law for both United States and private

8

parties), *vacated*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025) (vacating only the order granted to the United States); *United States v. Texas*, 719 F. Supp. 3d 640, 702 (W.D. Tex. 2024). Plaintiffs seek to vindicate this Court's prior holding. Forcing an individual to disclose private and personal information as part of vindicating constitutional rights would dissuade other similarly situated individuals from bringing such claims. *See Doe v. ICE*, 2024 WL 4389461, at *4 (noting that "[i]t is not hard to foresee the potentially chilling effect on other similar plaintiffs who may seek legal remedies for wrongful government conduct" and finding that "the potential deterrent effect of requiring Plaintiffs to proceed under their own names weighs in favor of granting their request for anonymity.").

Plaintiffs do not seek to restrict the public's general right to access the filings, proceedings, and rulings in this case. Plaintiffs' request is narrowly tailored to prevent only the public disclosure of the Plaintiffs' identities. Where, as here, the "public will have access to the facts relevant to the parties' arguments and the Court's ultimate decision in the case, an order permitting Plaintiff[s] to proceed under a pseudonym will not unreasonably interfere with the public's interest in access to judicial records and will promote the public's interest" by protecting every individual's constitutional rights. *Doe v. Stand. Ins. Co.,* No. 1:15–CV–00105–GZS, 2015 WL 5778566, at *3 (D. Me. Oct. 2, 2015).

Moreover, allowing Plaintiffs to proceed pseudonymously will not prejudice Defendants. Courts have found "minimal" prejudice where, as in this case, Plaintiffs are "willing[] to disclose their identities to the government" during discovery, "subject to

protections from retaliation and pseudonymity in court filings[.]" *D.B.U*, 2025 WL 1101149, at * 1.

Finally, courts across the country, including in the Tenth Circuit, have granted plaintiffs in similar situations leave to proceed anonymously, even under stricter circuit standards. *D.B.U*, 2025 WL 1101149, at * 1; *Doe v. ICE*, 2024 WL 4389461 at *3; *Lozano*, 620 F.3d at 194–96; *R.F.M. v. Nielsen*, 365 F.Supp.3d 350, 370–72 (S.D.N.Y. 2019). *See also Hispanic Interest Coalition of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1247, 1247 n.8 (11th Cir. 2012) (compiling cases). Indeed, the number of courts that have granted leave to proceed under pseudonyms has only increased in recent months in light of the federal government's unprecedented and undeniable use of immigration proceedings to target those whose speech (including legal advocacy in court) the federal government disagrees with. *See generally Ariz. Student Doe #1 v. Trump*, 2025 WL 1192826, at *3–4 (D. Ariz. Apr. 24, 2025) (grant); *SD Student Doe #1 v. Noem*, 2025 WL 1194080, at *7–8 (S.D. Cal. Apr. 24, 2025) (grant); *J.O.P. v. U.S. Dep't of Homeland Security*, 2025 WL 1180191, at *8–9 (D. Md. Apr. 23, 2025); *W.B. v. Noem*, 2025 WL 1180296, at *1 n.1 (N.D. Cal. Apr. 23, 2025) (grant); *Student Doe v. Noem*, 2025 WL 1134977, at *2 (E.D. Cal. Apr. 17, 2025) (grant); *Doe v. Becerra*, 2025 WL 691664, at *7 (E.D. Cal. Mar. 3, 2025) (grant).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their

motion to proceed under pseudonyms.[2]

Dated: May 13, 2025                                Respectfully submitted,

                                                   /s/ *Devraat Awasthi*

Elissa Stiles (OK Bar. No. 34030)                  Devraat Awasthi (OK Bar. No. 35544)
Rivas and Associates                               Megan Lambert (OK Bar. No. 33216)
P.O. Box 470348                                    American Civil Liberties Union of
Tulsa, OK 74147                                    Oklahoma Foundation
T: (918) 419-0166                                  P.O. Box 13327
F: (918) 513-6724                                  Oklahoma City, OK 73113
*estiles@rivasassociates.com*                      T: (405) 525-3831
                                                   *mlambert@acluok.org*
                                                   *dawasthi@acluok.org*


Spencer Amdur*                                     Noor Zafar*
Oscar Sarabia Roman*                               Omar Jadwat*
Cody Wofsy*                                         Grace Choi**
American Civil Liberties Union                     American Civil Liberties Union
Foundation, Immigrants' Rights Project             Foundation, Immigrants' Rights Project
425 California Street, 7th Floor                    125 Broad Street, 18th Floor
San Francisco, CA 94104                            New York, NY 10004
T: (415) 343-0770                                  T: (212) 549-2660
*samdur@aclu.org*                                  *nzafar@aclu.org*
*osarabia@aclu.org*                                *ojadwat@aclu.org*
*cwofsy@aclu.org*                                  *gchoi@aclu.org*

                                                   *Attorneys for Plaintiffs*
                                                   *\* Admitted pro hac vice*
                                                   *\*\*Pro hac vice application filed*

---

[2] Should Defendants require identification of Plaintiffs' identities for the limited purpose of establishing standing, Plaintiffs are amenable to providing such information pursuant to a protective order limiting disclosure of their identities to counsel for Defendants.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2025, I filed a true and correct copy of the

foregoing using the CM/ECF system, which will serve the filing on all counsel of record.

<u>*/s/ Devraat Awasthi*</u>
Devraat Awasthi

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

1. PADRES UNIDOS DE TULSA;
2. LEAGUE OF UNITED LATIN
   AMERICAN CITIZENS OKLAHOMA
   CITY;
3. BARBARA BOE;
4. CHRISTOPHER COE, on behalf
   of themselves and all those
   similarly situated,

        *Plaintiffs*,

        v.

1. GENTNER DRUMMOND, in his
   official capacity as Attorney General of
   the State of Oklahoma;
2. TIM TIPTON, in his official capacity as
   Commissioner of Public Safety for the
   Oklahoma Department of Public Safety;
3. VICKI BEHENNA, in her official
   capacity as District Attorney of
   Oklahoma County;
4. STEVE KUNZWEILER, in his official
   capacity as District Attorney of Tulsa
   County,

        *Defendants*.

Civil Action 5:24-cv-511-J

## <u>SECOND AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF</u>

## INTRODUCTION

1.      This action challenges Oklahoma House Bill 4156 ("H.B. 4156"), which purports to give Oklahoma state officials unprecedented power to arrest, detain, and expel noncitizens. Under this novel system, the State of Oklahoma has created its own immigration crimes, completely outside the federal immigration system. State police will arrest noncitizens for these entry and re-entry crimes; state prosecutors will bring charges in state courts; and state judges will issue removal orders requiring people to leave the State. The federal government has no role in, and no control over, Oklahoma's immigration scheme.

2.      H.B. 4156 violates the Supremacy Clause of the United States Constitution. Immigration is a quintessentially federal authority. Congress has created a carefully calibrated immigration system, with detailed provisions governing people's entry into the United States and their right to remain here. And Congress placed all the relevant tools and decision-making in the hands of *federal* officials—in keeping with the federal government's exclusive immigration powers and the sensitive foreign policy implications of these powers.

3.      H.B. 4156 jettisons this system, grasping control over immigration from the federal government and giving state officers the power to prosecute immigration crimes on their own and banish people from the State. In doing so, H.B. 4156 declares the State off-limits to entire categories of immigrants, most of whom have express federal permission to be in the United States.

2

4.      H.B. 4156 also violates the Commerce Clause because it impermissibly regulates people's entry into Oklahoma and imposes unacceptable burdens on interstate and foreign commerce.

5.      Plaintiffs hereby file this second amended complaint for declaratory and permanent injunctive relief. Plaintiffs will seek a preliminary injunction to enjoin enforcement of H.B. 4156.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7.      Venue is proper in the Western District of Oklahoma because a substantial portion of the relevant events occurred or will occur in the District and because Defendants reside in the District. 28 U.S.C. § 1391(b).

## PARTIES

8.      Plaintiff Barbara Boe is a 51-year-old Mexican national who lives in Tulsa. She entered the United States without inspection in 2000 and has resided in the country— in Oklahoma—ever since. She travels regularly outside of Oklahoma to visit family in New Jersey and North Carolina.

9.      Plaintiff Christopher Coe is a 37-year-old Mexican national who lives in Broken Arrow with his wife and stepdaughter. He entered the United States without inspection in 2007 and was removed to Mexico several years later. Thereafter, in 2012, he reentered the United States and has resided in the country ever since. He and his wife are in the process of gaining lawful status because his wife was the victim of a crime.

3

10.    Plaintiff Padres Unidos de Tulsa ("Padres Unidos") is a membership-based advocacy organization consisting of students, parents, and teachers. It is based in Tulsa, Oklahoma.

11.    Padres Unidos's mission is to ensure that Latinx immigrant students and their families can advocate for a quality education for all Tulsa Public School System students. The organization builds advocacy skills and organizes Latinx and immigrant communities to secure meaningful access to the full range of educational services, including mental health resources, meal assistance, special education services, and reading and math achievement.

12.    Members of Padres Unidos work collectively to ensure that schools, school boards, and superintendents provide equitable resources to their students and  children. The community that Padres Unidos works with will be directly affected by the disruption, uncertainty, and fear created by H.B. 4156, and members of Padres Unidos include individuals who would be subject to prosecution under H.B. 4156.

13.    Padres Unidos member Danny Doe is a 47-year-old national of El Salvador who lives in Tulsa with his U.S.-citizen wife and two U.S.-citizen children. He entered the United States without inspection in 2001 and has resided in the country ever since. He has an approved Violence Against Women Act ("VAWA") petition, and is seeking to reopen and dismiss a prior *in absentia* removal order. He travels outside of Oklahoma regularly for family-related travel.

14.    Another Padres Unidos member, Mario Moe, is a 39-year-old national of El Salvador. He first entered the United States without inspection in 2001. He received a

4

voluntary departure order in 2007, reentered without inspection in 2008, departed under a removal under in 2013, and reentered without inspection in 2013. He resides with his spouse and his four, minor U.S.-citizen children.

15.    Plaintiff League of United Latin American Citizens Oklahoma City ("LULAC OKC") is a council, or chapter, of LULAC, a nationwide, non-profit, non-partisan, membership-based organization founded in 1929. LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights in all aspects.

16.    LULAC has over 325,000 members nationwide, including in Oklahoma.

17.    LULAC OKC's members include noncitizens who have a variety of immigration statuses. LULAC OKC's members include individuals who would be subject to prosecution under H.B. 4156. They will be directly affected by the disruption, uncertainty, and fear created by H.B. 4156.

18.    LULAC OKC member Ronaldo Roe is a Mexican national who entered the United States without inspection in 2007. He has lived in Oklahoma since then. He regularly travels throughout Oklahoma for work and occasionally travels out of state for personal reasons, including recently to attend a wedding in Florida.

19.    Another LULAC OKC member, Soto Soe, entered the United States without inspection in 2002. He received a voluntary departure order in 2008. He re-entered the United States without inspection in 2009, and resided in the country until 2014 when he received another voluntary departure order. After attempting to enter the United States again in 2014, he was stopped at the border and issued a removal order. He last re-entered

5

the United States in 2015. Both his wife and child are U.S. citizens. He has a pending application for lawful permanent residence under the Violence Against Women Act.

20.    Defendant Gentner Drummond is the Attorney General of the State of Oklahoma. He is the "chief law officer of the state" and has the duty to "appear for the state" and "prosecute . . . criminal" actions in state and federal courts, including actions to enforce H.B. 4156. Okla. Stat. tit. 74 §§ 18, 18b. He is sued in his official capacity.

21.    Defendant Drummond urged legislators to pass H.B. 4156 and was involved in drafting portions of the bill. He has publicly stated his strong support for the law, applauding legislators for taking "swift action in making the bill a reality." Defendant Drummond also stated that H.B. 4156 is required due to "the consequences of the Biden Administration's utter failure to secure our nation's border."

22.    Defendant Tim Tipton is the Commissioner of Public Safety for the Oklahoma Department of Public Safety ("DPS"). Among other duties, he has the "right and power . . . to enforce the criminal laws of the state," including H.B. 4156. Okla. Stat. tit. 47 § 2-117. He is sued in his official capacity.

23.    Defendant Vicki Behenna is the District Attorney of Oklahoma County. Defendant Behenna has the duty to "diligently prosecute any violations" of state criminal laws in the county, including H.B. 4156. Okla. Stat. tit. 21 § 21-1305. She is sued in her official capacity.

24.    Defendant Steve Kunzweiler is the District Attorney of Tulsa County. Defendant Kunzweiler has the duty to "diligently prosecute any violations" of state criminal laws in the county, including H.B. 4156. Okla. Stat. tit. 21 § 1305. He is sued in

6

his official capacity.

## STATEMENT OF FACTS

### A. Legal Background: Comprehensive Federal Immigration System

25.    The federal government has exclusive power over immigration. *See, e.g.,* *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).

26.    Congress has created a comprehensive system of federal laws regulating immigration in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 et seq.

27.    Federal immigration statutes and the associated implementing regulations and precedential administrative law decisions form an exceptionally detailed, complex, and finely reticulated regulatory regime. Congress has frequently amended the relevant provisions of the INA, including by passing particularly significant legislation in 1952, 1965, 1980, 1986, 1990, 1996, 2000, 2001, 2005, and 2008, along with dozens of other Acts modifying the immigration regime in countless ways. Immigration legislation is proposed in every single Congress and frequently forms a point of major national debate.

28.    The INA contains complex and exclusive procedures for determining immigration and citizenship status and for determining whether an individual may lawfully remain in the United States, either temporarily or permanently. *See, e.g.*, 8 U.S.C. § 1229a(a)(3). Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular person may or may not be permitted to remain in the United States. The answer to that question can only be reached through the processes outlined in the INA and may depend on the discretionary determinations of federal officials.

29.    Many people who enter the United States without inspection ultimately obtain federal authorization to remain in the United States temporarily, indefinitely, or permanently.

30.    Congress has established that entry into the United States is a crime under certain circumstances. 8 U.S.C. § 1325 ("Improper Entry by Alien") provides criminal penalties for noncitizens who, inter alia, enter the United States at any time or place other than as designated by immigration officers. 8 U.S.C. § 1326 provides criminal penalties for noncitizens who reenter the United States without authorization after entry of an order of removal.

31.    Congress also created specific procedures to remove individuals from the United States. These are generally called removal proceedings and can take multiple forms. *See, e.g.*, 8 U.S.C. § 1229a (full removal proceedings); 8 U.S.C. § 1225 (expedited removal proceedings); 8 U.S.C. § 1231(a)(5) (reinstatement of removal proceedings). Under federal law, people are allowed to remain in the United States while administrative removal proceedings prescribed by the INA are pending.

32.    Prosecution for the federal entry and reentry crimes and the decision whether to pursue the removal of a given person from the country, and through what mechanism, are matters of federal discretion. Federal agents and policymakers may choose to deploy these tools—or not—for a wide range of reasons, including national priorities, migration patterns, international relationships, and humanitarian concerns.

**B.  H.B. 4156**

33.    On April 30, 2024, Governor Stitt signed H.B. 4156 into law.

34.    H.B. 4156 creates two new state law offenses: "State Illegal Entry" and "State Illegal Reentry." H.B. 4156 §§ 2(B), (D) (codified at Okla. Stat. tit. 21, § 1795(B), (D)).

35.    Each of these offenses can only be committed by an "alien," meaning any person who is not a citizen or national of the United States. H.B. 4156 § 2(A) (codified at Okla. Stat. tit. 21, § 1795(A)).

36.    A noncitizen commits an "impermissible occupation" ("State Illegal Entry") if they "willfully and without permission enter[] and remain[] in the State of Oklahoma without having first obtained legal authorization to enter the United States." H.B. 4156 § 2(B) (codified at Okla. Stat. tit. 21, § 1795(B)).

37.    "[A]ffirmative defense[s] to prosecution" for State Illegal Entry exist when a noncitizen has been granted "lawful presence" or "asylum" by the federal government, or if they have been approved for benefits under the federal Deferred Action for Childhood Arrivals (DACA) program. H.B. 4156 § 2(F) (codified at Okla. Stat. tit. 21, § 1795(F)). The statute does not define "lawful presence."

38.    H.B. 4156 does not provide a defense for people currently seeking asylum, other humanitarian protection, or any other relief available under federal law.

39.    A first violation of State Illegal Entry is a misdemeanor punishable by up to a year in county jail. Any subsequent violation is a felony punishable by up to two years in state prison. H.B. 4156 §§ 2(C)(1)-(2) (codified at Okla. Stat. tit. 21, § 1795(C)(1)- (2)).

40.    H.B. 4156 also creates a crime of State Illegal Reentry. This provision makes it a crime if a noncitizen "enters, attempts to enter, or is at any time found in Oklahoma" after

9

J.A. 138

they have been "denied admission, excluded, deported, or removed, or ha[ve] departed the United States while an order of exclusion, deportation, or removal is outstanding." H.B. 4156 § 2(D) (codified at Okla. Stat. tit. 21, § 1795(D)).

41.    A noncitizen is not subject to the State Illegal Reentry provision if (1) the U.S. Attorney General "expressly consented to [their] reapplying for admission" prior to their reentry, or (2) they were "not required to obtain such advance consent under this section or any prior statute." H.B. 4156 §§ 2(D)(1)-(2) (codified at Okla. Stat. tit. 21, § 1795(D)(1)-(2)).

42.    A violation of State Illegal Reentry is punishable by up to two years in prison. H.B. 4156 § 2(D) (codified at Okla. Stat. tit. 21, § 1795(D)).

43.    Noncitizens convicted of State Illegal Entry or State Illegal Reentry "shall be required to leave [Oklahoma] within seventy-two (72) hours following [their] conviction or release from custody, whichever comes first." H.B. 4156 §§ 2(C)(1)-(2); 2(D) (codified at Okla. Stat. tit. 21, § 1795(C)(1)-(2); (D)).

44.    Noncitizens charged with or convicted of State Illegal Entry or State Illegal Reentry are not eligible for probation, delayed sentencing, or community sentencing. H.B. 4156 § 2(G); § 3 (codified at Okla. Stat. tit. 21, § 1795(G); Okla. Stat. tit. 22 § 988.25).

45.    H.B. 4156 applies statewide, without any exception.

## C.  The Effect of H.B. 4156 on Plaintiffs

46.    H.B. 4156 creates a new state system to regulate immigration that completely bypasses and conflicts with the federal system. It allows state officers to arrest, detain, and expel from Oklahoma noncitizens who are convicted of the new state crimes—all without

10

any direction, input, or involvement whatsoever from federal officials.

47.    H.B. 4156 requires state officers to make determinations of federal immigration status and to incarcerate noncitizens pursuant to these determinations. The law does not make any exceptions for people in the process of seeking or obtaining federal immigration status.

48.    H.B. 4156 will uproot and expel thousands of immigrants from Oklahoma, including asylum seekers and immigrants applying for other federal immigration benefits and status. By subjecting these categories of immigrants to criminal punishment and a mandate to leave the State, H.B. 4156 effectively banishes large categories of immigrants who are entitled to remain in the United States while their cases are pending, and whom the federal government may eventually grant lawful status, permanent residence, and citizenship.

49.    The Oklahoma Association of Chiefs of Police and Metro Law Enforcement Agency leaders have said that H.B. 4156 raises racial profiling concerns and "may deteriorate public trust in law enforcement in already vulnerable communities."

50.    The harms of H.B. 4156 will be felt acutely by Plaintiffs in this case.

51.    Plaintiff Barbara Boe is a member of the LGBTQ community and came to the United States to escape the oppression, discrimination, and abuse she was experiencing in Mexico on account of her sexual orientation. She fears having to leave Oklahoma, which has been her home for over twenty years, and being forced to return to Mexico, where gay people suffer harm.

52.    Plaintiff Christopher Coe is the sole provider and protector of his wife and

child. Being detained, arrested, and removed under H.B. 4156 would be extremely disruptive to his family and would devastate their well-being.

53.    The harms of H.B. 4156 will also be felt acutely by Padres Unidos and LULAC OKC, whose membership includes individuals who would be subject to prosecution, imprisonment, and removal from the state under the law.

54.    Padres Unidos member Danny Doe fears being separated from his family. He is the primary financial provider for his family. One of his sons is already seeing a counselor due to his sadness and anxiety from worrying about his dad's immigration status.

55.    Padres Unidos member Mario Moe fears being separated from his family, especially because he has a U.S.-citizen child with a serious medical condition.

56.    LULAC OKC member Ronaldo Roe fears being arrested and removed under H.B. 4156. That would prevent him from continuing his critical caregiving responsibilities for his brother, who requires daily dialysis, and his parents and two nephews, for whom he is a legal guardian.

57.    LULAC OKC member Soto Soe fears being arrested and removed under H.B. 4156 because he will not be able to provide for his U.S.-citizen son.

## CLASS ACTION ALLEGATIONS

58.    Padres Unidos, LULAC OKC, and the Individual Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and two classes of other persons similarly situated.

59.    Padres Unidos, LULAC OKC, and the Individual Plaintiffs seek to represent the following two classes: (1) The Entry Class: All noncitizens who may now or in the

future enter the state of Oklahoma without having obtained the legal authorization to enter the United States; and (2) The Reentry Class: All noncitizens who may now or in the future enter, attempt to enter, or be at any time found in the state of Oklahoma after they have been denied admission to or excluded, deported, or removed from the United States; or have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

60.    The proposed classes satisfy the requirements of Rule 23(a)(1) because each respective class is so numerous that joinder of all members is impracticable. Hundreds if not thousands of noncitizens will be subjected to arrest, detention, prosecution and banishment from Oklahoma under H.B. 4156 and its implementation by Defendants. The proposed classes also include numerous future noncitizens who will enter Oklahoma and will be subjected to H.B. 4156.

61.    The classes satisfy the commonality requirements of Rule 23(a)(2). The members of the respective classes are subject to a common practice: arrest, detention, prosecution, and banishment from Oklahoma under H.B. 4156 contrary to the Supremacy Clause and the Commerce Clause. The suit also raises questions of law common to members of the proposed classes, including whether H.B. 4156 and its implementation violate the Supremacy Clause and Commerce Clause.

62.    The proposed classes satisfy the typicality requirements of Rule 23(a)(3), because the claims of the representative Individual Plaintiffs are typical of the claims of their respective classes. Additionally, Padres Unidos and LULAC OKC represent the claims of their respective members, and those members' claims are typical of the claims of

13

J.A. 142

the classes. Each proposed class member, including the representative Individual Plaintiffs and Padres Unidos and LULAC OKC members, will experience or face the same principal injury (arrest, detention, prosecution, and banishment), based on the same government practice (H.B. 4156 and its implementation), which is unlawful as to the respective classes because it violates the Supremacy Clause and Commerce Clause.

63.    The proposed classes satisfy the adequacy requirements of Rule 23(a)(4). The representative Plaintiffs seek the same relief as the other members of their respective classes— among other things, an order declaring H.B. 4156 unlawful and an injunction preventing its enforcement. In defending their rights and the rights of their members, the representative Plaintiffs will defend the rights of all proposed class members in their respective classes fairly and adequately.

64.    The proposed classes are represented by experienced attorneys from the American Civil Liberties Union Foundation Immigrants' Rights Project and the American Civil Liberties Union Foundation of Oklahoma. Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens, including cases asserting claims very similar claims to those asserted here.

65.    The proposed classes also satisfy Rule 23(b)(2). Defendants will act on grounds generally applicable to the classes by subjecting them to arrest, detention, and prosecution under H.B. 4156. Injunctive and declaratory relief is therefore appropriate with respect to the respective classes as a whole.

## CLAIMS FOR RELIEF

### Count One: Preemption; Equity

66.    Plaintiffs repeat and reallege all paragraphs above and incorporate them by reference as though fully set forth herein.

67.    The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."

68.    Federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

69.    H.B. 4156 violates the Supremacy Clause because it attempts to regulate matters that are exclusively reserved to the federal government and because it operates in a field over which Congress has exercised exclusive authority.

70.    H.B. 4156 further violates the Supremacy Clause because it conflicts with federal laws, contradicts federal admission and release decisions, imposes burdens and penalties not authorized by and contrary to federal law, creates its own immigration classifications, and directs state officers to take unilateral immigration enforcement actions.

71.    Plaintiffs may sue to obtain injunctive relief against H.B. 4156 in equity.

### Count Two: Commerce Clause; Equity; 42 U.S.C. § 1983

72.    Plaintiffs repeat and reallege all paragraphs above and incorporate them by reference as though fully set forth herein.

73.    The Constitution gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause not only gives Congress this power, but also bars states from interfering with Congress's regulation of interstate commerce.

74.    H.B. 4156 violates the Commerce Clause because it impermissibly regulates people's entry into Oklahoma and their movement across state and national borders. It therefore imposes unacceptable burdens on interstate and foreign commerce.

75.    Plaintiffs may sue to obtain injunctive relief against H.B. 4156 in equity and under § 1983.

**Count Three: Eighth and Fourteenth Amendments to the U.S. Constitution; Equity; 42 U.S.C. § 1983**

76.    Plaintiffs repeat and reallege all paragraphs above and incorporate them by reference as though fully set forth herein.

77.    The Eighth Amendment to the U.S. Constitution prohibits the infliction of "cruel and unusual punishments." The Eighth Amendment's guarantees are applied to the States through the Fourteenth Amendment.

78.    Under H.B. 4156, state officers have the authority to imprison individuals who are found in violation of the offenses set forth in H.B. 4156.

79.    H.B. 4156 violates the Eighth Amendment because it requires noncitizens convicted of state illegal entry or state illegal reentry to leave the State within seventy-

two hours of their conviction or release from custody. This effectively results in their banishment from the State and constitutes cruel and unusual punishment.

16

J.A. 145

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

    a.  Declare that H.B. 4156 is unlawful in its entirety;

    b.  Preliminarily and permanently enjoin Defendants from enforcing H.B. 4156;

    c.  Grant Plaintiffs' cost of suit, reasonable attorneys' fees, and other expenses pursuant to 28 U.S.C. § 1988; and

    d.  Grant any other and further relief that this Court may deem fit and proper.

Dated: May 13, 2025

Respectfully submitted,

/s/ *Devraat Awasthi*

| | |
|---|---|
| Elissa Stiles (OK Bar. No. 34030) | Devraat Awasthi (OK Bar. No. 35544) |
| Rivas and Associates | Megan Lambert (OK Bar. No. 33216) |
| P.O. Box 470348 | American Civil Liberties Union of |
| Tulsa, OK 74147 | Oklahoma Foundation |
| T: (918) 419-0166 | P.O. Box 13327 |
| F: (918) 513-6724 | Oklahoma City, OK 73113 |
| *estiles@rivasassociates.com* | T: (405) 525-3831 |
| | *mlambert@acluok.org* |
| | *dawasthi@acluok.org* |
| | |
| Spencer Amdur* | Noor Zafar* |
| Oscar Sarabia Roman* | Omar Jadwat* |
| Cody Wofsy* | Grace Choi** |
| American Civil Liberties Union | American Civil Liberties Union |
| Foundation, Immigrants' Rights Project | Foundation, Immigrants' Rights Project |
| 425 California Street, 7th Floor | 125 Broad Street, 18th Floor |
| San Francisco, CA 94104 | New York, NY 10004 |
| T: (415) 343-0770 | T: (212) 549-2660 |
| *samdur@aclu.org* | *nzafar@aclu.org* |
| *osarabia@aclu.org* | *ojadwat@aclu.org* |
| *cwofsy@aclu.org* | *gchoi@aclu.org* |

*Attorneys for Plaintiffs*
*\* Pro hac vice*
*\*\*Pro hac vice application filed*

17

J.A. 146

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, *et al.*,

Plaintiffs,

v.

GENTNER DRUMMOND, *et al.*,

Defendants.

Case No:    CIV-24-511-J

**DEFENDANTS' RESPONSE OPPOSING PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER**

Plaintiffs make an incredible demand of this Court: They seek, under the Supremacy and Commerce Clauses, an emergency temporary restraining order (TRO) of a state law that indisputably mirrors bedrock federal law, even though both the State of Oklahoma and the United States are now comfortable with its enforcement. This Court should deny Plaintiffs the TRO. Among other things, Plaintiffs lack standing to pursue their claims because they are admittedly violating federal law, their legal arguments no longer have the support of the United States, they have not acted with the urgency necessary for a TRO, and they have not even acknowledged significant legal developments in the past several months such as the United States' declaration of an invasion at the southern border. To rule for Plaintiffs is to rule *against* federal law, executive discretion, and federal prerogatives.

## BACKGROUND

This Court has already found that "Oklahoma undoubtedly 'bears many of the consequences of unlawful immigration.'" Doc. 39 at 6 (citation omitted). And the Court has acknowledged that the Oklahoma Legislature, with House Bill 4156 ("H.B. 4156"), declared and expounded upon the "crisis" of illegal immigration that "exists in Oklahoma"—a crisis that is "endangering Oklahomans, devastating rural, urban, and suburban communities and is severely straining even the most diligent and well-resourced state and local governmental entities." *Id.* (quoting H.B. 4156). Plaintiffs have made little effort to undermine the findings of this Court or the Legislature on these points, and the State will not expound on them further here. *Cf. Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 n.12 (1985) ("When Congress makes findings on essentially factual issues … those findings are of course entitled to a great deal of deference ….").

1

**J.A. 148**

The State will discuss what has happened *since* this Court's prior order. In short, Plaintiffs' claim that "[n]othing has changed since the Court's [earlier] decision," Plaintiffs' Motion at 5 ("Mot."), defies reality. Much has changed. A presidential election was held, with the topic of illegal immigration front and center. The people of the United States then elected a new federal administration that promised to enforce immigration law, and that administration soon withdrew its opposition to H.B. 4156. Moreover, on his first day, President Trump issued executive orders (EO) and proclamations that are important here:

- One EO (<u>Declaring a National Emergency at the Southern Border of the United States</u>) declared "a national emergency exists at the southern border of the United States" because it is "overrun by cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans." 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025). "This invasion has caused widespread chaos and suffering in our country." *Id.*

- Another EO (<u>Securing Our Borders</u>) emphasized that the "United States has endured a large-scale invasion at an unprecedented level" because "[m]illions of illegal aliens … successfully entered the United States … including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations." 90 Fed. Reg. 8467, 8467 (Jan. 20, 2025). The previous administration's policies "undermine[d] the rule of law and our sovereignty." *Id.* Thus, the Trump administration pledged to respect State law, and to cooperate "fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities." *Id.*

- A third EO (<u>Protecting the American People Against Invasion</u>) explained that "the prior administration invited, administrated, and oversaw an unprecedented flood of illegal immigration into the United States." 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025). Thus, to "protect[] the American people against invasion," the President ordered the Secretary of Homeland Security to "ensure State and local law enforcement agencies across the United States can assist with the protection of the American people." *Id.* at 8445. The President also ordered that "State and local governments" be "provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law." *Id.* at 8446.

- A fourth EO (<u>Guaranteeing the States Protection Against Invasion</u>) emphasized that the "sheer number of aliens [illegally] entering the United States has overwhelmed the system and rendered many of the [Immigration and National Act's] provisions

ineffective." 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025). This "has placed significant costs and constraints upon the States, which have collectively spent billions of dollars in providing medical care and related human services, and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries." *Id.* As such, the President declared that "the Federal Government has failed" in fulfilling its constitutional obligation "to 'protect each of [the States] against Invasion." *Id.* (quoting U.S. CONST. art. IV). He also "declare[d] that an invasion is ongoing at the southern border, which requires the Federal Government to take measures to fulfill its obligation to the States." *Id.*

- A fifth EO (<u>Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists</u>) designated certain international cartels as Foreign Terrorist Organizations and declared a national emergency "to deal with those threats." 90 Fed. Reg. 8439, 8439 (Jan. 20, 2025).

And that was just on the first day. Over the subsequent months, the administration issued several more EOs relating to illegal immigration. *See, e.g.*, *Strengthening and Unleashing America's Law Enforcement to Pursue Criminals and Protect Innocent Citizens*, 90 Fed. Reg. 18765 (Apr. 28, 2025) (encouraging "State and local law enforcement to aggressively police communities against all crimes"); *Protecting American Communities from Criminal Aliens*, 90 Fed. Reg. 18761 (Apr. 28, 2025) (criticizing and penalizing "sanctuary jurisdictions" that obstruct federal law enforcement relating to immigration and violate federal criminal law).

It is Plaintiffs' burden to earn a TRO. Their failure to mention any of these developments should disqualify their attempt. A TRO, that is, should not issue when a party makes an intentional choice to ignore critical, public alterations to the situation where a TRO is demanded. These EOs matter. As will be discussed below, this Court's order was based in part on the United States' express opposition to H.B. 4156, which is no longer the case. And the State's defense was based in part on claims of an invasion, which the United States has now confirmed exists. Certainly, it is possible these developments are not enough to salvage Oklahoma's law. But it is Plaintiffs' burden to convince the Court on that point, and they have

3

**J.A. 150**

barely even tried to adjust their arguments to meet the circumstances. Instead, they are sticking their heads in the sand and pretending that the developments have not even occurred.

Outside the confines of this case, Plaintiffs' counsel—the ACLU—has not been silent about the above developments. Most interestingly, the ACLU has openly *criticized* the April 28th federal EO targeting sanctuary jurisdictions. *See* Press Release, *ACLU Statement on Executive Order Targeting Sanctuary Cities, Officials Accused of Obstructing Law Enforcement*, April 28, 2025.[1] Before this Court, the ACLU claims that Oklahoma's law—which simply mirrors federal law—should be enjoined because "immigration is an *exclusively* federal power." Mot. at 2 (emphasis in original). Turns out, that sentiment is a ticket good for one ride only. When sanctuary jurisdictions openly defy federal law and policy on illegal immigration the ACLU touts the independence and "authority" of "the more [than] 17,000 local law enforcement agencies across this country" to chart their own course. Press Release, *supra*. One begins to suspect upholding the supremacy of federal law is not the true goal here.

In any event, Plaintiffs' claim that an expedited ruling is needed is not supported by their actions since the Trump Administration withdrew the United States' lawsuit. The Tenth Circuit dismissed the United States' appeal on March 25, 2025, denying the Plaintiffs' motion to intervene because they "are not properly designated as appellees." **_Seven weeks_** passed before Plaintiffs filed their current motions (on May 13, 2025). On top of that, when they did file, all the named Plaintiffs suddenly dropped from the case, without explanation. The supposedly urgent harm they would suffer apparently was not sufficient to remain in the case.

---

[1]     *Available    at*    https://www.aclu.org/press-releases/aclu-statement-on-executive-order-targeting-sanctuary-cities-officials-accused-of-obstructing-law-enforcement.

Instead, several pseudonymous Plaintiffs and a new organization are now being shoehorned in. But showing up this late in the game cannot possibly provide the emergency basis needed for a TRO, and even less so when the State has been given a mere 30 hours to defend itself. The new Plaintiffs are simply attempting to piggyback on the interests of the old Plaintiffs who are no longer even present. At a minimum, the unexplained swapping of Plaintiffs here should give this Court significant pause as to whether TRO relief is truly warranted.

## **STANDARD**

Rule 65 of the Federal Rules of Civil Procedure permits courts to issue preliminary injunctions or temporary restraining orders.[2] Both are considered "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008); *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). The test for demonstrating entitlement to a preliminary injunction or a TRO is well-established: a plaintiff must show that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Dominion Video Satellite v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001). Put simply, preliminary injunctions (or TROs) are the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

---

[2] Plaintiffs claim, without further explanation, that they "do not concede that this Court's injunction is no longer in place." Mot. at 2 n.1. But the Tenth Circuit's order dismissing Oklahoma's appeal was clear that "Oklahoma's request to vacate the judgment of the district court is denied as *unnecessary*." (emphasis added). For this, the Tenth Circuit cited *Janssen v. Harris*, 321 F.3d 998 (10th Cir. 2003), which held that the "effect of the filing of a notice of dismissal pursuant to Rule 41(a)(1)(i) is to leave the parties as though no action has been brought," *id.* at 1000 (citation omitted).

**J.A. 152**

As a result, courts "require more of the parties who request them." *Free the Nipple–Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). "[T]he right to relief must be clear and unequivocal." *Schrier*, 427 F.3d at 1258 (quotation omitted).

Moreover, when a plaintiff seeks facial relief, "it is necessary to proceed with caution and restraint." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). This is "[b]ecause facial challenges push the judiciary towards the edge of its traditional purview and expertise." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005). The Supreme Court has "made facial challenges hard to win" because they "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice*, 603 U.S. 707, 723 (2024) (citation omitted). Thus, facial challenges to laws are "disfavored." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Parties bringing a facial challenge "normally 'must establish that no set of circumstances exists under which the [statute] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (citation omitted). Therefore, "courts must be vigilant in applying a most exacting analysis to such claims." *Ward*, 398 F.3d at 1247. This case, of course, involves a facial challenge.

## <u>ARGUMENTS</u>

### I.    **Plaintiffs cannot rely on their illegal activity for standing to pursue a TRO.**

Confirming Article III standing is a critical threshold inquiry. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "First and foremost," that is, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 338–39 (cleaned up). Phrased differently, a plaintiff "must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii)

that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024); *see also Murthy v. Missouri*, 603 U.S. 43, 49–50 (2024) ("To establish standing, the plaintiffs must demonstrate a substantial risk that, in the near future, they will suffer an injury that is traceable to a Government defendant and redressable by the injunction they seek."). In a facial pre-enforcement challenge—as is the case here—a plaintiff must also satisfy a three-prong test, showing: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that the intended future conduct is "arguably … proscribed by [the challenged] statute," and (3) "the threat of future enforcement … is substantial." *SBA List v. Driehaus*, 573 U.S. 149, 160, 164 (2014) (quotations omitted).

To access the federal courts, a "plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). And the alleged "threatened injury must be certainly impending and not merely speculative." *Id.* (quotation omitted); *see also Younger v. Harris*, 401 U.S. 37, 42 (1971) (no controversy existed as to plaintiffs never threatened with prosecution who could allege only that they "fe[lt] inhibited" by the law). Speculative and subjective fears of state prosecution—asserted in this case by unnamed individual Plaintiffs and loosely knit interest groups—are not enough to confer standing. These plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

At the same time this Court was issuing its injunction ruling last year, the Supreme Court explained repeatedly just how high the bar is for establishing standing—both for

7

individuals *and* entities. In denying standing to two sovereign States and several medical professors in *Murthy*, for example, the Court emphasized that "[a]t the preliminary injunction stage … the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." 603 U.S. at 58 (citations omitted). And while denying standing to an organization of physicians challenging a controversial FDA action, the Court explained that "the standing requirement implements 'the Framers' concept of the proper—and properly limited—role of the courts in a democratic society.'" *All. for Hippocratic Med.*, 602 U.S. at 380 (quoting John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 DUKE L.J. 1219, 1220 (1993)). "In particular, the standing requirement means that the federal courts decide some contested legal questions later rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches in the democratic process." *Id.* These standing principles also "screen[] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* at 381.

Thus, although "organizations can assert the standing of their members," *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009), such standing must be rigorously scrutinized at the injunction or TRO phase. *See All. for Hippocratic Med.*, 602 U.S. at 393–94 ("organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals"). A membership organization may have standing to bring suit if, in pertinent part, "(a) its members would otherwise have standing to sue in their own right; [and] (b) the interests it seeks to protect are germane to the organization's purpose." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

8

**J.A. 155**

As an initial matter, Plaintiffs have failed to plead the injury of any individual member with particularity and plausibility, and the Plaintiff organizations in question lack direct standing, as well. "Like an individual," the Supreme Court has held, "an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct." *All. for Hippocratic Med.*, 602 U.S. at 394 (quotation omitted). An alleged injury in the form of a "setback" to Plaintiffs' "abstract social interests" does not support direct standing. *Id.*

Even more important—and really, the critical aspect of the standing discussion here— is that "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (a plaintiff cannot show injury if he has no "legally protected interest" in the conduct he wishes to vindicate). Here, the anonymous individual plaintiffs have openly admitted their "intent to engage in criminal conduct." Doc. 62 at 6. And they expressly concede that to establish standing, "the individual plaintiffs have had to make allegations which could subject them to a number of criminal *and immigration* consequences." *Id.* (emphasis added). Indeed, newcomer Plaintiffs Barbara Boe and Christopher Coe admit that they "fall[] squarely within the 'illegal entry' and 'illegal reentry' crimes" under H.B. 4156. Mot. at 4. If that is the case, they also "fall squarely" within the ambit of federal criminal law, which H.B. 4156 mirrors, as this Court has recognized. Thus, for standing purposes, they "lack[] standing" because they are "complaining that [Oklahoma] government action will make [their federal] criminal activity more difficult." *Walker*, 450 F.3d at 1093. Their interest, per the express

mandate of Congress enshrined in federal statutes, is "not 'legally protected.'" *Id.* And if they lack individualized standing, which they clearly do, it is difficult to see how the Plaintiff organizations could somehow avoid the same fate.[3]

Alternatively, the individual, unnamed plaintiffs have failed to allege sufficient facts establishing whether they are presently engaging, or will imminently engage, in conduct that violates H.B. 4156. In other words, even ignoring their admissions of illegality, their declarations are murky and never go beyond the "conjectural or hypothetical" at best. *Spokeo*, 578 U.S. at 338; *see also* Declaration of Barbara Boe ¶ 7 (describing her enjoyment of "travel to see … and spend holidays with" relatives "that live in New Jersey and North Carolina," but with no specified plans); Declaration of Christopher Coe, ¶ 8 (stating only that he is "worried" about being subject to H.B. 4156's enforcement). And although both the individual plaintiffs and the organizational plaintiffs' members tersely note their previous entry or reentry into the United States without inspection, the details of their *present* legal status within the state remain obscure—when mentioned at all. *See* Declaration of Barbara Boe, ¶ 5; Declaration of Christopher Coe, ¶¶ 5–7; Declaration of Michelle Lara, ¶¶ 10–11; Declaration of Nicole Maldonado, ¶¶ 13–14. For their part, neither Padres Unidos nor LULAC OKC has identified any single individual member with standing. Because the members do not have standing,

---

[3] Plaintiffs imply that the Tenth Circuit already found that they have standing here. Mot. at 4. This is misleading. A Tenth Circuit motions panel provisionally granted Plaintiffs' motion for permissive intervention in Oklahoma's appeal, subject to reconsideration by the merits panel. *See* Order at 2, *United States v. Oklahoma*, No. 24-6144 (10th Cir. Sept. 6, 2024). That initial order said nothing about standing. Moreover, the Tenth Circuit merits panel went on to outright *deny* Plaintiffs' intervention motion while dismissing the appeal as moot. *See* Order at 2, *United States v. Oklahoma*, No. 24-6144 (10th Cir. Mar. 25, 2025). If anything, this counsels against Plaintiffs' standing.

neither group can assert associational standing. *See Summers*, 555 U.S. at 498 (requiring "plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm").

The crux of the matter here is that, to the extent that any individual plaintiff is admitting that he or she is in Oklahoma unlawfully under federal law, a ruling in that plaintiff's favor will not eliminate their unlawfulness, as is the typical case with a plaintiff challenging a law. Rather, they are complaining that Oklahoma's actions will make their ongoing criminal activity more difficult. This cannot be a ground for standing, as "a court won't use its equitable power to facilitate illegal conduct." *Fourth Corner Credit Union v. Fed. Reserve Bank of Kan. City*, 861 F.3d 1052, 1054 (10th Cir. 2017) (Moritz, J.); *see also Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985) (observing that an "obviously sensible application" of the "unclean hands" doctrine is "to withhold an equitable remedy that would encourage, or reward (and thereby encourage), illegal activity, as where the injunction would aid in consummating a crime"). As for the alternative possibility, that one or more of the Plaintiffs are here with express federal permission, then enforcement of H.B. 4156 would be precluded altogether because H.B. 4156 does not go beyond what federal law prohibits. In other words, the lack of a credible threat of prosecution—"whether today or in the future"—equates to a lack of actual or imminent harm for standing purposes. *California v. Texas*, 593 U.S. 659, 670 (2021). In sum, Plaintiffs are stuck between a rock and a hard place. Either they are here illegally, in which case standing cannot be conferred, or they are not here illegally, in which case H.B. 4156 does not apply.[4] If

---

[4] Also, the Plaintiffs lack a cause of action in this case. And without a cause of action, they cannot sue Oklahoma in federal court.

sovereign states and medical organizations do not have standing to sue to challenge controversial governmental and private actions, as the Supreme Court has recently held, is it really the case that standing is found in individuals solely *because* they are present in the United States in violation of federal law? Surely not.

At a bare minimum, Plaintiffs have not shown that they are likely to have standing, such that a TRO could issue. Indeed, Plaintiffs devote barely a page of their motion to their standing arguments. This comes nowhere close to meeting *Murthy*'s rigorous standard: each plaintiff "must demonstrate standing for each claim," "against each defendant," and "for each form of relief." 603 U.S. at 61 (quotation omitted). Like the rest of their effort here, Plaintiffs simply have not put in the work to merit TRO relief.

## II.    **Plaintiffs' likelihood of success on the merits has decreased substantially.**

### a.    *The United States no longer supports Plaintiffs' Supremacy Clause arguments.*

On the Supremacy Clause, Plaintiffs apparently believe it is enough for them to note merely that "[t]his Court has already held that H.B. 4156 is likely field and conflict preempted." Mot. at 5. The State certainly acknowledges this Court's prior ruling. But the State would also point out that Plaintiffs ignore aspects of this Court's ruling that are helpful to Oklahoma, such as this Court's finding that H.B. 4156's "prohibitive provisions … largely resemble" and are "nearly identical" to federal law. Doc. 39 at 15. Similarly, this Court found that "[e]ffectively, H.B. 4156 criminalizes conduct already proscribed under federal law." *Id.* These points were not enough to convince this Court that an injunction was unwarranted, but with the changed circumstances now, they are worth remembering. Oklahoma, in short, has enacted

a law that mirrors federal law, rather than conflicts with it, which presumably explains why the United States no longer opposes the law while it still opposes sanctuary jurisdictions.

In a similar vein, this Court "acknowledge[d], to Oklahoma's credit," that the *Arizona* case was not directly on point, and that "not 'every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted." *Id.* at 16 (quoting *DeCanas v. Bica*, 424 U.S. 351, 355 (1976)). In other words, this Court admitted that it was making an extension of *Arizona*'s logic to the present circumstances. *Id.* Moreover, the Court admitted, to "Oklahoma's credit, [that] H.B. 4156 mandates expulsion only from Oklahoma, rather than from the United States." *Id.* at 18.

As such, it is important to observe that a "likelihood" finding is a predictor, and nothing more; it is not a permanent ruling, and it is subject to change. To be sure, several aspects of this Court's legal analysis would still seem to apply today. But, plainly, others do not. Indeed, this Court placed a strong emphasis on the fact that the United States previously opposed the State's position, which is no longer the case. For example, this Court wrote that the federal government's "power naturally encompasses discretion on enforcement." *Id.* at 20. But that carries a lot less weight when the current administration does not oppose the concurrent Oklahoma enforcement proposed here. Even more prominently, this Court dismissed Oklahoma's reliance on the Supreme Court's decision in *Kansas v. Garcia*, 589 U.S. 191 (2020), almost entirely by observing that in that case, "the federal government 'fully support[ed]' Kansas' power to prosecute." Doc. 39 at 21 (quoting *Kansas*, 589 U.S. at 212). "[T]he same cannot be said in this case," this Court wrote, "where *federal pushback is the genesis of litigation* …." *Id.* (emphasis added). That dynamic has flipped now. Based on this Court's own

13

**J.A. 160**

commentary, that is, the Court should at least consider treating the present case more like *Kansas* and less like *Arizona*, which would require upholding the law.

This Court also found significant the fact that "Mexico has already expressed concern over H.B. 4156." Doc. 39 at 22. But if the branch of government assigned with the task of foreign diplomacy is now undaunted by Mexico's supposed H.B. 4156 concerns, then it would seem sensical that this Court should not be concerned about Mexico's opposition, either. (Notably, the State's affiant who testified in this direction, Doc. 21-4, is now serving as the Deputy Secretary of State. Previously, he served as the U.S. Ambassador to Mexico.) Along the same lines, this Court held that "[s]ensitive matters of immigration policy 'must be made with one voice'" and "that voice belongs … to the United States." Doc. 39 at 23. But here, the United States no longer advocates for this position. If the United States is okay with States using their own (matching) voices as well in this arena, that would certainly seem to weaken the idea that Oklahoma is infringing on exclusive federal prerogatives.

Importantly, this Court cited and applied *Arizona*'s conclusion that a state law could not be justified as a cooperative effort "absent any request, approval, or other instruction from the Federal Government." *Id.* at 26 (quoting *Arizona*, 567 U.S. at 410). Although the United States has not yet offered an express approval here, its withdrawal of the lawsuit on which it was prevailing—as well as the numerous executive orders described above—would certainly seem to qualify under the "other instruction" framework. *See, e.g.*, 90 Fed. Reg. 8467, 8467 (Jan. 20, 2025) (criticizing the previous administration for undermining "the rule of law," and pledging to respect State law and cooperate "fully with State and local law enforcement

14

**J.A. 161**

officials in enacting Federal-State partnerships to enforce Federal immigration priorities"). This, again, would support upholding Oklahoma's H.B. 4156.

In seeking a TRO, Plaintiffs do not acknowledge this Court's previous reliance on the United States' opposition to H.B. 4156 in the lawsuit. But it would seem undeniable that, even accepting this Court's prior ruling without any disagreement, that Plaintiffs' likelihood of success on their Supremacy Clause claim has substantially decreased due to the United States' total abandonment of Plaintiffs' position, and its simultaneous embrace of the far-more-defensible position that federal immigration law should be enforced robustly rather than discarded at the executive's whim. This is a new day, in other words, and a new analysis must be undertaken that considers the changed circumstances.[5]

Of course, respectfully, the State does not agree with this Court's prior ruling, and the State reserves the right to argue as such more comprehensively later. For now, it should be sufficient to explain two areas of disagreement. First, this Court essentially held that, even though Oklahoma's law only removes illegal aliens from Oklahoma (and not the country), if Oklahoma were allowed to enforce H.B. 4156, then every state could do so, which would cause the nation's "immigration scheme [to] be turned on its head." Doc. 39 at 19 (quoting *United States v. Alabama*, 691 F.3d 1269, 1295 (11th Cir. 2012)). With respect, Oklahoma cannot see how every state enforcing state laws that mirror bedrock federal law could somehow upend

---

[5] It is also notable that this is not an issue where judges have all agreed. Even before the United States' decision to bow out of these cases, Judge Oldham dissented at length in the Fifth Circuit. *See United States v. Texas*, 97 F.4th 268, 298–337 (5th Cir. 2024) ("[T]o take from Texas its sovereign prerogative to enact a law that its people and its leaders want, plaintiffs must show that S.B. 4 is unconstitutional in every one of its potential applications. Plaintiffs likely cannot make that showing."). And the Eighth Circuit is currently accepting new briefing regarding Iowa's law.

our federal system. Regardless, Oklahoma's position does *not* ignore "the reality of what these ordinances accomplish." Doc. 39 at 20 (quoting *Lozano v. City of Hazleton*, 620 F.3d 170, 179 (3d Cir. 2010)). To the contrary, the "reality" is that only a handful of states have passed such laws, and the odds of the theory about what would happen in the aggregate actually coming to fruition are extremely low given the number of states that have gone the other way and embraced sanctuary jurisdictions. A sovereign state's law and ability to police its own territory should not be hindered based on aggregate hypotheticals that have no chance of coming to pass. As a practical matter, it is undeniable that for the foreseeable future, an illegal alien who is excluded from Oklahoma will have other states to rely on.

Second, Oklahoma continues to maintain that someone either has lawful presence in the United States or they do not. Logically, there can be no third way. The State disagrees, that is, with this Court's assertion that "it is just not that simple." Doc. 39 at 25. To be sure, immigration law is complex, but if someone has been granted "discretionary relief once prosecution has begun," Doc. 39 at 24, then they are seemingly, by definition, lawfully present in the United States. And, notably, the Court's only citation indicating otherwise is to a non-binding solo Supreme Court concurrence from 1982. *Id.* Again, the State voices this opposition with respect and understanding of the Court's position. But in the State's view, more compelling authority than a 43-year-old non-binding concurrence should be required for a State's sovereignly enacted law to be enjoined. In any event, even if there were some small group of persons who were allowed to be here under federal law but still subject to H.B. 4156, that would merely call for an as-applied challenge, not a facial challenge.

16

**J.A. 163**

> b. *H.B. 4156 does not violate the Commerce Clause because the regulated conduct is illegal and unrelated to foreign commerce*

As a sovereign entity, Oklahoma has the power to exclude unlawfully present individuals from its territory, subject to the limitations of the Constitution and applicable federal law. The power predates the Constitution, and "the Constitution did not strip states of that authority." *Arizona*, 567 U.S. at 418 (Scalia, J., concurring in part and dissenting in part). Plaintiffs contend that H.B. 4156 is unconstitutional because it interferes with the United States' power to regulate foreign commerce. This argument relies on a spectacularly overbroad interpretation of "dormant" Commerce Clause jurisprudence. Plaintiffs never convincingly explain how a state law that merely prohibits illegal entry and presence will negatively affect international commerce. The reason for this is obvious: by its very nature, illegal immigration is not legitimate international commerce.

Historically, the primary function of the dormant Foreign Commerce Clause dealt with the taxation or regulation of entities transporting immigrants to the United States, not regulation of the immigrants themselves. Early on, the Supreme Court distinguished between the regulation of people as commerce, and the regulation of people through a state's police power. *See Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102 (1837). *Miln* involved a state immigration statute that required each immigrant arriving at the Port of New York to be listed in a report to the mayor; the master of the ship would be fined for each unreported immigrant. *Id.* at 130–32. The Court upheld the statute as "a regulation, *not of commerce*, but police." *Id.* at 132 (emphasis added).

The Supreme Court has explained that "the dormant Commerce Clause's fundamental objective [is] preserving a national market for competition undisturbed by preferential

17

advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). A state statute is valid, even if it burdens foreign commerce, unless the burden imposed "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). States are allowed to regulate local matters, including commerce. *S. Pac. Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 766 (1945) ("Although the commerce clause conferred on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation."); *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 286 (1976) (nondiscriminatory tax, when applied to imported goods, did not impact federal regulation of foreign commerce). Here, Oklahoma's interest far outweighs any potential burden on foreign commerce even when viewed through a purely economic lens.

Again, the purpose of the dormant Commerce Clause is to "prevent[] the States from adopting protectionist measures and thus preserve[] a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997) ("economic isolationism" is "the very evil that the dormant Commerce Clause was designed to prevent"). And at root, H.B. 4156 "is not about economic protectionism; it is about unlawful immigration." *Texas*, 97 F.4th at 332 (Oldham, J., dissenting). In other words, the law is an expression of a state's police power to punish those committing a crime, much in the same way that a state could punish an illegal immigrant for trespassing on private property. And the state may properly deploy its police power to take something undeniably illegal under federal law and criminalize the same act under state law—especially when doing so "protect[s] and enhance[s]" the "essential rights ... of its citizens, authorized residents, and lawfully present visitors." H.B. 4156, § 1(A). That

18

**J.A. 165**

these actions are criminal under federal law renders a dormant Commerce Clause violation impossible. **Nothing is dormant**: Congress has spoken, and it has outlawed the behavior.

Plaintiffs allege they will be harmed because H.B. 4156 might impede their free movement in and out of Oklahoma—in their view, a condition that interferes with interstate commerce. For this, they principally rely on *Edwards v. California*, 314 U.S. 160 (1941). *Edwards* invalidated a California statute that prohibited "bringing into the State any indigent person who is not a resident of the State," *id.* at 171, holding that such was "an unconstitutional burden upon interstate commerce," *id.* at 177. The Court's reasoning was straightforward: amid the Dust Bowl and Great Depression, no "single State [could] isolate itself from difficulties common to all of them." *Id.* at 173.

In discussing *Edwards*, Plaintiffs omit the critical fact that the person California sought to exclude was "a citizen of the United States and a resident of Texas." *Id.* at 170. "[T]he nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all *citizens* be free to travel throughout the length and breadth of our land ...." *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651, 671 (1974) (emphasis added). Nothing in *Edwards* suggests—and the Court likely would have been astounded to contemplate—that a noncitizen *unlawfully in the country* could enjoy unfettered freedom of movement across state lines without any objection.

    c.   *Plaintiffs ignore that an invasion has been acknowledged by the United States.*

Incredibly, Plaintiffs do not once mention Oklahoma's alternative reliance on the State Invasion Clause. *See* U.S. CONST. art. I, § 10. To be sure, this Court previously dismissed that reliance as unconvincing. But that dismissal was largely based on a lack of any authoritative

19

support. Doc. 39 at 27–28. Since then, the United States issued a proclamation declaring a national emergency at the southern border, and it has repeatedly classified this emergency as an actual invasion. In the *Securing Our Borders* executive order, for example, the President explained that the "United States has endured a large-scale invasion at an unprecedented level" because "[m]illions of illegal aliens … successfully entered the United States … including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations." 90 Fed. Reg. 8467, 8467 (Jan. 20, 2025). And in the *Guaranteeing the States Protection Against Invasion* Proclamation, the President acknowledged that "the Federal Government has failed" in fulfilling its constitutional obligation "to 'protect each of [the States] against Invasion." 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025).

"A sovereign isn't a sovereign if it can't defend itself against invasion." *United States v. Abbott*, 110 F.4th 700, 725 (5th Cir. 2024) (Ho, J., concurring in the judgment in part and dissenting in part). Oklahoma still retains an inherent, sovereign power of self-defense. *See* U.S. CONST. art. I, § 10, cl. 3. Upon entering the Union, "the States did not part with that power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. (7 How.) 283, 400 (1849) (McLean, J.). Oklahoma has experienced a veritable deluge of illegal immigration and criminality: desperate traffickers, deadly weapons, and dangerous drugs. It is not arrant hyperbole to label this an invasion when, as noted above, the United States agrees and has argued that its own constitutional protection responsibilities have been triggered. And it certainly does not violate the Constitution when a state takes relatively minor steps to protect the health and lives of its citizens and lawful residents.

True, some courts have indicated "there are no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). That said, it is difficult to deny that "migration can be weaponized by one sovereign to inflict damage on another." *United States v. Abbott*, 92 F.4th 570, 579 (5th Cir. 2024) (en banc) (Ho, J., dissenting) (per curiam). The harm inflicted by foreign cartels in Oklahoma is staggering. And "these organizations pose a hybrid threat, combining characteristics of organized crime, insurgency, and terrorism." Christopher J. Curran, *Spillover: Evolving Threats and Converging Legal Authorities in the Fight Against Mexican Drug Cartels*, 6 HARV. NAT'L SEC. J. 344, 364 (2015). If both the State of Oklahoma and United States have diagnosed the current situation as an invasion, then Plaintiffs presumably face a high hurdle to show otherwise. But here, again, they have not even tried.

Put differently, Plaintiffs cannot succeed on a facial challenge to Oklahoma's "legislative judgment" unless it establishes that "the challenged statute violates the Constitution in all, or virtually all, of its applications." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (quotation omitted); *see also Moody*, 603 U.S. at 723 ("no set of circumstances under which the [law] would be valid") (quotation omitted). That burden has not been met here, at least in part because the Constitution contemplates States defending themselves from invasions. If the argument is, for example, that an "invasion" under the Constitution requires actions from an organized and cohesive group, is it not the case that Oklahoma could at least enforce its law against Mexican cartel members, or against organized Chinese crime syndicates? Whatever the case, given that the United States and Oklahoma are in lockstep on this point, it seems plain that facial relief is inappropriate.

**J.A. 168**

### III.    Plaintiffs cannot shield their unlawful behavior under a pseudonym.

By seeking leave to cloak themselves with pseudonyms, the individual Plaintiffs are attempting to enlist a federal court as the enabler of their admitted and ongoing lawbreaking. And even if Plaintiffs were not using pseudonym procedure to facilitate illegality, their request would still be "exceptional" and "unusual" in any event. *Luo v. Wang*, 71 F.4th 1289, 1296 (10th Cir. 2023). As a general and important rule, legal proceedings are public events to which members of the public have a right and interest in accessing. *See M.M. v. Zavaras*, 139 F.3d 798, 800 (10th Cir. 1998) ("Even a superficial recognition of our judicial history compels one to recognize that secret court proceedings are anathema to a free society."). Moreover, the public's significant interest in judicial proceedings includes knowing the identities of the parties involved. "Ordinarily, those using the courts must be prepared to accept the public scrutiny that is an inherent part of public trials." *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000).

Consistent with this, the Federal Rules of Civil Procedure require that "[t]he title of the complaint must name all the parties[,]" FRCP 10(a), and "must be prosecuted in the name of the real party in interest." FRCP 17(a)(1). As such, the Federal Rules do not support a general right to the "unusual procedure" of proceeding in litigation pseudonymously. *Femedeer*, 227 F.3d at 1246; *see also Nat'l Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989) (per curiam); *Zavaras*, 139 F.3d at 800; *United States ex rel. Little v. Triumph Gear Sys.*, 870 F.3d 1242, 1249 (10th Cir. 2017). Because such a practice runs contrary to federal rules, contravenes the public interest, and creates practical difficulties, burdens, and inconveniences in the litigation process, courts should exercise any discretion in this area sparingly. *See, e.g.*, *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1125 (10th Cir. 1979).

**J.A. 169**

In the Tenth Circuit, a plaintiff may "proceed anonymously only in those exceptional cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *Femedeer*, 227 F.3d at 1246 (emphasis added) (citing *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)); *see also Lindsey*, 592 F.2d at 1125 (proceeding pseudonymously is "allowed only where there is an important privacy interest to be recognized"). As a practical matter, it appears that the Tenth Circuit has denied nearly all opposed requests to proceed anonymously. *See, e.g., Luo*, 71 F.4th at 1303 (affirming district court's denial of anonymity based in part on plaintiff's "admitted and alleged conduct"); *Lindsey*, 592 F.2d at 1125 (affirming district court's refusal to allow plaintiff to proceed under pseudonym in case involving claims of malicious prosecution and slander); *Coe v. U.S. Dist. Court for Dist. of Colo.*, 676 F.2d 411, 418 (10th Cir. 1982) (affirming district court's denial of anonymity in case involving doctor's sexual improprieties); *Femedeer*, 227 F.3d at 1246 (denying anonymity in case involving sex-offender status); *Zavaras*, 139 F.3d at 804 (affirming dismissal of complaint by an anonymous plaintiff in case involving an indigent female inmate seeking abortion services); *Raiser v. Church of Jesus Christ of Latter-Day Saints*, 182 F. App'x 810, 811 (10th Cir. 2006) (unpublished) (affirming district court's denial of a motion to proceed under pseudonym in case involving civil rights litigation); *Triumph Gear Sys.*, 870 F.3d at 1250 (affirming dismissal of complaint when plaintiffs failed to seek permission to appear anonymously in case involving fear of employer retaliation); *Goico v. Kansas*, 773 F. App'x 1038, 1040 (10th Cir. 2019) (unpublished) (affirming district court's denial of plaintiff's request for anonymity in case involving a challenge to the state's attempts to legalize marijuana).

23

**J.A. 170**

Here, Plaintiffs are seeking to use this Court, a federal court, to enjoin a sovereign state from enforcing a law that indisputably mirrors federal law. Simultaneously, they are trying to use this Court to shield themselves—through pseudonyms—from actual federal law enforcement, who no longer support their attempt to expand federal preemption law. In their words, Plaintiffs' "admissions regarding their immigration histories could subject them to enforcement under federal entry or reentry crimes." Doc. 62 at 5. But what Plaintiffs hyperbolize as retaliation because "the federal government disagrees with" them, *id.* at 10, is really nothing more than everyday enforcement of the country's immigration laws. This complete disregard for the law, and the attempt to wield a federal court as a barrier against consequences for admitted federal lawbreaking, should not be tolerated.

### IV.    This Court should not provisionally certify a class.

Plaintiffs incorporate their motion for provisional class certification into their TRO effort. Mot. at 12.[6] Specifically, Plaintiffs seek provisional certification of two classes: "The Entry Class" and "The Reentry Class"—the former challenging Oklahoma's state crime of "Impermissible Occupation," and the latter challenging Oklahoma's separate felony offense for entering the State after having been "denied admission, excluded, deported, or removed." Doc. 61 at 1–2; OKLA. STAT. tit. 21, § 1795(B), (C)(2). This is improper: Plaintiffs have failed to present sufficient evidence that they are harmed by the challenged provisions, and Plaintiffs cannot prove that they satisfy the Rule 23(a) certification factors.

---

[6] For this reason, among others, the State has not kept its TRO response under 25 pages. In short, in addition to the limited timeframe, the State is filing an emergency response to multiple motions. The State reserves the right, of course, to file more thorough responses later. That an argument is not mentioned here should not be taken to mean that it is not preserved.

Preliminarily, certification is improper because the Plaintiffs lack standing to challenge H.B. 4156. "[A]ny analysis of class certification must begin with the issue of standing." *Vallario v. Vandehey*, 554 F.3d 1259, 1268 n.7 (10th Cir. 2009). In the class action context, any named plaintiffs "must have individual standing to bring claims on behalf of the absent class members . . . [and] may not rely on potential class members' injuries to establish their standing." *Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150, 1176 (D.N.M. 2016). Here, for reasons already explained above, Plaintiffs lack standing and thus should not be certified as a class.

But even if Plaintiffs somehow establish standing, they fail to satisfy Rule 23(a)'s requirements for provisional class certification. A party seeking provisional class certification still must prove numerosity, typicality, commonality, and adequacy. FRCP 23(a)(1)–(4); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Numerosity requires a showing that "the class is so numerous that joinder of all members is impracticable." FRCP 23(a)(1). Commonality requires a showing that "there are questions of law or fact common to the class." FRCP 23(a)(2). Typicality requires showing that "the claims or defenses of the representative parties are typical of the claims and defenses of the class." FRCP 23(a)(3). And adequacy requires showing that "the representative parties will fairly and adequately protect the interests of the class." FRCP 23(a)(4).

As for numerosity, Plaintiffs offer nothing more than "[m]ere speculation as to the number of class members," *Hayes v. Wal-Mart Stores*, 725 F.3d 349, 357 (3d Cir. 2013), in their allegation that H.B. 4156 "threatens thousands of noncitizens who live in and travel through Oklahoma," Doc. 61 at 2. Moreover, "noncitizens" is not the defining characteristic of H.B. 4156 because of the law's affirmative defenses and express aim "to protect" noncitizens who

25

**J.A. 172**

are "authorized residents[] and lawfully present visitors." H.B. 4156, § 1(A). As a result, Plaintiffs "cannot support a finding of numerosity." *Hayes*, 725 F.3d at 357. In terms of commonality, Plaintiffs cannot "demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 349–50 (citation omitted). To fulfill this requirement, persons must do more than just suffer "a violation of the same provision of law;" rather, they "must depend on a common contention . . . that is capable of class wide resolution." *Id.* at 350. Here, Plaintiffs have not shown and cannot show that the prospective members of the proposed classes have suffered the same injury—they can only prove that the prospective class members are potentially subject to the challenged provisions, should their future, hypothetical conduct subject them to the consequences of H.B. 4156.

Plaintiffs similarly cannot satisfy the typicality requirement. "It is well-established that a proposed class representative is not typical under Rule 23(a)(3) if the representative is subject to a unique defense that is likely to become a major focus of the litigation." *In re HomeAdvisor, Inc. Litig.*, 345 F.R.D. 208, 223 (D. Colo. 2024) (citations omitted). H.B. 4156 built in two affirmative defenses for all class members: (1) a federal grant of lawful presence or asylum; and (2) approval under the federal Deferred Action for Childhood Arrivals program between 2012 and 2021. *See* OKLA. STAT. tit. 21, § 1795(F). The organizational representatives are composed of several members, who ostensibly could qualify for one of the two affirmative defenses provided in Oklahoma's law. Doc. 61 at 1–2. Plaintiffs, therefore, likely cannot show that the representative is typical of all individuals in the class when a number of representative members potentially qualify for one of the two affirmative defenses available under the statute.

26

**J.A. 173**

Finally, the proposed class representatives cannot fairly and adequately protect the interests of the class. Given that the proposed class seemingly consists exclusively of persons who are actively violating federal law, the mere act of seeking a class (and later notifying them) likely risks bringing law enforcement—federal or state—attention on the rest of the class members. This is not protecting their interests.

Next, Plaintiffs' claims do not fall within any of Rule 23(b)'s catchall "types" of class actions. In addition to Rule 23(a)'s requirements, "the proposed class must satisfy at least one of the three requirements listed in 23(b)." *Dukes*, 564 U.S. at 345. Plaintiffs put forward 23(b)(2), which authorizes certification "where the party opposing the class has acted on grounds that apply generally to the class, so that final injunctive relief … is appropriate respecting the class as a whole." But for the reasons enumerated above (regarding standing, commonality, and typicality), sweeping injunctive relief is *not* appropriate. In the end, Plaintiffs are essentially asking this Court to certify a class of people who are united in their violation of fundamental federal law. That is a step a federal court should never take.[7]

### V.    The remaining factors and equities do not favor Plaintiffs here.

Last time, this Court found that the irreparable harm and equitable factors favored the United States, but that was largely due to the plaintiff being the United States. For example, the Court credited the United States' arguments "regarding Oklahoma's interference with its comprehensive foreign-policy framework as well as Mexico's expression of its concern over

---

[7] Nor should this Court grant statewide relief beyond the parties actually present in this case. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 721 (2018) (Thomas, J., concurring) ("universal injunctions are legally and historically dubious" in part because "as a general rule, American courts of equity did not provide relief beyond the parties to the case").

the signing of H.B. 4156." Doc. 39 at 29. The balance of the equities now, with the United States withdrawing its opposition, is entirely different. Plaintiffs are not a sovereign country— they are individuals who are here in violation of United States law or organizations supporting such individuals. Equity cannot, therefore, be in their favor. *See, e.g.*, *Original Invs., LLC v. State*, 542 F. Supp. 3d 1230, 1233 (W.D. Okla. 2021) (Friot, J.) (granting the State's motion to dismiss because "[i]t is well-settled … that 'a court won't use its equitable power to facilitate illegal conduct'" (citation omitted)). To the extent they face a "risk of arrest, prosecution, and detention," Mot. at 9, they will face those same harms under federal law regardless. And so on. Nor can the views of a private association about the law's effects, Mot. at 11, somehow trump the statutorily enshrined views of the Oklahoma Legislature and the perspective of the "chief law officer of the state." OKLA. STAT. tit. 74, § 18.

In the end, Oklahoma will be harmed by an injunction of a duly enacted law, whereas Plaintiffs' harms are not cognizable because they stem from admitted violations of federal law.

## VI.    This Court should require Plaintiffs to post a substantial bond.

If the Court finds Plaintiffs are entitled to the "extraordinary remedy" of a TRO that is "never awarded as of right," Plaintiffs should be required to post a substantial bond. *Winter*, 555 U.S. at 24. Rule 65(c) premises the issuance of a preliminary injunction or TRO on "the movant giv[ing] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Thus, "the trial judge's consideration of the imposition of bond is a necessary ingredient of an enforceable order for injunctive relief. The plain language of the rule permits no other analysis." *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).

Here, the President of the United States has repeatedly declared an invasion. And the Oklahoma Attorney General testified to Congress last year that over 100,000 people live in Oklahoma illegally, which costs "Oklahoma taxpayers more than $750 million each year – with minimal offsetting return." Doc. 21-1 at 4; *see also* 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) (noting that the States "have collectively spent billions of dollars" for medical care and increased law enforcement costs). Thus, the improper imposition of an injunction or TRO could cost the State millions, if not hundreds of millions, of dollars. Accordingly, Defendants could in theory request that the Court premise the granting of a TRO on Plaintiffs providing a security that corresponds to these enormous costs. At minimum, Plaintiffs should be required to post a bond of a substantial amount, given the immense burdens that the State shoulders from illegal immigration.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs a TRO.

Respectfully Submitted,

 s/ *Zach West*
GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov

*Counsel for Defendants*

30

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| PADRES UNIDOS DE TULSA, *et al.*,<br><br>                              *Plaintiffs*,<br><br>v.<br><br>GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.,*<br><br><br>                              *Defendants*. | Case No. 5:24-cv-511-J |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
## A TEMPORARY RESTRAINING ORDER
## OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION[1]

H.B. 4156 was unconstitutional when this Court enjoined it last year, and it is unconstitutional today. None of the intervening developments that Defendants cite alter this conclusion. Changes in Executive branch policies are irrelevant to the preemption analysis, as it is *Congress's* actions and purpose that dictate the inquiry. And this Court—along with every other court to address these issues—has already rejected Defendants' remaining merits arguments and found that H.B. 4156 is likely both field and conflict preempted. *United States v. Oklahoma*, 739 F. Supp. 3d 985, 1002, 1004, 1007 (W.D. Okla. 2024). Defendants' threshold arguments fare no better. Plaintiffs have standing to

---

[1] Plaintiffs respectfully request the Court's leave to file an overlength reply, *see* LR 7.1(h), in response to Defendants' overlength response, *see* LR 7.1(e); Opp. 24 n.6. Plaintiffs were not able to seek advance leave before the 5 PM deadline set by the Court this morning, nor obtain opposing counsel's position.

challenge H.B. 4156 because they and their members are engaged in conduct arguably proscribed by the law. Nor does their federal immigration status, or lack thereof, have any bearing on their ability to challenge a preempted state law under which they could be arrested, imprisoned, and banished from the State of Oklahoma. Plaintiffs also have a well-established cause of action in equity to seek relief from the enforcement of an unconstitutional law.

Finally, Defendants do not contest that Plaintiffs face danger of physical harm and could be subject to retaliation if they are unable to proceed anonymously. And their arguments against provisional class certification are meritless and contradicted by their own statements. This Court should provisionally certify the class, permit Plaintiffs to proceed under pseudonyms, and grant a temporary restraining order, or, in the alternative, a preliminary injunction.

## ARGUMENT

### I.    Plaintiffs Have Standing And Their Claims Are Justiciable.

The Individual Plaintiffs and LULAC OKC and Padres Unidos members are noncitizens who have "enter[ed] and remain[ed] in the State of Oklahoma without having first obtained legal authorization to enter the United States[,]" H.B. 4156 § 2(B), or are "found in Oklahoma" after they have been "denied admission, excluded, deported, or removed" from the United States. *Id.* § 2(D). They are not eligible for any of the affirmative defenses to prosecution under the Entry Provision, *see id.* § 2(F), or subject to any exceptions to the Reentry Provision, *see id.* § 2(D); *see also* Boe Decl. ¶¶ 2, 5; Coe Decl.

¶¶ 5–7; Lara Decl. ¶ 10, 11; Maldonado Decl. ¶ 13, 14.[2] Plaintiffs thus have standing

because they have engaged in conduct that is "arguably proscribed by the statute they wish

to challenge," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (cleaned up),

and are "among the direct targets of" H.B. 4156, *Initiative & Referendum Inst. v. Walker*,

450 F.3d 1082, 1097 (10th Cir. 2006). They have established a credible threat of

prosecution under a statute that "on its face" applies to them. *Frank v. Lee*, 84 F.4th 1119,

1134 (10th Cir. 2023); *see also United States v. Iowa*, 737 F. Supp. 3d 725, 740-45 (S.D.

Iowa 2024); *Idaho Org. of Res. Councils v. Labrador*, No. 1:25-CV-00178-AKB, 2025

WL 1237305, at *2–8 (D. Idaho Apr. 29, 2025) [hereinafter "*Idaho*"] (same); Omnibus

Ord. at 5-12, *Fla. Immigrant Coal. v. Uthmeier*, No. 1:25-cv-21524-KMW (S.D. Fla. Apr.

29, 2025), ECF No. 67 [hereinafter "*Florida*"] (same). Contrary to Oklahoma's suggestion,

*Murthy v. Missouri*, 603 U.S. 43 (2024), and *All. for Hippocratic Med.*, 602 U.S. at 367,

do not change the Court's standing analysis here. *Cf.* Opp. 7–9. Both cases involved

"speculation" about how the actions of third parties not before the court would impact

plaintiffs' standing. *See All. for Hippocratic Med.*, 602 U.S. at 383; *Murthy*, 603 U.S. at

69. By contrast, Plaintiffs are the direct targets of the challenged regulation.

Next, Oklahoma argues at length that Plaintiffs cannot have standing to challenge

H.B. 4156 because they are "in Oklahoma unlawfully under federal law" and therefore

---

[2] Oklahoma seems to challenge the organizations' "direct standing," Opp. 16, but
LULAC OKC and Padres Unidos only assert standing on behalf of their members (i.e.
associational standing), not organizational standing based on their own injuries. The
Supreme Court's decision in *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S.
367 (2024), is thus inapplicable.

have no "legally protected" interest in this case. Opp. 9, 11. This is a non-sequitur. Plaintiffs

have a significant legally protected interest in not being arrested, imprisoned, and banished

from the State of Oklahoma by a state entity that lacks the constitutional power to engage

in such action against them. *See Murphy v. NCAA*, 584 U.S. 453, 479 (2018) (explaining

that preemption represents a legally protected "federal right to be free from" impermissible

state regulation). Even if Individual Plaintiffs were "unlawfully" in the country under

federal law, Opp. 11—and most are not—that would not defeat their standing to challenge

a *state* prosecution under a law that is preempted. *See* Coe Decl. ¶ 7 ("in the process of

gaining [ ] lawful status"); Lara Decl. ¶ 11 (member Mario Moe has "pending U visa"

application); Maldonado Decl. ¶ 14 (member Soto Soe "has a pending application for

lawful permanent residence under the Violence Against Women Act"). Indeed,

Oklahoma's sweeping theory would eliminate standing in any case that challenges parallel

state prosecutions. *Cf. Hines v. Davidowitz*, 312 U.S. 52 (1941) (allowing suit by private

plaintiff alleging that state noncitizen registration law was preempted by federal scheme);

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) (finding individual had

standing to challenge preempted state law criminalizing transporting and harboring of

undocumented individuals); *Farmers Villas at Parkside Partners v. City of Farmers*

*Branch, Tex*., 726 F.3d 524, 529 (5th Cir. 2013) (similar). Courts across the country have

uniformly rejected similar arguments. *See Iowa*, 737 F. Supp. 3d at 740–45 (similarly

situated plaintiffs have standing); *Idaho*, 2025 WL 1237305, at \*2–8 (same); *Florida*, No.

1:25-cv-21524-KMW (S.D. Fla. Apr. 29, 2025), ECF No. 67 at 5–12 (same).

Finally, Defendants assert in a footnote that Plaintiffs lack a cause of action. Opp. 11 n.4. "Arguments raised in a perfunctory manner, such as in a footnote, are waived." *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc). Even assuming otherwise, this case is a paradigmatic application of *Ex parte Young*, 209 U.S. 123 (1908): the individual plaintiffs and members of LULAC OKC and Padres Unidos face prosecution under a preempted state statute, and they seek prospective relief against state officers—Defendants—charged with enforcing the law. *See also Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010) (holding that plaintiffs satisfied *Ex parte Young* in pre-enforcement preemption suit challenging state law regulating noncitizen employment); *United States v. Texas*, 97 F.4th 268, 309–10 (Oldham, J., dissenting) (recognizing suit in equity under *Ex parte Young* for those "directly affected by the regulations they sought to enjoin"); *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 906 n.19 (10th Cir. 2017) (same).[3]

## II.    H.B. 4156 Is Preempted Regardless Of Any Change In Executive Branch Policy.

Oklahoma's merits arguments rest almost entirely on a change in the Executive's policies with respect to immigration. Opp. 2–3, 12–16. But this is simply irrelevant to the Court's preemption analysis, and even Defendants acknowledge that "it is possible these developments are not enough to salvage Oklahoma's law." Opp. 3. The application of the Supremacy Clause turns on the intent of Congress—not the Executive. *See Wyeth v. Levine*,

---

[3] In addition, Plaintiffs' interstate commerce claim can be brought under 42 U.S.C. § 1983. *See Dennis v. Higgins*, 498 U.S. 439, 446, 451 (1991).

555 U.S. 555, 565 (2009) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." (emphasis added) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996))); *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1021 (10th Cir. 2022) ("The Supremacy Clause of the United States Constitution grants *Congress* the authority to preempt state law." (emphasis added)). The withdrawal of the United States from this case does not change the conclusion, required by longstanding precedent, that H.B. 4156 is preempted, because it does not remove the overwhelmingly dominant federal interest, or the pervasive scheme of regulation that Congress has enacted. *See Idaho*, 2025 WL 1237305 (enjoining similar law after United States withdrew its challenge in Oklahoma); *Florida*, No. 1:25-cv-21524-KMW (S.D. Fla. Apr. 29, 2025), ECF No. 67 (same).

Nor do any Executive Branch policy changes make this case "more like *Kansas* [*v. Garcia*, 589 U.S. 191 (2020)]." Opp. 14. As this Court recognized, *Kansas* involved prosecutions under a state identity fraud statute "that ha[d] no connection with immigration law." *Oklahoma*, 739 F. Supp. 3d at 1001 (quoting *Kansas*, 589 U.S at 209). Here, "H.B. 4156 touches so deliberately on matters of immigration regulation," *id.*, and displaces the carefully balanced statutory regime of federal control over the immigration system. Defendants speculate that the Executive is "now undaunted by Mexico's supposed H.B. 4156 concerns," Opp. 14, but whether or not that is true, it is irrelevant, because *Congress* is the one who has enacted a pervasive scheme that leaves no room for states to supplement, and *Congress* is the one who chose to place enforcement decisions in the hands of federal officers so that they would be "made with one voice." *Arizona*, 567 U.S. at 409; *see also Biden v. Texas*, 597 U.S. 785, 805-06 (2022).

6

**J.A. 183**

With respect to Oklahoma's argument that H.B. 4156 is permitted under the State War Clause, what this Court concluded last summer remains true today: "[n]either the Supreme Court nor the Tenth Circuit has recognized" this sweeping argument. *Oklahoma*, 739 F. Supp. 3d, at 1004–05; *id.* at 1005 (citing cases that have "rejected application of the State War Clause in the context of immigration"). Indeed, *no* court has accepted this breathtaking assertion of state supremacy, which would give states a blank check to disregard Congress and federal authority and unilaterally "enact and enforce state legislation regulating immigration otherwise preempted by federal law." *Texas*, 97 F.4th at 295; *id.* (rejecting Texas's invasion defense and explaining "that federal statutes addressing matters such as noncitizen entry and removal are still supreme even when the State War Clause has been triggered"); *see also Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("In order for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity…"). While Oklahoma is free to address crimes committed by "cartel members" and "crime syndicates" through its ordinary criminal laws, it cannot regulate entry and presence. Opp. 21. And federal immigration laws already specifically address the type of criminal conduct Oklahoma mentions—reinforcing that Congress has exhaustively regulated this field. *See*, *e.g.*, 8 U.S.C. §§ 1182(a)(2)(C) (grounds of inadmissibility and removability for drug trafficking); 1182(a)(2)(H) (human trafficking); 1182(a)(3) (security and terrorism).

Finally, Defendants suggest that H.B. 4156 is not preempted because "an illegal alien who is excluded from Oklahoma will have other states to rely on." Opp. 16. As an initial matter, the fact that H.B. 4156's substantive crimes regulate entry and reentry is by

itself enough to render the law preempted. If those provisions are enjoined, the remaining provisions must fall because they have no independent effect. Further, this Court and others have correctly rejected Defendants' argument, and they provide no basis for reconsideration other than their disagreement with the Court's conclusion. *See* Opp. 19–20; *see also United States v. Alabama,* 691 F.3d, 1269, 1293–95 (11th Cir. 2012) (invalidating similar attempt to expel a category of immigrants from a state, because states cannot "unilaterally determine that an[] alien unlawfully present in the United States cannot live within the state's territory"); *Lozano v. City of Hazleton*, 724 F.3d 297, 315–18 (3d Cir. 2013) (municipal housing regulations were preempted "interference with the federal removal process" even though they did not "control actual, physical entry into, or expulsion from [the City] or the United States"). Defendants also attempt to rewrite H.B. 4156 by suggesting, for the first time in this litigation, that someone who has been granted "discretionary relief once prosecution has begun" is "seemingly, by definition, lawfully present in the United States" and therefore not subject to the law. Opp. 16. But regardless of any last-ditch attempts by Oklahoma to save the statute, the Court must look to the plain text of the statute, and "[t]he plain text [of H.B. 4156] has no exceptions" that are applicable to Plaintiffs or that track federal law. *United States v. Iowa*, 126 F.4th 1334, 1347 (8th Cir. 2025), *vacated on other grounds,* No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025). And "even if" H.B. 4156 "had the same exceptions as federal law, the state law still conflicts with federal law because it creates a parallel scheme of enforcement for immigration law." *Id.* at 1348.

III.    **H.B. 4156 Violates The Commerce Clause.**

Oklahoma's Commerce Clause arguments are likewise unavailing. *Edwards v. California* established that attempts to exclude people at a state's borders violate the Commerce Clause. 314 U.S. 160, 173 (1941); TRO Mot. 8. Defendants contend that *Edwards* is distinguishable because it involved a United States citizen, who has the right to travel throughout the country. Opp. 19. But, even assuming the right to travel is so limited, *Edwards* did not rely on the right to travel in invalidating the statute; rather, it relied on the Commerce Clause, which applies to citizens and noncitizens alike. *Edwards*, 314 U.S. at 172–74.[4]

Nor are Commerce Clause claims limited to "trade," as Defendants seem to suggest. Opp. 17–18. Courts have been clear that the movement of people from one state to another constitutes interstate commerce. *See Covington & C. Bridge Co. v. Kentucky*, 154 U.S. 204, 218 (1894) ("to travel in person from Cincinnati to Covington" constitutes interstate commerce); *Hoke v. United States*, 227 U.S. 308, 320 (1913) ("a person may move or be moved in interstate commerce"); *United States v. Guest*, 383 U.S. 745, 758–59 (1966) ("[P]recedents firmly establish[] that the federal commerce power surely encompasses the movement in interstate commerce of persons"). Because H.B. 4156 "overtly blocks the flow of interstate commerce at a State's borders," it is "the clearest example of legislation" that discriminates against interstate commerce. *City of Philadelphia v. New Jersey*, 437

---

[4] Some concurring justices would have relied upon the right to travel in invalidating the statute. *Edwards*, 314 U.S. at 178 (Douglas, J., concurring); *id*. at 182 (Jackson, J., concurring). But the majority relied upon the Commerce Clause. *Id*. at 172–74.

U.S. 617, 624 (1978); *see also Edwards*, 314 U.S. at 173; *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935). Thus, H.B. 4156 is unconstitutional under the Commerce Clause.[5]

## IV.    Plaintiffs Should be Allowed to Proceed Under Pseudonyms.

Defendants do not contest that Plaintiffs' immigration status is highly sensitive and personal, and that they reasonably fear physical harm from both the federal government and private actors as a result of their involvement in this case. Opp. 22–24. Instead, they dismiss as "hyperbol[e]" the very real threat of retaliation that even they acknowledge Plaintiffs face. Opp. 24. The Court should exercise its discretion to permit Plaintiffs to proceed under pseudonyms.

Leave to proceed under pseudonyms is a matter of "informed discretion" for the *district* court. *M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir. 1998) (quoting *James v. Jacobson*, 5 F.3d 233, 242 (4th Cir. 1993)). Oklahoma suggests that "the Tenth Circuit has denied nearly all opposed requests to proceed anonymously," Opp. 23, but the cases they cite are off the mark. None involved the confluence of serious harms that Plaintiffs face here, including the disclosure of sensitive information regarding their immigration status,

---

[5] Defendants additionally contend that, because unlawful entry is a crime under federal law, there is no dormant Foreign Commerce Clause violation. Opp. 18–19. But even if this argument applied to Plaintiffs' interstate commerce claim, "Congress must manifest its unambiguous intent before a federal statute will be read to permit or to approve such a violation of the Commerce Clause as Oklahoma here seeks to justify." *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992). Congress has instead evinced its intent to preclude laws such as H.B. 4156 by crafting a comprehensive framework of laws regulating entry into the United States. *Oklahoma*, 739 F. Supp. 3d at 997–1002.

the threat of physical harm by private actors, or retaliatory criminal prosecution and deportation by the federal government.

Defendants acknowledge that Plaintiffs may face retaliation from the federal government for participating in this case. Opp. 24. Immigration enforcement action that targets Plaintiffs *because of* their participation in this case is hardly "everyday enforcement of the country's immigration laws." *Id*. It is precisely the type of retaliatory conduct that pseudonymity was designed to protect against. *D.B.U. v. Trump*, No. 1:25-CV-01163-CNS, 2025 WL 1101149, at *1 (D. Colo. Apr. 14, 2025); *Doe v. U.S. Imm. & Customs Enforcement*, No. 1:23-CV-00971-MLG-JMR, 2024 WL 4389461 at *3 (D.N.M. Oct. 3, 2024); *Doe v. Hobson*, 300 F.R.D. 576, 577 (M.D. Ala. 2014). Defendants do not respond at all to Plaintiffs' fear of retaliation from private actors who may violently target them for their immigration status and advocacy in court. ECF No. 62, at 6. And they ignore what is individually at stake for Barbara Boe and Christopher Coe: Boe is a member of the LGBT+ community and has built a life here in Tulsa free from the discrimination she fled in Mexico; Christopher Coe and his wife are seeking status because his wife was the victim of a crime, and he and his family fear retaliation should people find out about their cooperation with law enforcement. Boe Decl. ¶¶ 6, 8; Coe Decl. ¶¶ 7, 14. These private interests and threats of physical harm are significant factors in the Tenth Circuit's analytical framework. Defendants categorically fail to address them. Any of these factors by itself would favor anonymity, but together the need for anonymity is overwhelming.

11

**J.A. 188**

## V.       This Court Should Provisionally Certify A Class.

Class certification is proper because the "entry" and "reentry" classes satisfy the Rule 23 requirements, and because a trial court has broad discretion to grant class certification, including provisional certification. *See Florida*, No. 1:25-cv-21524-KMW (S.D. Fla. Apr. 29, 2025), ECF No. 67 at 28–37 (provisionally certifying nearly identical "entry" and "reentry" classes in a challenge against a nearly identical state law); *Idaho*, 2025 WL 1237305, at *15–20 (same). Defendants' arguments against class certification fail.

First, they contend that class certification is inappropriate because Plaintiffs lack standing. Opp. 25. But Plaintiffs plainly have standing to bring this action, as explained above. *Supra* at Section I.

Defendants next assert that Plaintiffs do not satisfy the numerosity requirement because their class definition based on "noncitizens" amounts to "speculation." Opp. 25–26. As an initial matter, the estimate that Plaintiffs provide, *see* Mot. for Class Cert. 6–7, ECF No. 61 ("thousands of individuals . . . who are at risk of enforcement under H.B. 4156" and up to "90,000[,]" the number of undocumented immigrants in Oklahoma), is not speculative. Indeed, Defendants themselves acknowledge that "over 100,000 people live in Oklahoma illegally," Opp. 29 (citing testimony from Oklahoma Attorney General), and even is if only a subset of this group is subject to H.B. 4156, that is more than enough to satisfy numerosity. *See Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) ("[T]he numerosity requirement is not a question of numbers. Rather, courts must consider factors that enter into the joinder impracticability issue.")

12

(cleaned up); *see also Barton v. Corr. Corp. of Am.*, No. 03-cv-428-JHP-SAJ, 2005 WL 5329514, at *3 (N.D. Okla. Sept. 1, 2005) (certifying class of 66 members); *Fabian v. Indep. Sch. Dist. No. 89 of Oklahoma Cnty.*, 409 F. Supp. 94, 95 (W.D. Okla. 1976) (certifying class of 142).

Third, Defendants' challenges to commonality and typicality also fail. Opp. 26. The resolution of class claims here "depend[s] on a common contention . . . that is capable of class wide resolution[,]" namely whether H.B. 4156's Entry and Reentry provisions are preempted. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also Hill v. Marathon Oil Co.*, No. CIV-08-37-R, 2010 WL 2365447, at *2 (W.D. Okla. June 9, 2010) ("There need only be one issue of law or fact common to all class members to satisfy the element of commonality."). Defendants have no response to this, other than to once again reiterate their arguments on standing. Opp. 26, 27. And typicality is not defeated just because some LULAC OKC and Padres Unidos members may have available affirmative defenses. Opp. 27. The members they have identified, and Individual Plaintiffs Boe and Coe, challenge H.B. 4156 on the same legal grounds as all class members, and seek the exact same relief: an injunction barring H.B. 4156's enforcement. That some non-class members of the organizations have different backgrounds or immigration histories does not defeat typicality. *See DG ex rel. Stricklin v. Devaughn*, 594 F.3d, 1188, 1197 (10th Cir. 2010) ("[T]ypicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances.").

Fourth, Defendants contest the adequacy of class representatives because certifying a class "likely risks bringing law enforcement . . . attention on the rest of the class members." Opp. 27. Defendants do not explain how certifying a class would result in increased law enforcement scrutiny of the hundreds and thousands of unnamed class members. And in any case, Representative Plaintiffs have established adequacy here because neither they nor their counsel "have any conflicts of interest with other class members," and they will "prosecute the action vigorously on behalf of the class." *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002).

Fifth, Defendants appear to have no independent argument about Rule 23(b)(2), arguing simply that Plaintiffs do not satisfy Rule 23(a). Opp. 27.  Regardless, Plaintiffs are a textbook Rule 23(b)(2) class, because they raise the same facial challenges to a general policy, each class member faces the same threat of arrest, prosecution, and expulsion based on H.B. 4156, and the relief they seek, an injunction blocking the statute's enforcement, would apply equally to the entire class. Mot. for Class Cert. 15–16, ECF No. 61. *See also* Fed. R. Civ. P. 23(b)(2); *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (23(b) is "almost automatically satisfied in actions primarily seeking injunctive relief."); *Dukes*, 564 U.S. at 360–61 (Rule 23(b)(2) applies when "a single injunction or declaratory judgment would provide relief to each member of the class")).

Finally, Defendants argue, in a footnote, that the Court should not grant statewide relief. Opp. 27 n.7. But a statewide injunction is necessary to ensure complete relief for the Plaintiffs. *See Idaho*, 2025 WL 1237305, at *20 (holding that "the issuance of a preliminary injunction on a statewide basis is necessary and appropriate" under nearly identical

circumstances); *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. and Rehab. Servs.*, 31 F.3d 1536, 1538, 1542, 1548 (10th Cir. 1994) (affirming preliminary injunction applying to all Medicaid-participating nursing homes in Kansas in a case brought by about half of the state's nursing homes).

## CONCLUSION

The Court should grant a temporary restraining order or preliminary injunction barring the enforcement of H.B. 4156.

Dated this 16th of May, 2025

Respectfully submitted,

/s/ *Devraat Awasthi*

Noor Zafar*
Omar Jadwat*
Grace Choi*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION, IMMIGRANTS' RIGHTS
    PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
*nzafar@aclu.org*
*ojadwat@aclu.org*
*gchoi@aclu.org*

Megan Lambert (OK Bar. No. 33216)
Devraat Awasthi (OK Bar. No. 35544)
AMERICAN CIVIL LIBERTIES UNION OF
    OKLAHOMA FOUNDATION
P.O. Box 13327
Oklahoma City, OK 73113
T: (405) 525-3831
*mlambert@acluok.org*
*dawasthi@acluok.org*

Spencer Amdur*
Oscar Sarabia Roman*
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION, IMMIGRANTS' RIGHTS
    PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
*samdur@aclu.org*
*osarabia@aclu.org*
*cwofsy@aclu.org*

Elissa Stiles (OK Bar. No. 34030)
RIVAS AND ASSOCIATES
P.O. Box 470348
Tulsa, OK 74147
T: (918) 419-0166
F: (918) 513-6724
*estiles@rivasassociates.com*

*Attorneys for Plaintiffs*
*Pro hac vice*

15

**J.A. 192**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 16, 2025, I filed a true and correct copy of the foregoing

using the CM/ECF system, which will serve the filing on all counsel of record.

*/s/ Devraat Awasthi*
Devraat Awasthi

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

PADRES UNIDOS DE TULSA, et al.,        )
                                                               )
                          Plaintiffs,                  )
                                                               )
v.                                                             )        Case No. CIV-24-511-J
                                                               )
GENTNER DRUMMOND, et al.,             )
                                                               )
                          Defendants.                )

**ORDER**[1]

Before the Court is Plaintiffs Padres Unidos de Tulsa, League of United Latin American Citizens Oklahoma City, Barbara Boe, and Christopher Coe's motion for injunctive relief.[2]  (Pls.' Mot. for Inj.) [Doc. No. 60].  At the Court's direction, Defendants Attorney General Gentner Drummond, Oklahoma Department of Public Safety Commissioner Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler responded in opposition.  (Defs.' Resp.) [Doc. No. 76].  For the reasons that follow, the Court grants Plaintiffs' motion to the extent it seeks a temporary restraining order.

**I.    Background**

This case is the product of two separate lawsuits challenging the constitutionality of Oklahoma House Bill 4156 (H.B. 4156), codified at Okla. Stat. tit. 21, § 1795, which imposes state criminal penalties on noncitizens who enter Oklahoma without authorization to enter the United States.  First, H.B. 4156 criminalizes what it terms an "impermissible occupation" in Oklahoma.

---

[1] All page citations in this Order refer to the Court's CM/ECF pagination.

[2] Plaintiffs also move for class certification under Federal Rule of Civil Procedure 23 and for leave to allow Boe and Coe to proceed under their designated pseudonyms.  *See* [Doc. Nos. 61, 62].  The Court addresses these requests below.

"A person commits an impermissible occupation if the person is an alien"—meaning "any person not a citizen or national of the United States"—and "willfully and without permission enters and remains in the State of Oklahoma without having first obtained legal authorization to enter the United States." Okla. Stat. tit. 21, § 1795(A)–(B). A first-time conviction for impermissible occupation is classified as a misdemeanor, "punishable by imprisonment in the county jail for a term of not more than one (1) year, or by a fine of not more than Five Hundred Dollars ($500.00), or by both such fine and imprisonment." *Id.* § 1795(C)(1). Any second or subsequent conviction for impermissible occupation, or any impermissible occupation "committed during the commission of any other crime," is classified as a felony, "punishable by imprisonment in the custody of the Department of Corrections for a term of not more than two (2) years, or by a fine of not more than One Thousand Dollars ($1,000.00), or by both such fine and imprisonment." *Id.* § 1795(C)(2). And for any impermissible occupation, "the person shall be required to leave the state within seventy-two (72) hours following his or her conviction or release from custody, whichever comes later." *Id.* § 1795(C)(1)–(2).

A charge of impermissible occupation is subject to certain affirmative defenses, specifically: (1) the federal government has granted the defendant "lawful presence in the United States"; (2) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; or (3) the defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals Program between certain dates. *Id.* § 1795(F).

H.B. 4156 also criminalizes the act of entering or attempting to enter Oklahoma by "[a]ny alien who has been denied admission, excluded, deported, or removed, or has departed the United States while an order of exclusion, deportation, or removal is outstanding," unless (1) "[p]rior to reembarkation of the alien at a place outside the United States or application by the alien for

2

admission from a foreign contiguous territory, the United States Attorney General has expressly consented to such alien's reapplying for admission"; or (2) "[w]ith respect to an alien previously denied admission and removed, such alien established that he or she was not required to obtain such advance consent." *Id.* § 1795(D). A noncitizen convicted under subsection (D) is deemed guilty of a felony, punishable by imprisonment for up to two years, a fine not exceeding $1,000.00, or both. *See id.* And like subsection (C), all those convicted under subsection (D) must leave Oklahoma. *See id.*

On May 21, 2024, the federal government—then led by President Joe Biden—sued the State of Oklahoma, Governor Kevin Stitt, Attorney General Gentner Drummond, the Oklahoma Department of Public Safety, and Oklahoma Department of Public Safety Commissioner Tim Tipton for declaratory and injunctive relief to enjoin enforcement of H.B. 4156 on grounds that the law was preempted and violated the Commerce Clause. The next day, it moved for a preliminary injunction.

On May 23, 2024, Padres Unidos de Tulsa and Ximena Monserrat Lopez Mena brought a separate yet similar lawsuit challenging H.B. 4156—on preemption and Commerce Clause grounds—against Attorney General Drummond, Commissioner Tim Tipton, Oklahoma County District Attorney Vicki Behenna, and Tulsa County District Attorney Steve Kunzweiler. An amended complaint followed one day later adding three additional plaintiffs—Jordy Madrigal Martinez, Antonio Marquez, and Rene Doroteo Hernandez (collectively, with Padres Unidos de Tulsa and Ximena Monserrat Lopez Mena, the Padres Unidos Group). That same day, the Padres Unidos Group moved for a preliminary injunction. The Court consolidated the two cases on June 5, 2024.

3

On June 28, 2024, just before H.B. 4156's scheduled effective date, the Court granted the federal government's motion for a preliminary injunction and denied the Padres Unidos Group's injunction motion as moot. *See United States v. Oklahoma*, 739 F. Supp. 3d 985, 1007 (W.D. Okla. 2024). In doing so, the Court found that H.B. 4156 was likely field preempted and conflict preempted. *See id.* at 997–1004. The State of Oklahoma and its officials appealed, but the federal government—now led by President Donald Trump—voluntarily dismissed its complaint before appellate review. The Tenth Circuit then dismissed the appeal as moot and denied the Padres Unidos Group's motion to intervene.

This all leads to the present request for a temporary restraining order (TRO). On May 13, 2025, Ximena Monserrat Lopez Mena, Jordy Madrigal Martinez, Antonio Marquez, and Rene Doroteo Hernandez voluntarily dismissed their claims, leaving Padres Unidos de Tulsa as the sole challenger in this consolidated case. Padres Unidos de Tulsa then moved for (1) leave to file a second amended complaint adding League of United Latin American Citizens Oklahoma City and two individuals (using the pseudonyms Barbara Boe and Christopher Coe) as plaintiffs, along with class action allegations; and (2) a TRO to enjoin the remaining defendants, Drummond, Tipton, Behenna, and Kunzweiler, from enforcing H.B. 4156. The Court granted leave to amend the same day, and the TRO request now awaits the Court's decision.

## II.    Use of Pseudonyms

Before turning to the merits of the TRO request, the Court considers whether Boe and Coe should be allowed to proceed under their designated pseudonyms. *See* [Doc. No. 62] at 1–11 (requesting leave for Boe and Coe to proceed under pseudonyms). "Proceeding under a pseudonym in federal court is, by all accounts, 'an unusual procedure.'" *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000) (quoting *M.M. v. Zavaras*, 139 F.3d 798, 800 (10th Cir. 1998)).

There is no "specific statute or rule supporting the practice," and "the Federal Rules of Civil Procedure mandate that all pleadings contain the name of the parties." *Id.*

Still, a plaintiff may be permitted to proceed under a pseudonym in certain "exceptional cases." *Id.* (quoting *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)). While "[t]he risk that a plaintiff may suffer some embarrassment is not enough," pseudonym status may be warranted in "cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *Id.* (quoting *Doe*, 951 F.2d at 324). Though pseudonymity is not the norm, "there is a long tradition in the federal courts of plaintiffs bringing suit under an alias." *Speech First, Inc. v. Shrum*, 92 F.4th 947, 950 (10th Cir. 2024).

Defendants argue that pseudonym status here serves as a shield from the consequences of federal immigration violations. *See* Defs.' Resp. at 23–25. In their view, "[b]y seeking leave to cloak themselves with pseudonyms," Boe and Coe "are attempting to enlist a federal court as the enabler of their admitted and ongoing lawbreaking." *Id.* at 23.

To be clear, the Court is not asked to enjoin enforcement of federal immigration law. Boe and Coe, if discovered in Oklahoma, may very well face removal or prosecution under the comprehensive federal immigration regime that Congress established. This Court's consideration of pseudonymity does not, and will not, interfere with that federal framework.

At the same time, though, Boe and Coe should not be forced to choose between challenging H.B. 4156 and exposing themselves to federal authorities. To require them to litigate this matter under their real names would effectively place a target on their backs simply for seeking judicial review of a state law they claim—and this Court once found—is likely preempted. *See Oklahoma*, 739 F. Supp. 3d at 997–1004.

The Court therefore finds that this case presents "exceptional" circumstances permitting the use of pseudonyms. So in this limited instance, it will allow Boe and Coe to litigate under their designated pseudonyms.

## III. <u>Legal Standard for a TRO</u>

Federal Rule of Civil Procedure 65 authorizes a district court to issue preliminary relief in the form of a TRO or a preliminary injunction. *See* Fed. R. Civ. P. 65(a)–(b). To obtain such relief, the moving party must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that [he] will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [his] favor; and (4) that the injunction is in the public interest." *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (internal quotation marks omitted).

Preliminary relief "is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (internal quotation marks omitted). Its issuance is "within the sound discretion of the trial court." *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 354 (10th Cir. 1986).

### A. Likelihood of Success

#### 1. Standing

At the threshold, Defendants challenge Plaintiffs' standing for preliminary relief. Article III of the Constitution limits federal courts' jurisdiction by requiring that litigants have standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "Standing is a prerequisite to a federal court's exercise of Article III jurisdiction, 'serv[ing] to identify those disputes which are appropriately resolved through the judicial process.'" *Peck v. McCann*, 43 F.4th 1116, 1129 (10th Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). It "ensures the plaintiff

has a personal stake in the dispute, distinguishing them from a mere bystander." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) (brackets and internal quotation marks omitted).

"Standing must be substantiated 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan*, 504 U.S. at 561). At the preliminary injunction stage, this means that "at least one" plaintiff "make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Does 1–11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1261 (10th Cir. 2024) ("If 'at least one plaintiff' has a personal stake . . . then 'the suit may proceed.'" (quoting *Biden v. Nebraska*, 600 U.S. 477, 489 (2023))). The Court assumes the same standard applies to Plaintiffs' request for a TRO.[3]

"To establish standing, a plaintiff must prove: (1) they 'ha[ve] suffered or likely will suffer an injury in fact,' (2) 'the injury likely was caused or will be caused by the defendant,' and (3) 'the injury likely would be redressed by the requested judicial relief.'" *Rocky Mountain Gun*, 121 F.4th at 108 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024)). Put more simply, "a plaintiff must establish three elements: an injury-in-fact, causation, and redressability." *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007)).

---

[3] Appellate courts naturally have fewer opportunities to establish standing requirements at the TRO stage because TROs, unlike preliminary injunctions, are "generally not appealable." *Bessent v. Dellinger*, 145 S. Ct. 515, 516 (2025) (mem.) (Gorsuch, J., dissenting). Nevertheless, because the core requirements for obtaining a TRO and a preliminary injunction are "essentially the same," the Court sees no reason why the showing for standing, subject to necessary procedural adjustments, should not likewise be the same. *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018).

Here, the dispute centers on the first element: injury-in-fact. To establish this type of injury, "a plaintiff must show that they have suffered or likely will suffer 'an invasion of a legally protected interest' that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical.'" *Rocky Mountain Gun*, 121 F.4th at 109 (quoting *Lujan*, 504 U.S. at 560).

At the heart of Defendants' standing argument is the assertion that Boe and Coe, along with the members Padres Unidos de Tulsa (Padres) and League of United Latin American Citizens Oklahoma City (LULAC) seek to protect, lack a "legally protected interest" due to their unlawful presence in the United States. *See* Defs.' Resp. at 10–12. In support, Defendants cite language from *Initiative and Referendum Institute v. Walker* observing that "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not legally protected." 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc) (internal quotation marks omitted).

But Defendants' reliance on *Walker* is misplaced. The Tenth Circuit's brief reference to criminal activity was nothing more than an illustrative example—one of several types of conduct generally deemed insufficient to meet the threshold for standing. *See Kerr v. Polis*, 930 F.3d 1190, 1198 (10th Cir. 2019) (characterizing the "situations" from *Walker* as an "illustrative list"). It was not a sweeping declaration that any unlawful status (like unauthorized presence) categorically precludes standing.

More fundamentally, though, Defendants' position would broadly eviscerate standing in preemption challenges of parallel state laws.[4] Under Defendants' theory, someone facing criminal

---

[4] Federal courts evaluate standing on a "claim-by-claim basis; a plaintiff may have standing to bring some, but not all, claims raised in a complaint." *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 813 (10th Cir. 2021). Because the Court ultimately finds that

prosecution under a state law mirroring federal law would be precluded from asserting preemption merely because their underlying conduct is unlawful under federal law. This logic would allow states to insulate even the most severe criminal sanctions from judicial scrutiny simply by mirroring federal prohibitions. *See Idaho Org. of Res. Councils v. Labrador*, ___ F. Supp. 3d ___, No. 1:25-cv-00178-AKB, 2025 WL 1237305, at *8 (D. Idaho Apr. 29, 2025) (rejecting argument that plaintiffs' unlawful presence under federal immigration law precluded standing in preemption challenge of state immigration law); *cf. Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1014–16 (9th Cir. 2013) (finding standing for plaintiff engaged in conduct criminalized under federal immigration law to challenge state immigration law on preemption grounds); *Lozano v. City of Hazleton*, 620 F.3d 170, 191–94 (3d Cir. 2010) (finding standing for unauthorized immigrants challenging local immigrant-targeting ordinance on preemption grounds), *vacated on other grounds*, 563 U.S. 1030 (2011).

Alternatively, but still within standing's injury-in-fact requirement, Defendants argue that Plaintiffs "have failed to allege sufficient facts establishing whether they are presently engaging, or will imminently engage, in conduct that violates H.B. 4156." Defs.' Resp. at 11. Put differently, Defendants maintain that Plaintiffs lack a harm that is both "concrete and particularized" and is "actual or imminent."

Indeed, the injury-in-fact requirement obligates a plaintiff to demonstrate a harm that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). To be concrete, an injury must "be 'real' rather than 'abstract.'" *Lupia v. Medicredit, Inc.*, 8 F.4th 1184,

---

Plaintiffs are likely to prevail on their preemption claims, its standing analysis focuses on that theory.

1190 (10th Cir. 2021) (quoting *Spokeo*, 578 U.S. at 340). But it need not be "tangible." *Spokeo*, 578 U.S. at 340. And an injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1). As for imminence, "a plaintiff need not wait for the harm to occur to satisfy the injury-in-fact requirement." *Rocky Mountain Gun*, 121 F.4th at 109. Instead, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 409–10, 414 n.5).

For a pre-enforcement challenge to be justiciable, the plaintiff must show "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the challenged statute, and (2) that there exists a credible threat of prosecution thereunder." *Rocky Mountain Gun*, 121 F.4th at 110 (brackets and internal quotation marks omitted). For sufficient intent, "the plaintiff must present 'concrete plans to engage in conduct that ha[s] [the] potential to violate' the challenged statute." *Id.* at 110 (quoting *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016)). "Speculative plans or vague intentions to *potentially* violate the challenged statute are insufficient." *Id.* (emphasis in original). Regarding the threat of prosecution, the mere presence of an unconstitutional statute, without more, does not entitle a party to sue. *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006). But "[t]he threat of prosecution is generally credible where the defendant 'has not disavowed any intention of invoking' the statute against the plaintiff." *Rocky Mountain Gun*, 121 F.4th at 110 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)).

10

Coe declares that he is a 37-year-old citizen of Mexico who reentered the United States "without inspection"[5] in 2012.  Pls.' Mot. for Inj., Ex. 2 at 2.  He has remained in the United States ever since and now resides in Oklahoma.  *Id.*, Ex. 2 at 2.  Before his surreptitious reentry, the federal government removed him twice.  *Id.*, Ex. 2 at 2.

Coe's continued presence in Oklahoma, then, plainly exposes him to prosecution under H.B. 4156.  *See* Okla. Stat. tit. 21, § 1795(D).  The same is true for Boe.  *See id.*, Ex. 1 at 2–4 (declaring that Boe, a citizen of Mexico who has not claimed eligibility for H.B. 4156's limited defenses, entered the United States surreptitiously in 2000, has remained in the United States ever since, and now resides in Oklahoma).  And nothing in the record suggests that Defendants have disavowed enforcing H.B. 4156 against Coe, Boe, or anyone else.  The Court therefore finds that they have made a clear showing of likely injury-in-fact.  Further, though not challenged by Defendants,[6] the Court finds that each individual satisfies the remaining standing requirements of

---

[5] Federal law mandates that noncitizens enter the United States through designated entry points, where they must present necessary entry documents and undergo inspection by federal immigration officers.  8 U.S.C. § 1225(a)(3) ("All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."); 8 C.F.R. § 235.1 (requiring that noncitizens apply for lawful entry in person at designated ports of entry and present required documents for inspection).  Noncitizens who surreptitiously enter or reenter the United States may face prosecution under 8 U.S.C. §§ 1325 and 1326, federal statutes with which H.B. 4156 aligns.

[6] Federal courts have "an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

causation[7] and redressability.[8]  Thus, the Court finds that Boe and Coe have established standing to seek preliminary relief enjoining H.B. 4156.

The Court reaches the same conclusion for Padres and LULAC, two organizations in Oklahoma.  "It has long been settled that . . . an association may have standing solely as the representative of its members."  *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986) (internal quotation marks omitted).  Associational standing "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others."  *Id.* at 290.  To establish associational standing, Padres and LULAC must show: (1) "[their] members would otherwise have standing to sue in their own right," (2) "the interests [they] seek[] to protect are germane to [their] purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of . . . individual members in the lawsuit."  *Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397–98 (10th Cir. 1992) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

---

[7] Causation requires "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan*, 504 U.S. at 560 (alterations and internal quotation marks omitted).  "[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular [statute], the causation element of standing requires the named defendants to possess authority to enforce the complained-of [statute]."  *Bronson*, 500 F.3d at 1110.  Such authority is clearly present here.

[8] Redressability requires it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).  "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005).  The relief Boe and Coe request—enjoining enforcement of H.B. 4156—would redress their injuries.

12

J.A. 205

The first prong asks "whether any member of [the organization] would have had standing individually to bring the[] claims." *Utah Ass'n of Counties v. Bush*, 455 F.3d 1094, 1099 (10th Cir. 2006); *see also Osage Producers Ass'n v. Jewell*, 191 F. Supp. 3d 1243, 1250 (N.D. Okla. 2016) (explaining that the first prong requires "an associational plaintiff to specifically identify at least one member harmed by the defendant's conduct"). In other words, Padres and LULAC must identify at least one member who, like Boe or Coe, faces a credible threat of prosecution under H.B. 4156.

Padres identifies one member, a 39-year-old Salvadoran national, who reentered the United States in 2013 following a prior removal. *See* Pls.' Mot. for Inj., Ex. 3 at 4. He now lives in Oklahoma with his wife and four U.S.-citizen children. *See id.*, Ex. 3 at 4. His presence in Oklahoma exposes him to a credible threat of prosecution under H.B. 4156. *See* Okla. Stat. tit. 21, § 1795(D).

LULAC, for its part, similarly identifies a member who reentered the United States after removal. *See* Pls.' Mot. for Inj., Ex. 4 at 5–6; *see also id.*, Ex. 4 at 5 (identifying another member who entered the United States surreptitiously in 2007, regularly travels throughout Oklahoma for work, and does not claim eligibility for H.B. 4156's defenses). He has lived in this country ever since. *See id.*, Ex. 4 at 6. Like Boe and Coe, his presence in Oklahoma exposes him to a credible threat of prosecution under H.B. 4156. *See* Okla. Stat. tit. 21, § 1795(D).

In sum, the Court finds that Padres and LULAC satisfy the first prong of associational standing.

Next, the Court concludes that the interests Padres and LULAC seek to protect are germane to their organizational purposes. *See Collins v. Daniels*, 916 F.3d 1302, 1312 (10th Cir. 2019) (observing that the second prong of associational standing requires a showing by the organization

13

that the interests it seeks to protect are germane to its purpose). Here, both move to enjoin enforcement of a state immigration law—one they claim federal law preempts—that targets their members based on immigration status. And both organizations strive to advocate for and protect the rights of immigrant communities by increasing access to educational opportunities, enhancing civic engagement, and providing community-based support services. *See* Pls.' Mot. for Inj., Ex. 4 at 2 ("LULAC is the largest and oldest Latino civil rights organization in the United States. LULAC's mission is to improve the lives of Latino families throughout the United States and to protect their civil rights in all aspects."); *id.*, Ex. 3 at 2 ("Padres['s] . . . mission is to amplify the voices of students and families to increase access to meaningful educational opportunities for immigrant students and all community members in the Tulsa Public School System."). What follows from these stated missions is that their "litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996); *see also Gonzalez ex rel. Doe v. Albuquerque Pub. Schs.*, No. CIV 05–580 JB/WPL, 2006 WL 1305032, at *2–3 (D.N.M. Jan. 17, 2006) (finding Padres had associational standing to challenge state questioning of members on immigration status).

Finally, "[i]ndividual participation is not normally required when 'an association seeks prospective or injunctive relief for its members' because 'the remedy, if granted, will inure to the benefit of those members of the association actually injured.'" *Gonzalez*, 2006 WL 1305032, at *2 (internal citation omitted) (first quoting *United Food*, 517 U.S. at 546; second quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)); *see also C.R. Educ. & Enf't Ctr. v. Sage Hosp. Res. LLC*, 222 F. Supp. 3d 934, 943 (D. Colo. 2016) ("Because [the organization] seeks only declaratory and injunctive relief, individual participation of [its] members is not required."). So since Padres and

LULAC seek only declaratory and injunctive relief, individual participation of their members is not required. *See* [Doc. No. 64] at 17.

In sum, the Court concludes that Padres and LULAC have made the requisite clear showing of associational standing necessary for preliminary relief.

### 2. Preemption

Next, the Court turns to the likelihood that H.B. 4156 is preempted by federal law.[9] Less than a year ago, it concluded that H.B. 4156 was likely both field and conflict preempted.[10] *See Oklahoma*, 739 F. Supp. 3d at 997–1004. *And though the case's posture has shifted, the principles underpinning that decision remain unchanged.*

---

[9] "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012). Nonetheless, the Supremacy Clause of "Article VI of the Constitution provides that the laws of the United States 'shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting U.S. Const. art. VI, cl. 2). It is well established that "state law that conflicts with federal law is 'without effect.'" *Id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). "Congress may . . . pre-empt, *i.e.*, invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

[10] Federal law can preempt state law either by an express statement of preemption or by implication. *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011). Implied preemption, the sole kind of preemption at issue in this case, includes field preemption and conflict preemption. *Id.* Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Conflict preemption, on the other hand, can occur in one of two ways: "where compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks and citations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Expectedly, Defendants disagree. They insist that a change in course is warranted because the federal government, led by a new chief executive, effectively greenlighted H.B. 4156 by dropping its prior preemption challenge. *See* Defs.' Resp. at 13–17. *But Congress's intent—not the shifting enforcement priorities of presidential administrations—controls the preemption inquiry. See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." (internal quotation marks omitted)); *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990) ("Pre-emption fundamentally is a question of congressional intent . . . ."); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("[P]re-emption claims turn on Congress's intent . . . ."). And in finding H.B. 4156 preempted last year, the Court was guided by just that.

First, in finding H.B. 4156 field preempted, it found "strong support for the conclusion that Congress . . . legislated . . . comprehensively in the field of noncitizen entry and reentry." *Oklahoma*, 739 F. Supp. 3d at 999 (internal quotation marks omitted). And applying the Supreme Court's instruction that "[w]here Congress occupies an entire field, . . . even complimentary state regulation is impermissible," it concluded that "Oklahoma's attempt to parallel federal law must fail." *Id.* (first quotation quoting *Arizona*, 567 U.S. at 401).

This Court found, too, that H.B. 4156 was likely conflict preempted. It observed that "[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer." *Id.* at 1003 (quoting *Arizona*, 567 U.S. at 408). And H.B. 4156's sweeping authorization for state officers to arrest, prosecute, and punish noncitizens, it reasoned, conflicted with the "system Congress created." *Id.* (quoting *Arizona*, 567 U.S. at 408); *see also id.* ("Congress' delineation of these cooperative frameworks . . . is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present. Nor is it a grant of authority

to a state to enact a statute that gives authority under state law to state officials to arrest or remove someone illegally present." (internal citation and quotation marks omitted)).

Now, to be fair, the Court did cite the federal government's then-opposition to H.B. 4156 as additional support for preemption. *See id.* at 997–1004. And the change in posture may bolster Defendants' position as a matter of policy. In the end, however, the Court's discussion of federal enforcement discretion and immigration considerations—like foreign policy, resource allocation, and humanitarian concerns—underscores Congress's intent to make immigration regulation exclusively federal. These considerations are not an invitation for preemption analysis to shift based on the enforcement priorities of a given administration. *See Kansas v. Garcia*, 589 U.S. 191, 212 (2020) ("The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." (quoting U.S. Const. art. VI, cl. 2)). That understanding is what guides the Court's ruling, both now and then.

Defendants may also disagree with the Court's heavy application of *Arizona* to H.B. 4156. The Court itself acknowledged that *Arizona*'s criticism of parallel state legislation arose in the context of "noncitizen registration, not noncitizen entry and reentry." *Oklahoma*, 739 F. Supp. 3d at 998. Still, the Court's reading of *Arizona* and the Supreme Court precedent that predates it leads to one conclusion: "*Arizona*'s logic . . . naturally extend[s] to this case." *Id.* Without further guidance from the Tenth Circuit or Supreme Court, that position is unlikely to change.

In the end, the Court recognizes now, as it did then, that Oklahoma "undoubtedly bears many of the consequences of unlawful immigration." *Id.* at 993 (internal quotation marks omitted). The topic is one of great importance to Oklahomans—historically and today. And the Court does not make light of the concerns Defendants raise. Yet "[f]or nearly 150 years, the Supreme Court has held that the power to control immigration—the entry, admission, and removal of

17

noncitizens—is *exclusively* a federal power." *Id.* at 991 (emphasis in original) (quoting *United States v. Texas*, 97 F.4th 268, 278–279 (5th Cir. 2024)). This finding flows naturally and consistently from Congress's creation of a federal "framework regulating the entry, presence, and removal of noncitizens." *Oklahoma*, 739 F. Supp. 3d at 991. Comprehensively, that framework identifies "*who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully." *Id.* (emphasis in original) (quoting *Texas*, 97 F.4th at 283). And it specifically delineates the ways in which states may operate within it. *See id.* at 1003. Ultimately, the Court believes Congress's preemptive intent could not be clearer. *See Idaho Org.*, 2025 WL 1237305, at *10–13 (recently enjoining state law criminalizing unlawful entry and reentry on preemption grounds); *Fla. Immigrant Coal. v. Uthmeier*, ___ F. Supp. 3d ___, No. 25-21524-CV-WILLIAMS, 2025 WL 1423357, at *10 (S.D. Fla. Apr. 29, 2025) ("[C]ourts across the country have unanimously held that nearly identical state illegal entry and reentry laws recently enacted are likely preempted by federal immigration law governing noncitizen entry.").

For these reasons, and consistent with its prior ruling, the Court finds that Plaintiffs are likely to succeed on their claims that H.B. 4156 is preempted.[11]

### 3.    Invasion Defense

Also relevant to preemption, Defendants maintain that H.B. 4156 is essential to fend off the "invasion" of illegal immigration in Oklahoma. Defs.' Resp. at 20–23. This position, previously rejected by the Court, derives from Article I, Section 10, Clause 3 (the State War Clause)

---

[11] Because the Court finds Plaintiffs are likely to prevail on their preemption claims, it need not address their likelihood of success on any remaining theories. *See Whinery v. Premier Funeral Mgmt. Grp. IV, LLC*, No. CIV-20-130-D, 2020 WL 13669025, at *2 (W.D. Okla. May 15, 2020) ("To show a substantial likelihood of success on the merits, the movant must, at a minimum, present a prima facie case for prevailing on at least one claim asserted in its pleading." (internal quotation marks omitted)).

of the Constitution, which provides: "No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."  U.S. Const. art. I, § 10, cl. 3.  Defendants insist their reliance on the State War Clause is especially suitable now, pointing to a series of federal proclamations "declaring a national emergency" and "classif[ying] this emergency as an actual invasion."  Defs.' Resp. at 21.

But these proclamations do not sway the Court's reasoning.  To be sure, when Defendants faced opposition to H.B. 4156 during President Biden's tenure, they pointed to his own remarks as evidence of an immigration "crisis" in this country.  [Doc. No. 21] at 9.  And while the Biden administration was unlikely to acknowledge its gravity, Attorney General Drummond described a "veritable deluge of illegal immigration and criminality: desperate human beings, deadly weapons, dangerous drugs, etc."  *Id.* at 38.  The Court does not downplay these realities.

The Court's position then and now, however, is that the "historical and constitutional context" of the State War Clause does not support its use as a defense for legislation like H.B. 4156.  *Oklahoma*, 739 F. Supp. 3d at 1005.  Indeed, "[n]either the Supreme Court nor the Tenth Circuit has recognized [its] application . . . as broadly as [Defendants] advocate[]."  *Id.*  And "[o]ther courts have . . . rejected application of the State War Clause in the context of immigration."  *Id.* (collecting cases).  So while the federal government may have declared an "invasion" as a matter of policy, the Court remains unconvinced that Defendants can invoke the State War Clause to defend against preemption.

### B.    Remaining Showing for Preliminary Relief

To secure a TRO, Plaintiffs must demonstrate not only a likelihood of success on the merits but also that irreparable harm is likely, the balance of equities tips in their favor, and that injunctive relief serves the public interest.  *Little*, 607 F.3d at 1251.

"To show a threat of irreparable harm, a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (internal quotation marks omitted).  When the Court granted the federal government injunctive relief last year, it focused on the irreparable harm the government faced.  *See Oklahoma*, 739 F. Supp. 3d at 1005–06.  Now, the focus shifts to whether Plaintiffs, too, can demonstrate irreparable harm.

The Tenth Circuit has recognized that "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Fish*, 840 F.3d at 752 (internal quotation marks omitted).  And some courts have extended this general principle to even structural constitutional injuries, such as Supremacy Clause violations.  *See United States v. Alaska*, 608 F. Supp. 3d 802, 809 (D. Alaska 2022) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm even when the constitutional injury is structural, such as a Supremacy Clause violation." (footnote and internal quotation marks omitted)); *Idaho Org.*, 2025 WL 1237305, at *14 ("Plaintiffs are likely to succeed on the merits of their claim that the challenged offenses violate their constitutional interests because federal law preempts them.  Such '[a]n alleged constitutional infringement will often alone constitute irreparable harm.'" (quoting *Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984))).  *But see EEOC v. Local 638*, No. 71 Civ. 2877 (RLC), 1995 WL 355589, at *5 (S.D.N.Y. June 7, 1995) ("[A] Supremacy Clause violation allegedly caused by the enforcement of state regulations that may

20

**J.A. 213**

have been preempted by federal law could not constitute per se irreparable harm.").  Even so, this Court is hesitant to apply a per se rule of irreparable harm in the context of a likely Supremacy Clause violation.

Nevertheless, Plaintiffs here make a clear showing of likely irreparable harm.  Boe, Coe, and the members Padres and LULAC represent face the imminent threat of state-sanctioned arrest, prosecution, and punishment absent preliminary relief.  Unquestionably, that threat constitutes irreparable harm justifying injunctive relief.  *See Farmwork Assoc. of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311, 1337–40 (S.D. Fla. 2024) (finding a likelihood of irreparable harm where plaintiffs faced the threat of prosecution under a state law mirroring federal immigration law); *Valle del Sol Inc.*, 732 F.3d at 1029 (finding a likelihood of irreparable harm where plaintiffs faced the threat of prosecution under a state law mirroring federal immigration law); *Ga. Latino All. for Hum. Rts. v. Gov. of Ga.*, 691 F.3d 1250, 1268–69 (11th Cir. 2012) (same).

According to Defendants, this harm is not irreparable because Plaintiffs would "face th[e] same harms under federal law."  Defs.' Resp. at 29.  That may be true.  But the question is whether they will suffer irreparable harm absent an injunction—like state-sanctioned prosecution.  *See Little*, 607 F.3d at 1251.  The Court finds they likely will.  Besides, state penalties imposed under H.B. 4156 would seemingly be cumulative—not a substitute—for those under federal law.

Finally, the Court turns to the third and fourth factors for preliminary relief—the balance of harms and the public interest—which merge when the government opposes the request.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The Court has already detailed the harms H.B. 4156 poses, all while acknowledging Defendants' concerns over unchecked immigration.  But in weighing these harms, the Court cannot help but recognize that "the burden on Defendants if they are . . . enjoined from enforcing the challenged [statute] is a continuation of the status quo."  *Idaho Org.*,

2025 WL 1237305, at *15.   Indeed, "Defendants have never previously regulated aliens' entry or reentry into either [Oklahoma] or the United States." *Id.*  And they undoubtedly possess a criminal code at their disposal to prosecute conduct—like drug trafficking and violence—they argue flows from unauthorized presence.  What's more, the current presidential administration has more than demonstrated its commitment to enforcing the comprehensive framework Congress established for immigration regulation.  In short, balancing the harms and public interest, the Court finds the scales tilt in Plaintiffs' favor.

For these reasons, the Court finds that Plaintiffs have established their entitlement to preliminary relief.

## IV.    <u>Class Certification</u>

When a federal court issues preliminary relief, it "should be no more burdensome . . .  than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).   Traditionally, this means that courts "provide[] party-specific relief, directing the defendant to take or not take some action relative to the plaintiff."  *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring); *see also Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute.").

"[S]o-called nationwide and statewide injunctions," by contrast, "prevent enforcement of a law against persons other than the plaintiffs."  *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 931 (2024) (mem.) (Kavanaugh, J., concurring).   While some courts authorize this relief in "rare" circumstances, *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1281 (11th Cir. 2021), the Tenth Circuit has yet to take an express position.  On top of that, members of the Supreme Court

have recently decried their use, particularly those injunctions extending to nonparties nationwide. *Trump v. Hawaii*, 585 U.S. 667, 721 (2018) (Thomas, J., concurring) (stating that nationwide injunctions "are legally and historically dubious"); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring) (noting that nationwide injunctions "have little basis in traditional equitable practice"); *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753, 756 (2025) (mem.) (Alito, J., dissenting) (describing nationwide injunctions as defying "foundational limits on equitable jurisdiction" (internal quotation marks omitted)); *Labrador*, 144 S. Ct. at 931 (Kavanaugh, J., concurring) ("As I see it, prohibiting nationwide or statewide injunctions may turn out to be the right rule as a matter of law regardless of its impact on this Court's emergency docket.").[12]

A class action avoids these criticisms. *See Robinson v. Labrador*, 747 F. Supp. 3d 1331, 1349 (D. Idaho 2024) (explaining that "class certification and injunctive relief are not inconsistent with the Supreme Court's guidance" and that members of the Supreme Court have "referenced class certification as a legitimate way to obtain the widespread relief . . . impermissibly granted . . . via universal injunction"); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1306 (11th Cir. 2022) ("Reviewing courts should also be skeptical of nationwide injunctions premised on the need to protect nonparties. Several procedural devices allow nonparties with similar interests to seek the protection of injunctive relief—class certification under [Federal] Rule [of Civil Procedure] 23, joinder and intervention in an existing lawsuit, or even filing a new lawsuit of their own."). Plaintiffs bring such an action here and move for class certification under Federal Rule of Civil

---

[12] Notwithstanding these concerns, courts are generally less reluctant to grant statewide injunctions in cases of preemption. *See Farmworker Assoc. of Fla., Inc. v. Uthmeier*, No. 23-cv-22655-ALTMAN/Reid, 2025 WL 775558, at *2 (S.D. Fla. Mar. 11, 2025) ("[C]ourts routinely grant statewide injunctions where . . . the plaintiffs have shown a strong likelihood of success on the merits of their claim that a state law is preempted." (collecting cases)).

23

J.A. 216

Procedure 23 in lockstep with their request for preliminary relief.  *See* (Pls.' Mot. for Class Certification) [Doc. No. 61].

A party seeking class certification must show that it meets the "four threshold requirements" of Rule 23: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical . . . of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (alterations in original) (quoting Fed. R. Civ. P. 23(a)).  Where, as here, a plaintiff seeks certification under Rule 23(b)(2), it must also show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

In their Rule 23 motion, Plaintiffs state that they "seek only *provisional* class certification for purposes of issuing preliminary relief, allowing additional time for the court to evaluate the matter before granting full class certification."  Pls.' Mot. for Class Certification at 6 (emphasis added).  Numerous courts have found provisional certification alone sufficient for purposes of awarding preliminary relief.  *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020) ("We have approved provisional class certification for purposes of preliminary injunction proceedings."); *Carrillo v. Schneider Logistics*, No. CV 11–8557 CAS (DTBx), 2012 WL 556309, at *9 (C.D. Cal. Jan. 31, 2012) ("[C]ourts routinely grant provisional class certification for purposes of entering injunctive relief." (collecting cases)); *Fla. Immigrant Coal.*, 2025 WL 1423357, at *2 ("A district court may provisionally certify a class for purposes of a preliminary injunction." (internal quotation marks omitted)); *Idaho Org.*, 2025 WL 1237305, at *15–19

24

J.A. 217

(granting provisional class certification with preliminary injunction of state entry and reentry law); *Afghan & Iraqi Allies Under Serious Threat v. Pompeo*, No. 18-cv-1388 (TSC), 2019 WL 367841, at *1 n.1 (D.D.C. Jan. 30, 2019) (granting provisional class certification "for the sole purpose of resolving" a motion for preliminary injunction, a motion for partial dismissal, and a motion for expedited discovery); *cf. Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1548 (10th Cir. 1994) (finding class certification unnecessary where all class members inherently benefitted from injunctive relief). "Although a plaintiff requesting provisional certification must still demonstrate that Rule 23's requirements are met, the court's normally rigorous analysis is tempered by the understanding that such certifications may be altered or amended before the decision on the merits." *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (brackets and internal quotation marks omitted).

Plaintiffs here request that the Court provisionally certify two classes under Rule 23: (1) the "Entry Class," consisting of all noncitizens subject to the crime of "Impermissible Occupation" under H.B. 4156, specifically Okla. Stat. tit. 21, § 1795(C); and (2) the "Reentry Class," consisting of all noncitizens subject to the separate felony offense for "enter[ing], attempt[ing] to enter, or [being] at any time found in Oklahoma" after having been "denied admission, excluded, deported, or removed, or ha[ving] departed the United States while an order of exclusion, deportation, or removal is outstanding" under H.B. 4156, specifically Okla. Stat. tit. 21, § 1795(D). *See* Pls.' Mot. for Class Certification at 1–2.

A.    **Numerosity**

First, Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[T]here is no set formula to determine if the class is so numerous that it should be so certified." *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006)

(internal quotation marks omitted).  Because the inquiry is so "fact-specific," the Tenth Circuit "grant[s] wide latitude to the district court in making this determination."  *Id.*

Plaintiffs cite evidence indicating that "Oklahoma is home to an estimated 90,000 undocumented immigrants."  Pls.' Mot. for Class Certification at 7.  Given this substantial number, it stands to reason that the number of noncitizens falling within each proposed class would easily reach into the hundreds.  Federal courts have required much less for numerosity.  *See, e.g.*, *Stewart v. Abraham*, 275 F.3d 220, 226–227 (3d Cir. 2001) (presuming numerosity at 40 members); *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) (same).  For purposes of provisional certification, the Court finds that Plaintiffs have established numerosity.

### B.    Commonality

Second, Rule 23(a)(2) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To satisfy this requirement, Plaintiffs must show that their claims rely on a "common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  It is "not enough . . . to demonstrate common questions apply to the class"; rather, "a class-wide proceeding [must] generate common *answers* apt to drive the resolution of the litigation." *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1192 (10th Cir. 2023) (emphasis in original) (internal quotation marks omitted).  Still, commonality "do[es] not require that every member of the class share a fact situation *identical* to that of the named plaintiff."  *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (emphasis in original).  "A finding of commonality requires only a single question of law or fact common to the entire class."  *Sherman*, 84 F.4th at 1192 (internal quotation marks omitted).

Here, members of both proposed classes face arrest, prosecution, and punishment under H.B. 4156. Plaintiffs contend that Defendants' enforcement of the law is unlawful because the statute is preempted by federal immigration law. That preemption question presents a common issue of law that, if resolved in Plaintiffs' favor, would apply uniformly across the classes. As such, resolution of the preemption issue would "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350. For purposes of provisional certification, the Court finds that Plaintiffs have established commonality.

### C.    Typicality

Third, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Like commonality, typicality "do[es] not require that every member of the class share a fact situation identical to that of the named plaintiff." *Colo. Cross Disability Coal.*, 765 F.3d at 1216. "Typicality requires only that the claims of the class representative and class members are based on the same legal or remedial theory." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 924 (10th Cir. 2018) (internal quotation marks omitted); *see also Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988) ("[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory.").

Again, the named Plaintiffs seek the same declaratory and injunctive relief as the class members and challenge H.B. 4156 on the same legal grounds. That their individual backgrounds may differ does not defeat typicality where, as here, the claims arise from a uniform statutory scheme and rest on a shared preemption theory. For purposes of provisional certification, the Court finds Plaintiffs have established typicality.

### D.    Adequacy

Fourth, Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The "adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (alterations and internal quotations omitted). Accordingly, the "inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Id.* at 625. To be an adequate class representative, the "representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* at 625–26. In the Tenth Circuit, "[r]esolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002) (internal quotation marks omitted).

Barbara Boe and Christopher Coe wish to serve as representatives of the Entry and Reentry Classes, respectively, while Padres and LULAC seek to represent the interests of members of both classes. *See* Pls.' Mot. for Class Certification at 10–13. Nothing in the record suggests any conflict between the representatives and the classes they seek to represent. All Plaintiffs share a common interest in halting enforcement of H.B. 4156, and each either faces or represents individuals who face prosecution under that law. And all are represented by counsel—specifically, ACLU Immigrants' Rights Project and its affiliate in Oklahoma—with extensive experience in class

action and civil rights litigation.  For purposes of provisional certification, the Court finds the adequacy requirement satisfied.  Additionally, for purposes of provisional certification, the Court appoints Plaintiffs' counsel as class counsel under Rule 23(g).  *See* Fed. R. Civ. P. 23(g) (explaining that "[u]nless a statue provides otherwise, a court that certifies a class must appoint class counsel" upon consideration of several factors).

### E.    Rule 23(b)(2)

Where, as here, a plaintiff seeks certification under Rule 23(b)(2), it must also show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) "has been liberally applied in the area of civil rights."  *Braggs v. Dunn*, 317 F.R.D. 634, 667 (N.D. Ala. 2016) (internal quotation marks omitted).  "Indeed, some courts have gone so far as to say that the rule's requirements are 'almost automatically satisfied in actions primarily seeking injunctive relief.'"  *Id.* (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994)).  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart Stores*, 564 U.S. at 360.

Plaintiffs seek declaratory and injunctive relief that, if granted, would apply equally to all class members and enjoin enforcement of H.B. 4156 on a classwide basis.  Because the challenged conduct is alleged to rest on grounds generally applicable to the classes, and the requested relief is indivisible in nature, the Court finds that Rule 23(b)(2) is satisfied for purposes of provisional certification.

Accordingly, having found that Rule 23(a) and Rule (b)(2) are satisfied, the Court provisionally certifies two classes—the Entry Class and the Reentry Class—for purposes of enjoining Defendants' enforcement of H.B. 4156. *See* Okla. Stat. tit. 21, § 1795(C)–(D).

## V.    Conclusion

In closing, Defendants' frustrations are not lost on the Court. But those concerns, however pressing, cannot override the constitutional design. When determining whether a state law like H.B. 4156 is preempted ***the Supreme Court instructs courts like this one to look to the intent of Congress, not the enforcement priorities of any particular administration***. Doing so, and based on the comprehensive and exhaustive immigration framework that Congress designed, the Court is left with one conclusion: H.B. 4156 must fail. What remains, however, is the federal government's ability, with lawful assistance from its state partners, to enforce that framework as Congress intended.

For the reasons above, the Court GRANTS Plaintiffs' motion for injunctive relief [Doc. No. 60] to the extent it seeks a TRO; GRANTS Plaintiffs' motion for leave to proceed under pseudonyms [Doc. No. 62]; and GRANTS Plaintiff's motion for class certification [Doc. No. 61] to the extent it seeks provisional certification for purposes of preliminary relief.

The Court *provisionally* certifies the following classes: (1) the Entry Class, comprising all noncitizens subject to H.B. 4156's crime of "Impermissible Occupation" under Okla. Stat. tit. 21, § 1795(C); and (2) the Reentry Class, comprising all noncitizens subject to H.B. 4156's separate felony offense for "enter[ing], attempt[ing] to enter, or [being] at any time found in Oklahoma" after having been "denied admission, excluded, deported, or removed, or ha[ving] departed the United States while an order of exclusion, deportation, or removal is outstanding" under Okla.

Stat. tit. 21, § 1795(D).   Further, the Court appoints Plaintiffs' counsel as counsel for the provisional classes.

Finally, the Court temporarily restrains Defendants—along with their officers, agents, servants, employees, attorneys, and any person acting in concert or participation with them—from enforcing H.B. 4156.   Under Federal Rule of Civil Procedure 65(b)(2), this TRO will expire fourteen days after entry, unless extended for good cause or dissolved or modified sooner under Rule 65(b)(4).  The Court waives the bond requirement under Rule 65(c).

IT IS SO ORDERED this 20th day of May, 2025.

BERNARD M. JONES
UNITED STATES DISTRICT JUDGE