No. 25-6080

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

───────────────────────────

PADRES UNIDOS DE TULSA, *et al.*,

*Plaintiffs-Appellees,*

v.

GENTNER DRUMMOND, *et al.*,

*Defendants-Appellants.*

───────────────────────────

On appeal from the United States District Court
for the Western District of Oklahoma
The Hon. Bernard M. Jones
No. 5:24-cv-511-J

## JOINT APPENDIX – VOLUME 2

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov
*Counsel for Defendants-Appellants*

### <u>INDEX</u>
**VOL. 2 OF 2**

| <u>Bates No.</u> | <u>Description</u> |
|---|---|
| J.A. 227 | 2025.05.27 [Dkt. 82] Defs' Resp. in Opp. to Preliminary Injunction |
| J.A. 268 | 2025.05.27 [Dkt. 82-1] Ex. 1 - AG's Written Testimony to U.S. House Homeland Security Committee 1.10.2024 |
| J.A. 277 | 2025.05.27 [Dkt. 82-2] Ex. 2 - Decl. of Donnie Anderson |
| J.A. 283 | 2025.05.29 [Dkt. 86] Pls' Reply in Supp. of Mtn for Preliminary Injunction |
| J.A. 297 | 2025.06.03 [Dkt. 87] Order Granting Preliminary Injunction |
| J.A. 315 | 2025.06.04 [Dkt. 88] Notice of Appeal |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, *et al.*,

                                    *Plaintiffs,*

v.                                                            Case No:        CIV-24-511-J

GENTNER DRUMMOND, *et al.*,

                                    *Defendants.*

**DEFENDANTS' RESPONSE OPPOSING PLAINTIFFS' MOTION FOR A
<u>PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 2

STANDARDS .............................................................................................................. 4

ARGUMENTS .............................................................................................................. 6

    I.   Plaintiffs lack a cause of action to pursue relief here. ................................. 6

    II.  Plaintiffs cannot rely on their illegal activity for standing to pursue a
         preliminary injunction. ................................................................................. 14

    III. Plaintiffs' likelihood of success on the merits has decreased substantially. .... 18

    IV. Congress did not intend for lawbreaking to be shielded via pseudonym. ......... 23

    V.  This Court should not provisionally certify classes of federal lawbreakers. .... 30

    VI. The remaining factors and equities do not favor Plaintiffs here. ...................... 34

    VII. This Court should require Plaintiffs to post a substantial bond. ....................... 34

CONCLUSION ............................................................................................................. 34

J.A. 228

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*A.D. v. Park City Sch. Dist.*,
No. 2:23-cv-665, 2024 WL 1178578 (D. Utah Mar. 19, 2024) ..................................................24

*Abraham v. WPX Prod. Prods., LLC*,
184 F. Supp. 3d 1150 (D.N.M. 2016) ...........................................................................................30

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .........................................................................................................................6

*Aliah K. ex rel. Loretta M. v. Haw., Dep't of Educ.*,
788 F. Supp. 2d 1176 (D. Haw. 2011) ............................................................................................2

*Arizona v. United States*,
567 U.S. 387 (2012) ...............................................................................................................4, 19, 23

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ...........................................................................................7, 8, 9, 10, 11, 12

*Bradshaw v. Am. Airlines, Inc.*,
123 F.4th 1168 (10th Cir. 2024) .....................................................................................................6

*Canal Auth. of Fla. v. Callaway*,
489 F.2d 567 (5th Cir. 1974) ..........................................................................................................4

*Chamber of Commerce of United States v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) ........................................................................................................7

*Coe v. U.S. Dist. Ct. for Dist. of Colo.*,
676 F.2d 411 (10th Cir. 1982) ......................................................................................................25

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
589 U.S. 327 (2020) .........................................................................................................................6

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
825 F.2d 1461 (10th Cir. 1987) ....................................................................................................35

*Davis v. Passman*,
442 U.S. 228 (1979) .........................................................................................................................6

*DeCanas v. Bica*,
424 U.S. 351 (1976) .......................................................................................................................20

*Doe v. City of Albuquerque*,
667 F.3d 1111 (10th Cir. 2012) ......................................................................................................6

*Doe v. MIT,*
    46 F.4th 61 (1st Cir. 2022) ...................................................................................24

*Ellis v. Liberty Life Assurance Co. of Boston,*
    958 F.3d 1271 (10th Cir. 2020) ...........................................................................16

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975) ...............................................................................................4

*Ex parte Young,*
    209 U.S. 123 (1908) .............................................................................................10

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) .............................................................................................16

*Femedeer v. Haun,*
    227 F.3d 1244 (10th Cir. 2000) .............................................................24, 25, 26, 27

*Gonzaga Univ. v. Doe,*
    536 U.S. 273 (2002) .................................................................................. 9, 10, 14

*GTE Corp. v. Williams,*
    731 F.2d 676 (10th Cir. 1984) ...............................................................................4

*Health & Hosp. Corp. of Marion Cnty. v. Talevski,*
    599 U.S. 166 (2023) .............................................................................................14

*Initiative & Referendum Inst. v. Walker,*
    450 F.3d 1082 (10th Cir. 2006) .................................................................... 14, 15

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ............................................................. 12, 19, 20, 21, 22

*Kerr v. Polis,*
    20 F.4th 686 (10th Cir. 2021) ..............................................................................15

*Kerr v. Polis,*
    930 F.3d 1190 (10th Cir. 2019) ...........................................................................15

*L.M. ex rel. A.M. v. City of Gardner,*
    No. 19-2425-DDC, 2019 WL 4168805 (D. Kan. Sept. 3, 2019) ...........................25

*Liddell v. Heavner,*
    180 P.3d 1191 (Okla. 2008) ...................................................................................6

*M.D. Mark, Inc. v. Kerr-McGee Corp.,*
    565 F.3d 753 (10th Cir. 2009) ...............................................................................7

*M.G. ex rel. Garcia v. Armijo,*
    117 F.4th 1230 (10th Cir. 2024) ..........................................................................13

*Martin v. Mukasey*,
   517 F.3d 1201 (10th Cir. 2008) ............................................................28

*Moody v. NetChoice*,
   603 U.S. 707 (2024) ...........................................................................5

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
   413 U.S. 405 (1973) .........................................................................21

*Nat'l Commodity & Barter Ass'n v. Gibbs*,
   886 F.2d 1240 (10th Cir. 1989) ........................................................29

*Original Invs., LLC v. Okla.*,
   542 F. Supp. 3d 1230 (W.D. Okla. 2021) ...............................1, 8, 13, 34

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
   502 F. Supp. 3d 492 (D.D.C. 2020)...................................................31

*Plyler v. Doe*,
   457 U.S. 202 (1982) .........................................................................19

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980) .........................................................................24

*Safe Streets Alliance v. Hickenlooper*,
   859 F.3d 865 (10th Cir. 2017) ...........................................9, 10, 11, 12, 14

*Schrier v. Univ. of Colo.*,
   427 F.3d 1253 (10th Cir. 2005) ..........................................................4

*Speech First, Inc. v. Shrum*,
   92 F.4th 947 (10th Cir. 2024) ...........................................................24

*United States v. Hansen*,
   599 U.S. 762 (2023) ...........................................................................5

*United States v. Oklahoma*,
   739 F. Supp. 3d 985 (W.D. Okla. 2024) ...........................3, 4, 7, 8, 12, 21

*United States v. Supreme Ct. of N.M.*,
   839 F.3d 888 (10th Cir. 2016) ............................................................8

*Vallario v. Vandehey*,
   554 F.3d 1259 (10th Cir. 2009) ........................................................30

*W.N.J. v. Yocom*,
   257 F.3d 1171 (10th Cir. 2001) ........................................................25

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ....................................................................31, 33

iv

**J.A. 231**

*Ward v. Utah*,
   398 F.3d 1239 (10th Cir. 2005) ................................................................4, 5

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ...........................................................................................5

*White v. Ziriax*,
   No. CIV-24-631-J, 2025 WL 1178594 (W.D. Okla. Jan. 29, 2025) ................7

*Whole Woman's Health v. Jackson*,
   595 U.S. 30 (2021) ...........................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...............................................................................................4

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ...........................................................................................6

*Younger v. Harris*,
   401 U.S. 37 (1971) ...........................................................................................27

## **Statutes**

8 U.S.C § 1158 ...................................................................................................13

8 U.S.C. § 1182 ..................................................................................................13

8 U.S.C. § 1231 ..................................................................................................13

8 U.S.C. § 1325 ..................................................................................................20

8 U.S.C. § 1326 .......................................................................................9, 10, 20

42 U.S.C. § 1983 ..................................................................................................7

OKLA. STAT. tit. 74, § 18 ...................................................................................34

## **Constitutional Provisions**

U.S. CONST. art. VI, cl. 2 ...................................................................................22

## **Other Authorities**

Fed. R. Civ. P. 23 ........................................................................................31, 33

Geraldine Szott Moohr, *The Federal Interest in Criminal Law*,
   47 SYRACUSE L. REV. 1127 (1997) .....................................................................5

Steven D. Clymer, *Unequal Justice: The Federalization of Criminal Law*,
   70 S. CAL. L. REV. 643 (1997) ............................................................................5

Less than two weeks ago, Defendants ("the State" or "Oklahoma") responded at length to Plaintiffs' combined motion for a temporary restraining order ("TRO") or a preliminary injunction. Given the shortened time frame for the present filing, the State stands on and incorporates that response here. *See* Doc. 76. In sum, this Court should deny Plaintiffs a preliminary injunction of House Bill 4156 ("H.B. 4156") because: (1) federal lawbreaking cannot bestow standing to challenge a state law on the same topic as the federal law; (2) Congress did not preempt state laws that mirror federal entry and reentry laws at the state level; (3) Plaintiffs ignore critical developments, such as the United States' declaration of an invasion at the southern border; (4) Plaintiffs have not made a case for provisional certification of an enormous class of federal lawbreakers, and those lawbreakers should not be given pseudonymous status to avoid federal law enforcement; and (5) the equities do not permit injunctive relief here, as Plaintiffs have not acted with urgency and "[i]t is well-settled … that 'a court won't use its equitable power to facilitate illegal conduct.'" *Original Invs., LLC v. Oklahoma*, 542 F. Supp. 3d 1230, 1233 (W.D. Okla. 2021) (citation omitted).

For purposes of this response, then, the State will focus primarily on raising and preserving additional arguments, such as Plaintiffs' lack of a cause of action, and interacting with this Court's recent order granting a TRO.[1] *See* Doc. 80. In the end, the State's position is unchanged: To grant equitable relief, pseudonym status, and provisional class certification to Plaintiffs plainly subverts federal criminal law in the name of upholding it. This Court should therefore deny a preliminary injunction, and the TRO should be allowed to expire.

---

[1] Because the State's submission of a comprehensive response under significant time constraints has also required rebuttal of the arguments contained in Plaintiffs' pseudonym and class-certification motions, this Response exceeds 25 pages.

## BACKGROUND

This is the third time the State has responded to preliminary injunction motions on this same topic in this Court. Last year, before the United States dismissed its lawsuit, Oklahoma filed a combined response to the injunction motions submitted by the United States and Plaintiffs. Oklahoma incorporates that response by reference, as well. *See* Doc. 21; *see also, e.g.*, *Aliah K. ex rel. Loretta M. v. Haw., Dep't of Educ.*, 788 F. Supp. 2d 1176, 1183 (D. Haw. 2011) (permitting defendant to "incorporate[] by reference its memorandum in opposition to the August 2010 TRO Motion" in opposing a later preliminary injunction/TRO motion). Moreover, out of an abundance of caution, Oklahoma attaches two of the exhibits from that filing here: (1) Attorney General Gentner Drummond's 2024 testimony to the U.S. House Homeland Security Committee, and (2) the declaration of Donnie Anderson, the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. *See* Exhibits 1 & 2. Those affidavits, in addition to H.B. 4156 itself, explain in detail the "border crisis [that] has swamped Oklahoma with an unprecedented onslaught of criminal activity." Doc. 21 at 2. Plaintiffs have provided nothing to undermine this material.

The remaining two declarations from last year come from affiants who have since accepted positions in the United States government: Rodney Scott has been nominated to lead U.S. Customs and Border Protection (CBP), and Christopher Landau is serving as the 23rd Deputy Secretary of State. Oklahoma will not attach Mr. Scott or Mr. Landau's declarations here, both because the affiants are moving into public service, and because they were both asked to rebut affidavits submitted by the United States. *See, e.g.*, Doc. 21-4, at ¶ 3 (Landau: "I submit this Declaration in response to the Declaration of Eric Jacobstein …."). Those United

**J.A. 234**

States affidavits are now gone from this case, and Plaintiffs have offered nothing similar in their place. This should matter, because this Court expressly grounded part of its original ruling on that withdrawn testimony. Specifically, this Court relied on the "declarations provided by the United States regarding Oklahoma's interference with its comprehensive foreign-policy framework as well as Mexico's expression of its concern over the signing of H.B. 4156" to find that the "United States' arguments are well-taken." *United States v. Oklahoma*, 739 F. Supp. 3d 985, 1006 (W.D. Okla. 2024). Among the arguments this Court found "well-taken" (based on the now-absent affidavits) were that H.B. 4156 "would harm the United States' relationship with foreign nations" and "will displace the federal exercise of discretion in enforcing immigration laws, as well as interfere with federal immigration proceedings." *Id.* No such findings are possible here, and no rebuttals needed, because Plaintiffs have not even tried to replace this evidentiary material. Nor could they, since the United States no longer opposes H.B. 4156's enforcement.

This leads to Director Anderson's affidavit, which deserves closer inspection. He testified that enforcement of H.B. 4156 "would necessarily be limited by the resources available to the [State Bureau] and the willingness of the federal government to assist." Exhibit 2 at ¶ 8. "Put differently," he wrote, "[H.B.] 4156 does not appear to me to be designed to operate in opposition to the federal government, but in some form of collaboration with it." *Id.* And now the United States is willing to collaborate. Yet, with this Court's TRO, a state law mirroring federal law is being stymied despite both sides to that equation being willing to collaborate on enforcement. This is improper. With the United States having dismissed its

3

**J.A. 235**

case, there is no basis to find that H.B. 4156 will "displace federal exercise of discretion" or "interfere with federal immigration proceedings." *Oklahoma*, 739 F. Supp. 3d at 1006.

## STANDARDS

Again, a preliminary injunction is supposed to be "an *extraordinary* remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008) (emphasis added); *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). To obtain this extraordinary remedy, a plaintiff—not a defendant—has the burden to show that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) ("The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff."). Because of this heavy burden, preliminary injunctions are the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984). Stated differently, "the right to relief must be clear and unequivocal." *Schrier*, 427 F.3d at 1258 (quotation omitted). Such is not the case here, where substantial questions about standing, a cause of action, the appropriateness of equitable relief, and the merits abound. *See, e.g.*, *Oklahoma*, 739 F. Supp. 3d at 998 (admitting, "to Oklahoma's credit," that *Arizona v. United States*, 567 U.S. 387 (2012) is not directly on point and must be extended to reach H.B. 4156).

Moreover, when a plaintiff seeks facial relief, "it is necessary to proceed with caution and restraint." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975). This is "[b]ecause facial challenges push the judiciary towards the edge of its traditional purview and expertise." *Ward v. Utah*, 398 F.3d 1239, 1247 (10th Cir. 2005). As a result, the Supreme Court has "made facial

challenges *hard to win*" because they "'threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Moody v. NetChoice*, 603 U.S. 707, 723 (2024) (emphasis added) (citation omitted). Thus, facial challenges to laws are "disfavored." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). Plaintiffs bringing a facial challenge "normally 'must establish that no set of circumstances exists under which the [statute] would be valid.'" *United States v. Hansen*, 599 U.S. 762, 769 (2023) (citation omitted). Therefore, "courts must be vigilant in applying a most exacting analysis to such claims." *Ward*, 398 F.3d at 1247.

This case involves a pre-enforcement facial challenge to a state criminal law, yet the TRO made no mention of the higher standard for facial challenges—challenges that the Supreme Court has expressly made "hard to win." *NetChoice*, 603 U.S. at 723. This standard should be particularly onerous for plaintiffs challenging a state criminal law that echoes an uncontested federal law—a situation utterly commonplace throughout criminal law. *See, e.g.*, Steven D. Clymer, *Unequal Justice: The Federalization of Criminal Law*, 70 S. CAL. L. REV. 643, 654–55 (1997) (collecting numerous examples of "duplicative" state and federal criminal laws); Geraldine Szott Moohr, *The Federal Interest in Criminal Law*, 47 SYRACUSE L. REV. 1127, 1128 (1997) ("Congress has, over the past decade, enacted numerous federal criminal laws[,] many of which punish conduct already criminalized by state penal codes."). Showing a likelihood of success on the merits of a claim that is undeniably "hard to win," when *both* sovereigns in our country's federalist structure disagree, should demand far more than the paltry effort Plaintiffs have put forward. That a law *might* infringe upon the federal domain does not mean that it always will, which means that facial relief is inappropriate. Here, for example, surely there are

persons unlawfully present—murderers, rapists, etc.—whom Congress did not intend to shield from a state's unlawful presence law. What sense does it make, after all, to say that a state can prosecute an illegal alien for murder or rape but not for being here unlawfully?

Also important, in terms of legal standards, is that courts (federal and state) are required to presume that Oklahoma's laws are constitutional. *See, e.g.*, *Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012) ("[W]e give all statutes a presumption of constitutionality ...."); *Liddell v. Heavner*, 180 P.3d 1191, 1200 (Okla. 2008) (a "statute will be presumed to conform to the state and federal Constitutions and will be upheld unless it is clearly, palpably and plainly inconsistent with the Constitution"). Narrowing in further, "[i]n all pre-emption cases," courts are required to "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citations omitted). The Tenth Circuit recognized this "presumption" against preemption as recently as five months ago, citing *Arizona*, 567 U.S. at 399. *Bradshaw v. Am. Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024). This presumption, combined with the difficulties of a facial challenge, should make Plaintiffs' effort to secure equitable relief nearly impossible.

## ARGUMENTS

### I.    Plaintiffs lack a cause of action to pursue relief here.

A private plaintiff must show he has a private right or cause of action before he can demonstrate a likelihood of success. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 334 (2020) ("private rights of action to enforce federal law must be created by Congress") (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286–287 (2001)); *Davis v. Passman*, 442

U.S. 228, 239 n.18 (1979) (explaining how a "cause of action" differs from other related concepts). But in their injunction motion, Plaintiffs omitted any discussion of a private right or cause of action. *See* Doc. 60. This by itself should quash their effort to obtain an "extraordinary" injunction, given that they alone bear the burden to prove that they are likely to succeed in this "hard to win" posture. *See NetChoice*, 603 U.S. at 723. Plaintiffs attempted to rectify this omission in their TRO reply, but as the State has recently been reminded by this Court, "a party waives issues and arguments raised for the first time in a reply brief." *White v. Ziriax*, No. CIV-24-631-J, 2025 WL 1178594, at *3 n.6 (W.D. Okla. Jan. 29, 2025) (quoting *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009)). In any event, no such private right of action exists here. At a minimum, whether illegal immigrants have a legal "right" to bring a pre-enforcement facial challenge to a state illegal presence law is *highly* debatable, which is not the stuff of which extraordinary injunctions are made.

In their Second Amended Complaint, Plaintiffs do not assert that Congress has created a cause of action for them on the Supremacy Clause claim; indeed, they do not even cite 42 U.S.C. § 1983 for that claim. Rather, they merely cite the Supremacy Clause and "equity" as the basis for the suit. Doc. 64 at 15. This is not enough. As this Court has correctly recognized, "the Supremacy Clause does not create a cause of action" and is "not the source of any federal rights." *Oklahoma*, 739 F. Supp. 3d at 996 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)). This alone refutes Plaintiffs' reliance (in their TRO reply) on *Chamber of Commerce of United States v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010). *See* Doc. 78 at 5. In *Edmondson*, the Tenth Circuit found that the "Chambers have a valid right of action under the Supremacy Clause," 594 F.3d at 756, a holding that has been abrogated by *Armstrong*.

To be sure, this Court previously held that the United States could win an injunction anyway based solely on the Court's equitable authority. *Oklahoma*, 739 F. Supp. 3d at 996–97. But most of the authorities this Court relied on specifically discussed the ability of the federal government to obtain relief in equity. *See, e.g., United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016) ("To the extent that *Armstrong*'s Supremacy Clause holding is motivated by the desire to preserve the federal government's 'ability to guide the implementation of federal law,' this counsels in favor of—not against—permitting the United States to invoke preemption." (internal citation omitted)). That point is moot now. And there is a *chasm* between finding that "the federal government may bring an action in equity to enforce federal supremacy," *Oklahoma*, 739 F. Supp. 3d at 996, and a finding that individuals who are here illegally may use equity in a similar manner, *see, e.g., Original Invs.*, 542 F. Supp. 3d at 1233 (W.D. Okla. 2021) ("It is well-settled … that 'a court won't use its equitable power to facilitate illegal conduct.'"). The latter does not necessarily follow from the former—at all. Thus, while it is undeniable that "in a proper case, relief may be given in a court of equity to prevent an injurious act by a public officer," *Oklahoma*, 739 F. Supp. 3d at 996 (quoting *Armstrong*, 575 U.S. at 327), this is not a "proper case" for the deployment of equitable relief. Equity may at times allow someone to "sue to enjoin unconstitutional actions by state and federal officers," *id.* (quoting *Armstrong*, 575 U.S. at 327), but not here.

Nevertheless, this Court previously indicated that, while Oklahoma was "correct that the Court is limited in its jurisdiction," "for Oklahoma to prevail on its argument that equitable relief is unavailable, it must identify some law that has displaced the Court's equitable powers." *Id.* at 997. Respectfully, putting the burden on Oklahoma to identify a law disavowing equitable

8

**J.A. 240**

relief—rather than on Plaintiffs to identify a cause of action—conflicts with the most relevant Tenth Circuit precedent interpreting *Armstrong*: *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017). In *Hickenlooper*, the Tenth Circuit firmly rejected an attempt by private individuals and organizations to obtain equitable relief against Colorado for injuries resulting from that state's contravention of the federal Controlled Substances Act ("CSA"). Like here, the plaintiffs there argued that a state law (legalizing marijuana) was preempted. But rather than permit equitable relief, the Tenth Circuit concluded that the plaintiffs had no "federal substantive rights that have been injured by Colorado." *Id.* at 877. Even in the context of preemption and equity, that is, the Tenth Circuit put the burden *on the plaintiffs* to show that the CSA gave them a "substantive private right" to sue. *Id.* at 914 (Hartz, J., concurring).

In doing so, the Tenth Circuit reviewed *Armstrong* and "over thirty Supreme Court cases" and explained that "where the text and structure" of a law provides "no indication that Congress intend[ed] to create new individual rights, there is *no basis* for a private suit." *Id.* at 901 n.13 (emphasis in original) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002)). It is "critical[]," the Tenth Circuit held, that unless Congress has given a private plaintiff "a federal right of her or his own to vindicate in the CSA, the plaintiff cannot maintain a cause of action—in law *or in equity*—against any defendant for violating the CSA." *Id.* at 902 (emphasis added). And the "same threshold inquiry applies when we ask 'whether a statutory violation may be enforced through § 1983.'" *Id.*[2] In the end, the Tenth Circuit "will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *Id.* "'*Congress*

---

[2] Plaintiffs' Commerce Clause claim cites both equity and Section 1983. Doc. 64 at 15–16.

*must have created a specific and uniquely federal right or remedy*, enforceable in a federal court of equity'
for injunctive relief to issue." *Id.* at 902–03 (emphasis added) (citation omitted).

The Tenth Circuit further explained that "[f]or a statute to create such private rights,
its text must be 'phrased in terms of the persons benefited.'" *Id.* at 903 (quoting *Gonzaga Univ.*,
536 U.S. at 283). Obviously, nothing in the Immigration and Nationality Act ("INA")
prohibitions on illegal entry and reentry is phrased in a way that suggest *benefits* for the persons
breaking those laws. Punishments, not benefits, are the express instructions. *See, e.g.*, 8 U.S.C.
§ 1326(a) ("alien … shall be fined … or imprisoned not more than 2 years, or both").
Regardless, like in *Hickenlooper*, "no discerning inquiry is necessary because [Plaintiffs] have
*never* alleged that they have any substantive rights" in the INA or anywhere else "by which they
can enforce the [INA's] preemptive effects." *Id.* at 903. Plaintiffs are "required to plausibly
allege that they are vindicating a federal substantive *right* to be able to maintain a cause of
action in equity of the type they assert here. But they failed to do so." *Id.* at 903–04 (emphasis
added). Again, Plaintiffs' complaint does not list the INA as an anchor for their claim.
"Perhaps in antiquity a private citizen could enter a judicial forum and demand equitable relief
in the absence of any injury to a protected substantive right. But such incantations almost
certainly ceased to hold any power in 1788." *Id.* at 904.

Ignoring all this binding instruction, Plaintiffs make a mere passing reference to
*Hickenlooper*, relying solely on Footnote 19. *See* Doc. 78 at 5. In that footnote, the Tenth Circuit
echoed *Armstrong* (and *Ex parte Young*, 209 U.S. 123 (1908)), in stating that "if an individual
claims federal law immunizes him from state *regulation*, the court may issue an injunction upon
finding the state *regulatory actions* preempted." *Hickenlooper*, 859 F.3d at 906 n.19 (emphasis in

original) (quoting *Armstrong*, 575 U.S. at 326). But later in that same footnote, the Tenth Circuit indicated that "immunizes" means that the person has federal "rights" that he cannot be forced to give up through a threat of state prosecution. *See id.* ("It is the official 'coercion' at issue (e.g., 'putting the challenger to the choice between abandoning his *rights* or risking *prosecution*') that gives rise to such preemption-based *defenses*." (citation omitted)). The idea that the INA grants violators of its criminal strictures any sort of immunity or substantive "rights" is illogical and cannot be what Congress intended when it enacted the INA. It simply cannot be the case that law-abiding Colorado citizens lack a right of action to obtain equitable relief for injuries caused by Colorado's contravention of federal law (*Hickenlooper*), while law-breaking non-citizens in Oklahoma are permitted to obtain prospective equitable relief to allow them to thwart federal law (here). This dichotomy would turn the rule of law on its head.

Oklahoma recognizes, of course, that this argument veers closer to the merits. And it is true that if Oklahoma is correct on the merits, then Plaintiffs would also *ipso facto* lack a cause of action to bring their claim. But the flipside of this is not necessarily true. Even if Congress intended to preempt states from mirroring federal entry and reentry prohibitions, as this Court has previously found, that does not necessarily mean that Congress intended to provide persons breaking those federal laws with a "right" or "immunity" that could be exercised prospectively in equity. Rather, it is more plausible that Congress intended *at most* for the United States to be the exclusive wielder of injunctive authority, and for persons violating the law to bring preemption arguments in a defensive posture, when facing a state prosecution. Indeed, both *Armstrong* and *Hickenlooper* (in the very footnote cited by Plaintiffs) contemplated this scenario, observing that a state "court may not convict a criminal defendant

11

**J.A. 243**

of violating a state law that federal law prohibits." *Hickenlooper*, 859 F.3d at 906 n.19 (quoting *Armstrong*, 525 U.S. at 326). This explanation would be unnecessary to include if all such individuals could just bring anonymous pre-enforcement challenges in federal court.

There is nothing improper with a defensive avenue being the only one available to Plaintiffs. Just four years ago, the Supreme Court observed—in rejecting the argument that equitable relief just *had* to be available to a group of plaintiffs—that "those seeking to challenge the constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021). Put succinctly, there is no "unqualified right to pre-enforcement review of constitutional claims in federal court." *Id.* "To this day," the Supreme Court explained, "*many* federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims, *not* in federal pre-enforcement cases." *Id.* (emphases added). That's how the Supreme Court's decision in *Kansas v. Garcia* came about; the aliens were convicted in state court, had their convictions overturned by the Kansas Supreme Court (on preemption grounds), and then had the convictions reinstated by the U.S. Supreme Court. *See* 589 U.S. 191 (2020). Oklahoma's position here is not esoteric or unfair, according to the Supreme Court itself. Plaintiffs lack a cause of action, and they are not entitled to equitable pre-enforcement relief.

Even under this Court's prior formulation, Oklahoma should still prevail. This Court, that is, seems to believe that instead of the burden being on Plaintiffs to show a created right of action, Oklahoma must cite to a "constitutional or statutory provision that expressly or impliedly displaces an action arising in equity." *Oklahoma*, 739 F. Supp. 3d at 997. This is easy here. By criminalizing the underlying behavior in the INA, Congress impliedly displaced the

ability of courts to rely on equity to grant individuals engaging in that behavior prospective relief from state action targeting the same illegal conduct. Since it "[i]t is well-settled … that 'a court won't use its equitable power to facilitate illegal conduct," *Original Invs.*, 542 F. Supp. 3d at 1233, the creation of a statute making the conduct in question here illegal as a federal matter takes federal court equity off the table, even if an individual may later attempt to protest about preemption in a defensive manner in state court.

Indeed, "several characteristics of the federal statute before [the Court], when taken together, make clear that Congress intended to foreclose respondents from bringing this particular action for injunctive relief." *M.G. ex rel. Garcia v. Armijo*, 117 F.4th 1230, 1252 (10th Cir. 2024). Here, the INA repeatedly explains that the targets of its provisions do not have a right to sue. *See, e.g.*, 8 U.S.C. § 1231(a)(4)(D) ("No cause or claim may be asserted under this paragraph against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien."); *id.* § 1158(d)(7) ("No private right of action. … Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."). Further, Congress directed immigration officers to "order ... removed from the United States without further hearing or review" an alien who lacks a "valid entry document." *Id.* § 1182(a)(7)(A)(i)(I). To be sure, there is no express language disavowing a right to sue for the specific entry and reentry crimes here—but why would it be needed? Surely, the sheer fact of criminalization is enough to show Congress's intent not to create a simultaneous right to sue for the relevant lawbreakers.

13

**J.A. 245**

Finally, again, Plaintiffs' invocation of Section 1983 for the Commerce Clause claim does not help their lack of a cause of action. As *Hickenlooper* explained, the "same threshold inquiry applies when we ask 'whether a statutory violation may be enforced through § 1983.'" 859 F.3d at 902. It is a "plaintiff's burden under § 1983" to show that a statute '*unambiguously* confer[s] individual federal rights.'" *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 230 (2023) (Alito, J., dissenting) (agreeing with and quoting the majority's explanation of Section 1983). "[I]f Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms." *Gonzaga Univ.*, 536 U.S. at 290. Congress has not done so here. And any private right of action claim predicated on Section 1983 and Congress's "dormant" Foreign Commerce Clause power must fail because a dormant power necessarily implies the lack of a positive exercise of congressional authority in creating a cause of action.

## II.    Plaintiffs cannot rely on their illegal activity for standing to pursue a preliminary injunction.

The State has already explained why Plaintiffs lack standing. *E.g.*, Doc. 76 at 6–12. Again, Oklahoma incorporates those arguments here. In short, Plaintiffs are open about their intent and actions violating federal law, Doc. 62 at 6 & Doc. 60 at 4, and "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc). Plaintiffs' interest in remaining in Oklahoma without being charged under H.B. 4156, per the express mandate of Congress enshrined in federal statutes, is "not 'legally protected.'" *Id.* And if they lack individualized standing, it is difficult to see how the Plaintiff organizations could somehow avoid the same fate.

14

**J.A. 246**

According to this Court, "Defendants' reliance on *Walker* is misplaced." Doc. 80 at 8. As an initial matter, this Court found that the "Tenth Circuit's brief reference to criminal activity was nothing more than an illustrative example—one of several types of conduct generally deemed insufficient to meet the threshold for standing." *Id.* The State agrees—and is confused as to how this favors Plaintiffs here. *Walker* stated a rule: the term "legally protected interest" in the standing analysis "has independent force and meaning." 450 F.3d at 1093. It then gave three examples of this rule's application, one of which was broadly phrased: "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not 'legally protected.'" *Id.* That example *is* "illustrative," and it applies here: Plaintiffs are present in the United States illegally, by their admission, and they are suing because their continued violation of federal law will be more difficult if the State prosecutes them for illegal presence. Nothing in *Kerr v. Polis*, 930 F.3d 1190 (10th Cir. 2019), (to the extent that decision is still valid[3]) contradicts this reading of *Walker*. To the contrary, the *Kerr* panel *reaffirmed* that *Walker* provided an "illustrative list of situations … in which an asserted 'legally protected interest' is not recognized." *Id.* at 1198.

Nevertheless, without citation, this Court found that *Walker*'s statement "was not a sweeping declaration that any unlawful status (like unauthorized presence) categorically precludes standing." Doc. 80 at 8. Perhaps not, although *Walker*'s statement was broadly phrased, and broadly phrased statements are just as mandatory for this Court and the State as narrowly phrased statements. Regardless, the State is not herein arguing that Plaintiffs'

---

[3] This Court cites the panel decision in *Kerr*, but the Tenth Circuit issued a subsequent *en banc* decision that did not fully agree with the panel and did not discuss *Walker* at all. *See Kerr v. Polis*, 20 F.4th 686 (10th Cir. 2021) (en banc).

unlawful presence precludes them from judicial relief entirely; they may raise preemption in state court defenses. Nor is the State arguing that Plaintiffs are categorically excluded from federal courts on other claims unrelated to illegal presence. The State is simply arguing, based on binding precedent, that to show standing for an equitable pre-enforcement facial challenge Plaintiffs cannot have a "legally protected interest" in being present in Oklahoma without punishment when the federal government has criminalized that very presence.

Next, this Court found that "Defendants' position would broadly eviscerate standing in preemption challenges of parallel state laws." Doc. 80 at 8. Even if true, this is irrelevant. No one is guaranteed standing for anything: if Plaintiffs lack standing, they lack standing. The Supreme Court's *FDA* case just last term repeatedly made this clear. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("the standing requirement means that the federal courts may never need to decide some contested legal questions"); *id.* at 396 ("this Court has long rejected that kind of 'if not us, who?' argument as a basis for standing"); *id.* ("The 'assumption' that if these plaintiffs lack 'standing to sue, no one would have standing, is not a reason to find standing.'" (citation omitted)). In any event, it is not obvious that the universe of people needing standing to challenge as preempted state laws that merely parallel uncontested federal laws is very broad; in our federalist structure, nearly all parallel state laws will surely be constitutional. *See, e.g.*, *Ellis v. Liberty Life Assurance Co. of Boston*, 958 F.3d 1271, 1278 (10th Cir. 2020) (deeming field preemption "rare").

At a bare minimum, this Court cited little authority indicating that a ruling in Oklahoma's favor would have a broad impact in this context or any other context. Rather, the Court relied on a brand-new district court decision issued less than a month ago, and the Court

added as a "*cf.*" a Ninth Circuit case from a decade ago again involving illegal immigration and a Third Circuit case that was vacated on other grounds. Doc. 80 at 9. Although those citations are favorable to the Court's position, the State sees little grounding in this non-binding material for the claim that standing will be "broadly eviscerate[d]" here if the State prevails.

Respectfully, this Court is also incorrect that "someone facing criminal prosecution under a state law mirroring federal law would be precluded from asserting preemption." Doc. 80 at 8–9. As explained above, these individuals could raise preemption as a defense to state court prosecutions. Thus, states would not be able "to insulate even the most severe criminal sanctions from judicial scrutiny simply by mirroring federal prohibitions." *Id.* at 9.

This Court's alternative holding that Plaintiffs "have made a clear showing of likely injury-in-fact," Doc. 80 at 11, is difficult to square with the completely anonymous nature of the proceedings thus far (and seemingly into the future given this Court's pseudonymity ruling). Plaintiffs certainly purport to be here unlawfully, which, as explained above, should end the matter in terms of standing. *See id.* (acknowledging that one Plaintiff has been removed *twice*). But how anything here can be "clear" when Plaintiffs hide behind pseudonyms and detail-deficient allegations is a mystery to Oklahoma. This is especially the case when these pseudonymous Plaintiffs didn't even appear in this year-long case until several weeks ago and no explanation has been given for why prior named Plaintiffs have been dropped in favor of cloaked lawbreakers. Plaintiffs bear the burden here of making a rigorous showing of standing, and they have not done so. Instead, Plaintiffs devoted a mere page of their motion to standing.

Oklahoma also disputes that the rest of the standing prongs have been met. Redressability, for example, seems particularly problematic when Plaintiffs' illegality and

exposure to prosecution remains under federal law even if H.B. 4156 is enjoined. The injunction, that is, does nothing to remove Plaintiffs' illegal status and exposure to punishment. Finally, the associational standing arguments largely depend on the standing (or lack thereof) of the individual Plaintiffs. Because the individual Plaintiffs lack standing, so do the organizational Plaintiffs. The organizations also fail the second prong of associational standing because, yet again, the "interests" they seek to protect are the continued illegal behavior and actions of their members—which cannot confer standing. Much as an organization devoted to perpetuating bank robberies nationwide could not claim standing based on that joint and illicit interest, the organizations cannot base their standing here on a joint interest to have their members escape the rule of law in this country. And to the extent certain members are law-abiding, they may very well have standing to pursue unrelated claims elsewhere, but they lack standing to challenge a law that simply mirrors federal law and affects federal lawbreakers only.

### III.    Plaintiffs' likelihood of success on the merits has decreased substantially.

Despite a tectonic "shift[]" in "the case's posture," the Court continues to conclude that H.B. 4156 is "likely both field and conflict preempted." Doc. 80 at 15. But the United States' abandonment of its support of Plaintiffs' legal position only underscores the point that Oklahoma has consistently maintained throughout the course of this litigation: Congress did not intend to preempt the enactment of state laws that merely mirror federal entry and reentry laws at the state level. H.B. 4156 is derived from—and complements—federal law. As such, it exemplifies a *cooperative* relationship between federal and state sovereigns. It neither displaces nor interferes with the overarching framework of federal immigration law. And when both

sovereigns in question are comfortable with the law's legality, that has significance. It may not be controlling, per se, but it speaks volumes as to the relative strengths of the arguments about congressional intent here when this country's dual sovereigns are unified in their position. To hold otherwise is to in essence find that the United States and Oklahoma have teamed up to defy congressional intent, which is a theory that should not be embraced unless the evidence in support is crystal-clear and unequivocal. Nothing of the sort exists here; Plaintiffs certainly have not put forward that substantial a case.

"From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Kansas*, 589 U.S. at 212. This principle holds no less true in the immigration context: "the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400 (cleaned up). Accordingly, states are not deprived of "power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982). When "the Federal Government … prescribe[s] what it believes to be appropriate standards for the treatment of [aliens], the States may, of course, follow the federal direction." *Id.* at 219 n.19.

Oklahoma has done no more than that in enacting H.B. 4156, which mirrors federal criminal law. Indeed, it is undeniable that H.B. 4156 is more limited than federal criminal law because it does not regulate the removal of anyone from the United States itself. In its Order, this Court emphasized that "Congress's intent … controls the preemption inquiry." Doc. 80 at 16. Rightly so. But this Court should not so readily endorse Plaintiffs' maximalist view of field preemption and conflict preemption in the arena of federal immigration law. Plaintiffs

have come nowhere close to meeting the exacting burden of showing that H.B. 4156 is likely preempted on its face and in every single possible application. Indeed, their effort is so flimsy that it is clear they are still relying implicitly on the previous work of the previous administration in this case—which is yet another reason why it matters here that the United States has abandoned its prior position. Plaintiffs should not be permitted to meet their incredibly onerous burden by effectively piggybacking on the effort of a separate sovereign litigant who has decided not to participate anymore. The abandoned views of the prior administration cannot be elevated over the intentional decisions of the present one.

To recap, field preemption occurs only in the "rare case[]" where state law "fall[s] into a field that is implicitly reserved exclusively for federal regulation." *Kansas*, 589 U.S. at 208. In order to demonstrate that a field has been preempted, Plaintiffs must show that the "clear and manifest purpose of Congress" was a "complete ouster of state power" in that area. *DeCanas v. Bica*, 424 U.S. 351, 357 (1976). This "can be inferred from a framework of regulation so pervasive ... that Congress left no room for the States to supplement it" or a "federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (quotations omitted). But while "[f]ederal governance of immigration and alien status is extensive and complex*," Arizona* itself makes plain that the federal government has occupied only "the field of alien registration," not all immigration regulation. *Id.* at 395, 401.

Aliens who surreptitiously enter or reenter the United States "shall" face federal criminal prosecution. 8 U.S.C. §§ 1325, 1326. Notably, the federal entry and reentry crimes under the INA are far less detailed than those for alien registration, which extensively prescribe

when, where, how, and with whom aliens are to register. *Compare* 8 U.S.C. §§ 1325, 1326, *with* 8 U.S.C. §§ 1301–1306. In any event, preemption may not be "inferred merely from the comprehensive character" of federal law. *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973). The fact that Congress has criminalized certain categories of conduct is a far cry from showing it has simultaneously foreclosed *all* state laws on the subject. *See Kansas*, 589 U.S. at 212 ("Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap[.]"). By the same token, H.B. 4156 neither conflicts with nor stands as an obstacle to federal objectives in immigration enforcement. Rather, H.B. 4156 echoes and amplifies those objectives—which is evidenced here by the fact that the current administration does not oppose it. In other words, Oklahoma is not acting unilaterally "to achieve its own immigration policy" by ignoring federal immigration law or acting at variance with its directives. *Arizona*, 567 U.S. at 408. As discussed, the very enforcement of H.B. 4156 will often depend on federal cooperation. *See* Exhibit 2.

This Court acknowledges its "heavy application of *Arizona* to H.B. 4156." Doc. 80 at 17. But the Court's application takes the form of an extension that the Supreme Court has consistently declined to impose. *See Kansas*, 589 U.S. at 210. In short, a parallel state-law crime based on unique harms to Oklahomans does not create conflict with federal law.

Nearly a year ago, the Court contrasted the federal government's "full[] support[]" of the state law in *Kansas*, 589 U.S. at 212, with this case, "where federal pushback is the genesis of litigation and H.B. 4156 touches so deliberately on matters of immigration regulation," *Oklahoma*, 739 F. Supp. 3d at 1001. Today, Oklahoma and the United States are operating in unison. Thus, based on this Court's own words, the ground has shifted in a way that is legally

21

**J.A. 253**

significant. Rather than embrace that point, however, this Court came close to recanting its previous words, admitting that it cited "the federal government's then-opposition to H.B. 4156 as additional support for preemption," but deeming a "change" in that opposition as an irrelevant "matter of policy" now. Doc. 80 at 17. A year ago, *Kansas* was distinguishable because the United States supported Kansas. Now, the United States' support is deemed unimportant to preemption. What's good for the goose should be good for the gander. Yet somehow, Oklahoma's sovereign interests in protecting those lawfully present within its borders get undermined each go-round. This should not be.

Unlike most everything else in this case—including the United States' position and the make-up of the Plaintiffs—Oklahoma's position has never once changed. To be sure, the Court is correct that "the enforcement priorities of a given administration" do not govern preemption analysis. Doc. 80 at 17. Preemption arises from "'the Laws of the United States,'" not federal officers' "criminal law enforcement priorities." *Kansas*, 589 U.S. at 212 (quoting U.S. CONST. art. VI, cl. 2). But the Supreme Court has made clear—in a case where the United States and a state were unified—that nothing about an "overlap" in federal and state criminal law demands preemption. *Kansas*, 589 U.S. at 212. Further, "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Id.* In this case, federal enforcement priorities have not been upset—they are being strengthened and supported by Oklahoma's complementary state-law analogue to the federal crimes of illegal entry and reentry. That is to say, H.B. 4156 does not deviate from federal law—it derives from it, and federal law does not preempt it.

In the meantime, Plaintiffs have completely ignored the United States' own declaration of an invasion at the southern border. So far, this Court has not credited these significant developments. Nevertheless, the fact remains that the federal government itself now speaks of the emergency at the border as an actual invasion. The United States' own considered views on the crisis are more than enough to prevent a sovereign state's invasion argument from being brushed aside as a fanciful or fringe notion. Moreover, this Court's insistence solely on black-letter *judicial* authority recognizing a state's ability to invoke the prospect of invasion also diminishes the *executive* branch's coequal authority to determine when an invasion is in fact occurring. In sum, Oklahoma "has moved to protect its sovereignty—not in contradiction of federal law, but in complete compliance with it." *Arizona*, 567 U.S. at 437 (Scalia, J., concurring in part and dissenting in part). "If securing its territory in this fashion is not within the power of [Oklahoma], we should cease referring to it as a sovereign State." *Id.* And if the United States' agreement with Oklahoma means nothing, then its own sovereignty is diminished, as well. Rather than undermine the sovereignty of two governments by holding that they are both opposed to the United States Constitution, this Court should place the lawless label where it belongs here—on Plaintiffs, who are undeniably violating federal law and attempting to use this Court to further that lawbreaking.

**IV.     Congress did not intend for lawbreaking to be shielded via pseudonym.**

In issuing a TRO, this Court emphasized that "[w]hen determining whether a state law like H.B. 4156 is preempted, *the Supreme Court instructs courts like this one to look to the intent of Congress, not the enforcement priorities of any particular administration.*" Doc. 80 at 30 (emphasis in original). But this concern for the intent of

Congress and the supremacy of federal law is largely absent from the analysis of Plaintiffs'

request to proceed pseudonymously. Pseudonym permission, after all, is *not* found in the Rules

of Civil Procedure or any relevant congressional enactment. *See* Doc. 80 at 5 ("There is no

'specific statute or rule supporting the practice,' and 'the Federal Rules of Civil Procedure

mandate that all pleadings contain the name of the parties.'" (citation omitted)). And Congress

has straightforwardly outlawed the behavior in question here. Thus, if congressional intent is

truly our lodestar, then there can be no pseudonym status for Plaintiffs.

"Judicial hostility to a party's use of a pseudonym springs from our Nation's tradition

of doing justice out in the open, neither 'in a corner nor in any covert manner.'" *Doe v. MIT*,

46 F.4th 61, 68 (1st Cir. 2022) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 567

(1980) (plurality opinion)). Accordingly, "an order granting pseudonymity should be

periodically reevaluated if and when circumstances change." *Id.* at 73. Where there are

"questions about whether anonymity is being improperly exploited, … the court may require

the plaintiff to proceed under his or her legal name." *Speech First, Inc. v. Shrum*, 92 F.4th 947,

950 (10th Cir. 2024). Even when courts permit parties to proceed pseudonymously, "it is often

with the requirement that the real names of the plaintiffs be disclosed to the defense and the

court but kept under seal thereafter." *A.D. v. Park City Sch. Dist.*, No. 2:23-cv-665, 2024 WL

1178578 (D. Utah Mar. 19, 2024).

This Court previously found that under *Femedeer v. Haun*, 227 F.3d 1244 (10th Cir.

2000), "this case presents 'exceptional' circumstances permitting the use of pseudonyms"

because requiring Plaintiffs to proceed under their true names would "expos[e] them[] to

federal authorities." Doc. 80 at 5–6. With respect, again, this seems quite contrary to other

portions of the order, where this Court emphasized that the intent of Congress is sacrosanct. *See, e.g.*, Doc. 80 at 16 ("*Congress's intent … controls the preemption inquiry.*" (emphasis in original)).

There is simply no evidence that Congress intended to protect the identities of litigants who are unlawfully present in the United States from "federal authorities." The fact of criminalization itself counsels strongly otherwise. Moreover, the Court's finding in this regard did not identify which of the *Femedeer* categories makes this case exceptional, it did not discuss the prejudice to the State if Plaintiffs are allowed to proceed anonymously, and it did not require Plaintiffs to submit their true names under seal. Each of these issues indicates that the Court should revisit its order permitting the Plaintiffs to proceed pseudonymously.

Under *Femedeer*, there are three categories of "exceptional cases" in which a party should be permitted to proceed pseudonymously: (1) matters of a highly sensitive and personal nature; (2) a real danger of physical harm; and (3) where the injury litigated against would be incurred as a result of the disclosure of plaintiff's identity. *Femedeer*, 227 F.3d at 1246. The first *Femedeer* category is inapplicable here. "Matters of a highly sensitive and personal nature" typically include "challenges to laws involving birth control, abortion, and homosexuality" or other acts that could cause public embarrassment if litigants were forced to proceed under their true names. *See W.N.J. v. Yocom*, 257 F.3d 1171, 1172 (10th Cir. 2001) (citing *Coe v. U.S. Dist. Ct. for Dist. of Colo.*, 676 F.2d 411, 416 (10th Cir. 1982)). Other examples involve sexual assault of minors and similar cases where disclosure of a plaintiff's identity "might lead to further severe emotional distress" or "the real potential of additional psychological harm." *L.M. ex rel. A.M. v. City of Gardner*, No. 19-2425-DDC, 2019 WL 4168805, at *2 (D. Kan. Sept. 3, 2019). Here, Plaintiffs' unlawful immigration status does not involve personal intimate

25

**J.A. 257**

details of a potentially embarrassing nature such that they should be shielded from the public or federal authorities. It seems doubtful that federal lawbreaking of any sort could *ever* be deemed personal or intimate enough to deserve the protection of a federal court. Plaintiffs are not entitled to proceed anonymously under this category.

The third category is also inapplicable. The "injury litigated against" in this case is arrest and prosecution under H.B. 4156. Plaintiffs are under no threat of suffering that injury because the Court has already enjoined enforcement of that law. (The State disagrees with this, obviously, but the current reality is what it is.) To the extent that Plaintiffs are at risk of enforcement of *federal* law, that cannot possibly be a trigger for pseudonym status in a case where the federal law in question is unchallenged. It is entirely inappropriate for a federal court to protect federal lawbreakers from the federal consequences of their actions.

The second category is inapplicable for essentially the same reason. Importantly, while "real danger of physical harm" may warrant the use of pseudonyms, such harm must be "coterminous to the harm [Plaintiffs are] seeking to avoid by filing [their] claim." *Femedeer*, 227 F.3d at 1246. And again, the harm Plaintiffs are seeking to avoid is arrest and deportation under Oklahoma's immigration law, not federal immigration law. Even if this Court believes that federal law enforcement would vindictively target Plaintiffs—although surely this Court is required to assume the federal government will act in good faith—federal immigration law is not the subject of these proceedings. As such, the risk of harm of deportation by federal authorities in not "coterminous to the harm" Plaintiffs are seeking to avoid in their lawsuit, and the second *Femedeer* factor is not implicated.

26

**J.A. 258**

Because this case does not fall under any of the categories enumerated in *Femedeer*, Defendants request that the Court revisit its ruling and require Plaintiffs to proceed under their true names.

Given the discretionary nature of the decision to allow Plaintiffs to proceed pseudonymously, Defendants ask the Court to consider the prejudice to the State. If Plaintiffs proceed pseudonymously, there is no way Oklahoma will know whether any of the Plaintiffs are actually subject to arrest and deportation under H.B. 4156.[4] The prejudice to Defendants is thus twofold: (1) Oklahoma must defend an action in which it is required to blindly trust pseudonymous affidavits to establish standing, and (2) the State will be unable to raise affirmative defenses, such as the Fugitive Disentitlement Doctrine, which as a practical matter requires knowledge of the Plaintiffs' true identities.

If Plaintiffs are allowed to proceed pseudonymously, the State and the Court are left to blindly trust the affidavits of anonymous individuals to establish standing in this case. While Courts have allowed anonymous standing in other contexts, it is particularly inappropriate here because, as this Court recognized, Plaintiffs remain subject to deportation under federal law. Doc. 80 at 5. If Plaintiffs are found and deported by federal law enforcement, their

---

[4] Plaintiffs point out that a district attorney's office has filed charges under H.B. 4156 against a criminal defendant in Rogers County, Oklahoma. *See* Doc. 60 at 2 (describing *State v. Falcon–Romo*, No. CM-2025-264 (Rogers Cnty. Dist. Ct.)). Oklahoma has no way of knowing, for example, whether a pseudonymous plaintiff in this case might also currently be the subject of an ongoing state-court prosecution. At the very least, this evasiveness would raise serious concerns under the abstention doctrine articulated in *Younger v. Harris*, 401 U.S. 37, 54 (1971) (holding that "the possible unconstitutionality of a statute 'on its face' does not in itself justify an injunction against good-faith attempts to enforce it," especially in the absence of "any showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief").

challenge to Oklahoma's immigration law becomes moot. Moreover, if Plaintiffs simply leave Oklahoma while this matter is pending, their claims are moot. But under pseudonyms, neither the State nor the Court is in a position to discover potential mootness.

Furthermore, under the Fugitive Disentitlement Doctrine, actions brought by "fugitive immigrants" are subject to dismissal. *See Martin v. Mukasey*, 517 F.3d 1201, 1204 (10th Cir. 2008). Importantly, an alien does not need to be arrested or charged with a crime in order to be a "fugitive." *Id.* at 1203–04. Rather, an alien's failure to appear before DHS and provide it with a current address is sufficient to render the alien a "fugitive" for the purposes of the Fugitive Disentitlement Doctrine. *Id.* But again, Defendants have no way of knowing whether any of the Plaintiffs are "fugitive aliens" if Plaintiffs are allowed to proceed pseudonymously. Thus, Defendants respectfully assert that this Court's order is prejudicial to Defendants in that it frustrates, indeed largely vitiates, the Fugitive Disentitlement Doctrine as an affirmative defense in this case.

Because Defendants will suffer prejudice if Plaintiffs are allowed to proceed pseudonymously, the Court should require Plaintiffs to proceed under their true names. If that leads them to drop out of the case, then that is their choice. Much like Plaintiffs are not guaranteed standing or a pre-enforcement cause of action in equity, they are also not guaranteed pseudonym status. Plaintiffs do not have a right, that is, to enter federal court, announce their violation of federal law in order to attack a nearly identical state law, and receive protection from the federal consequences of that announcement.

It is also worth considering just how drastic this Court's pseudonym ruling is, when combined with the Court's provisional class certification. Essentially, this Court is holding that

**J.A. 260**

it can shield hundreds (if not thousands) of individuals who are violating federal law from the consequences of those violations, should they choose to come to this Court and announce their lawbreaking. Based on the Court's ruling, any one of the class members could presumably show up to litigate in person and they would have to be granted anonymity, just like the current Plaintiffs. This broad undermining of federal law and federal law enforcement is not and should not be the business of the federal courts. Put differently, if Oklahoma cannot prosecute under H.B. 4156, it is only because the federal government can. But if this Court hides Plaintiffs' identity from the federal government, then it is shielding lawbreakers from the only sovereign that can prosecute them. That should not be.

Finally, as a longstanding matter of standard practice in the Tenth Circuit, courts require pseudonymous parties to provide their true names to opposing parties and the Court. *W.N.J.*, 257 F.3d at 1172 (citing *Nat'l Commodity & Barter Ass'n v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989)). Requiring such disclosure alleviates some of the jurisdictional concerns surrounding anonymous pleadings. *Id.* As set forth in detail above, there are substantial jurisdictional concerns in this case that may arise if Plaintiffs continue to proceed pseudonymously. While Oklahoma maintains that such concerns dictate Plaintiffs should be required to proceed under their true names, the State understands that this Court is disinclined to enforce such a requirement. If Plaintiffs are permitted to continue under pseudonyms, the Court can alleviate some of the issues surrounding pseudonymous proceedings by requiring the individual Plaintiffs to provide the Court and Defendants' counsel with their true identities. Of course, this leads to difficulties as well, given that any such filing under seal would likely prohibit the State from sharing the names of federal lawbreakers with federal authorities. This

**J.A. 261**

would be a bizarre outcome in the name of federal supremacy. In its TRO, this Court claimed that it was not interfering with "the federal government's ability, with *lawful assistance from its state partners*, to enforce that [immigration] framework as Congress intended." Doc. 80 at 30 (emphasis added). Respectfully, this Court's pseudonymity ruling threatens to do just that, in spades, and it should be reconsidered.

## V.    This Court should not provisionally certify classes of federal lawbreakers.

The State previously contended that Plaintiffs failed to satisfy Rule 23. Doc. 76 at 24–27. The State incorporates these certification arguments here. To summarize, Plaintiffs lack standing and should not be permitted to certify a class. Moreover, Plaintiffs cannot satisfy Rule 23's numerosity, typicality, commonality, and adequacy requirements. Nor can they show Oklahoma has "acted on grounds that apply generally to the class, so that final injunctive relief ... is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Provisional or not, "any 'analysis of class certification must begin with the issue of standing.'" *Vallario v. Vandehey*, 554 F.3d 1259, 1268 n.7 (10th Cir. 2009) (citation omitted). Named plaintiffs "must have individual standing to bring claims on behalf of the absent class members ... [and] may not rely on potential class members' injuries to establish their standing." *Abraham v. WPX Prod. Prods., LLC*, 184 F. Supp. 3d 1150, 1176 (D.N.M. 2016). As explained above, Plaintiffs lack standing and thus should not be certified as a class. Most significantly, like the individual Plaintiffs, the proposed classes are—according to this Court—classes of federal lawbreakers who are not challenging the federal law they are breaking. *See, e.g.*, Doc. 80 at 27 ("Here, members of both proposed classes face arrest, prosecution, and punishment under H.B. 4156."). This is something that should not be certified under Rule 23, any more

30

**J.A. 262**

than a court should certify a class of mafia members who are complaining that a state is making their federally outlawed organized crime activities more difficult.

But even if Plaintiffs can establish standing, provisional certification is improper if Rule 23(a) and (b) are not satisfied. A party seeking provisional class certification still must demonstrate numerosity, typicality, commonality, and adequacy. Fed. R. Civ. P. 23(a)(1)–(4); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011); *see also P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) ("[A] plaintiff requesting provisional certification must still demonstrate that Rule 23's requirements are met ….").

On numerosity, this Court gave credit to what is very nearly sheer speculation from Plaintiffs about the size of the classes. Plaintiffs cited one random non-governmental source for the total amount of "estimated … undocumented immigrants," Doc. 61 at 6–7, and this Court was forced to then guesstimate downward as to the actual number, *see* Doc. 80 at 26 ("it stands to reason that the number falling within each proposed class would easily reach into the hundreds"). Respectfully, the State fails to see how Plaintiffs have "established" anything on numerosity with this meager approach. In addition, Plaintiffs are noticeably cagey and ambiguous in describing the proposed classes. For example, they claim the "Entry Class includes [but is not limited to?] noncitizens who live in or travel to Oklahoma and who may [just may?] be subject to prosecution for entering the state without federal authorization." Doc. 61 at 6–7. This intentionally squirrely approach cannot possibly lead to firm numbers for purposes of numerosity. While there is no set formula for determining the class, there must be some definitive characteristic among the group so as to ascertain the number in the first place—and the State sees nothing definite in Plaintiffs' language.

31

**J.A. 263**

On commonality, the Court concluded that "[t]he preemption question presents a common issue of fact that, if resolved in Plaintiffs' favor, would apply uniformly across the classes." Doc. 80 at 26. But this cannot be true of Plaintiffs' purported classes, given the tepid and undefined language Plaintiffs use to describe the classes. In other words, how can a court determine that commonality is met when the class itself is so amorphously described? In any event, H.B. 4156 does not treat all "noncitizens" the same, thus a resolution of the preemption question will not provide uniformity when each "noncitizen" has not suffered the same injury. Because Plaintiffs have alleged only that the prospective class members are potentially subject to the challenged provisions based on their future, hypothetical, individualized, and unlawful conduct, they cannot satisfy commonality. Plaintiffs similarly cannot satisfy the typicality requirement. The Court correctly noted that typicality "requires only that the claims of the class representative and class members are based on the same legal or remedial theory." Doc. 80 at 27. But the representatives' claims do not "arise from a uniform statutory scheme." *Id.* As noted above, Oklahoma's scheme builds in affirmative defenses which treat "noncitizens" distinctly (and, in other words, non-uniformly) based on (1) "federal grant[s] of lawful presence or asylum"; or (2) "approval under the federal Deferred Action for Childhood Arrivals program." H.B. 4156(F)(1)–(2). The representatives here could hypothetically qualify for either of these defenses in Oklahoma's law and would not be treated similarly to any non-qualifying members of the class. *See* Doc. 61 at 1–2. As a result, Plaintiffs cannot establish typicality.

Finally, the proposed class representatives cannot protect the interests of the class. Even if this Court is correct that "[a]ll Plaintiffs [including their representatives] share a common interest in halting enforcement of H.B. 4156," Doc. 80 at 28, this ignores the State's

contention that merely seeking and administering the class would risk garnering unwanted and harmful attention from law enforcement to members of the class who are actively violating federal law. Class administration itself clearly risks potential harm for the prospective class members here, as it risks drawing federal attention and law enforcement to the scene. Certification, as a result, has the potential to do anything but protect class members' interests.

Next, Plaintiffs' claims do not fall within any of Rule 23(b)'s catchall "types" of class actions. In addition to Rule 23(a)'s requirements, "the proposed class must satisfy at least one of the three requirements listed in 23(b)." *Dukes*, 564 U.S. at 345. Here, Plaintiffs put forward Rule 23(b)(2), which authorizes certification "where the party opposing the class has acted on grounds that apply generally to the class, so that final injunctive relief is ... appropriate respecting the class as a whole." But any relief rendered to the class will be distributed to the class non-uniformly, in violation of the principle cited by this Court that the challenged provision must be "enjoined or declared unlawful only as to all of the class members or to none of them." Doc. 80 at 29 (citing *Dukes*, 564 U.S. at 360). With respect to H.B. 4156's affirmative defenses (as discussed above), the unique positioning of each individual "noncitizen" composing the class renders any kind of injunctive relief fragmentary and inconsistent because every noncitizen falls distinctly within or outside of H.B. 4156's safe harbors. As a result, Plaintiffs cannot show that Oklahoma has acted on grounds that "apply generally to the ["noncitizen"] class" here. Fed. R. Civ. P. 23(b)(2). Class certification, as a result, is improper here.

**J.A. 265**

## VI.    The remaining factors and equities do not favor Plaintiffs here.

Oklahoma incorporates its prior equities arguments here. Doc. 76 at 27–28. Again, Plaintiffs are individuals who are here in violation of United States law or organizations supporting such individuals. *See, e.g.*, Doc. 80 at 5 (admitting that Plaintiffs "may very well face removal or prosecution under the comprehensive federal immigration regime that Congress established"). Equity cannot, therefore, be in their favor. *See, e.g.*, *Original Invs.*, 542 F. Supp. 3d at 1233 (W.D. Okla. 2021) (granting the State's motion to dismiss because "[i]t is well-settled … that 'a court won't use its equitable power to facilitate illegal conduct'" (citation omitted)). Nor can the views of a private association about the law's effects, Doc. 60 at 11, somehow trump the statutorily enshrined views of the Oklahoma Legislature and the perspective of the "chief law officer of the state." OKLA. STAT. tit. 74, § 18. The equities here are straightforward and simple: equity cannot be in favor of private individuals who seek to shield and enable their breaking of valid and unchallenged federal laws. In the end, Oklahoma will be harmed by an injunction of a duly enacted law, whereas Plaintiffs' harms are not cognizable because they stem from admitted violations of federal law.

Moreover, Plaintiffs have never attempted to justify their seven-week-long delay in filing their amended complaint, they have not explained their last-minute withdrawal of named Plaintiffs, and they have not given any reason whatsoever for why equity should favor these new Plaintiffs when they apparently waited an entire year to join the lawsuit.

## VII.    This Court should require Plaintiffs to post a substantial bond.

Rule 65(c) premises the issuance of a preliminary injunction or TRO on "the movant giv[ing] security in an amount that the court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained." The idea that

Plaintiffs should be subject to no bond at all is mistaken and should be revisited. Again, "the

trial judge's consideration of the imposition of bond is a necessary ingredient of an enforceable

order for injunctive relief. The plain language of the rule permits no other analysis." *Coquina*

*Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).

## **CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs a preliminary injunction.

Respectfully submitted,

s/ *Zach West*

GARRY M. GASKINS, II
  *Solicitor General*
ZACH WEST
  *Director of Special Litigation*
CULLEN D. SWEENEY
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov

*Counsel for Defendants*

35

**J.A. 267**

# Exhibit 1

# Exhibit 1

*Attorney General Gentner Drummond's Written Testimony Submitted to the U.S. House Homeland Security Committee on Wednesday, January 10, 2024*

Good morning, Chairman Green, Ranking Member Thompson and members of the Committee. Thank you for inviting me to participate in today's hearing on this critical issue.

I am Gentner Drummond, and I was elected as Oklahoma's Attorney General in 2022.

As the chief law enforcement officer of Oklahoma, it is my duty to protect the people of my state. I am here to testify about the dangers my citizens face due to a porous border and the failure of the federal government to enforce the law.

In the early evening of November 20, 2022, law enforcement responded to a quadruple homicide after a Chinese national allegedly entered a garage on a 10-acre marijuana farm in Kingfisher County, about an hour's drive west of Oklahoma City. According to investigators, the man then pulled out a handgun and kept it trained on a group of people – also Chinese nationals – who were inside. He said they owed him $300,000 that he had invested in the grow operation, and that they had exactly 30 minutes to pay up or he would kill them all.

According to investigators, the assailant killed three men, execution-style, with gunshots to the back of the head, and one woman with two shots to the abdomen. Another man sustained a gunshot wound but survived after being medi-flighted for emergency surgery. It took personnel from six law enforcement agencies to process the gruesome scene.

Much to the credit of law enforcement, police arrested the suspect in Florida two days later.

The carnage of that day is but one tragic example of a failed system plagued by failing leadership. Throughout Oklahoma, law enforcement comes into daily contact with foreign nationals who entered our country illegally or who remain here illegally — or both. This is tragic and common in Oklahoma's illegal marijuana grow operations.

The voters of Oklahoma legalized medical marijuana in 2018. While that legalization led to some legitimate cannabis-related businesses, organized criminals have overtaken the industry.

1

**J.A. 270**

Our law enforcement partners report that the foreign nationals most often involved in these illegal enterprises come from China and Mexico. We have identified individuals from many other countries, to include Cuba, Bulgaria and Russia.

The one thing these criminals have in common is that they have no regard for our laws or public safety. Criminal illegal immigrants are not content with only growing black-market marijuana. They also produce and distribute fentanyl, and they engage in sex trafficking and labor trafficking.

Oklahoma's law enforcement community fights a constant battle against these evils. The Oklahoma Bureau of Narcotics and Dangerous Drugs, the Oklahoma State Bureau of Investigation, and scores of municipal and county law enforcement agencies deserve much praise for their heroic efforts. Thanks to the leadership of Director Donnie Anderson, the director of the Oklahoma Bureau of Narcotics, his agents and law enforcement partners have seized countless tons of dangerous drugs and arrested untold numbers of traffickers. It should be no surprise to this committee that many of these criminals are foreign nationals who entered this country illegally through our unsecured southern border.

Even the state agency that was created to regulate the legal marijuana market has been forced to combat the explosion of illegal grows. My office has a strong partnership with the Oklahoma Medical Marijuana Authority, led by Director Adria Berry, which provides critical information to our agents and other law enforcement. Thanks to this collaboration, we are able to identify and investigate criminal enterprises that all too often are operated by foreign nationals.

While there have been great successes, the ongoing border crisis ensures a never-ending flood of illegal foreign nationals who continue to perpetrate criminal activities that endanger our people. You may wonder how these foreign nationals have infiltrated the medical marijuana industry in Oklahoma. The pattern is a common one. Foreign operatives conduct a "straw" purchase of rural property just outside city limits. Sometimes they have a front man lease the real estate. Either way, they take steps to conceal their activities. It is common to see that they have pushed up a

berm to prevent visibility from the roads. They often will post armed personnel to stand watch and imply threat.

Members, you can imagine the impact these kinds of actions have in communities throughout rural Oklahoma. Families are scared. They feel unsafe. Smaller law enforcement departments are literally out-manned and out-gunned, and they feel ill-equipped to address the threat.

When I was sworn in as Attorney General, I pledged to the people of Oklahoma that I would do everything in my power to protect them from these dangerous criminals. I petitioned our legislature for greater resources and broader authority to combat this threat. They responded with millions of dollars for equipment and personnel, and they granted my office more power to fight this criminal epidemic being fueled by the border crisis.

In response, I established the Organized Crime Task Force. It is the first of its kind for Oklahoma. And, of course, it is needed because federal officials have failed to enforce the law and secure the border. In the short seven months since its creation, the Organized Crime Task Force has investigated and is prosecuting more than 50 complex, multi-jurisdictional criminal cases. The vast majority of these cases involve Mexican or Chinese drug syndicates.

Because these foreign actors have no vested interest in the well-being of our communities, law enforcement officials have discovered rampant building-code violations that, in turn, have led to fires and explosions. In one case alone, fire at an illegal marijuana grow destroyed more than 10,000 acres and necessitated deploying the National Guard and other agencies across Oklahoma and Texas. In the wake of such incidents, my office demanded strict enforcement of building codes against these illegal foreign operators. As a result, approximately one-half of the marijuana grows in the state were found to be out of compliance. That translates to thousands of unsafe operations across Oklahoma, putting lives and communities at risk.

These foreign actors are creating additional costs that cannot fully be quantified. For instance, the Oklahoma Department of Corrections reports that it currently houses nearly 500 illegal

immigrants convicted of state crimes. At an average cost of $63.53 per inmate per day, the State
of Oklahoma pays roughly $11 million per year to incarcerate criminal illegals.

Before those criminal aliens were sent to the Department of Corrections, they were in the
custody of a local jail, who have their own costs for housing. Likewise, there is a significant cost
for law enforcement to investigate these crimes and for prosecutors to prosecute them.
The unsecure border contributes to costs beyond the criminal justice system as well. Oklahoma's
water resource authority reports of strain on the utility grid when these operations – which
employ no one legally and give nothing back to the community – demand commercial levels of
water consumption. We have seen instances where a lone farmhouse is purchased by a foreign
entity and a line that once consumed 3,000 to 4,000 gallons a month began consuming tens or
hundreds of thousands of gallons monthly. This can equal the consumption of the entire local
grid. Other bad actors drill un-permitted wells and draw down from the subterranean water of
legitimate farmers, sometimes eliminating the source supply completely. Once these operations
have run their course, the criminals simply pull up stakes overnight, leaving behind dilapidated,
unsafe structures that are an environmental blight and a threat to public safety.

Additionally, it is widely understood that Oklahoma, like every other state, bears a significant
financial burden related to the routine services that must be provided to those who are here
illegally. While it is not possible to ascertain the exact amount of that cost to Oklahoma, it is
easy to understand the magnitude of that cost. The State bears the burden for the education,
health and welfare of a robust and growing illegal population. It is estimated that well over
100,000 live among us, costing Oklahoma taxpayers more than $750 million each year – with
minimal offsetting return.

It is important to note that the illegal immigrant population in Oklahoma is vulnerable to
exploitation. My office has observed many instances where members of this population become
victims of horrific crimes. Every case being investigated by my Organized Crime Task Force –
*every* single case – involves some level of undocumented labor trafficking. Law enforcement is
seeing this particularly in operations run by Chinese nationals. Officers see tell-tale signs such as
abandoned and substandard living conditions for workers and a complete disregard for human

4

J.A. 273

welfare, not to mention countless Occupational Safety and Health Administration (OSHA) violations. We have examples of illegal workers being fed from dog-food bowls, and our agents plan to begin using so-called "cadaver" dogs to find potential unknown victims of these wretched conditions.

During an investigation into illegal drug activities by Chinese nationals, our agents recently coordinated with other law enforcement to serve simultaneous warrants on multiple addresses. At one location, agents found two female Chinese nationals, who spoke no English. Mattresses on the floor of their bedroom were littered with condoms, lotion and other unsavory supplies. The women had been in the country for months, but they could not say where they were and they had not been out of the house since their arrival. They simply awoke every day, worked and went back to sleep. This living horror, which was merely *incidental* to the initial investigation, further illustrates the human cost of allowing persons to remain unsafe and undocumented.

These foreign actors are blatant and cavalier in their efforts. Our investigators are finding job advertisements on international websites targeting and recruiting poor and rural Chinese. These ads, in Mandarin, are thinly veiled offerings to engage in criminal activity. One particularly distasteful ad recruits "girls under 50" for "purely formal bed" and "four days off a month." Another offers jobs for a "massage spa" to people who are "able to endure hardships" and who have "good hygiene."

Illegal aliens forced into this clandestine world have nowhere to turn. On the occasions that Oklahoma law enforcement *does* find people at these operations, agents resort to Google Translate attempting to communicate with Mandarin-speaking workers. The agents contact HSI, but invariably they are told that the system is too overloaded for the federal government to assist.

In the end, our officers know it doesn't really matter whether HSI responds. We confirm that anyone brought in to HSI will simply be released. Without appropriate recourse, officers typically are forced to leave the victimized illegal aliens where they were found.

The upshot is this: If an immigrant claims he or she has entered the country before November 1

**J.A. 274**

of 2020, to be deported they must have incurred at least two DUIs or a DUI plus a more egregious crime. This situation puts the criminal in control. The local field office director of HSI has been disempowered from removing persons without convictions, even if they are repeatedly implicated in criminal reports. Illegal immigrants are also taking advantage of VAWA (Violence Against Women Act) programs or DACA (Deferred Action for Childhood Arrivals) participation.

And it is important to remember that the crimes of these foreign actors range from prostitution to money-laundering to underground casinos. Among the Mexican drug cartels, the Oklahoma Bureau of Narcotics and federal authorities have seen increased activity from cartels such as La Familia, the New Generation Jalisco Cartel and the notorious Sinaloa Cartel.

With the cartels harvesting so much marijuana in Oklahoma, the issue is no longer about smuggled marijuana from Mexico. Rather, the contraband of choice is now fentanyl, a narcotic as addictive as it is deadly. In this regard, the director of the Houston High-Intensity Drug Trafficking Area, Mike McDaniel, reports that we are seeing unprecedented levels of partnership between Chinese nationals and the Mexican cartels operating along the southwest border. Chinese and Mexican nationals work alongside the cartels to produce the opioid in labs in Mexico before transporting it across the border. Director McDaniel indicates the cooperation extends to organized distribution schemes to the U.S. The illicit fentanyl industry is incredibly lucrative. One gram, roughly the weight of a single Sweet & Low packet, can produce 500 pills at an expense of about 10 cents. On the street, each pill sells for between $10 and $20.

When Oklahoma law enforcement first interdicted large quantities, we were not seeing an equivalent amount on the street, which led us to believe that the supply was supporting drug habits of insular communities such as foreign-run marijuana grow operations. Tragically, that threat has now invaded our own communities. In 2017, Oklahoma recorded 54 fentanyl overdoses. Only five years later, that number grew to 474. While final figures for this past year are not yet known, we do know there were 317 fentanyl deaths in the first *five* months of 2023 *alone*. The situation has become so dire, in fact, Oklahoma's Department of Mental Health now

6

J.A. 275

operates vending machines for Naloxone, which is used to treat people who are overdosing on an opioid.

The opioid user is not the only one put in harm's way. In August of last year, law enforcement officers in northern Oklahoma responded to a local residence for a welfare check. An officer checking out the premises unknowingly was exposed to fentanyl. He collapsed to the ground, unconscious. The officer's partner was able to administer a triple dose of Naloxone to bring him back from the brink of death.

Mr. Chairman, members of the committee, I believe it is time for accountability. The people of Oklahoma don't deserve to live under constant threat from criminal foreign nationals. The people of Oklahoma don't deserve to have their communities flooded with illegal drugs that were smuggled across our unsecure border. Oklahoma families don't deserve to have their loved ones ripped away by those same drugs.

Members, once the hearing process is concluded, you will have a very weighty decision to make. I trust that each of you has great respect for that solemn duty, and that you will make your decision with great care and deliberation.

As I conclude my testimony here today, I want to ask you to remember the people of Oklahoma as you deliberate. Remember the murder victims, and the drug overdose victims, and the families who mourn them. And of course, please remember the law enforcement officers who risk their lives every day to protect us from it all.

Thank you, Mr. Chairman, Mr. Ranking Member, and members of the Committee.

# Exhibit 2

# Exhibit 2

*Declaration of Donnie Anderson*

Appellate Case: 25-6080   Document: 32-2   Date Filed: 08/29/2025   Page: 55

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

                                    *Plaintiff,*

v.                                                          Case No.        5:24-cv-00511-J

THE STATE OF OKLAHOMA, *et al.*

                                    *Defendants.*

## DECLARATION OF DONNIE ANDERSON

I, Donnie Anderson, declare the following under 28 U.S.C. § 1746, and state under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I am the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. As the Director, I supervise the staff of the Oklahoma Bureau of Narcotics and am responsible for the administration and enforcement of the Uniform Controlled Dangerous Substances Act pursuant to 63 O.S. 2023, § 2-101 *et seq.* The Bureau was established by the Legislature as a law enforcement agency in 1975 and is presently mandated to exercise civil, criminal, and administrative enforcement and regulatory powers as they relate to controlled dangerous substances, money laundering, and human trafficking.

2.      Since the State of Oklahoma approved medical marijuana in 2018, the Bureau has seen a significant increase in the number of encounters with foreign nationals, both with and without legal status in the United States, operating within medical marijuana facilities. As acknowledged in House Bill 4156, such encounters are "increasingly frequent" and "particularly common in regard to illegal marijuana grow operations, which have exploded in

Appellate Case: 25-6080   Document: 32-2   Date Filed: 08/29/2025   Page: 56

number in recent years."

3.      Many of these medical marijuana facilities rely on low paid agricultural workers to perform labor for operations. These laborers are often foreign nationals, both with and without legal status. These laborers make up the low-cost workforce that allows the black market marijuana trade to persist. Some of the laborers serve as prime targets for labor exploitation by human traffickers who themselves may also be foreign nationals, both with and without legal status.

4.      The Bureau has conducted several hundred investigations and enforcement actions involving black-market marijuana operations since 2018. Several of our investigations and subsequent enforcement actions taken related to illegal marijuana operations stem from tips made by concerned property owners in rural communities who notice unusual and unsettling activity occurring on neighboring properties. In fact, these tips are one of the primary ways that we learn about black-market operations. These grow operations can also affect rural communities through introducing banned foreign chemicals to the land, abandoning of grow cites by operators, and the stressing of electrical utilities and water resources. It is clear that rural Oklahomans are being increasingly affected and disturbed by illegal operations in the State.

5.      During the course of those investigations, the Bureau has uncovered numerous instances of suspected human trafficking of foreign nationals. Some examples include laborers who were not being paid for their work or continuously being promised future payment upon harvest of the marijuana crop. The Bureau has also observed workers with limited access to food or shelter, and others who were not in possession of their identification documents, such

2

as an official ID card or passport, because these documents were kept by those in charge at another location. In certain investigations, we have documented instances of the same laborers being contacted at successive illegal grow operations. In other words, these laborers move to the next black-market operation after the Bureau shuts down the illegal grow at which they were contacted. These examples can also be indicative of human trafficking and labor exploitation of vulnerable individuals, even if not admitted to by suspected victims.

6.      In sum, these laborers, whether trafficked or not, play a major role in the massive black-market industry by providing the low-paid workforce necessary to perpetuate it. House Bill 4156 could address that problem, both by discouraging persons unlawfully in the United States from coming to Oklahoma, and by providing the Bureau and other Oklahoma law enforcement with an additional tool to use against persons here willingly and unlawfully. The hope is to shrink the black market by shrinking the available labor force. Of course, discerning between those who are trafficked and those who are willingly violating the law is a challenging task, especially when, as occurs, those in charge of black-market grows disguise themselves as mere or even trafficked laborers. But it is a task the Bureau and other Oklahoma law enforcement are capable of tackling.

7.      Because many of these black-market operations are associated with international criminal organizations, we have seen violent and deadly altercations occurring at illicit marijuana grows. A recent tragic example of this occurred at a black-market marijuana farm in Kingfisher County, Oklahoma. A Chinese national, demanding that workers at the grow give him hundreds of thousands of dollars as a return for his investment, ultimately executed four other Chinese nationals. The killer, who was ultimately charged in Oklahoma

3

and pled guilty to murdering the four workers, initially fled to Florida because he feared being killed by others in the criminal organization if he remained in Oklahoma. Many other violent crimes occur that go unreported because the victims or affected grows are also involved in the black-market marijuana trade.

8. At present, the Oklahoma Bureau of Narcotics has no independent mechanism to confirm the legal status of an individual in the United States. We rely on federal law enforcement, to include Homeland Security Investigations (HSI), the Drug Enforcement Administration (DEA), and the Federal Bureau of Investigation (FBI), to determine legal status, especially in investigations of alleged human trafficking. Thus, although House Bill 4156 provides another tool in our toolchest for going after criminals, it would necessarily be limited by the resources available to the Bureau and the willingness of the federal government to assist. Put differently, HB 4156 does not appear to me to be designed to operate in opposition to the federal government, but in some form of collaboration with it.

9. While the Bureau aggressively targets black-market criminals and human traffickers in its enforcement efforts; we will continue to aid victims of human trafficking, with or without legal status, under House Bill 4156 by connecting victims of human trafficking with charities and other local, state, and federal resources available. We will continue to work with federal law enforcement to ensure public safety, enforce the law, and support victims. Executed on June 12, 2024.

Donnie Anderson

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

---

PADRES UNIDOS DE TULSA, *et al.*,

                      *Plaintiffs*,

     v.

GENTNER DRUMMOND, in his official capacity as Oklahoma Attorney General, *et al.,*

                      *Defendants*.

Case No. 5:24-cv-511-J

---

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR**
**A PRELIMINARY INJUNCTION**

This Court has twice found that H.B. 4156 is likely preempted and enjoined its enforcement. *See United States v. Oklahoma*, 739 F. Supp. 3d 985, 1007 (W.D. Okla. 2024); *Padres Unidos de Tulsa v. Drummond*, No. CIV-24-511-J, ECF No. 80, slip op. at 17 (W.D. Okla. May 20, 2025) ("TRO"). In doing so, it has acted in lockstep with 150 years of Supreme Court precedent and the unanimous consensus of courts across the country in affirming a fundamental principle: the regulation of noncitizen entry and presence is a quintessentially federal field. *See United States v. Texas*, 97 F.4th 268, 295 (5th Cir. 2024); *United States v. Iowa*, 126 F.4th 1334, 1352 (8th Cir. 2025), *vacated*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025) (voluntarily dismissed by the United States); *Idaho Org. of Res. Councils v. Labrador*, No. 1:25-CV-00178-AKB, 2025 WL 1237305, at *20 (D. Idaho Apr. 29, 2025) ("*Idaho*"); *Fla. Immigrant Coal. v. Uthmeier*,

**J.A. 283**

No. 1:25-cv-21524-KMW (S.D. Fla. Apr. 29, 2025), ECF No. 67 ("*Florida*"). Faced with this unbroken precedent all but foreclosing its merits arguments, Oklahoma takes a different tack in its third attempt to persuade the Court of its position: it devotes the bulk of its brief to raising threshold arguments that Plaintiffs lack a cause of action and standing. But these arguments also fail. Plaintiffs have a cause of action in equity. *Ex parte Young*, 209 U.S. 123 (1908), is bedrock law and one of the most well-established uses of equity in federal court. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). This is a classic *Ex parte Young* case. And this Court has issued a thoroughly-reasoned opinion concluding that they have standing. Finally, Oklahoma offers no new arguments or evidence to alter the Court's finding that H.B. 4156 is preempted, its grant of pseudonymity, and provisional class certification. Accordingly, the Court should grant a preliminary injunction.

## STANDARD

When addressing a motion for preliminary injunction, a district court applies the same standard as it applies to a motion for temporary restraining order. *See, e.g.*, *Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1289 (D. Kan. 2018). To obtain preliminary relief in the form of a TRO or a preliminary injunction, *see* Fed. R. Civ. P. 65(a)–(b), the moving party must demonstrate: "(1) a likelihood of success on the merits; (2) a likelihood that [he] will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [his] favor; and (4) that the injunction is in the public interest." *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (internal quotation marks omitted).

## ARGUMENT

**I.   Plaintiffs Can Sue in Equity and Have Standing.**

**A.  Plaintiffs Have a Cause of Action in Equity.**

Oklahoma argues that Plaintiffs cannot sue in equity. Resp. at 6–7. But this ignores longstanding precedent affirming the "power of federal courts of equity" to "issue an injunction upon finding the state regulatory actions preempted," even absent an implied cause of action under the Supremacy Clause and absent a statutory cause of action. *Armstrong v. Exceptional Child Center*, 575 U.S. 320, 326-31 (2015). *See also Chamber of Com. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010) (holding that plaintiffs satisfied *Ex parte Young* to assert preenforcement, preemption suit challenging certain provisions of state statute regulating immigration)[1]; *Texas*, 97 F.4th at 277 ("Even if a statute 'does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds.'") (citation omitted); *Florida* at 12, 12 n.8 (holding plaintiffs may sue under "the Court's equitable jurisdiction pursuant to *Ex parte Young*"); *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260-62 (11th Cir. 2012) (same).

---

[1] Oklahoma claims that *Armstrong* "abrogated" *Edmonson*, Resp. at 7, but this is incorrect. In saying that the Supremacy Clause does not itself "include[ ] a private right of action," the Supreme Court was careful to note that the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity," and, "in its application to state officers" does not rest "rest[ ] upon an implied right of action contained in the Supremacy Clause." *Id*. at 327. The Court then proceeded to analyze plaintiffs' claims in equity under *Ex parte Young*. *Id.* at 327–31. Thus, *Armstrong* did nothing to alter the central holding in *Edmonson*—"that plaintiffs can challenge an allegedly preempted state law in federal court prior to enforcement by asserting a cause of action in equity." *Farmworker Ass'n of Fla., Inc. v. Moody*, No. 23-cv-22655, 2025 WL 1133682, at *4 (S.D. Fla. Apr. 17, 2025) (rejecting similar argument).

3

**J.A. 285**

*Safe Streets Alliance v. Hickenlooper*, on which Defendants rely, Resp. at 8–12, is not to the contrary. 859 F.3d 865 (10th Cir. 2017). Although the Tenth Circuit in *Safe Streets* interpreted *Armstrong* narrowly and held that *some* plaintiffs must vindicate a federal substantive right to invoke the court's equity powers, *id*. at 902–05, it explicitly excepted from its holding suits in equity under *Ex parte Young*. *Id*. at 892 n.5 ("preemption-based affirmative defenses to enforcement actions exist"); *id.* at 906 n.19 (recognizing suits in equity under *Ex parte Young*). *Safe Streets* underscored that a "court may issue an injunction upon finding the state *regulatory actions* preempted," "if an individual claims federal law immunizes him from state *regulation*." *See id.* at 906 n.19 (quoting *Armstrong*, 575 U.S. at 324, and *Ex parte Young*, 209 U.S. at 155-56); *Texas*, 97 F.4th at 309–10 (Oldham, J., dissenting) (recognizing suit in equity under *Ex parte Young* for those "directly affected by the regulations they sought to enjoin."); *Farmworker Ass'n of Fla., Inc. v. Moody*, 734 F.Supp.3d 1311, 1344 (S.D. Fla. 2024) (finding that private plaintiffs had suit in equity to challenge Florida law as preempted) ("*FWAF*"). That is exactly what Plaintiffs claim here: that federal immigration law immunizes them from prosecution under H.B. 4156. In other words, they are asserting their "federal right to be free from any other [entry or reentry] requirements," a right that Congress provided by pervasively regulating this domain. *Murphy v. NCAA*, 584 U.S. 453, 479 (2018). Thus, neither *Armstrong* nor *Safe Streets* bar their preemption suit in equity. *See CNSP, Inc. v. Webber*, No. 17-0355, 2020 WL 2745456, at *5-9 (D.N.M. May 27, 2020) (finding that neither *Armstrong* nor *Safe Streets* barred plaintiff's preemption claims in equity under *Ex parte Young*). In addition, Plaintiffs have a cause of action under § 1983 for their Commerce Clause claim. *Dennis v.*

*Higgins*, 498 U.S. 439, 446 (1991) ("the Commerce Clause confers rights, privileges, or immunities within the meaning of § 1983"). Defendants' argument to the contrary is meritless, and all of the cases they cite involve statutory—not constitutional—claims. Resp. at 14.

Defendants also argue that the INA impliedly displaces this equitable power because it criminalizes unlawful entry and reentry, thereby precluding equitable suits against *state* laws allegedly "targeting the same illegal conduct." Resp. at 12–13. That is wrong. The bar for displacing equitable relief is extremely high, *see Huie v. Bowen*, 788 F.2d 698, 704-05 (11th Cir. 1986) (collecting cases), and "the INA does not display either of the two aspects" that *Armstrong* found, when taken together, "established Congress's intent to foreclose equitable relief." *FWAF*, 2025 WL 1133682, at *5 (cleaned up) (quoting *Armstrong*, 575 U.S. at 328). The INA is not a statutory scheme designed for adjudicating challenges to preempted state statutes—much less one that Congress determined should be the "sole remedy." *Id.* (cleaned up). Nor does Plaintiffs' challenge to H.B. 4156 create a "judicially unadministrable" standard. *Id.* at *6; *id.* at *3–7 & n.6 (exhaustively rejecting this argument and collecting cases).[2]

---

[2] Defendants also contend that Plaintiffs have no statutory cause of action under the INA, Resp. at 10, 13, but Plaintiffs have never claimed that cause of action. *See Armstrong*, 575 U.S. at 331-32 (separately analyzing whether the Medicaid Act provided a "private right of action," and only after concluding that Congress had affirmatively displaced the normally-available equitable cause of action); *see also Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 434-35 (5th Cir. 2023) (plaintiffs have "a cause of action . . . at equity" to seek "relief on preemption grounds" even where the relevant federal statute "does not confer a private right") (internal quotation marks omitted); *Texas*, 97 F.4th at 277 (same).

Finally, Oklahoma argues that Plaintiffs cannot bring a preenforcement challenge to H.B. 4156 and must instead raise preemption as a defense in a criminal proceeding. Resp. 11–12. But Plaintiffs need not expose themselves to prosecution to challenge a preempted state law. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced"). Plaintiffs satisfy *Ex parte Young*'s exception to sovereign immunity as they seek prospective relief against Defendants, who are state officers, and who have "a demonstrated willingness" to "enforce" H.B. 4156. *Frank v. Lee*, 84 F.4th 1119, 1132 (10th Cir. 2023) (citation omitted); *see also Edmondson*, 594 F.3d at 760 (permitting preenforcement, preemption suit). Notably, Oklahoma does not contest that Defendants are state officers charged with enforcing H.B. 4156 and are willing to exercise that duty.

## B. Plaintiffs Have Standing.

This Court found that all Plaintiffs have standing, *see* TRO at 6–15, and Defendants' disagreements with that decision are unpersuasive. As this Court rightly concluded, and Defendants do not contest, Resp. at 16, their position that any unlawful presence "categorically precludes" standing would "broadly eviscerate standing in preemption challenges of parallel state laws." TRO at 8–9 (collecting cases). And even if Defendants' strained reading of *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) were correct—and it is not, TRO at 8—Plaintiffs' "presen[ce] in the United States

illegally" would not defeat their standing to challenge a *state* prosecution under a law that is preempted. Resp. at 15.

Plaintiffs Boe and Coe have also "made a clear showing of likely injury-in-fact" because they are "plainly" subject to prosecution under H.B. 4156, are not eligible for any of the law's defenses, and Defendants have not "disavowed enforcing H.B. 4156" against them. TRO at 11. Oklahoma does not contest this. Resp. at 17. And redressability is satisfied because an injunction against H.B. 4156 would protect Plaintiffs from being prosecuted under a preempted *state* law. That they may be prosecuted under *federal* law is irrelevant. *Cf.* Resp. at 17–18. The organizational plaintiffs also have standing because at least one member faces "a credible threat of prosecution," and, Defendants' inflammatory analogy notwithstanding, Resp. at 18, the interests they seek to protect "are germane to their organizational purposes" of "advocat[ing] for and protect[ing] the rights of immigrant communities." TRO at 13–14.

## II. Plaintiffs Are Likely to Succeed on the Merits.

### A. H.B. 4156 is Preempted.

Defendants offer nothing to disturb the Court's prior holding that "Plaintiffs are likely to succeed on their claims that H.B. 4156 is [both field and conflict] preempted."[3]

*See* TRO at 15, 18; *see also Oklahoma*, 739 F. Supp. 3d at 1002, 1004. They once again

---

[3] Because entry and removal are an area of dominant—indeed, exclusive—federal interest, and because of longstanding exhaustive federal regulation in this area, no presumption against preemption applies, *see* Resp. at 6; *United States v. Locke*, 529 U.S. 89, 90 (2000). And facial relief is appropriate, *cf.* Resp. at 5–6, because field preemption invalidates every application of H.B. 4156, and the law conflicts with federal law in every application: unilateral enforcement will happen every time H.B. 4156 is enforced.

assert that H.B. 4156 is not preempted because it "merely mirror[s] federal entry and reentry laws" and does not "regulate the removal of anyone from the United States." Resp. at 18–19. But "[w]here Congress occupies an entire field, . . . even complementary state regulation is impermissible," TRO at 16 (citing *Oklahoma*, 739 F.Supp. 3d at 999), and the expulsion of noncitizens from Oklahoma is an "impermissible intrusion into a federal domain." *Oklahoma*, 739 F.Supp. 3d at 1000 (citing *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012)). Nor does enforcement of H.B. 4156 "depend on federal cooperation." Resp. at 21; Ex. 2, at ¶ 8. "'[N]o coherent understanding of the term [cooperate] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government'"—which is precisely what H.B. 4156 allows. *Oklahoma*, 739 F. Supp. 3d 985, 1004 (quoting *Arizona*, 567 U.S. at 410). This "sweeping authorization for state officers to arrest, prosecute, and punish noncitizens" renders H.B. 4156 conflict preempted. TRO at 16. And *Kansas v. Garcia*, 589 U.S. 191 (2020), continues to be inapplicable because the "preemption analysis" does not shift "based on the enforcement priorities of a given administration." TRO at 17.

Defendants try again to get out from under the binding force of *Arizona* by asserting that the alien registration scheme is much more complex than the one regulating entry. *See* Resp. at 20–21. But the opposite is true. *Compare Padres Unidos de Tulsa v. Drummond*, No. CIV-24-526-J, ECF No. 15, at 2–3 (W.D. Okla. May 24, 2024) ("First PI Mot.") (collecting statutes regulating entry) *with* 8 U.S.C. §§ 1301–1306 (governing registration). Finally, Oklahoma's "invasion" argument, Resp. at 23, continues to be meritless and the

**J.A. 290**

Court should reject it again. TRO at 18–19 (concluding that recent presidential "proclamations do not sway the Court's reasoning" on this matter).

### B.  H.B. 4156 Violates the Commerce Clause.

This Court did not address Plaintiffs' Commerce Clause claim because it found "Plaintiffs are likely to prevail on their preemption claims," TRO at 18, and Defendants do not address it at all. Plaintiffs incorporate by reference the arguments made in their prior briefs that H.B. 4156 violates the Commerce Clause. *See* First PI Mot. at 19–22; *Padres Unidos*, No. CIV-24-511-J, ECF No. 28, at 7–9 (W.D. Okla. June 18, 2024); *Id.*, ECF No. 60, at 9–11; *Id.*, ECF No. 78, at 9–10.

### III.    Plaintiffs Satisfy the Remaining Preliminary Injunction Factors.

Plaintiffs satisfy the remaining factors for a preliminary injunction. TRO at 20 (citing *Little*, 607 F.3d at 1251). They "face the imminent threat of state-sanctioned arrest, prosecution, and punishment" and this "[u]nquestionably . . . constitutes irreparable harm justifying injunctive relief." *Id.* at 21 (collecting cases). The balance of harms and the public interest also "tilt in Plaintiffs' favor." *Id.* at 21, 22. "'[T]he burden on Defendants if they are . . . enjoined from enforcing the challenged [statute] is a continuation of the status quo,'" *id.* (quoting *Idaho*, 2025 WL 1237305, at *15), and they may utilize the "criminal code at their disposal to prosecute conduct . . . they argue flows from unauthorized presence." *Id.* at 22.

### IV.    Provisional Class Certification is Appropriate.

This Court provisionally certified, for purposes of preliminary injunction proceedings, an entry and reentry class and appointed Plaintiffs' counsel as counsel for the

classes. *See* TRO at 24–31. Defendants' objections to certification, *see* Resp. at 30-31, are without merit.

As an initial matter, Representative Plaintiffs have standing. *See* TRO at 12; *supra* Part I.B. Defendants once again argue that "firm numbers" are required for numerosity, Resp. at 31, but that is simply incorrect. "[T]here is no set formula to determine" numerosity, and it is satisfied where the class is "so numerous that joinder of all members is impracticable." TRO at 25 (quoting Fed. R. Civ. P. 23(a)(1)); *see also Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006)); *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) ("[T]he numerosity requirement is not a question of numbers.").

Nor are the classes too "amorphously described" to satisfy commonality. Resp. at 32. To the contrary, "members of both proposed classes face arrest, prosecution, and punishment under H.B. 4156," and the question of whether H.B. 4156 is preempted "presents a common issue of law that, if resolved in Plaintiffs' favor, would apply uniformly across the classes." TRO at 27. And contrary to what Oklahoma claims, Resp. at 32, the defenses contained in H.B. 4156 do not defeat typicality "where, as here, the claims arise from a uniform statutory scheme and rest on a shared preemption theory." TRO at 27. The Representative Plaintiffs cannot assert the affirmative defenses, *see id.* at 11, 13, and in any event someone eligible for an affirmative defense may nevertheless be arrested and detained under H.B. 4156.

Finally, Oklahoma's objection to adequacy, based on an alleged "risk" of "drawing federal attention and law enforcement to the scene" is as nonsensical as it is irrelevant.

**J.A. 292**

Resp. at 33. Adequacy is satisfied because there is no "conflict between the representatives and the classes they seek to represent," and "all Plaintiffs share a common interest in halting enforcement of H.B. 4156." TRO at 28–29.

## V.    Plaintiffs Should be Allowed to Proceed Under Pseudonyms.

"Exceptional circumstances" permit the use of pseudonyms here. TRO at 6. This case involves "matters of a highly sensitive and personal nature, real danger of physical harm," and "the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000). Defendants are wrong to suggest that granting pseudonymity "protect[s] federal lawbreakers from the federal consequences of their actions." Resp. at 26. Plaintiffs "may very well face removal or prosecution" under federal laws, and the Court's grant of pseudonymity "does not, and will not, interfere with that framework." TRO at 5.

Far from exposing them to mere "embarrass[ment]," Resp. at 26, disclosure of Plaintiffs' immigration status would reveal information of a "highly sensitive and personal nature." TRO at 5; *see also Lozano v. City of Hazleton*, 620 F.3d 170, 194–96 (3d Cir. 2010), *vacated on other grounds by* 563 U.S. 1030 (2011) (permitting noncitizens to sue under pseudonyms in preemption challenge to state law); Order Granting Motion to Proceed Under Pseudonym, *Iowa Migrant Movement for Just. v. Bird*, No. 4:24-cv-00161-SHL-SBJ (S.D. Iowa June 6, 2024), ECF No. 37. And Plaintiffs face a real threat of physical harm, both by private parties and through retaliatory federal enforcement. *See* Doe Mot., ECF No. 62 at 4–6. Oklahoma completely discounts this risk, effectively inviting this Court to throw up its hands even where "federal law enforcement would vindictively

target Plaintiffs." Resp. at 26. But Plaintiffs "should not be forced to choose between challenging H.B. 4156 and exposing themselves to federal authorities. To require them to litigate this matter under their real names would effectively place a target on their backs simply for seeking judicial review of a state law they claim—and this Court once found— is likely preempted." TRO at 5 (citing *Oklahoma*, 739 F. Supp. 3d at 997–1004).

Finally, to the extent that Oklahoma "will suffer prejudice if Plaintiffs are allowed to proceed pseudonymously," Resp. at 28, it has "suggested no reason to disbelieve any statement in the declarations relevant to the requirements of standing." *Speech First, Inc. v. Shrum*, 92 F.4th 947, 950 (10th Cir. 2024). Thus, "at this stage of the case," the Court was correct to "rely on the pleadings" to establish standing and grant pseudonymity. *Id.*[4] And Oklahoma cites no authority permitting use of "the Fugitive Disentitlement Doctrine as an affirmative defense" in a *preemption* challenge to a state law. *See Martin v. Mukasey*, 517 F.3d 1201, 1205 (10th Cir. 2008) (noting limited application in criminal and immigration appeals). Nor has the State put forth even a shred of evidence suggesting that Plaintiffs would be subject to the Doctrine. The Court should not reconsider its pseudonymity grant and expose Plaintiffs to the risk of harm and retaliation based on Oklahoma's unsupported assertions of prejudice.

---

[4] "At this stage it is enough to *allege* the facts establishing standing." *Speech First*, 92 F.4th at 950 n.1. At a later stage, should it be necessary, "the district court could verify the existence and status of the pseudonymous members through in camera review." *Id*. This would obviate Defendants' concerns about verifying Plaintiffs' identities for the purposes of standing, Resp. at 27–29, while protecting Plaintiffs from retaliation.

## CONCLUSION

The Court should grant a preliminary injunction barring the enforcement of H.B. 4156.

Dated this 29th of May, 2025

Respectfully submitted,

/s/ *Elissa Stiles*
Elissa Stiles (OK Bar. No. 34030)
RIVAS AND ASSOCIATES
P.O. Box 470348
Tulsa, OK 74147
T: (918) 419-0166
F: (918) 513-6724
*estiles@rivasassociates.com*

Noor Zafar*
Omar Jadwat*
Grace Choi*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION, IMMIGRANTS' RIGHTS
    PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
*nzafar@aclu.org*
*ojadwat@aclu.org*
*gchoi@aclu.org*

Spencer Amdur*
Oscar Sarabia Roman*
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION, IMMIGRANTS' RIGHTS
    PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
*samdur@aclu.org*
*osarabia@aclu.org*
*cwofsy@aclu.org*

Megan Lambert (OK Bar. No. 33216)
Devraat Awasthi (OK Bar. No. 35544)
AMERICAN CIVIL LIBERTIES UNION OF
    OKLAHOMA FOUNDATION
P.O. Box 13327
Oklahoma City, OK 73113
T: (405) 525-3831
*mlambert@acluok.org*
*dawasthi@acluok.org*

*Attorneys for Plaintiffs*
*\*Pro hac vice*

J.A. 295

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2025, I filed a true and correct copy of the foregoing

using the CM/ECF system, which will serve the filing on all counsel of record.

<u>*/s/ Elissa Stiles*</u>
Elissa Stiles

**J.A. 296**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

PADRES UNIDOS DE TULSA, et al.,     )
                                      )
            Plaintiffs,        )
                                        )
v.                                  )     Case No. CIV-24-511-J
                                        )
GENTNER DRUMMOND, et al.,      )
                                      )
            Defendants.     )

**<u>ORDER</u>**[1]

On May 20, 2025, after fairly substantial briefing, this Court temporarily restrained enforcement of Oklahoma House Bill 4156 (H.B. 4156),[2] which authorizes state officers to arrest, prosecute, and punish noncitizens who enter Oklahoma without authorization to enter the United States. *See Padres Unidos de Tulsa v. Drummond*, ___ F. Supp. 3d ___, No. CIV-24-511-J, 2025 WL 1444433, at *1–16 (W.D. Okla. May 20, 2025). In its 31-page ruling, the Court found that Plaintiffs had standing and were likely to prevail on their claims that H.B. 4156 is preempted. *See id.* This conclusion was hardly novel: in cases brought by both the federal government and private parties, "courts across the country have unanimously held that nearly identical state illegal entry and reentry laws . . . are likely preempted by federal immigration law governing noncitizen entry." *Fla. Immigrant Coal. v. Uthmeier*, ___ F. Supp. 3d ___, No. 25-21524-CV-WILLIAMS, 2025 WL 1423357, at *10 (S.D. Fla. Apr. 29, 2025) (collecting cases).

---

[1] All page citations in this Order refer to the Court's CM/ECF pagination.

[2] H.B. 4156 is codified at Okla. Stat. tit. 21, § 1795.

Now, 14 days later, the Court must consider whether a preliminary injunction is warranted. *See* (Pls.' Mot. for Inj.) [Doc. No. 60].[3]  Because the standard for a temporary restraining order is "essentially the same" as that for a preliminary injunction,[4] *People's Tr. Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018), one might wonder what has changed.  The answer is nothing.

Indeed, the Constitution still empowers Congress to "establish an uniform Rule of Naturalization."  U.S. Const. art. I, § 8, cl. 4.  Congress's "comprehensive framework regulating the entry, presence, and removal of noncitizens"[5] stands firmly intact.  *United States v. Oklahoma*, 739 F. Supp. 3d 985, 991 (W.D. Okla. 2024).  Any preemption challenge continues to turn on "Congress's intent," not the shifting enforcement priorities of presidential administrations. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 324 (2016) (internal quotation marks omitted). And this Court remains bound by the Supreme Court's instruction that "the power to control immigration—the entry, admission, and removal of noncitizens—*is exclusively a federal power*." *Oklahoma*, 739 F. Supp. 3d at 991 (emphasis added) (quoting *United States v. Texas*, 97 F.4th 268, 278–79 (5th Cir. 2024)); *see also Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.").  So consistent with this understanding and its ruling 14 days ago, the Court grants Plaintiffs a preliminary injunction enjoining Defendants from enforcing H.B. 4156.

---

[3] At the Court's direction, Defendants opposed the request for a preliminary injunction on May 27, 2025.  *See* (Defs.' Resp.) [Doc. No. 82].  Plaintiffs replied two days later.  *See* [Doc. No. 86].

[4] A party seeking a temporary restraining order or preliminary injunction must show "(1) a likelihood of success on the merits; (2) a likelihood that [he] will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in [his] favor; and (4) that the injunction is in the public interest."  *Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (internal quotation marks omitted).

[5] Congress enacted this statutory framework, the Immigration and Nationality Act (INA), in 1952.

2

J.A. 298

This conclusion does not overlook that a "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and internal quotation marks omitted); *see also Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (stressing that preliminary relief "is an extraordinary remedy, the exception rather than the rule" (internal quotation marks omitted)). It merely reflects that Plaintiffs have met that burden.

The Court does not aim to parrot its prior ruling. *See Padres Unidos*, 2025 WL 1444433, at *1–16. Instead, it addresses only the new arguments raised against preliminary relief and clarifies what the issuance of such relief does, and doesn't, mean. That discussion follows.

## I.    <u>Discussion</u>

### A.    Cause of Action

A plaintiff must assert a valid cause of action to obtain relief. *Davis v. Passman*, 442 U.S. 228, 236–41 (1979). At the threshold, Defendants argue that Plaintiffs lack a valid cause of action for the relief they seek. *See* Defs.' Resp. at 12–20. In doing so, they lean heavily on the Tenth Circuit's decision in *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017), which they argue broadly curtails a private party's ability to obtain injunctive relief on preemption grounds. *See* Defs.' Resp. at 15–18.

In *Hickenlooper*, two landowners and a nonprofit, citing the Supremacy Clause, sued to enjoin Colorado's state-authorized marijuana regime on the ground that it sanctioned conduct illegal under, and thus preempted by, the federal Controlled Substances Act (CSA). 859 F.3d at 876. These plaintiffs were not themselves subject to any regulation under the state regime and instead alleged only incidental injuries—such as property damage and emotional harms—

3

stemming from its implementation. *See id.* at 896 ("The [landowners] seek . . . far-flung relief even though their only alleged injuries concern property damage and emotional harms."). Effectively, they sought to wield the CSA's preemptive force as a basis for dismantling a state framework that, while not regulating them directly, facilitated federally unlawful conduct. *See id.* at 895 (observing the plaintiffs' attempt "to enforce the CSA's preemptive effects . . . so long as they have been injured—in any way—by official conduct that also violates a federal statute" (emphasis omitted)).

But as the Tenth Circuit explained, "the Supremacy Clause is not the source of any federal rights" and "certainly does not create a cause of action." *Id.* at 900 (internal quotation marks omitted) (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015)). Nor does it "give *affected* parties a constitutional (and hence congressionally unalterable) *right to enforce federal law* against the States." *Id.* (emphasis in original) (quoting *Armstrong*, 575 U.S. at 325). To enforce a federal statute, a plaintiff must identify "a federal right of his or her own to vindicate under the statute at issue." *Id.* at 902 (internal quotation marks and alterations omitted). And because the plaintiffs had no such substantive rights in the CSA to vindicate, they could not invoke it to remedy their injuries. *See id.* at 877, 901–03.

Importantly, though, *Hickenlooper* did not purport to foreclose the availability of an equitable cause of action under *Ex parte Young*.[6] In addressing a different subset of plaintiffs in the case, *Hickenlooper* stressed that they were not seeking to "enjoin Colorado from *enforcing* [anything] *against them*." *Id.* at 906 (emphasis in original). Rather, they targeted the broader

---

[6] *Ex parte Young* represents an equitable exception to Eleventh Amendment sovereign immunity. 209 U.S. 123, 155–56 (1908). The doctrine allows a plaintiff to sue a state official, in their official capacity, in seeking to enjoin enforcement of a state law that conflicts with federal law. *See id.* at 159–60.

implementation of the regime itself.  *See id.*  *Hickenlooper* then reaffirmed that "[o]f course, a 'court may not convict a criminal defendant of violating a state law that federal law prohibits,'" and reiterated that "if an individual claims federal law immunizes him from state *regulation*, the court may issue an injunction upon finding the state *regulatory actions* preempted."[7]  *Id.* at 906 n.19 (emphasis in original) (quoting *Armstrong*, 575 U.S. at 326).  In such cases, *Hickenlooper* confirmed, "court[s] need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"  *Id.* (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645–46 (2002)).  This is precisely what Plaintiffs assert and seek here.  *See* [Doc. No. 64] at 2–3, 7–12, 15.

In short, while *Hickenlooper* reaffirmed that the Supremacy Clause is not self-executing, it did not displace the equitable authority of federal courts to issue an injunction when a plaintiff shows "federal law immunizes him from state *regulation*."  859 F.3d at 906 n.19 (emphasis in original) (quoting *Armstrong*, 575 U.S. at 326); *see also CNSP, Inc. v. Webber*, No. 17-0355 KG/SCY, 2020 WL 2745456, at *8 (D.N.M. May 27, 2020) ("[*Hickenlooper*] emphasized the plaintiffs could not maintain their preemption claims because they did not seek to enjoin the state

---

[7] Defendants cite additional language from *Hickenlooper* "indicat[ing] that 'immunizes' means that the person has federal 'rights' that he cannot be forced to give up through a threat of state prosecution."  Defs.' Resp. at 17.  They then contend that Plaintiffs' equitable claims fail because it is "illogical" to conclude that the INA "grants violators of its criminal str[u]ctures any sort of immunity or substantive 'rights.'"  *Id.*  But this argument rests on a flawed premise that a plaintiff seeking to enjoin state officials from enforcing a preempted law must first identify a federal statutory right of their own.  On the contrary, the Supreme Court has permitted an *Ex parte Young* claim where plaintiffs alleged only that a state's regulatory actions violate federal law—preemption included.  *See Verizon Md.*, 535 U.S. at 645 ("The prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies our straightforward inquiry." (internal quotation marks omitted)).  Naturally, Defendants may dispute whether H.B. 4156 actually contravenes federal law.  "But the inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim."  *Verizon Md.*, 535 U.S. at 646.

from enforcing the state marijuana laws '*against them*.' The Tenth Circuit contrasted the plaintiffs' claims with claims brought pursuant to *Ex parte Young*, explaining 'if an individual claims federal law immunizes him from state *regulation*, the court may issue an injunction upon finding the state *regulatory actions* preempted.'" (emphasis in original) (internal citation omitted) (quoting *Hickenlooper*, 859 F.3d at 906 n.19)); *cf. Verizon Md.*, 535 U.S. at 638–48 (permitting *Ex parte Young* suit to enjoin state commission order allegedly preempted by federal law); *Farmworker Assoc. of Fla., Inc. v. Uthmeier*, No. 23-CV-22655-RAR, 2025 WL 1133682, at *5 (S.D. Fla. Apr. 17, 2025) ("Nothing in *Armstrong* interferes with the[] 'ability to sue to enjoin unconstitutional actions by state and federal officers'—an ability that, as *Armstrong* made clear, is 'the creation of courts of equity,' and which 'reflects a long history of judicial review of illegal executive action, tracing back to England.'" (quoting *Armstrong*, 575 U.S. at 327)).

Now this is not to say that this equitable authority is unbounded. As the Supreme Court has explained, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327. "Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." *Id.* at 327–28 (internal quotation marks omitted).

But the Court discerns no such "'intent to foreclose' equitable relief" here. *Id.* at 328 (quoting *Verizon Md.*, 535 U.S. at 647). Defendants point to three provisions of the INA as evidence of such intent, starting with 8 U.S.C. § 1231(a)(4)(D). *See* Defs.' Resp. at 19. That provision states that where a noncitizen is imprisoned on a state or federal crime and subject to an order of removal but has not yet completed their sentence, "[n]o cause or claim may be asserted . . . against any official of the United States or of any State to compel the release, removal, or consideration for release or removal of any alien." 8 U.S.C. § 1231(a)(4)(D). In other words,

Congress made clear that noncitizens serving criminal sentences may not sue to compel their release from custody or removal from the United States before completing their sentence. Plaintiffs make no such request here. And nothing about § 1231(a)(4)(D)'s contextual placement suggests that Congress intended to foreclose a preemption challenge to a state immigration law.

Second, in describing the "procedure" for asylum proceedings, 8 U.S.C. § 1158(d)(7) states that "[n]othing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person." Plaintiffs' request here is in no way tied to the asylum procedures set out in subsection (d).

Third, 8 U.S.C. § 1182(a)(7)(A)(i) renders "inadmissible" any noncitizen who lacks "valid entry document[s]." Under 8 U.S.C. § 1225(b)(1)(A), certain "inadmissible" noncitizens—namely, those "arriving" at the border or those not admitted or paroled and who cannot affirmatively show two years of continuous presence in the United States—may be summarily removed by federal immigration officers "without further hearing or review" unless they indicate an intent to apply for asylum or express a fear of persecution. Again, it's difficult to follow how Congress's authorization of expedited removal proceedings in limited circumstances reflects an intent to foreclose the preemption challenge at issue here.

And the same is true with respect to Defendants' suggestion that Congress has impliedly foreclosed equitable challenges to state laws that criminalize conduct already criminalized under federal law. *See* Defs.' Resp. at 18–19. To be sure, they do not cite a single case adopting that view in this context. And for good reason: courts have routinely entertained equitable claims against state legislation mirroring federal immigration laws. *See, e.g.*, *Texas*, 97 F.4th at 275–77

7

(entertaining suit in equity challenging state immigration law closely mirroring federal unlawful entry and reentry provisions); *Fla. Immigrant Coal.*, 2025 WL 1423357, at *1–22 (same).

In short, the Court concludes that Plaintiffs have stated a cognizable claim in equity for the relief they seek.

### B.    Standing

The Court has already found that Plaintiffs have Article III standing to seek preliminary relief. *See Padres Unidos*, 2025 WL 1444433, at *3–8. And though that ruling arose in the context of a temporary restraining order, the Court applied the same standard that governs preliminary injunctions.[8] *See id.* at *3. That discussion need not be repeated here.

Even so, one argument against standing warrants closer scrutiny. Defendants argue again that Plaintiffs lack a "legally protected interest."[9] Defs.' Resp. at 20–24. In doing so, they rely on *Initiative and Referendum Institute v. Walker*'s observation that "a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not legally protected." 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc) (internal quotation marks

---

[8] Article III of the Constitution limits federal courts' jurisdiction by requiring that litigants have standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). "Standing must be substantiated 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). At the preliminary injunction stage, this means that "at least one" plaintiff "make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A plaintiff "must establish three elements [for standing]: an injury-in-fact, causation, and redressability." *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 973 (10th Cir. 2020) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007)).

[9] To establish the first element of standing, an injury-in-fact, "a plaintiff must show that they have suffered or likely will suffer 'an invasion of a *legally protected interest*' that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical.'" *Rocky Mountain Gun*, 121 F.4th at 109 (emphasis added) (quoting *Lujan*, 504 U.S. at 560).

omitted). From that, Defendants gather that Plaintiffs lack a legally protected interest because their presence in the United States is unauthorized under federal law. *See* Defs.' Resp. at 20–24.

*Walker* involved a First Amendment challenge to a Utah constitutional provision requiring a supermajority for certain ballot initiatives. *Walker*, 450 F.3d at 1085. In addressing standing, the Tenth Circuit offered several illustrative examples of asserted interests that are not "legally protected." *Id.* at 1093. Relevant here, it quoted a federal practice treatise for the proposition that "a person complaining that government action will make his *criminal* activity more difficult lacks standing because his interest is not 'legally protected.'" *Id.* (emphasis added) (quoting 3 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, *Federal Practice and Procedure* § 3531.4, at 830 (2d ed. Supp. 2005)). *Walker* offered no commentary on this general statement, nor did it elaborate on how or when such reasoning applies. *See id.* And understandably so: *Walker* concerned an intent to engage in political advocacy, not criminal conduct. *See id.* at 1098.

This Court has already expressed concern about the implications of Defendants' reading of *Walker* in the context of preemption challenges. *See Padres Unidos*, 2025 WL 1444433, at *4. But even setting that concern aside, *Walker*'s general principle appears to address a different circumstance altogether. As the Supreme Court observed, "it is not a [federal] *crime* for a removable alien to remain present in the United States." *Arizona*, 567 U.S. at 407 (emphasis added). And removal proceedings are civil, *not criminal*, in nature. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984). So when Plaintiffs seek to prevent enforcement of a state law that imposes penalties for unauthorized presence, they are surely not attempting to make federal "criminal activity" any easier. *Walker*, 450 F.3d at 1093. Put differently, they do not ask this Court

9

**J.A. 305**

to bless prospective entry or reentry into the country—conduct that *is* criminalized under federal law. *See* 8 U.S.C. §§ 1325(a), 1326(a).

To be clear, none of this condones unauthorized presence or past criminal entries. The Court said as much from the outset. *See Padres Unidos*, 2025 WL 1444433, at *3 ("To be clear, the Court is not asked to enjoin enforcement of federal immigration law. [Plaintiffs], if discovered in Oklahoma, may very well face removal or prosecution under the comprehensive federal immigration regime that Congress established."). The only question in this limited context is whether Plaintiffs have standing to sue—and whether *Walker*'s general principle applies. Perhaps, as Defendants suggest, *Walker* stands for the sweeping proposition that all "lawbreakers' lack standing. Defs.' Resp. at 23. But absent any elaboration from *Walker* itself, the Court must take the quoted statement at face value. And as written, it does not apply.

For these reasons and those previously set out, the Court finds that Plaintiffs have standing to seek preliminary relief.

## C.    Likelihood of Success on the Merits

In two cases now[10]—one brought by the federal government and this one by private parties—the Court has found that the challengers are likely to prevail on their claims that H.B.

---

[10] In their response, Defendants suggest that the Court has overlooked the fact that Plaintiffs bring a facial challenge to H.B. 4156. *See* Defs.' Resp. at 11. To be sure, a facial challenge "is a head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (brackets and internal quotation marks omitted). And the Supreme Court has indeed "made facial challenges hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). But still, the fact that there could be "murderers" and "rapists" prosecuted under H.B. 4156 does not defeat a facial challenge. Defs.' Resp. at 12. The question is not whether those individuals could be prosecuted for other crimes, but whether H.B. 4156's regulation of *immigration* conflicts with federal law. Further, to the extent Defendants maintain that Article I, Section 10, Clause 3 (the State War Clause) of the Constitution insulates H.B. 4156 from a facial challenge, the Court has already found that argument unpersuasive. *See Padres Unidos*, 2025 WL 1444433, at *10 ("The Court's position then and now . . . is that the 'historical and constitutional context' of the State War

10

J.A. 306

4156 is preempted.[11]  *See Oklahoma*, 739 F. Supp. 3d at 997–1004; *Padres Unidos*, 2025 WL 1444433, at *8–9.  In granting the temporary restraining order in this case, the Court was unconvinced that the federal government's newfound "greenlight[ing]" of H.B. 4156 weakened Plaintiffs' position.  *Padres Unidos*, 2025 WL 1444433, at *8.  That is because, again, "*Congress's intent—not the shifting enforcement priorities of presidential administrations—controls the preemption inquiry*."  *Id.* (emphasis in original).  And applying that inquiry in light of *Arizona*,[12] the Court concluded that "Congress's preemptive intent could not be clearer."  *Id.*  This conclusion, again, is no outlier.  *See Fla. Immigrant Coal.*, 2025 WL 1423357, at *10 ("[C]ourts across the country have unanimously held that nearly identical state illegal entry and reentry laws recently

---

Clause does not support its use as a defense for legislation like H.B. 4156." (quoting *Oklahoma*, 739 F. Supp. 3d at 1005)).

[11] Federal law can preempt—that is, invalidate—state law either expressly or implicitly.  *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1241 (10th Cir. 2011).  Implied preemption, the sole kind of preemption at issue in this case, includes field preemption and conflict preemption.  *Id.*  Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Conflict preemption, on the other hand, can occur in one of two ways: "where compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (internal quotation marks and citations omitted).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

[12] In *Arizona*, the Supreme Court held that most provisions of S.B. 1070, Arizona's attempt to regulate immigration, were preempted.  567 U.S. at 400–10.  "While making clear that the problems posed to the States by illegal immigration must not be underestimated, the Supreme Court nonetheless constrained the state legislation that it concluded impermissibly intruded into areas of immigration regulation."  *Oklahoma*, 739 F. Supp. 3d at 994 (brackets, internal citation, and quotation marks omitted).  This Court has repeatedly recognized that "*Arizona*'s logic . . . naturally extend[s]" to H.B. 4156.  *Padres Unidos*, 2025 WL 1444433, at *9 (alterations in original) (quoting *Oklahoma*, 739 F. Supp. 3d at 998).

enacted are likely preempted by federal immigration law governing noncitizen entry." (collecting cases)).

Defendants, as they have before, urge that *Kansas v. Garcia*, 589 U.S. 191 (2020), not *Arizona*, should guide the Court's preemption inquiry. *See* Defs.' Resp. at 24–28. In *Garcia*, three noncitizens used another person's Social Security number on tax-withholding forms when securing employment. 589 U.S. at 195. Following their convictions under Kansas statutes for identity theft and making false information, they argued that the laws were preempted by the Immigration Reform and Control Act of 1986 (IRCA) as applied to their conduct. *See id.* They raised both field and conflict preemption claims. *See id.* at 208–13.

As to field preemption, the Supreme Court found the Kansas statutes "*fundamentally unrelated*" to any field occupied by Congress. *Id.* at 208 (emphasis in original). It explained that IRCA's "employment verification system is designed to prevent the employment of unauthorized aliens, whereas tax-withholding forms help to enforce income tax laws." *Id.* at 208–09. Moreover, "using another person's Social Security number on tax forms threatens harm that has *no connection with immigration law*." *Id.* at 209 (emphasis added).

Turning to conflict preemption, the Supreme Court held that the limited overlap between the Kansas statutes and federal laws prohibiting similar conduct did not come close to establishing preemption. *See id.* at 211 ("The mere fact that state laws like the Kansas provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption."). *Garcia* warned that "[o]ur federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap," and stressed that "there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap." *Id.* at 212. And to the extent state prosecutions might disrupt federal enforcement

12

**J.A. 308**

priorities, it reminded that "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Id.* (quoting U.S. Const. art. VI, cl. 2).

But, of course, this Court has never suggested that minimal overlap alone suffices for preemption. In finding likely field preemption days ago, the Court explained that there is "strong support for the conclusion that Congress . . . legislated . . . comprehensively in the field of noncitizen entry and reentry." *Padres Unidos*, 2025 WL 1444433, at *9 (quoting *Oklahoma*, 739 F. Supp. 3d at 999); *see also Oklahoma*, 739 F. Supp. 3d at 1000 ("[T]here is strong evidence Congress intended to occupy the field for *any decision* related to noncitizen removal." (alterations in original) (quoting *Texas*, 97 F.4th at 285)). "And applying the Supreme Court's instruction that '[w]here Congress occupies an entire field, . . . even complimentary state regulation is impermissible,' it concluded that 'Oklahoma's attempt to parallel federal law must fail.'" *Padres Unidos*, 2025 WL 1444433, at *9 (quoting *Oklahoma*, 739 F. Supp. 3d at 999).

In finding likely conflict preemption, the Court likewise "observed that '[f]ederal law specifies limited circumstances in which state officers may perform the functions of an immigration officer.'" *Id.* (quoting *Oklahoma*, 739 F. Supp. 3d at 1003). And it explained that "H.B. 4156's sweeping authorization for state officers to arrest, prosecute, and punish noncitizens . . . conflicted with the 'system Congress created.'" *Id.* (quoting *Oklahoma*, 739 F. Supp. 3d at 1003).

To be sure, the Court's findings were influenced by the broader implications surrounding immigration policy—such as "federal enforcement discretion and immigration considerations . . . like foreign policy, resource allocation, and humanitarian concerns." *Id.* But that is entirely consistent with Supreme Court precedent. In assessing the preemption of several provisions of a

state immigration law in *Arizona*, the Supreme Court engaged in "extensive discussion" of the same longstanding considerations. *See Oklahoma*, 739 F. Supp. 3d at 1001 (citing *Arizona*, 567 U.S. at 395, 397). In the end, that discussion was "not an invitation for preemption analysis to shift based on the enforcement priorities of a given administration," but rather an explanation for why, given the magnitude of immigration regulation, Congress intended "to make immigration regulation exclusively federal." *Padres Unidos*, 2025 WL 1444433, at *9; *see also Biden v. Texas*, 597 U.S. 785, 815 (2022) (Kavanaugh, J., concurring) ("Because the immigration statutes afford substantial discretion to the Executive, different Presidents may exercise that discretion differently. That is Administrative Law 101.").

And *Arizona* remains binding on this Court. Surely it cannot be said that *Garcia*'s rejection of enforcement-priority-based preemption in a case having "no connection with immigration law," *Garcia*, 589 U.S. at 209, casts doubt on *Arizona*'s thorough examination of these and other concerns in a case—like this one—that touches so directly on immigration regulation, *see Oklahoma*, 739 F. Supp. 3d at 1002 ("Sensitive matters of immigration policy 'must be made with one voice.'" (quoting *Arizona*, 567 U.S. at 409)).

So again, for these reasons and consistent with its prior rulings, the Court finds that Plaintiffs are likely to prevail on their claims that H.B. 4156 is preempted.[13]

### D.    Pseudonymity

In granting the temporary restraining order 14 days ago, the Court allowed Plaintiffs Barbara Boe and Christopher Coe to proceed under their designated pseudonyms. *See Padres*

---

[13] The Court likewise finds, consistent with its ruling 14 days ago, that Plaintiffs face a likelihood of irreparable harm absent preliminary relief and that the balancing the harms and public interest tilt in their favor. *See Padres Unidos*, 2025 WL 1444433, at *10–11.

14

J.A. 310

*Unidos*, 2025 WL 1444433, at *2–3.  Defendants now ask the Court to reconsider that ruling.  *See* Defs. Resp. at 29–36.

"Proceeding under a pseudonym in federal court is, by all accounts, 'an unusual procedure.'"  *Femedeer v. Haun*, 227 F.3d 1244, 1246 (10th Cir. 2000) (quoting *M.M. v. Zavaras*, 139 F.3d 798, 800 (10th Cir. 1998)).  There is no "specific statute or rule supporting the practice," and "the Federal Rules of Civil Procedure mandate that all pleadings contain the name of the parties." *Id.*

Still, a plaintiff may be permitted to proceed under a pseudonym in "exceptional cases." *Id.* (quoting *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)).  While "[t]he risk that a plaintiff may suffer some embarrassment is not enough," pseudonym status may be warranted in "cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *Id.* (quoting *Doe*, 951 F.2d at 324).  Though pseudonymity is not the norm, "there is a long tradition in the federal courts of plaintiffs bringing suit under an alias." *Speech First, Inc. v. Shrum*, 92 F.4th 947, 950 (10th Cir. 2024).  "The decision whether to allow litigation by pseudonym is left to the Court's discretion." *Doe v. Priority Background Sols., Inc.*, No. 24-CV-337-JFH-SH, 2024 WL 4564534, at *1 (N.D. Okla. Oct. 24, 2024) (citing *Zavaras*, 139 F.3d at 802).

The Court previously found that Boe and Coe presented with "exceptional" circumstances warranting pseudonymity.  Requiring them to litigate under their real names, the Court explained, "would effectively place a target on their backs simply for seeking judicial review of a state law they claim—and this Court once found—is likely preempted." *Padres Unidos*, 2025 WL 1444433, at *3 (citing *Oklahoma*, 739 F. Supp. 3d at 997–1004).  That dilemma, tied directly to their immigration status, falls neatly within the category of "matters of a highly sensitive and personal

nature" and thus qualifies as an "exceptional" circumstance. *Femedeer*, 227 F.3d at 1246 (internal quotation marks omitted). The Court sees no reason to depart from that position.

Nor do Defendants' mischaracterizations of the Court's ruling move the needle. As they see it, "[i]t is entirely inappropriate for a federal court to protect federal lawbreakers from the federal consequences of their actions." Defs.' Resp. at 32. But the Court was clear: its ruling was limited to pseudonymity and did not insulate Plaintiffs from "removal or prosecution under the comprehensive federal immigration regime that Congress established." *Padres Unidos*, 2025 WL 1444433, at *3. After all, this case concerns a state immigration law, and the federal government stands in no better—or worse—position to prosecute or remove Plaintiffs for federal immigration violations by virtue of their pseudonymity.

Finally, Defendants' speculative concerns about standing do not outweigh the showing for pseudonymity. Defendants suggest that Boe and Coe may be deported or leave Oklahoma during this litigation. *See* Defs.' Resp. at 33–34. And if their true names remain undisclosed, Defendants argue, neither they nor the Court would be in any position to assess whether the case has become moot.

The Court remains unmoved. Boe and Coe have each lived in the United States for over a decade. *See* Pls.' Mot. for Inj., Exs. 1–2. And while nothing compels them to remain in Oklahoma during this case, they express no desire to leave. *See id.* On the contrary, their desire to stay is a driving reason they filed suit. *See id.*

In sum, the Court sees no reason to revisit its conclusion that this case presents "exceptional" circumstances permitting the use of pseudonyms.[14]

---

[14] Nor does the Court find any reason to revisit its *conditional* certification, for purposes of preliminary relief, of the (1) "Entry Class" and (2) "Reentry Class." *See Padres Unidos*, 2025 WL

## II.    <u>**Conclusion**</u>

As this Court has said before, nothing here today "make[s] light of the concerns Defendants raise." *Padres Unidos*, 2025 WL 1444433, at *3.    Oklahoma, now as then, "may have understandable frustrations with the problems caused by illegal immigration." *Oklahoma*, 739 F. Supp. 3d at 1007 (quoting *Arizona*, 567 U.S. at 416).

Nor, lest it need repeating, does this ruling shield those who violate federal immigration law from the consequences of their actions.    The federal government retains, as it always has, "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394.    And noncitizens who violate federal immigration law—whether in Oklahoma or elsewhere—remain subject to that authority, if and when the federal government chooses to act.

At its core, indeed, this ruling changes little at all.    States, like Oklahoma, remain free to prosecute noncitizens and citizens alike for crimes they maintain flow from unlawful immigration. And the federal government, as the Supreme Court has held "[f]or nearly 150 years," retains its "*exclusive*[]" power to control immigration. *Oklahoma*, 739 F. Supp. 3d at 991 (emphasis in original).

In the end, that is why H.B. 4156 must fail—not to excuse unlawful presence or shield criminal conduct, but because it is what the Constitution demands.

For these reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction [Doc. No. 60].    Pending further proceedings, Defendants—along with their officers, agents, servants, employees, attorneys, and any person acting in concert or participation with them—are hereby preliminarily enjoined from enforcing H.B. 4156.    This injunction applies to the following classes:

---

1444433, at *13 (conditionally certifying classes upon satisfaction of Federal Rules of Civil Procedure 23(a) and 23(b)(2)).

(1) the Entry Class, consisting of all noncitizens subject to H.B. 4156's "Impermissible Occupation" offense under Okla. Stat. tit. 21, § 1795(C); and (2) the Reentry Class, consisting of all noncitizens subject to H.B. 4156's separate felony offense for "enter[ing], attempt[ing] to enter, or [being] at any time found in Oklahoma" after having been "denied admission, excluded, deported, or removed, or ha[ving] departed the United States while an order of exclusion, deportation, or removal is outstanding" under Okla. Stat. tit. 21, § 1795(D).

Plaintiffs shall post a bond of $17.87 as security. *See* Fed. R. Civ. P. 65(c).

IT IS SO ORDERED this 3rd day of June, 2025.

_____
BERNARD M. JONES
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

PADRES UNIDOS DE TULSA, *et al.*,

*Plaintiffs,*

v.

GENTNER DRUMMOND, *et al.*,

*Defendants.*

Case No:    CIV-24-511-J

## NOTICE OF APPEAL

Notice is hereby given that Gentner Drummond, in his official capacity as Attorney General of Oklahoma; Tim Tipton, in his official capacity as Commissioner of Public Safety for the Oklahoma Department of Public Safety; Vicki Behenna, in her official capacity as District Attorney of Oklahoma County; and Steve Kunzweiler, in his official capacity as District Attorney of Tulsa County, Defendants, in the above-named case, hereby appeal to the United States Court of Appeals for the Tenth Circuit from the Order entered in this action on June 3, 2025, at Dkt. No. 87.

Dated this 4th day of June, 2024.

Respectfully submitted,

s/ *Cullen D. Sweeney*

GARRY M. GASKINS, II, OBA # 20212
  *Solicitor General*
ZACH WEST, OBA # 30768
  *Director of Special Litigation*
CULLEN D. SWEENEY, OBA # 30269
  *Assistant Solicitor General*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Cullen.Sweeney@oag.ok.gov

*Counsel for Defendants*