No. 25-6080

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————

PADRES UNIDOS DE TULSA, et al.,

*Plaintiffs-Appellees*,

v.

GENTNER DRUMMOND, in his official capacity as
Attorney General of Oklahoma, et al.,

*Defendants-Appellants.*

———————————

On appeal from the United States District Court
for the Western District of Oklahoma
No. 5:24-cv-511 (Jones, J.)

———————————

**BRIEF OF THE AMERICAN IMMIGRATION LAWYERS ASSOCIATION
AS *AMICUS CURIAE* SUPPORTING APPELLEES AND AFFIRMANCE**

———————————

Jonathan Weinberg
Wayne State University Law School
471 West Palmer Street
Detroit, MI 48202
weinberg@wayne.edu
(313) 577-4015

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and 29(a)(4)(A), *amicus curiae* the American Immigration Lawyers Association states that it has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

/s/ Jonathan Weinberg
Jonathan Weinberg
weinberg@wayne.edu
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE .......................................................................... 1

STATEMENT OF THE CASE ................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 3

ARGUMENT ......................................................................................................... 8

I.    Oklahoma's "lawful presence" defense has no basis in federal law. ...................... 8

II.   H.B. 4156 criminalizes the presence of large classes of people whom federal law permits to remain in the country .............................................. 12

    A. H.B. 4156 criminalizes the presence of people in removal proceedings with valid claims for relief from removal, including cancellation of removal. ................................................................. 13

    B. H.B. 4156 criminalizes the presence of victims of crime, domestic violence survivors, and juveniles with pending meritorious federal immigration applications. ................................................. 14

    C. H.B. 4156 criminalizes the presence of people with meritorious claims for humanitarian relief. ............................................. 19

    D. H.B. 4156 criminalizes the presence of people with meritorious TPS applications. ............................................................... 20

    E. H.B. 4156 criminalizes the presence of people who would have meritorious claims for relief from removal, but who have not been placed in proceedings. ..................................................... 21

III.  Oklahoma's law broadly conflicts with the federal government's discretion over immigration enforcement. ............................................... 23

IV.   Oklahoma's law is not saved by the fact that it proposes to expel noncitizens only from the state and not from the country. .................... 24

CONCLUSION ................................................................................................... 26

CERTIFICATES OF COMPLIANCE AND DIGITAL SUBMISSION .................. 27

CERTIFICATE OF SERVICE .............................................................................. 28

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States,*
    567 U.S. 387 (2012) ........................................................... 7, 11, 23, 24

*City of Hazleton v. Lozano,*
    563 U.S. 1030 (2011) ..................................................................... 25

*Edwards v. California,*
    314 U.S. 160 (1941) ........................................................................ 25

*Estrada v. Becker,*
    917 F.3d 1298 (11th Cir. 2019) ..................................................... 9

*Lok v. INS,*
    548 F.2d 37 (2d Cir. 1977) ............................................................ 8

*Lozano v. City of Hazleton,*
    620 F.3d 170 (3d Cir. 2010) ......................................................... 25

*Plyler v. Doe,*
    457 U.S. 202 (1982) ........................................................................ 4

*Sac & Fox Nation of Missouri v. Norton,*
    240 F.3d 1250 (10th Cir. 2001) ................................................... 11

*Singh v. Gonzales,*
    499 F.3d 969 (9th Cir. 2007) ......................................................... 8

*Texas v. United States,*
    126 F.4th 392 (5th Cir. 2025) ....................................................... 9

*United States v. Alabama,*
    691 F.3d 1269 (11th Cir. 2012) ................................................... 25

*United States v. South Carolina,*
    720 F.3d 518 (4th Cir. 2013) ....................................................... 24

*Williams v. Taylor,*
    529 U.S. 362 (2000) ...................................................................... 10

**Statutes and Regulations**

8 C.F.R. § 1003.18 ................................................................. 22

8 C.F.R. § 204.11 .................................................................. 17

8 C.F.R. § 208.16 .................................................................. 20

8 C.F.R. § 212.16 .................................................................. 16

8 C.F.R. § 212.17(b)(1) ........................................................ 15

8 C.F.R. § 212.18 .................................................................. 16

8 C.F.R. § 214.11(d)(9)(i) ..................................................... 16

8 C.F.R. § 214.14(c)(5)(i) ..................................................... 15

8 C.F.R. § 245.24(b)(11) ...................................................... 15

8 C.F.R. §§ 1208.16-1208.18 ................................................. 4

28 C.F.R. § 1100.35 ............................................................... 8

8 U.S.C. § 1101(a)(15)(T) ................................................ 4, 15

8 U.S.C. § 1101(a)(15)(U) ...................................................... 4

8 U.S.C. § 1101(a)(27)(J) ................................................. 4, 17

8 U.S.C. § 1153(b)(4) ........................................................... 18

8 U.S.C. § 1154(a)(1)(C) ........................................................ 4

8 U.S.C. § 1154(a)(1)(D)(v) ................................................... 4

8 U.S.C. § 1158 ................................................................. 4, 20

8 U.S.C. § 1182 (d)(13) ........................................................ 16

8 U.S.C. § 1182(a)(3)(E) ...................................................... 15

8 U.S.C. § 1182(a)(9)(A) .................................................. 12, 18

8 U.S.C. § 1182(a)(9)(C) ...................................................... 18

8 U.S.C. § 1182(a)(9)(C)(iii) ................................................. 16

8 U.S.C. § 1182(d)(14) ................................................................. 15

8 U.S.C. § 1182(d)(3)(A)(ii) ........................................................ 16

8 U.S.C. § 1187 ............................................................................ 12

8 U.S.C. § 1225(b)(1)(A)(ii) ........................................................ 20

8 U.S.C. § 1229a(a)(1) ................................................................... 2

8 U.S.C. § 1229a(c)(7)(C)(iv) ...................................................... 17

8 U.S.C. § 1229b ......................................................................... 22

8 U.S.C. § 1229b(b)(2) ................................................................ 17

8 U.S.C. § 1231(b)(3) ...................................................... 4, 20, 22

8 U.S.C. § 1254a(a)(4) ................................................................. 20

8 U.S.C. § 1255(h) ...................................................................... 18

8 U.S.C. § 1326 ........................................................................ 6, 7

8 U.S.C. §§ 1154(a)(1)(A)(iii)-(vii) ............................................... 4

8 U.S.C. §§ 1154(a)(1)(B)(ii)-(v) .................................................. 4

8 U.S.C. §§ 1254a(a)-(c) ............................................................. 21

8 U.S.C. §§ 1325 ........................................................................... 7

8 U.S.C. 1229b(b) ................................................................... 4, 13

42 U.S.C.A. § 18081 .............................................................. 10, 11

Okla. H.B. 4156 ...................................... 1-3, 5, 8-14, 18-21, 24

Okla. H.B. 4156 § 2(F)(1)(b) ...................................................... 10

Okla. H.B. 4156 § 2(F)(2) ........................................................... 10

Okla. H.B. 4156, § 2(C) ................................................................ 2

Okla. H.B. 4156, § 2(C)(1) ..................................................... 2, 11

Okla. H.B. 4156, § 2(C)(2) ................................................................2, 11

Okla. H.B. 4156, § 2(D) .......................................................................... 2

Okla. H.B. 4156, § 2(D)(1) ...................................................................... 2

Okla. H.B. 4156, § 2(D)(2) ...................................................................... 3

Okla. H.B. 4156, § 2(F) .....................................................................2, 11

Okla. H.B. 4156, § 2(F)(1)(a) ............................................................... 10

## **Other Authorities**

Congressional Research Service, *Temporary Protected Status and
     Deferred Enforced Departure*,
     https://sgp.fas.org/crs/homesec/RS20844.pdf (updated September
     23, 2024). ...................................................................................... 21

Jacob Sullum, *Trump Reiterates His Promise to Protect Farm and Hospitality
     Workers From "Pretty Vicious" Deportation*, Reason (July 8, 2025),
     https://reason.com/2025/07/08/trump-reiterates-his-promise-to-
     protect-farm-and-hospitality-workers-from-pretty-vicious-
     deportation/.................................................................................... 23

U.S. Citizenship & Immigration Services, *Discretionary Options for
     Military Members, Enlistees and Their Families*,
     https://www.uscis.gov/military/discretionary-options-for-military-
     members-enlistees-and-their-families............................................ 10

USCIS Policy Manual, Volume 3, Part B—Victims of Trafficking,
     *available at* https://www.uscis.gov/policy-manual/volume-3-part-b-
     chapter-1 ....................................................................................15, 16

USCIS Policy Manual, Volume 3, Part C- Victims of Crimes, *available at*
     https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-1 ...................14, 15

USCIS Policy Manual, Volume 3, Part D–Violence Against Women Act,
     *available at* https://www.uscis.gov/policy-manual/volume-3-part-d-
     chapter-1 ........................................................................................ 16

USCIS Policy Manual, Volume 6, Part J- Special Immigrant Juveniles,
     *available at* https://www.uscis.gov/policy-manual/volume-6-part-j-
     chapter-2 ........................................................................................ 18

USCIS Policy Manual, Volume 6, Part J- Special Immigrant Juveniles, *available a*t https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-2.................................................................................................17

USCIS Policy Manual, Volume 7, Part F- Special Immigrant Based Adjustment, *available at* https://www.uscis.gov/policy-manual/volume-7-part-f-chapter-7 ...............................................................18

USCIS, *Green Card Based on Special Immigrant Juvenile Classification, available at* https://www.uscis.gov/green-card/green-card-eligibility/green-card-based-on-special-immigrant-juvenile-classification............................................18

USCIS, *Policy Alert: Special Immigrant Juvenile Classification and Deferred Action*, March 7, 2022, *available at* https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf. ........................................18

## INTEREST OF AMICUS CURIAE

The American Immigration Lawyers Association (AILA), founded in 1946, is a national, nonpartisan, nonprofit association with more than 18,000 members throughout the United States and abroad, including lawyers and law school professors who practice and teach in the field of immigration and nationality law. AILA seeks to promote justice, advocate for fair and reasonable immigration law and policy, and advance the quality of immigration and nationality law and practice. AILA's members practice regularly before the Department of Homeland Security, immigration courts, the Board of Immigration Appeals, and the Office of the Chief Administrative Hearing Officer, as well as before the federal courts. AILA has participated as amicus curiae in numerous cases before the U.S. Courts of Appeals and the U.S. Supreme Court.[1]

## STATEMENT OF THE CASE

On April 30, 2024, the governor of Oklahoma signed House Bill 4156 [H.B. 4156] into law. That state statute creates two new criminal offenses applicable only to people who are not U.S. citizens. In addition, it directs that some of those noncitizens must "be required to leave the state" of Oklahoma.

---

[1] All parties have consented to the filing of this brief. This brief has not been authored, in whole or in part, by counsel to any party in this case. No party or counsel to any party contributed money intended to fund preparation or submission of this brief. No person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparation or submission of this brief.

First, H.B. 4156 makes it a state criminal offense for a noncitizen to be present in the state of Oklahoma if that person has not "first obtained legal authorization to enter the United States." H.B. 4156, § 2(C). It is an affirmative defense that the noncitizen has been granted "lawful presence in the United States," or alternatively has been granted asylum, or was approved for DACA ("Deferred Action for Childhood Arrivals") before July 16, 2021. *Id.* § 2(F). This new state offense is a misdemeanor and persons convicted of it are subject to imprisonment. *Id.* § 2(C)(1). A second violation of the offense becomes a felony, punishable by longer periods of imprisonment. *Id.* § 2(C)(2). In addition, individuals who violate H.B. 4156 "shall be required to leave the state." *Id.* § 2(C)(1). We will refer to this new crime, as the bill does, as "impermissible occupation."

Second, H.B. 4156 makes it a state criminal offense for a noncitizen to be present in the state of Oklahoma if that person has been denied admission to or been deported from the United States, or has departed the United States while a removal order was outstanding, unless—since that time, and prior to the noncitizen's arrival—"the United States Attorney General has expressly consented" to the person's reapplying for admission. *Id.* §§ 2(D), 2(D)(1). This offense is a felony. We will refer to this new crime as "presence after removal."[2]

---

[2]     In the federal immigration scheme, the term "removal" covers both denial of admission at the U.S. border, and deportation of an already-admitted person from the interior of the United States. *See* 8 U.S.C. § 1229a(a)(1) ("[r]emoval proceedings" are "proceedings for deciding the inadmissibility or deportability" of a noncitizen).

A subclass of the persons subject to the second offense of "presence after removal"—noncitizens who were denied admission—can escape liability if federal law did not require them to secure advance consent. *Id.* § 2(D)(2). By its terms, though, this exception does not apply to noncitizens who were duly admitted to the United States and later deported. Those people, thus, are criminally liable if they return without advance consent, even if they were not required to seek consent, they have legal status, and their return was entirely legal under federal law. "Lawful presence" is not a defense to prosecution under this section.[3]

## INTRODUCTION AND SUMMARY OF ARGUMENT

H.B. 4156 is startlingly out of sync with federal immigration law. Federal immigration law offers persons who are in the United States without authorization a variety of routes by which they may secure the federal government's permission to remain here. That is true notwithstanding that such a person entered, in the words of H.B. 4156, without having "obtained legal authorization to enter the United States." It is true notwithstanding that such a person had previously been denied admission or deported. It is true notwithstanding that, depending on circumstances, the federal government may have discretion to criminally prosecute the illegal entrant.

To determine whether under *federal* law a person who is present in the United States after entering without authorization (or who has re-entered after removal) will

---

[3]    The state's contrary statement in its brief, *see* Opening Brief of the State of Oklahoma at 9-10, is belied by the statutory text.

have permission to remain, federal authorities hear and adjudicate that person's federal immigration-law status in accordance with a maze of federal statutory and regulatory provisions.

Depending on the circumstances of the individual case, federal authorities will be answering questions such as (but not limited to) these: Is the person eligible for cancellation of removal under 8 U.S.C. 1229b(b)? Is the person entitled to status as a self-petitioner under the Violence Against Women Act, codified in relevant part at 8 U.S.C. §§ 1154(a)(1)(A)(iii)-(vii), 1154(a)(1)(B)(ii)-(v), 1154(a)(1)(C), and 1154(a)(1)(D)(v)? Is the person entitled to a visa under 8 U.S.C. § 1101(a)(15)(T), as the victim of a severe form of human trafficking, or § 1101(a)(15)(U), by virtue of having provided assistance as a crime victim to law enforcement? Is the person eligible for Special Immigrant Juvenile status, as described in 8 U.S.C. § 1101(a)(27)(J)? Is the person eligible for asylum under 8 U.S.C. § 1158, withholding of removal under 8 U.S.C. § 1231(b)(3), or protection under the Convention Against Torture under 8 C.F.R. §§ 1208.16-1208.18? The list of implicated federal statutory provisions is long.

"Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country, perhaps even as a citizen." *Plyler v. Doe*, 457 U.S. 202, 240 n. 6 (1982) (Powell, J., concurring). Indeed, "even the [federal government] cannot predict with certainty whether any individual alien has a right to reside in the country until deportation proceedings have run their course." *Id.*

If the federal government decides to initiate a removal proceeding, some determinations relating to a noncitizen's right to remain may be made quickly. Others may take longer. But if noncitizens do not have the opportunity to raise such claims to remain, and federal immigration authorities do not have the opportunity to hear them, then the body of immigration law that Congress intended and enacted will be frustrated.

In this way, H.B. 4156 frustrates Congress's plan. Under H.B. 4156, the state of Oklahoma can imprison and expel noncitizens without regard to their ultimate entitlement to immigration relief, and without regard to whether they would be allowed to stay in the United States once the process played out. That is unconstitutional.

H.B. 4156's "impermissible occupation" crime broadly covers people who have entered the United States without authorization, without regard to what relief they may have obtained or may yet obtain under federal immigration law. To be sure, the Oklahoma law purports to exempt people with "lawful presence in the United States." But that carveout is insufficient.

First, the term "lawful presence in the United States" has no federal statutory definition and has no single, coherent meaning in U.S. immigration law. It is impossible to tell from the face of the statute what sort of federal immigration relief Oklahoma police might deem to confer "lawful presence"—and our Constitution does not empower state officials to make these federal determinations. The language of the Oklahoma law suggests that the scope of "lawful presence" under that state statute makes many people subject to *state* imprisonment and expulsion notwithstanding that

they have *federal* permission to stay in the United States.

Second, even if the "lawful status" language in the Oklahoma law exempts from prosecution everyone who had already received some form federal immigration relief, it in any event allows the prosecution and expulsion of persons whose meritorious claims for such relief are *pending*. It moreover allows the prosecution of persons whom the federal government has not sought to place in proceedings at all, but who would be able to bring valid claims for relief if they were placed in proceedings. That too conflicts with the federal scheme, inappropriately putting Oklahoma in the driver's seat in making federal immigration-law determinations.

The conflict posed by the "presence after removal" provision is, if anything, worse. That provision does not even purport to have an exception for persons granted lawful presence. It allows prosecution of some persons whose entry into the United States was fully lawful. It allows prosecution of persons who have been granted asylum subsequent to their entry into the United States.

The state of Oklahoma argues that there is no conflict because federal law incorporates a similar provision in 8 U.S.C. § 1326. Opening Brief of the State of Oklahoma [Okla. Br.] at 37-40. But the genius of federal law is that federal authorities can approach the criminal prohibition in § 1326 so that it operates in harmony with the entire federal immigration scheme. Because both § 1326 and federal law governing relief from immigration removal are administered by the same government, they can be administered so as to be consistent and coherent. The federal government can limit its

criminal prosecutions to instances that further the goals of federal immigration law. At a minimum, it can limit its prosecutions to persons it has determined have no right to remain here. That structure falls apart when Oklahoma can bring prosecutions more broadly and without regard to whether federal immigration relief processes are ongoing.

The Department of Justice currently approaches this case as if plaintiffs' sole claim were a conflict between Oklahoma's new statute and the criminal prohibitions in 8 U.S.C. §§ 1325 & 1326. Brief for the United States at 14-16. But that misses the point. The unconstitutional conflict does not lie in the fact that both state and federal law contain criminal prohibitions. It derives from the fact the federal immigration statutes consist of a complex body of federal law, granting persons who have entered without authorization (or subsequent to removal) a wide range of routes through which they may be permitted to remain in the United States. That body of law incorporates criminal prohibitions as a single facet of its scheme. For Oklahoma to make that single facet a basis for state criminal prosecution while subverting the rest of the federal immigration-law plan—imposing prison and expulsion on noncitizens notwithstanding that they have received, or are eligible to receive, some federal protection from removal—poses exactly the sort of conflict the Supreme Court condemned in *Arizona v. United States*, 567 U.S. 387, 402 (2012).

# ARGUMENT

## I. Oklahoma's "lawful presence" defense has no basis in federal law.

Oklahoma and the United States both argue that H.B. 4156 contains affirmative defenses, including "lawful presence," that they claim "ensure alignment with federal law." U.S. Br. at 5; *see also* Okl. Br. at 10 (pointing to the affirmative defenses as evidence that the law does nothing to "prevent[]—or even purport[] to inhibit in any way—illegal aliens from seeking asylum or other relief under federal law"). These affirmative defenses, however, cannot save H.B. 4156.

As practitioners of immigration law, AILA members are deeply familiar with one basic tenet: immigration law is extremely complex. Circuit courts have compared federal immigration law to "King Minos's labyrinth in ancient Crete," *Lok v. INS*, 548 F.2d 37, 38 (2d Cir. 1977), and as "second only to the Internal Revenue Code in complexity." *Singh v. Gonzales*, 499 F.3d 969, 980 (9th Cir. 2007) (quotation omitted). A web of federal statutes and regulations establish rules governing who is authorized to enter and stay in the United States. There are also federal statutes and regulations regarding individuals who may not be present in the United States under a specific visa or lawful permanent resident status, but who nonetheless are permitted to stay in the United States, are granted express authorization to work, and are protected from deportation. *See, e.g.*, 28 C.F.R. § 1100.35 ("Authority to permit continued presence in the United States for victims of severe forms of trafficking in persons"); *infra* Part II (describing various categories of individuals who are permitted to remain and work in the United States

8

notwithstanding an initial unlawful entry or reentry after deportation).

H.B. 4156's affirmative defenses do not—and cannot—account for that complexity. The statute does not ensure that individuals who have viable defenses to removal, or whom the federal government may choose not to prosecute or remove, are not subject to criminal prosecution and expulsion from Oklahoma on account of their immigration history.

First, the Immigration and Nationality Act (INA or Act) contains no definition of "lawful presence" as it is used in H.B. 4156. "'[L]awfully present' is not a standalone immigration classification, and it is not defined anywhere in the Act." *Estrada v. Becker*, 917 F.3d 1298, 1304 (11th Cir. 2019). Thus, it is unclear what "lawful presence" in H.B. 4156 even exempts, as it has no agreed-upon definition in federal immigration law.

For example, courts have disagreed about whether some immigration statuses are "lawful" or not. In litigation regarding DACA, the parties and court have agreed that DACA "confer[s] lawful presence" which "makes recipients eligible for a variety of state and federal benefits." *Texas v. United States*, 126 F.4th 392, 411 n.22 (5th Cir. 2025). By contrast, in litigation regarding whether DACA recipients were eligible to attend specific universities in Georgia, which were required to verify the "lawful presence" of college applicants, DACA recipients have been found to be "not lawfully present." *Estrada*, 917 F.3d at 1301.

The text of H.B. 4156 indicates that Oklahoma's definition of "lawfully present" excludes asylum and DACA. Affirmative defenses from prosecution for impermissible

occupation are available to persons with "lawful presence," H.B. 4156, § 2(F)(1)(a); persons who have been granted asylum, *id.* § 2(F)(1)(b), and persons who obtained DACA prior to July 16, 2021, *id.* § 2(F)(2). This tells us that DACA and asylum are not themselves "lawfully present" statuses under H.B. 4156 because if they were, their inclusion in the statute would be surplusage. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (courts "must give effect, if possible, to every clause and word of a statute").

But that in turn casts doubt on other forms of federal protection from removal. The federal government grants "deferred action" in a wide range of contexts, allowing individuals to remain in the United States. *See, e.g.,* U.S. Citizenship & Immigration Services, Discretionary Options for Military Members, Enlistees and Their Families, https://www.uscis.gov/military/discretionary-options-for-military-members-enlistees-and-their-families. But if DACA is not itself "lawful presence," then presumably other forms of deferred action granted by the federal government that are not listed in the Oklahoma law are not "lawful presence" either. This means that many people with federally-granted protection against removal, including family members of military service members, are not "lawfully present" within the meaning of the Oklahoma law.

The only place that the term "lawful presence" appears to be used in the U.S. Code is in a reference to determining eligibility for health care benefits under the Affordable Care Act health exchanges. *See* 42 U.S.C.A. § 18081 (setting forth "[p]rocedures for determining eligibility for [Health Care] Exchange participation,"

10

which includes designating authority to the Secretary of Health and Human Services to "establish a program" to determine, among other things, whether an individual is "a citizen or national of the United States or an alien lawfully present in the United States"); *id.* (establishing a process for the Secretary of Homeland Security to resolve inconsistencies in attestation of that "lawful presence").

It is within the United States' purview to define lawful presence as needed in specific subsets of federal law, including eligibility for health care benefits. Those statutes specifically delegate authority to federal cabinet officials to define who is included or excluded for those purposes. *See, e.g.,* 42 U.S.C.A. § 18081. They do not, however, set forth definitions to be applied with respect to immigration law or criminal law. *See, e.g., Sac & Fox Nation of Missouri v. Norton,* 240 F.3d 1250, 1266 (10th Cir. 2001) (noting that definitions of the term "reservation" in different statutory contexts differ from each other and from the general definition). Nor is this an area the State has expertise in. *See Arizona,* 567 U.S. at 408–10 (describing limited and specific scenarios in which state officers cooperate with federal immigration enforcement).

And there is a larger problem: The affirmative defense of "lawful presence" does not apply at all to H.B. 4156's "presence after removal" crime. *See* H.B. 4156, § 2(F) (specifying that the defense applies only to prosecution under § 2(C)(1) & (2), i.e., impermissible occupation); Brief for the United States at 6 (describing the Oklahoma law). Yet individuals who previously had a prior removal order and reentered are still eligible for protection against removal. Indeed, their entry may have been entirely legal.

People who were removed from the United States and wait out a five- or ten-year period of inadmissibility may legally return. *See* 8 U.S.C. § 1182(a)(9)(A). If they enter via the Visa Waiver Program, see 8 U.S.C. § 1187, or as Canadian citizens arriving by land, they need not secure any advance permission from the U.S. government. Yet the Oklahoma statute would render these noncitizens, who have legal immigration status under federal law, criminals under state law.

It may have been the case, as the United States asserts, that Oklahoma included these affirmative defenses because it was trying to avoid conflict with federal law. U.S. Br. at 17. But Oklahoma's intent is irrelevant. The complexity and comprehensiveness of the federal immigration scheme is just one reason why the affirmative defenses in HB 4156 cannot save it from its inherent conflict with federal immigration law.

## II. H.B. 4156 criminalizes the presence of large classes of people whom federal law permits to remain in the country.

The ambiguity of H.B. 4156's "lawful presence" exemption renders that statute unconstitutionally vague and incapable of coherent enforcement. But even if that were not the case—even if its exceptions were clear and were read as broadly as possible— the Oklahoma statute would still criminalize the presence in the United States of large classes of people who are entitled to remain in this country under federal law. It would also still criminalize the presence of individuals with viable *pending* claims, not yet finally adjudicated, for immigration relief. And it would still criminalize the presence of individuals who *would have* successful claims for relief if they were placed in removal proceedings, but who have not asserted those claims because the federal government

has not chosen to place them in proceedings. In each of these respects as well, H.B. 4156 conflicts with federal immigration law.

### A. H.B. 4156 criminalizes the presence of people in removal proceedings with valid claims for relief from removal, including cancellation of removal.

Even if the federal government has placed someone in immigration court proceedings—and the person assuredly does not have "lawful presence" yet—the federal government may nonetheless grant that person the right to stay, lawfully, in the United States at the conclusion of those proceedings. After all, the *point* of holding federal removal proceedings before an immigration judge is to determine whether a noncitizen should be able to stay in the United States. Oklahoma, which would jail and expel such noncitizens if it encounters them while their proceedings are ongoing, ignores that federal process.

Some people in removal proceedings—even if they entered or re-entered illegally—are able to apply for cancellation of removal under 8 U.S.C. § 1229b(b), enabling them to adjust their status to that of lawful permanent resident. Those applicants must meet multiple criteria, including establishing a period of continuous physical presence and good moral character. Applicants must also demonstrate that their removal would cause "extreme hardship" to a qualifying U.S. citizen or lawful permanent resident family member. *See id.* A person in the process of seeking such relief does not yet have "lawful presence." Rather, that person has invoked a lawful means, established by Congress, of achieving legal status in the United States. But

Oklahoma would jail and expel such a person before the federal government could grant their application.

> ## B. H.B. 4156 criminalizes the presence of victims of crime, domestic violence survivors, and juveniles with pending meritorious federal immigration applications.

Oklahoma's law similarly criminalizes victims of crime, including domestic violence survivors, with meritorious claims to remain in the United States under federal law. Many such people will not be able to squeeze into Oklahoma's understanding of "lawful presence." But even if they did, Oklahoma could still prosecute them for presence after removal. And—crucially—Oklahoma law would still subject *everyone* in this category to criminal penalties while their federal applications for immigration relief were still in process. Congress did not create multiple routes for victims of crime, domestic violence survivors, and juveniles to get federal immigration relief only so that a state could jail and expel them while their applications were pending.

Individuals who have been the victims of qualifying criminal activity in the United States and who have been helpful to law enforcement may apply for U nonimmigrant status, and their family members may apply for related statuses. Congress created the U nonimmigrant status to strengthen law enforcement's ability to investigate and prosecute serious crimes, by encouraging victims of criminal activity to cooperate with law enforcement without fear due to their own lack of immigration status. *See* USCIS Policy Manual, Volume 3, Part C- Victims of Crimes, *available at* https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-1. After four years, a

person who receives U nonimmigrant status may apply for lawful permanent residence. *Id.*

A prior removal order or denial of admission is not a bar to receiving U nonimmigrant status. The federal immigration agency (U.S. Citizenship and Immigration Services or USCIS) has broad discretion to waive nearly all grounds of inadmissibility for U applicants, including those that apply to individuals who are unlawfully present in the United States or who reentered after immigration violations. *See* 8 U.S.C. § 1182(d)(14); 8 C.F.R. § 212.17(b)(1) (discretion to waive inadmissibility grounds if "it is in the public or national interest").[4] Under the regulations, a prior removal order issued by DHS is automatically cancelled upon approval of the U nonimmigrant petition. *See* 8 C.F.R. § 214.14(c)(5)(i).

Similarly, Congress created the T nonimmigrant status to protect victims of severe human trafficking. *See* USCIS Policy Manual, Volume 3, Part B—Victims of Trafficking, *available at* https://www.uscis.gov/policy-manual/volume-3-part-b-chapter-1; 8 U.S.C. § 1101(a)(15)(T) (defining T nonimmigrant status requirements). A person with T nonimmigrant status may also later apply for lawful permanent residence. *Id.* The inadmissibility ground of unlawful presence can be waived where trafficking was at least one central reason for the unlawful presence, and inadmissibility grounds related

_____

[4] The only inadmissibility ground that cannot be waived for U nonimmigrant status or adjustment of status to lawful permanent residence is 8 U.S.C. § 1182(a)(3)(E), applicable to participants in "Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing." 8 C.F.R. § 245.24(b)(11).

to unlawful presence after a prior removal or immigration violations can also be waived if they were caused by or incident to the trafficking victimization, and if it is in the national interest to grant the waiver. *Id.*; *see also* 8 U.S.C. § 1182(d)(3)(A)(ii) & (d)(13); 8 C.F.R. § 212.16; 8 C.F.R. § 212.18. As with U nonimmigrant status, approval of a T nonimmigrant petition automatically cancels a prior removal order. *See* 8 C.F.R. § 214.11(d)(9)(i).

In addition to U or T status, many survivors of domestic violence may be eligible for special protections under the Violence Against Women Act (VAWA). *See* USCIS Policy Manual, Volume 3, Part D–Violence Against Women Act, *available at* https://www.uscis.gov/policy-manual/volume-3-part-d-chapter-1. With the passage of VAWA in 1994, Congress created a process by which victims of abuse could "self-petition" for immigration status without relying on an abusive family member to file the petition—a process that abusive spouses could use to further abuse or threaten the noncitizen spouses. *Id.*

A VAWA applicant is not barred from receiving VAWA status if she was previously removed. She can seek to waive the inadmissibility grounds that apply to unlawful presence after a removal if she can show a connection between the abuse and the removal or departure from the United States, or the reentry. *See* 8 U.S.C. § 1182(a)(9)(C)(iii) (specific waiver available to VAWA applicants). An immigration judge can also grant special-rule cancellation of removal under VAWA, and thus lawful permanent residence, to a victim of abuse if their removal would result in "extreme

hardship" to the victim or their child or parent. *See* 8 U.S.C. § 1229a(c)(7)(C)(iv), 1229b(b)(2). The Oklahoma law accounts for none of this complexity, or for the ability of various survivors of domestic abuse or victims of crimes to obtain federal immigration status and lawful presence despite prior removals or a lack of immigration authorization to enter the United States.

Congress has also enacted special protections for vulnerable juveniles. Designation as a "Special Immigrant Juvenile" (SIJ) is a type of immigration classification designed to protect vulnerable juveniles present in the United States who cannot be reunited with a parent due to abuse, neglect, or abandonment, and whose best interest is not served by return to their country of nationality. *See* 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11. In order to obtain SIJ classification, a juvenile must first seek what is known as a predicate order from a state court, which makes findings under state law regarding dependency and custody of the juvenile, as well as findings that reunification with a parent is not possible due to abuse, neglect, or abandonment, and that return to the juvenile's country of nationality or last habitual residence is not in their best interest. *See generally* USCIS Policy Manual, Volume 6, Part J- Special Immigrant Juveniles, *available at* https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-2.

Once a juvenile obtains SIJ classification, though, they still do not have lawful immigration status or "lawful presence" as contemplated by Oklahoma's law. Congress has provided a path for them to adjust status to that of a lawful permanent resident,

after waiting for an available visa number. *See* 8 U.S.C. § 1153(b)(4). The inadmissibility grounds that may be triggered by unlawful reentry are irrelevant to initially obtaining SIJ classification,[5] and at the time of the application to adjust status, are waivable.[6] *See* 8 U.S.C. § 1255(h) (inadmissibility grounds applicable to SIJ are waivable "for humanitarian purposes, family unity, or when it is otherwise in the public interest").

It may take years, though, before an SIJ grantee can adjust status.[7] In the meantime, they are generally able to receive federal work authorization. *See* USCIS, *Policy Alert: Special Immigrant Juvenile Classification and Deferred Action*, March 7, 2022, *available at* https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf.

 Attempting to understand H.B. 4156's application to any of this leads one quickly into a swamp. A child whom the Department of Homeland Security has

---

[5]     USCIS Policy Manual, Volume 6, Part J- Special Immigrant Juveniles, *available at* https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-2 ("Grounds of inadmissibility do not apply to the adjudication of the SIJ petition.").

[6]     USCIS Policy Manual, Volume 7, Part F- Special Immigrant Based Adjustment, *available at* https://www.uscis.gov/policy-manual/volume-7-part-f-chapter-7 (explaining that inadmissibility under § 1182(a)(9)(A) and § 1182(a)(9)(C) is waivable).

[7]     Although the SIJ petition must be submitted before the juvenile turns 21, eligibility for SIJ and later for adjustment of status will continue even after the juvenile has turned 21, which is particularly common given long visa backlogs and processing delays. USCIS, *Green Card Based on Special Immigrant Juvenile Classification*, *available at* https://www.uscis.gov/green-card/green-card-eligibility/green-card-based-on-special-immigrant-juvenile-classification ("There is no age limit to apply for a Green Card as an SIJ. If you were under 21 on the date you properly filed your Form I-360, we will not deny your SIJ based Form I-485 based on your current age, even if you are older than 21 when you file your Form I-485 or when we adjudicate it.").

designated as a Special Immigrant Juvenile does not, without more, have lawful status, so there is no bar to Oklahoma's jailing her for impermissible occupation and forcing her to leave the state. That child may well have been removed from the United States at some point in the past and reentered unlawfully, so she can be jailed for presence after removal. Oklahoma's law would criminalize these vulnerable juveniles, despite the fact they are following the processes Congress established to provide a pathway to lawful status and protect them.

More broadly, Congress has provided avenues for victims of crime, including domestic violence survivors and juveniles, to receive lawful status—whether U, T, SIJ, or VAWA—and later to become lawful permanent residents. That is so even if they have previously been denied admission to the United States or removed. But those crime victims and others, if their attempts to gain legal status are still in process, will still be guilty of impermissible occupation as defined in H.B. 4156. Even *after* they achieve legal status under federal law, they can be jailed for presence after removal. Oklahoma's law subjects them all to criminal penalties, thwarting Congress's intention to protect victims of crime and to strengthen law enforcement's ability to combat crime.

### C. H.B. 4156 criminalizes the presence of people with meritorious claims for humanitarian relief.

The same defect resonates through the many forms of relief from removal that federal immigration law provides. Under federal immigration law, applicants for many types of status are permitted to remain in the United States while the appropriate federal agency reaches its decision. Some of these applicants are also in removal proceedings

before the immigration court; others are not. Oklahoma's law thwarts fair adjudication of those applications and interferes with the federal government's legal obligations.

Asylum law, for example, establishes a process for evaluation and final determination of an applicant's claim. *See* 8 U.S.C. § 1158. By law, the federal government cannot deport an individual until it is clear that they will not face likely persecution or torture in their home country. *Id.*; *see also* 8 U.S.C. § 1231(b)(3) (withholding of removal applicants); 8 C.F.R. § 208.16 (Convention Against Torture applicants); 8 U.S.C. § 1225(b)(1)(A)(ii) (process to assess risk of persecution and torture within expedited removal process). Congress also ensured protection against premature removal for applicants for Temporary Protected Status ("TPS"). 8 U.S.C. § 1254a(a)(4) (guaranteeing stay of removal for applicants showing prima facie eligibility).

Oklahoma's law would frustrate the federal government's obligations toward these noncitizens. The statute offers no suggestion that merely having filed an application for asylum – or withholding of removal, or protection under the Convention Against Torture–- causes a person to have "lawful presence" in the United States." Thus, Oklahoma could convict people with valid pending claims for humanitarian relief of impermissible occupation. It could certainly convict them of presence after removal, since lawful presence plays no role in that offense. All that could take place while their federal process was still ongoing.

### D. H.B. 4156 criminalizes the presence of people with meritorious TPS applications.

In the same way, Oklahoma's law would criminalize immigrants with pending

Temporary Protected Status ("TPS") applications. Some of those individuals might be in removal proceedings; others might not be. TPS is a type of status given to immigrants from certain countries facing civil war or armed conflict, environmental disasters, or other "extraordinary and temporary conditions." 8 U.S.C. § 1254a(a)-(c). Once a country is designated for TPS by the Secretary of Homeland Security, nationals of that country residing in the United States can apply for that status and are protected from removal for the period of designation. In Oklahoma, over 3,100 people have TPS. *See* Congressional Research Service, Temporary Protected Status and Deferred Enforced Departure, https://sgp.fas.org/crs/homesec/RS20844.pdf (updated September 23, 2024).

Oklahoma's law would jail and expel individuals with pending TPS applications, which would not themselves confer "lawful presence." That is so even where their federal proceedings would ultimately grant them a right to remain in this country. Once again, Congress chose to create TPS and a means to apply for it. A state has no power to jail individual applicants for that status on the basis of its position that it – unlike Congress – is unwilling to tolerate their immigration-law failings.

### E. H.B. 4156 criminalizes the presence of people who would have meritorious claims for relief from removal, but who have not been placed in proceedings.

Finally, the Oklahoma law fails to recognize that some individuals who did not enter the United States with federal authorization, and who do not have any pending applications for immigration relief, could nonetheless make meritorious claims for relief

if they were put into immigration removal proceedings in the future. Federal law provides that noncitizens can seek some forms of relief described above only *after* being placed in proceedings. *See, e.g.,* 8 U.S.C. §§ 1231(b)(3) (withholding of removal), 1229b (cancellation of removal). The Oklahoma law would criminalize people who have not been able to raise their meritorious claims for relief because the federal government has not sought to deport them.

This collides head-on with federal immigration law. Federal immigration law allows certain individuals without status to remain in the country because it is Congress's judgment that those people should be allowed to stay. Oklahoma is asserting the right to short-circuit that process, jailing people and expelling them from the state notwithstanding that the Department of Homeland Security has not sought to remove them, and if it did, a federal immigration judge would find that they have a right to remain in the country.

Oklahoma's law also ignores the fact that not all immigration proceedings come to completion. Immigration judges regularly exercise their discretion to terminate or administratively close immigration court proceedings against an individual. But if that occurs, and federal immigration proceedings against an individual are administratively closed pursuant to 8 C.F.R. § 1003.18, Oklahoma's law would still criminalize that individual's presence. The state law would conflict with a federal determination not to pursue the individual's removal from the United States. This is a quintessential conflict.

### III. Oklahoma's law broadly conflicts with the federal government's discretion over immigration enforcement.

Most fundamentally, Oklahoma's law is pre-empted because it overrides federal discretion over immigration enforcement. Oklahoma claims the right to arrest people who have not been the target of federal enforcement at all. But as the Supreme Court explained in *Arizona v. United States*, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials . . . . [who] decide whether it makes sense to pursue removal at all [and whether to grant] asylum and other discretionary relief." 567 U.S. at 396.

In "the system Congress created," there will be some noncitizens—such as "a veteran, a college student, or someone assisting with a criminal investigation" —"whom federal officials determine should not be removed." *Id.* at 408. Under the Congressional scheme, it is the job of "[f]ederal officials" —not state ones—to consider the equities of individual cases, turning on factors including "whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service," whether a removal will implicate international relations, and conditions in noncitizens' home countries. *Id.* at 396.

The current Administration has recognized the importance of the federal government's exercise of that authority. *See*, e.g., Jacob Sullum, *Trump Reiterates His Promise to Protect Farm and Hospitality Workers From "Pretty Vicious" Deportation*, Reason (July 8, 2025), https://reason.com/2025/07/08/trump-reiterates-his-promise-to-protect-farm-and-hospitality-workers-from-pretty-vicious-deportation/.

H.B. 4156 empowers Oklahoma to imprison and expel noncitizens even where the federal government has not sought to remove them, and even where the federal process would determine that they have valid defenses to removal. There can be no clearer example of a state frustrating the Congressional scheme. *See Arizona*, 567 U.S. at 402.

Oklahoma's "impermissible occupation" offense, "[b]y authorizing state officers to decide whether an alien should be detained for being removable, . . . violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409. Oklahoma's "presence after removal" offense is worse. It authorizes the jailing of noncitizens even if the federal government already has granted them protection from removal, and indeed even if their re-entry was legal.

That is not constitutional. Discretionary decisions whether to detain and imprison individual noncitizens must be made by the federal government—as Congress intended—not by the states. *See id.; United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) (striking down a state law making it illegal to use false ID to prove legal immigration status, and explaining that federal-law enforcement in this area "necessarily involves the discretion of federal officials, [so that] a state's own law in this area, inviting state prosecution, would 'stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'").

## IV.  Oklahoma's law is not saved by the fact that it proposes to expel noncitizens only from the state and not from the country.

Finally, the State places some stress on the fact that the Oklahoma law would not

expel noncitizens from the United States entirely – only from the state of Oklahoma. Okla. Br. at 9, 35. But that cannot possibly save Oklahoma's plan.[8] First, it conflicts with the federal immigration-law scheme, which encourages noncitizens seeking immigration-law benefits and relief from removal to engage with federal authority at locations including a U.S. Citizenship and Immigration Services Field Office and an Application Support Center in Oklahoma City.

More fundamentally, it is inconsistent with basic principles of our federalism. A state has no power to decree that an undesirable person be pushed over the border to be some other state's problem. The Constitution prohibits "attempts on the part of any single State to isolate itself from difficulties common to all of them" by expelling people across its border and forbidding them to return. *Edwards v. California*, 314 U.S. 160, 173-74 (1941).

And more fundamentally still, "[i]f every other state enacted similar legislation to overburden the lives of aliens, the immigration scheme would be turned on its head. The . . . fifty states working in concert" could supplant federal authority to decide who may remain in this country. *United States v. Alabama*, 691 F.3d 1269, 1295 n.21 (11th Cir. 2012); *see also Lozano v. City of Hazleton*, 620 F.3d 170, 179 (3d Cir. 2010), *vacated on other grounds*, 563 U.S. 1030 (2011). The Constitution does not permit this piecemeal takeover of Congress's authority.

---

[8]    Even the United States declines to defend this provision of the Oklahoma law. *See* Brief for the United States at 12 n.2.

## CONCLUSION

For the reasons articulated above, Oklahoma's law conflicts with federal immigration law and is preempted.


DATE: November 5, 2025                    Respectfully submitted,

                                          /s/ Jonathan Weinberg
                                          Wayne State University Law School
                                          471 West Palmer Street
                                          Detroit, MI 48202
                                          (313) 577-4015
                                          weinberg@wayne.edu

                                          *Attorney for Amicus*
                                          *American Immigration Lawyers Association*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,484 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

DATE: November 5, 2025                    /s/ Jonathan Weinberg
                                          Jonathan Weinberg
                                          weinberg@wayne.edu
                                          *Counsel for Amicus Curiae*


## CERTIFICATE OF DIGITAL SUBMISSION

I certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, those documents will be exact copies of this ECF submission;

(3) this digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, NordVPN File Checker, and according to the program is free of viruses.

DATE: November 5, 2025                    /s/ Jonathan Weinberg
                                          Jonathan Weinberg
                                          weinberg@wayne.edu
                                          *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.  No paper copies are required pursuant to 10th Cir. R. 29.3.

/s/ Jonathan Weinberg
Jonathan Weinberg
weinberg@wayne.edu
*Counsel for Amicus Curiae*