No. 25-6080

===

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

===

PADRES UNIDOS DE TULSA, ET AL.;

*Plaintiffs-Appellees*,

V.

GENTNER DRUMMOND, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF OKLAHOMA, ET AL.;

*Defendants-Appellants*.

===

On Appeal from the United States District Court
for the Western District of Oklahoma
5:24-cv-00511-J
(The Honorable Bernard M. Jones)

===

## BRIEF FOR *AMICUS CURIAE*
## UNITED MEXICAN STATES
## IN SUPPORT OF PLAINTIFFS-APPELLEES

===

Luis Cortes Romero        Amy Rubenstein, Esq.
Novo Legal Group, PLLC    Novo Legal Group, LLC
19309 68th Ave S.         4280 Morrison Rd.
Ste. R102                 Denver, CO 80219
Kent, WA 98032            Phone: (303) 335-0250
Phone: (206) 212-0260

*Attorneys for United Mexican States*
*as Amicus Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ................................................................ 1

INTRODUCTION ........................................................................................ 2

STATEMENT OF THE CASE ...................................................................... 3

SUMMARY OF THE ARGUMENT ............................................................ 6

ARGUMENT ............................................................................................. 8

    I.   H.B. 4156 Threatens the U.S.–Mexico Relationship and Intrudes on Federal Power ........................................................................................ 8

        a.   The Founding Structure Requires One National Voice ............ 8

        b.   Century and a Half of Supreme Court Precedent Bars State Freelancing .............................................................................................. 8

        c.   Arizona v. United States Controls Here .................................... 9

        d.   H.B. 4156 Flouts the One-Voice Principle and Damages a Critical Bilateral Relationship .................................................................... 11

    II.   H.B. 4156 Would Subject Tens of Thousands of Mexican Nationals in Oklahoma to Enforcement of Complex Federal Immigration Law by Untrained State Officers ................................... 12

    III.   H.B. 4156 Threatens Bilateral Cooperation in Security, Trade, and Tourism ........................................................................................ 17

        a.   Trade and Tourism ...................................................................... 17

        b.   H.B. 4156's Predictable Harm .................................................. 17

    IV.   H.B. 4156 Impacts Border Security and Migration Cooperation ... ............................................................................................................ 23

CONCLUSION ....................................................................................... 24

CERTIFICATE OF COMPLIANCE WITH THE TYPE-VOLUME LIMIT ............................................................................................................ 26

CERTIFICATE OF SERVICE ................................................................ 27

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) .......................................................................... 11, 14

*Arizona v. United States,*
  *567 U.S. 387 (2012)* ...................................................... 11, 12, 14, 28, 30

*Chy Lung v. Freeman,*
  92 U.S. 275 (1876) ...................................................................... 10, 11, 14

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) .......................................................................... 10, 14

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) .............................................................. 10, 14, 22, 23

*Kansas v. Garcia,*
  589 U.S. 191 (2020) ................................................................................ 24

*Padres Unidos de Tulsa v. Drummond,*
  2025 WL 1444433 (W.D. Okla. May 20, 2025) ...................................... 6

*Padres Unidos de Tulsa v. Drummond,*
  2025 WL 1573590 (W.D. Okla. June 3, 2025) ....................................... 6

*United States v. Oklahoma,*
  739 F. Supp. 3d 985 (W.D. Okla. 2024) ................................................. 5

*Vasquez Perdomo v. Noem,*
  143 S. Ct. ___ (Sept. 5, 2025) .............................................................. 18

## STATUTES

8 U.S.C. § 1101(a)(3) ................................................................ 4

8 U.S.C. § 1325(a) .................................................................... 3

8 U.S.C. § 1325(b) .................................................................... 3

8 U.S.C. § 1326(a) ................................................................. 3, 4

8 U.S.C. § 1326(c) .................................................................... 3

8 U.S.C. § 1357(g) .................................................................. 16

H.B. 4156 ... 2, 3, 4, 5, 6, 7, 8, 13, 14, 15, 16, 17, 18, 19, 22, 23, 26, 28, 30, 32, 33

Okla. Stat. tit. 21, § 1795 .......................................................... 3

Okla. Stat. tit. 21, § 1795(A) ................................................... 23

Okla. Stat. tit. 21, § 1795(C)(1) ................................................. 4

Okla. Stat. tit. 21, § 1795(C)(2) ................................................. 4

Okla. Stat. tit. 21, § 1795(D) ................................................... 23

Okla. Stat. tit. 21, § 1795(D)(1) ................................................ 4

Okla. Stat. tit. 21, § 1795(D)(2) ................................................ 4

Okla. Stat. tit. 21, § 1795(E) .................................................... 5

Okla. Stat. tit. 21, § 1795(F) .................................................... 4

Okla. Stat. tit. 21, § 1795(G) .................................................... 5

## OTHER AUTHORITIES

Alexia Aston,
*Law Enforcement Organizations Speak Out Against Oklahoma's HB 4156*, THE OKLAHOMAN (May 15, 2024) ........................................ 19, 25

Bella Casey & Luisa Clausen,
*Oklahoma Law Targeting Immigrants Puts Politics Over Policy, Tulsa County Sheriff Says*, TULSA WORLD (last updated Sept 15, 2025) ...... 19

*Constitución Política de los Estados Unidos Mexicanos*,
Tit. II, ch. I, art. 40 (Oct. 15, 2025) ...................................................... 9

Embajada de México en los Estados Unidos,
Secretaría de Relaciones Exteriores, *Tourism Statistics* (Jan.–Aug. 2021) ........................................................................................................ 29

Embajada de México en los Estados Unidos,
Secretaría de Relaciones Exteriores, *Trade Between Mexico and Oklahoma* (2024) .......................................................................... 21, 29

Int'l Trade Admin.,
U.S. Dep't of Com., *Mexico – Travel and Tourism* (Country Commercial Guide, Nov. 5, 2023) .................................................. 21, 30

Jasmine Garsd,
*In attempting to curtail immigration, the U.S. looks for allies in Latin America*, NPR (June 10, 2024) ............................................................ 31

Jeanne Batalova & William A. Kandel,
*Frequently Requested Statistics on Immigrants and Immigration in the United States*, MIGRATION POLICY INST. (Apr. 10, 2024) ............... 24

Kevin Canfield,
*Immigration Law Could Deter Victims from Reporting Crime, Tulsa Mayor Worries*, TULSA WORLD (Apr. 24, 2024) .................................... 27

League of United Latin Am. Citizens (LULAC),
  *LULAC Denounces Oklahoma's Anti-Immigrant and
  Unconstitutional HB 4156* (May 1, 2024)............................................20

League of United Latin Am. Citizens (LULAC),
  *LULAC Denounces Oklahoma's Anti-Immigrant and Unconstitutional
  HB 4156* (May 2, 2024) ......................................................................25

Lionel Ramos,
  *Federal Judge Stops Oklahoma Immigration Law From Taking
  Effect, Latino Community Reacts*, KOSU-NPR (July 2, 2024) .....20, 26

M. Angeles Villarreal,
  *U.S.-Mexico Economic Relations* (Cong. Research Serv., IF11175,
  June 06, 2024)......................................................................................29

M. Angeles Villarreal,
  *U.S.-Mexico Economic Relations: Trends, Issues, and Implications*
  (Cong. Research Serv., RL32934, June 25, 2020) ..............................28

Migration Policy Inst.,
  *State Immigration Data Profiles: Oklahoma – Demographics* (2023) 15

Okla. Office of Mgmt. & Enter. Servs.,
  *Map the Impact: The Economic Contributions of Immigrants in
  Oklahoma* (2021)...........................................................................15, 16

Okla. Office of Mgmt. & Enter. Servs., *Notes from Meeting with the
  Consul of Mexico – July Meeting* (July 22, 2024) ...............................18

Secretaría de Relaciones Exteriores,
  *Defensa de la soberanía nacional y protección a la comunidad
  mexicana en el exterior, ejes prioritarios del canciller designado De la
  Fuente* (Oct. 8, 2024) ..........................................................................22

Secretaría de Relaciones Exteriores,
*The Consulate of Mexico in Oklahoma City Increases Its Consular Services, Assistance, and Protection After Passage of HB 4156* (Apr. 30, 2024) ............................................................................................ 27

Secretaría de Relaciones Exteriores,
*The Consulate of Mexico in Oklahoma City Increases Its Consular Services, Assistance, and Protection After Passage of HB 4156* (April 30, 2024) ........................................................................................... 17

Stef W. Kight,
*Mexico Agrees to Accept Non-Mexican Migrants Rejected by U.S.*, AXIOS (May 3, 2023) ............................................................................ 32

Tanvi Misra,
*The Fatal Flaw in the Border Patrol's Rescue Program*, HIGH COUNTRY NEWS (Sept. 1, 2024) ............................................................ 32

The Federalist No. 3 ................................................................................ 12

The Federalist No. 42 ........................................................................... 9, 14

The Federalist No. 80 .............................................................................. 12

U.S. Dep't of State,
Bureau of W. Hemisphere Affs., *U.S. Relations With Mexico* (Sept. 16, 2024) ...................................................................................................... 31

U.S. Dep't of State,
Bureau of W. Hemisphere Affs., *U.S. Relations With Mexico* (Sept. 29, 2022) ...................................................................................................... 28

Vienna Convention on Consular Relations,
art. 36, Apr. 24, 1963, 596 U.N.T.S. 261 ............................................... 6

Vienna Convention on Consular Relations,
art. 5(a), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 ..................... 17

vi

Wash. Off. on Latin Am. (WOLA),
    *Weekly U.S.-Mexico Border Update: Asylum Rule, Mexico Data, CBP*
    *One, 2024 Campaign, Migrant Deaths* (Sept. 6, 2024) .......................32

# INTEREST OF *AMICUS CURIAE*[1]

The United Mexican States is a sovereign neighbor, principal trading partner, and treaty counterpart of the United States. Its nationals, consular officers, and enterprises are directly impacted by how the United States structures and enforces immigration law. The Constitution commits immigration and foreign affairs to the National Government so the Nation may speak with one voice to other sovereigns. State-by-state criminalization of immigration status threatens that uniformity, risks impairing compliance with binding commitments and disrupts cross-border law enforcement and commercial cooperation. Mexico submits this brief to protect those sovereign interests and to assist the Court in applying settled preemption principles that preserve federal primacy in this domain and prevent the diplomatic and practical harms that follow from a patchwork of state immigration codes.

No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

---

[1] The Plaintiffs-Appellants consented to the Mexican Government's filing, but the Defendants-Appellees did not respond to the consent request. Accordingly, pursuant to F.R.A.P. 29(a)(3), the United Mexican States is concurrently filing a motion for leave to file an amicus curiae brief supporting Plaintiffs-Appellants and affirming the District Court's decision.

## INTRODUCTION

From its founding, the United States has spoken to the world as a single Nation, not a collection of fifty different sovereigns pursuing their own foreign policies. The Constitution accomplishes that unity by vesting exclusive authority over immigration and foreign affairs in the National Government. That allocation is not a matter of political convenience; it is a structural guarantee of stability, predictability, and uniformity in international relations. Oklahoma's House Bill 4156 ("H.B. 4156") departs from this settled structure. By creating its own crimes of unlawful entry and presence, Oklahoma has claimed for itself a power the Constitution assigns to the Nation as a whole. However styled, the statute places a State in direct conversation with foreign governments, interjects itself into the administration of international commitments, and threatens the very uniformity of the Nation as a whole.

For Mexico, this case is not about partisan disagreement with any administration. It is about the enduring principle that immigration policy must be uniform and national. Our sovereign interests—protecting Mexican nationals and ensuring compliance with treaty obligations—depend on the United States speaking with one voice. If each state may enact its own immigration code, the United States' ability to conduct foreign affairs is compromised.

## STATEMENT OF THE CASE

For more than a century, Congress has occupied the field of immigration law, creating a comprehensive framework that governs both civil and criminal regulation of entry, presence, and reentry into the United States. The Immigration and Nationality Act ("INA") establishes federal offenses for unlawful entry and reentry. A noncitizen who enters at an undesignated place, eludes inspection, or gains admission by fraud commits a federal crime, punishable by up to six months' imprisonment for a first violation and up to two years for subsequent offenses, in addition to civil penalties. 8 U.S.C. § 1325(a)–(b). Similarly, Congress made it a felony for any previously removed noncitizen to reenter or be found in the United States without the prior consent of the Attorney General, subject to escalating penalties for those with prior criminal convictions. 8 U.S.C. § 1326(a)–(c). These provisions reflect Congress's deliberate judgment that unlawful entry and reentry are matters of national import warranting uniform, national enforcement.

Despite this settled federal framework, Oklahoma enacted H.B. 4156 on April 30, 2024. Okla. Stat. tit. 21, § 1795. The law creates two new state-law crimes that attempt to expand upon preexisting federal prohibitions.

First, H.B. 4156 criminalizes the "impermissible occupation" of Oklahoma by any "alien" who enters and remains in the state without federal authorization. *Id*. § 1795(B). Using the federal definition of "alien," 8 U.S.C. § 1101(a)(3), the statute

3

provides limited affirmative defenses for lawful presence, asylum, or certain deferred-action protections. *Id*. § 1795(F). Convictions carry misdemeanor penalties for first offenses and felony penalties for subsequent offenses, including incarceration, fines, and mandatory departure from the state within seventy-two hours of release. *Id*. § 1795(C)(1)–(2).

Second, H.B. 4156 creates a state felony for "unlawful reentry." Any "alien" who reenters Oklahoma after removal or deportation from the United States is guilty of a felony unless prior federal consent was obtained. *Id*. § 1795(D)(1)–(2). Though patterned on 8 U.S.C. § 1326(a), Oklahoma's provision creates a parallel state-level enforcement regime.

H.B. 4156 also imposes collateral requirements unknown to federal law. Arresting agencies must collect extensive identifying information and cross-reference it with federal, state, and local databases, including lists designating individuals as potential threats to national security. Okla. Stat. § 1795(E). The law prohibits probation or delayed sentencing for any conviction under its terms. *Id*. § 1795(G).

Shortly after enactment, private plaintiffs challenged H.B. 4156 as preempted by federal law. The United States—under the prior administration—filed its own suit, and the district court issued a preliminary injunction. *United States v.*

*Oklahoma*, 739 F. Supp. 3d 985 (W.D. Okla. 2024). After the federal government voluntarily dismissed its case, the appeal was dismissed as moot.

Litigation resumed when private plaintiffs amended their complaint, seeking classwide relief. The district court provisionally certified classes under Federal Rule of Civil Procedure 23(b)(2) and issued a temporary restraining order. *Padres Unidos de Tulsa v. Drummond*, 2025 WL 1444433 (W.D. Okla. May 20, 2025). On June 3, 2025, the court granted a preliminary injunction, holding that H.B. 4156 is preempted. *Padres Unidos de Tulsa v. Drummond*, 2025 WL 1573590 (W.D. Okla. June 3, 2025). This appeal followed.

From the perspective of the United Mexican States, this case implicates more than the domestic allocation of power under the Supremacy Clause. By creating its own criminal regime for immigration violations, Oklahoma has placed the United States at odds with binding international obligations. Each detention of a Mexican national under H.B. 4156 would trigger consular-notification duties under the Vienna Convention on Consular Relations, art. 36, Apr. 24, 1963, 596 U.N.T.S. 261. The predictable result would be a dramatic surge in consular interventions, straining treaty compliance and risking systemic violations.

Mexico's sovereign interest in this litigation thus goes beyond that H.B. 4156 destabilizes bilateral cooperation, and that fractures the United States ability to speak

with one voice with respect to significant foreign policy matters, it also concerns the welfare of its nationals in Oklahoma.

## SUMMARY OF THE ARGUMENT

The Constitution vests exclusive authority over immigration enforcement in the federal government, not the states, because immigration policy is inseparable from the conduct of foreign relations. H.B. 4156, which criminalizes mere presence in the state without federal authorization, impermissibly intrudes upon this exclusive federal domain. While Oklahoma asserts an interest in protecting its internal order, the enforcement of immigration laws by individual states threatens the federal government's grounded ability to speak with one voice in matters of foreign affairs.

The Mexican government has long relied on consistent, centralized enforcement of immigration law by the federal government of the United States. When states act unilaterally—enacting laws that criminalize presence, authorize removals, or deputize local officials to determine legal status—they destabilize this bilateral framework and impair Mexico's ability to fulfill its obligations to its nationals under international law. H.B. 4156 risks widespread racial profiling and inconsistent treatment of Mexican citizens, imposes a severe burden on Mexico's consular system, and undermines decades of coordinated diplomatic engagement between the two sovereigns.

U.S. Supreme Court precedent—especially *Arizona v. United States*, 567 U.S. 387 (2012)—unambiguously forbids states from creating parallel immigration enforcement regimes, even when such laws are styled as complementary to federal policy. The central concern is not mere duplication, but disruption: the diplomatic friction, civil rights injuries, and fragmentation of national policy that inevitably result when states act alone. If allowed to stand, H.B. 4156 would open the door to fifty divergent immigration codes, each exposing foreign nationals to arbitrary detention, criminal punishment, and expulsion without federal oversight, while also preventing the United States from fulfilling its international obligations.

Mexico respectfully urges this Court to reaffirm the principle that immigration enforcement is a uniquely federal responsibility. That principle is essential for the protection of the rights of Mexican nationals in Oklahoma and is a practical necessity in maintaining the integrity of U.S.-Mexico relations and the orderly administration of international law.

# ARGUMENT

## I.    H.B. 4156 Threatens the U.S.–Mexico Relationship and Intrudes on Federal Power

### a.  The Founding Structure Requires One National Voice

From the founding, the United States has been understood as one nation in its dealings abroad. James Madison explained that the Constitution was designed so the United States would be regarded as "one nation, in respect to other nations." *The Federalist No. 42* (James Madison) (J. Cooke ed. 1961). Mexico's own constitutional design reflects the same federalist commitment: "The Mexican people want to constitute into a representative, democratic, secular, federal, Republic, made up by free and sovereign States in everything related to its domestic regime, but united in a federation established according to the principles of this fundamental law." *Constitución Política de los Estados Unidos Mexicanos*, Tit. II, ch. I, art. 40 (Oct. 15, 2025).[2] Both nations expect to engage with a single federal sovereign in matters of foreign relations.

### b.  Century and a Half of Supreme Court Precedent Bars State Freelancing

The Supreme Court has consistently recognized that principle. In *Chy Lung v. Freeman*, the Court struck down a California law that arbitrarily detained Chinese immigrants, warning that "a single State can, at her pleasure, embroil us in disastrous

---

[2] https://www.diputados.gob.mx/LeyesBiblio/pdf/CPEUM.pdf

quarrels with other nations." 92 U.S. 275, 279–80 (1876). That admonition has only gained force with time.

In *Hines v. Davidowitz*, the Court invalidated Pennsylvania's alien-registration statute, explaining that regulation of immigrants is "intimately blended and intertwined" with the Nation's foreign relations. 312 U.S. 52, 66–67 (1941). For matters "embracing our relations with foreign nations, we are but one people, one nation, one power." *Id.* at 63–65. The Court cautioned that state measures risk imposing "distinct, unusual and extraordinary burdens" on foreign nationals, provoking international controversies "of the gravest moment." *Id.* at 65–66.

Modern decisions are no different. In *Crosby v. National Foreign Trade Council*, the Court unanimously struck down Massachusetts's Burma law because it interfered with the President's foreign-affairs discretion. 530 U.S. 363, 382 n.18, 385 (2000). And in *Am. Ins. Ass'n v. Garamendi*, the Court reaffirmed the need for the United States to speak with "one voice" in foreign affairs. 539 U.S. 396, 424–25 (2003).

### c. *Arizona v. United States* Controls Here

*Arizona v. United States* distilled these principles in the precise context at issue here. The Court reiterated that the "Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." 567 U.S. 387, 394 (2012). It recognized that immigration policy affects "trade, investment,

tourism, and diplomatic relations for the entire Nation," and warned of "harmful reciprocal treatment" of U.S. citizens abroad if states go their own way. *Id.* at 395. Most importantly, the Court declared: "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States," citing *Chy Lung* and the Founders' understanding that "bordering States … under the impulse of sudden irritation" might undermine national foreign relations. *Id.* at 395 (citing *Chy Lung*, 92 U.S. at 279–80; *The Federalist No. 3* (John Jay) (C. Rossiter ed. 2003)). Echoing *Hines* and *Chy Lung*, the Court emphasized that "[d]ecisions of this nature touch on foreign relations and must be made with one voice." *Id.* at 409. Applying those principles, *Arizona* invalidated state crimes that "mirror[ed]" federal immigration offenses and state arrest powers untethered to federal direction. *Id.* at 401–02, 413. The only provision the Court allowed to proceed—§ 2(B)'s status check—survived only subject to narrow construction and in a posture that demanded cooperative, not independent, state action. *Id.* at 415–16.

The doctrine is rooted as well in the Framers' structural design. As Alexander Hamilton put it, "[t]he peace of the whole ought not to be left at the disposal of a part. The Union will undoubtedly be answerable to foreign powers for the conduct of its members." *The Federalist No. 80* (Alexander Hamilton) (C. Rossiter ed. 1961).

*Arizona* is the modern confirmation of that founding logic: state-by-state immigration regimes are incompatible with the allocation of foreign-affairs authority to the national government.

### d.  H.B. 4156 Flouts the One-Voice Principle and Damages a Critical Bilateral Relationship

Taken together, these precedents establish an unambiguous, continuous principle: immigration enforcement and related foreign-affairs matters are not for the states. They are entrusted to the federal government, which alone must weigh the complex and often competing diplomatic, security, and economic considerations implicated by immigration policy.

The implications for the Mexican government are direct and concrete. Mexico and the United States are deeply intertwined partners—economically, diplomatically, and culturally. Mexico and the United States collaborate closely on issues that immigration policy touches at every turn: the treatment of nationals abroad, law-enforcement coordination, border management, trade, and tourism. Each domain independently shapes bilateral relations. For decades, Mexico has justifiably relied on the United States to speak with a single, federal voice when negotiating these matters. When a state like Oklahoma enacts a law that directly regulates who may remain within its borders on the basis of federal immigration status, it does not merely address a "local" concern. It disrupts a bilateral partnership of national importance. If Oklahoma's H.B. 4156 were allowed to take effect, that

reliance would be upended. Mexico would confront the untenable prospect of managing immigration policy not only with Washington, but separately with fifty state governments. That fragmentation would undermine the predictability and stability of one of the world's most important bilateral relationships.

The Supreme Court's consistent jurisprudence—from *Chy Lung* through *Hines*, *Crosby*, *Garamendi*, and *Arizona*—confirms that the Constitution forbids precisely this outcome. Immigration and foreign relations must be governed federally, not by Oklahoma or any other state. H.B. 4156 is preempted because it intrudes on that exclusive federal domain and threatens the very foreign-affairs coherence that has been essential to U.S.–Mexico relations for nearly two centuries. *See Crosby*, 530 U.S. at 382 n.18, 385 (considering foreign governments' objections as "competent and direct evidence" that state law frustrates federal objectives). As this Court has made clear, "[i]f we are to be one nation in any respect, it clearly ought to be in respect to other nations." *The Federalist No. 42* (James Madison). Federal supremacy in the realm of immigration ensures that foreign governments can rely on a single voice.

## II.    H.B. 4156 Would Subject Tens of Thousands of Mexican Nationals in Oklahoma to Enforcement of Complex Federal Immigration Law by Untrained State Officers

Oklahoma is home to roughly 218,000 foreign-born residents, about 5.5% of its population. *See* Okla. Office of Mgmt. & Enter. Servs., *Map the Impact: The*

*Economic Contributions of Immigrants in Oklahoma* (2021), at 1.[3] Of these, more than 40% are from Mexico. *Id.* The Migration Policy Institute estimates approximately more than 101,000 Mexican nationals that reside in Oklahoma. Migration Policy Inst., *State Immigration Data Profiles: Oklahoma – Demographics* (2023).[4]

H.B. 4156 would effectively deputize local police to enforce the nation's extraordinarily complex body of immigration law. By criminalizing the presence of Mexican nationals under conditions already comprehensively governed by federal law, Oklahoma asserts a role in foreign affairs that is entrusted exclusively to the federal government. But these officers are not trained to apply the Immigration and Nationality Act's intricate provisions—spanning admission categories, grounds of removability, discretionary relief, asylum, cancellation, and treaties. Congress itself has recognized that immigration law is uniquely federal and unusually complicated, providing a carefully delimited mechanism under 8 U.S.C. § 1357(g) for local participation, only under federal training and oversight. H.B. 4156 bypasses that structure, exposing tens of thousands of Mexican nationals in Oklahoma to arrests by officers lacking the expertise or authority to determine lawful status.

---

[3]https://oklahoma.gov/content/dam/ok/en/omes/documents/AICMapTheImpactOklahoma.pdf
[4] https://www.migrationpolicy.org/data/state-profiles/state/demographics/OK

The consequences are profound. Most Mexican nationals in Oklahoma are long-term residents: 93% are of working age, with employment concentrated in industries critical to the state's economy. Okla. Office of Mgmt. & Enter. Servs., *Map the Impact: The Economic Contributions of Immigrants in Oklahoma* (2021), at 5.[5] They pay hundreds of millions in taxes annually and are raising thousands of U.S.-citizen children. *Id.* Criminalizing their mere presence would subject entire families to fear of racial profiling, wrongful arrest, and fractured households. And for Mexico, it would trigger a tidal wave of consular obligations under the Vienna Convention on Consular Relations, art. 5(a), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.[6]

Mexico has already seen this burden firsthand. Its Consulate in Oklahoma City announced after H.B. 4156's passage: "Mexico expresses its concern over the signing into law of Oklahoma H.B. 4156, which will go into effect on July 1," and it was forced to expand consular services to respond to the law. Secretaría de Relaciones Exteriores [S.R.E.] [Ministry of Foreign Affs.], *The Consulate of Mexico in Oklahoma City Increases Its Consular Services, Assistance, and Protection After*

---

[5]https://oklahoma.gov/content/dam/ok/en/omes/documents/AICMapTheImpactOklahoma.pdf
[6] https://legal.un.org/ilc/texts/instruments/english/conventions/9_2_1963.pdf

*Passage of HB 4156* (April 30, 2024).[7] H.B. 4156 thus directly undermines Mexico's ability to fulfill its international duty to protect its nationals.

Tulsa and Oklahoma City police have conceded they cannot enforce H.B. 4156 without resorting to racial profiling. Okla. Office of Mgmt. & Enter. Servs., *Notes from Meeting with the Consul of Mexico – July Meeting* (July 22, 2024).[8] Such profiling would fall most heavily on Mexican nationals and Mexican Americans.

The danger is underscored by *Vasquez Perdomo v. Noem*, 143 S. Ct. ___ (Sept. 5, 2025) (granting stay), where the Supreme Court allowed federal immigration "roving patrols" based in part on race. Justice Sotomayor warned that the ruling risked turning Latinos into "second-class citizens." *Id.* (Sotomayor, J., dissenting). If federal officers operating under uniform supervision may err toward profiling, the risks multiply when authority is dispersed across 77 Oklahoma sheriffs with no immigration training. H.B. 4156 would invite discriminatory enforcement of a kind long recognized as corrosive to constitutional liberties and foreign relations.

---

[7] https://www.gob.mx/sre/prensa/the-consulate-of-mexico-in-oklahoma-city-increases-its-consular-services-assistance-and-protection-after-passage-of-hb-4156?idiom=en
[8] https://oklahoma.gov/content/dam/ok/en/omes/documents/NotesConsulofMexJuly meeting.pdf

Oklahoma's own law-enforcement leaders have acknowledged as much. The Oklahoma Association of Chiefs of Police warned that H.B. 4156 would create "legal challenges in anti-racial profiling." *See* Alexia Aston, *Law Enforcement Organizations Speak Out Against Oklahoma's HB 4156*, THE OKLAHOMAN (May 15, 2024).[9] The Tulsa County Sheriff conceded it "would push us toward racial profiling, because how else are you going to enforce this?" *See* Bella Casey & Luisa Clausen, *Oklahoma Law Targeting Immigrants Puts Politics Over Policy, Tulsa County Sheriff Says*, TULSA WORLD (last updated Sept 15, 2025).[10] Civil-rights groups have likewise condemned the law for "open[ing] the door to racial profiling." League of United Latin Am. Citizens (LULAC), *LULAC Denounces Oklahoma's Anti-Immigrant and Unconstitutional HB 4156* (May 1, 2024).[11] Unsurprisingly, its passage caused "a spike in worry and fear" among Mexican and Central American residents in Oklahoma. Lionel Ramos, *Federal Judge Stops Oklahoma Immigration Law From Taking Effect, Latino Community Reacts*, KOSU-NPR (July 2, 2024).[12]

---

[9] https://www.oklahoman.com/story/news/2024/05/15/oklahoma-immigration-bill-police-organizations-react-to-hb-4156/73698727007/

[10] https://tulsaworld.com/news/local/oklahoma-law-targeting-immigrants-puts-politics-over-policy-tulsa-county-sheriff-says/article_6c235572-5369-11ef-a3c2-2b96c32ecee3.html

[11] https://lulac.org/news/pr/LULAC_DENOUNCES_OKLAHOMAS_ANTI_IMMIGRANT_AND_UNCONSTITUTIONAL_HB4156

[12] https://www.kosu.org/politics/2024-07-02/federal-judge-stops-oklahoma-immigration-law-from-taking-effect-latino-community-reacts

### III.   H.B. 4156 Threatens Bilateral Cooperation in Security, Trade, and Tourism

#### a. Trade and Tourism

The United States and Mexico are bound by an extraordinarily deep bilateral relationship. Mexico is Oklahoma's second-largest export market, supporting 60,000 state jobs. Embajada de México en los Estados Unidos [Embassy of Mex. in the U.S.], Secretaría de Relaciones Exteriores [S.R.E.], *Trade Between Mexico and Oklahoma* (2024).[13] Tourism is reciprocal and vital: in 2022, 12.5 million Mexicans visited the United States, spending $19.2 billion, while 33.5 million U.S. citizens traveled to Mexico. *See* Int'l Trade Admin., U.S. Dep't of Com., *Mexico – Travel and Tourism* (Country Commercial Guide, Nov. 5, 2023).[14]

#### b. H.B. 4156's Predictable Harm

H.B. 4156 jeopardizes all of this. It forces Mexico to engage with not one U.S. sovereign but fifty, undermining the "one voice" principle at the very core of bilateral stability. The protection of a nation's citizens abroad has long been recognized as one of the most delicate and essential responsibilities of government. *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941). That principle remains vital today, reflected in Mexico's declared priority to "safeguard the security and human rights

---

[13] https://embamex.sre.gob.mx/eua/images/stories/2024/Economicos/tradebystate/Oklahoma.pdf
[14] https://www.trade.gov/country-commercial-guides/mexico-travel-and-tourism

of the Mexican community abroad." *See* Secretaría de Relaciones Exteriores [S.R.E.] [Ministry of Foreign Affs.], *Defensa de la soberanía nacional y protección a la comunidad mexicana en el exterior, ejes prioritarios del canciller designado De la Fuente* [*Defense of National Sovereignty and Protection of the Mexican Community Abroad, Priority Axes of Designated Foreign Minister De la Fuente*] (Oct. 8, 2024). [15]

H.B. 4156 criminalizes mere presence within Oklahoma for "any person not a citizen or national of the United States" who has not "first obtained legal authorization to enter the United States" or who has been removed. H.B. 4156, § 2(A)–(D) (codified at Okla. Stat. tit. 21, § 1795(A)–(D)). Such a law imposes "distinct, unusual and extraordinary burdens" on noncitizens, *Hines*, 312 U.S. at 65, unlike generally applicable statutes such as identity-theft provisions upheld in *Kansas v. Garcia*, 589 U.S. 191, 198 (2020).

Because the statute targets only noncitizens, it inevitably burdens those of Mexican descent. In 2022, 44% of U.S. immigrants were Latino, and Mexican immigrants alone comprised 23% of the total immigrant population. *See* Jeanne Batalova & William A. Kandel, *Frequently Requested Statistics on Immigrants and*

---

[15] https://www.gob.mx/sre/prensa/defensa-de-la-soberania-nacional-y-proteccion-a-la-comunidad-mexicana-en-el-exterior-ejes-prioritarios-del-canciller-designado-de-la-fuente?state=published

*Immigration in the United States*, MIGRATION POLICY INST. (Apr. 10, 2024).[16] Enforcement thus cannot be disentangled from racial profiling of Latino communities.

The law does not resemble generally applicable criminal statutes; it is directed at a class of persons defined by nationality and status. Local law enforcement themselves have warned it will push police toward racial profiling and erode trust with immigrant communities. That erosion of trust, in turn, undermines public safety and strains diplomatic ties. Oklahoma's own law-enforcement leaders have acknowledged as much. Alexia Aston, *Law Enforcement Organizations Speak Out Against Oklahoma's HB 4156*, THE OKLAHOMAN (May 15, 2024) (The Oklahoma Association of Chiefs of Police warned that H.B. 4156 would create "legal challenges in anti-racial profiling.")[17]; Bella Casey & Luisa Clausen, *Oklahoma Law Targeting Immigrants Puts Politics Over Policy, Tulsa County Sheriff Says*, TULSA WORLD (Aug. 12, 2024)[18]; *see also* League of United Latin Am. Citizens (LULAC), *LULAC Denounces Oklahoma's Anti-Immigrant and Unconstitutional HB 4156*

---

[16] https://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states-2024
[17] https://www.oklahoman.com/story/news/2024/05/15/oklahoma-immigration-bill-police-organizations-react-to-hb-4156/73698727007/
[18] https://www.tulsaworld.com/news/local/oklahoma-law-targeting-immigrants-puts-politics-over-policy-tulsa-county-sheriff-says/article_6c235572-5369-11ef-a3c2-2b96c32ecee3.html

(May 2, 2024).[19] Unsurprisingly, its passage caused "a spike in worry and fear" among Mexican and Central American residents in Oklahoma. Lionel Ramos, *Federal Judge Stops Oklahoma Immigration Law From Taking Effect, Latino Community Reacts*, KOSU-NPR (July 2, 2024).[20]

These consequences are not hypothetical. Victims of domestic violence and trafficking have expressed fear of reporting abuse, worried that doing so will trigger prosecution under H.B. 4156. The consequences are stark. Victims of crime—including domestic-violence survivors—face impossible choices. One longtime resident, "Lilu," explained that fear of deportation deterred her from reporting abuse. Bella Casey & Luisa Clausen, *Oklahoma Law Targeting Immigrants Puts Politics Over Policy, Tulsa County Sheriff Says*, TULSA WORLD (Aug. 12, 2024).[21] Even after reporting, she feared for herself and her family. *Id.* Tulsa's mayor, G.T. Bynum, has warned that such laws deter victims from contacting police: "If a child is molested, I want their parents to call … regardless of the citizenship status of the parents."

---

[19] https://lulac.org/news/pr/LULAC_DENOUNCES_OKLAHOMAS_ANTI_IMMI GRANT_AND_UNCONSTITUTIONAL_HB4156
[20] https://www.kosu.org/politics/2024-07-02/federal-judge-stops-oklahoma-immigration-law-from-taking-effect-latino-community-reacts
[21] https://tulsaworld.com/news/local/house-bill-4156-instills-fear-in-tulsa-immigrant-community-reluctance-to-report-crimes/article_b1e970f0-5369-11ef-b765-57b14dadaa4c.html

Kevin Canfield, *Immigration Law Could Deter Victims from Reporting Crime, Tulsa Mayor Worries*, TULSA WORLD (Apr. 24, 2024).[22]

To counter these harms, Mexico has been forced to expand consular operations in Oklahoma, diverting resources from other pressing bilateral priorities. Secretaría de Relaciones Exteriores [S.R.E.] [Ministry of Foreign Affs.], *The Consulate of Mexico in Oklahoma City Increases Its Consular Services, Assistance, and Protection After Passage of HB 4156* (Apr. 30, 2024).[23] Every consular dollar spent responding to H.B. 4156 is a dollar unavailable for trade, security, or tourism initiatives.

Immigration policy is inseparable from economic and cultural exchange. *Arizona v. United States*, 567 U.S. 387, 395 (2012). For decades, Mexico and the United States have deepened economic integration through trade agreements and cross-border travel. M. Angeles Villarreal, *U.S.-Mexico Economic Relations: Trends, Issues, and Implications* (Cong. Research Serv., RL32934, June 25, 2020).[24] In 2023, bilateral trade totaled nearly $800 billion, with 80% of Mexico's exports

---

[22] https://tulsaworld.com/news/local/government-politics/immigration-law-could-deter-victims-from-reporting-crime-tulsa-mayor-worries/article_d83c8036-01ba-11ef-b6f6-8b003097b947.html
[23] https://www.gob.mx/sre/prensa/the-consulate-of-mexico-in-oklahoma-city-increases-its-consular-services-assistance-and-protection-after-passage-of-hb-4156?idiom=en
[24] https://crsreports.congress.gov/product/pdf/RL/RL32934

bound for the United States. U.S. Dep't of State, Bureau of W. Hemisphere Affs., *U.S. Relations With Mexico* (Sept. 29, 2022)[25]; M. Angeles Villarreal, *U.S.-Mexico Economic Relations* (Cong. Research Serv., IF11175, June 06, 2024).[26] Oklahoma alone counts Mexico as its second-largest export market, supporting over 60,000 jobs. Embajada de México en los Estados Unidos [Embassy of Mex. in the U.S.], Secretaría de Relaciones Exteriores [S.R.E.], *Trade Between Mexico and Oklahoma* (2024).[27]

Tourism and travel are equally intertwined. U.S. tourists account for over half of Mexico's international visitors, while 12.5 million Mexicans traveled to the United States in 2022, spending $19.2 billion. Embajada de México en los Estados Unidos [Embassy of Mex. in the U.S.], Secretaría de Relaciones Exteriores [S.R.E.], *Tourism Statistics* (*Estadísticas de Turismo*) (Jan.–Aug. 2021)[28]; Int'l Trade Admin., U.S. Dep't of Com., *Mexico – Travel and Tourism* (Country Commercial Guide, Nov. 5, 2023).[29] H.B. 4156 risks unraveling these gains. By subjecting Mexican nationals to profiling and detention, it discourages travel to Oklahoma, strains

---

[25] https://2021-2025.state.gov/u-s-relations-with-mexico
[26] https://crsreports.congress.gov/product/pdf/IF/IF11175/3
[27]https://embamex.sre.gob.mx/eua/images/stories/2024/Economicos/tradebystate/Oklahoma.pdf
[28] https://embamex.sre.gob.mx/eua/index.php/en/2016-04-09-20-40-51/tourism/1762-tourism-statistics-2
[29] https://www.trade.gov/country-commercial-guides/mexico-travel-and-tourism

bilateral commercial ties, and threatens ripple effects on tourism in both directions. *See Arizona*, 567 U.S. at 395.

## IV.    H.B. 4156 Impacts Border Security and Migration Cooperation

Mexico and the United States have invested in joint legal frameworks—from asylum processing to anti-smuggling task forces. These initiatives depend on cooperation at the national level. A patchwork of state-level immigration crimes destabilizes that cooperation, chills vital information-sharing, and makes the border less secure.

Effective border management depends on unified action between Mexico and the federal government of the United States—not unilateral measures by individual states. As the State Department recently emphasized, U.S. immigration policy is "toothless without Mexican cooperation." Jasmine Garsd, *In attempting to curtail immigration, the U.S. looks for allies in Latin America*, NPR (June 10, 2024).[30]

The record of collaboration is long: coordinated enforcement at the border, joint efforts to reduce unlawful crossings, initiatives addressing root causes of migration, and expansion of legal pathways. U.S. Dep't of State, Bureau of W. Hemisphere Affs., *U.S. Relations With Mexico* (Sept. 16, 2024).[31] Mexico has

---

[30] https://www.npr.org/2024/06/10/g-s1-3467/asylum-immigration-biden-sheinbaum-bukele-border
[31] https://www.state.gov/u-s-relations-with-mexico

accepted non-Mexican migrants returned from the United States, Stef W. Kight, *Mexico Agrees to Accept Non-Mexican Migrants Rejected by U.S.*, AXIOS (May 3, 2023),[32] and has expanded refugee settlements and asylum programs. In July 2024, Mexico reported more migrant encounters than the United States for the first time. Wash. Off. on Latin Am. (WOLA), *Weekly U.S.-Mexico Border Update: Asylum Rule, Mexico Data, CBP One, 2024 Campaign, Migrant Deaths* (Sept. 6, 2024).[33]

H.B. 4156 jeopardizes these efforts. By sowing fear among Mexican nationals and diverting consular resources, it chills the flow of crucial intelligence—such as information about smuggling networks—that law enforcement on both sides depends on. *See* Tanvi Misra, *The Fatal Flaw in the Border Patrol's Rescue Program*, HIGH COUNTRY NEWS (Sept. 1, 2024).[34] The result: diminished cooperation, less secure borders, and greater danger to both nations.

## CONCLUSION

H.B. 4156 is not an isolated local statute. It is a unilateral assertion of immigration authority by a single U.S. state that risks fracturing a legal and diplomatic framework built over generations. For the government of Mexico and the

---

[32] https://www.axios.com/2023/05/03/biden-mexico-migration-border-deportation-title-42

[33] https://www.wola.org/2024/09/weekly-u-s-mexico-border-update-asylum-rule-mexico-data-cbp-one-2024-campaign-migrant-deaths

[34] https://www.hcn.org/issues/56-9/the-fatal-flaw-in-the-border-patrols-rescue-program

tens of thousands of Mexican nationals living in Oklahoma, the stakes are immediate and concrete: detention, prosecution, removal, and the erosion of consular protection. This case threatens the United States capacity to speak with one voice in immigration matters.

That voice has always belonged to the federal government—not only to ensure consistency of domestic enforcement, but to preserve the international coherence on which bilateral relations depend. The United Mexican States respectfully submits that this Court should hold that Oklahoma's H.B. 4156 is preempted, and reaffirm that immigration enforcement remains an exclusively federal responsibility.

Respectfully submitted,

*/s/* Luis Cortes Romero
Luis Cortes Romero, Esq.
Amy Rubenstein, Esq.
Novo Legal Group, PLLC
Attorneys for Petitioners

## CERTIFICATE OF COMPLIANCE WITH THE TYPE-VOLUME LIMIT

1. This document complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   [X] this document contains **4,644** words, or

   [ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [X] this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman, or

   [ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: November 05, 2025          */s/* Luis Cortes Romero _____
                                          Luis Cortes Romero, Esq.
                                          Novo Legal Group, PLLC
                                          Attorney for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 05, 2025, I electronically filed the foregoing **BRIEF FOR AMICUS CURIAE UNITED MEXICAN STATES IN SUPPORT OF PLAINTIFFS-APPELLEES** using the Court's CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: November 05, 2025               */s/* Luis Cortes Romero
                                      Luis Cortes Romero, Esq.
                                      Novo Legal Group, PLLC
                                      Attorney for *Amicus Curiae*